**UNITED STATES BANKRUPTCY COURT**　　　　　<u>FOR PUBLICATION</u>
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------x
In re:

　　　　　　　　　　　　　　　　　　　　　　　Chapter 11

AMR CORPORATION, *et al.*,　　　　　　　　　Case No. 11-15463 (SHL)

　　　　　　　　　　Reorganized Debtors.　　　(Jointly Administered)

------------------------------------------------------------------------x
CAROLYN FJORD, *et al.*,

　　　　　　　　　　Plaintiffs,

　　　　　v.　　　　　　　　　　　　　　　　Adv. Pro. No. 13-01392 (SHL)

AMR CORPORATION, AMERICAN AIRLINES,
AMERICAN GROUP, INC. and AMERICAN, INC.,

　　　　　　　　　　Defendants,

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS,

　　　　　　　　　　As Intervenor.

------------------------------------------------------------------------x

<u>**MEMORANDUM OF DECISION**</u>

A P P E A R A N C E S :

**ALIOTO LAW FIRM**
*Counsel for Plaintiffs*
One Sansome Street, 35th Floor
San Francisco, CA 94104
By:　　Joseph M. Alioto, Esq.

**MESSINA LAW FIRM, P.C.**
*Counsel for Plaintiffs*
961 Holmdel Road
Holmdel, NJ 07733
By:　　Gil D. Messina, Esq.

**LATHAM & WATKINS LLP**
*Counsel for Defendants and merged entity*
*American Airlines Group, Inc.*
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
By:     Daniel M. Wall, Esq.
        Sadik Huseny, Esq.


**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the Plaintiffs' motion to amend and supplement the complaint (the

"Motion") (ECF No. 106) in this civil antitrust action challenging the merger between American

Airlines and US Airways that took place in December 2013.  The Motion seeks to add a claim

for treble damages under Section 4 of the Clayton Antitrust Act (15 U.S.C. § 15(a)) (the

"Clayton Act") and a demand for a jury trial.  This is the Plaintiffs' second attempt to add a

damages claim and related jury demand.  The Court denied the Plaintiffs' first motion to amend

because the proposed amendments failed to assert a sufficient basis for the damages suffered by

the individual Plaintiffs.  *See Fjord v. AMR Corp. (In re AMR Corp.)*, 506 B.R. 368, 386 (Bankr.

S.D.N.Y. 2014).  The Defendants oppose this new Motion, contending that the proposed

amendments still fail to state a damages claim for a variety of reasons.  For the reasons explained

below, the Court agrees and denies the Motion.

## BACKGROUND

A detailed account of the Debtors' bankruptcy case and the early stages of this adversary

proceeding can be found in the Court's decision on the Plaintiffs' first motion to amend,

familiarity with which is assumed.  *See generally Fjord*, 506 B.R. at 373–76.  But some brief

history is necessary to understand the issues raised by the Motion.

In November 2013, the Plaintiffs sought a temporary restraining order to block the proposed merger between American and US Airways, a merger that formed the basis of the Debtors' reorganization. At the hearing on the TRO motion, the Court asked Plaintiffs' counsel to provide information about the individual Plaintiffs and how they would be harmed by the merger. Nov. 25 Hr'g Tr. 35:21–22, 36:16–17 (ECF No. 79). Plaintiffs' counsel could not identify allegations in the complaint that addressed the harm to the named Plaintiffs. *Id.* at 36:18–22. After the hearing, the Court denied the request for a TRO and permitted consummation of the merger because Plaintiffs failed to demonstrate irreparable harm or a likelihood of success on the merits of their antitrust claims. *See Fjord v. AMR Corp. (In re AMR Corp.)*, 502 B.R. 23 (Bankr. S.D.N.Y. 2013). That decision highlighted examples of the deficiencies in the Plaintiffs' pleadings, including the lack of information regarding the individual Plaintiffs and the failure to articulate how they would be harmed by the merger. *Id.* at 33–35.

In January 2014, the Plaintiffs filed their first motion to amend the complaint. In that motion, the Plaintiffs sought to add new factual allegations, a claim for treble damages under Section 4, and a demand for a jury trial. They also sought to modify language regarding the divestiture and declaratory relief sought under Section 16 of the Clayton Act, 15 U.S.C. § 26. *See* Proposed First Amended Complaint at 1, 38-39, Prayer for Relief A–D (ECF No. 91–2).[1] The Court granted in part and denied in part the first motion to amend. *See Fjord*, 506 B.R. 368. On the one hand, the Court permitted amendment to include new factual allegations that arose

---

[1]    The first motion to amend also included a request for a preliminary injunction requiring the Defendants to hold their assets separate during the pendency of the case. At the hearing on the first motion, the Plaintiffs clarified that they were not seeking such preliminary injunctive relief, notwithstanding the language of the proposed amended complaint. Feb. 13 Hr'g Tr. 35:11–38:11, 45:7–13 (ECF No. 100).

after the merger and revisions of the proposed divestiture relief.[2]  On the other hand, the Court

denied the remainder of the requested relief, finding that the proposed amended complaint failed

to assert a sufficient basis for treble damages allegedly suffered by the individual Plaintiffs.  *Id.*

at 385–86.  Consistent with the Court's ruling, the Plaintiffs filed an amended complaint in April

2014 (the "Amended Complaint") (ECF No. 103).

The Plaintiffs filed a second motion to amend and supplement the complaint (ECF No.

105), again seeking to add a damages claim and a jury trial demand.  In this motion, the Plaintiffs

sought to add over 160 new paragraphs to the Amended Complaint, but their abbreviated papers

contained only a cursory explanation about why the Plaintiffs would be entitled to the relief

sought.[3]  The Court subsequently expressed concern about the boilerplate content of the motion,

noting that it would be inappropriate for the Plaintiffs to raise new arguments for the first time in

the reply brief.  May 16 Hr'g Tr. 14:7–16:21 (ECF No. 107).  To address these concerns, the

Plaintiffs filed a revised motion to file a second amended complaint (ECF No. 106), which is the

matter now before the Court.

The proposed second amended and supplemental complaint (the "PSASC") (ECF No.

106–1, Ex. A) identifies forty named Plaintiffs.  In ruling on the Plaintiffs' first motion to amend

the complaint, the Court observed that the complaint provided little, if any, information about the

actual Plaintiffs.  *See Fjord*, 506 B.R. at 385-86.  In this second attempt to amend the complaint,

the Plaintiffs propose extensive new allegations about individual Plaintiffs.  But notwithstanding

the additional text, the Plaintiffs still have failed to allege any information regarding twenty-

---

[2]      The modifications regarding divestiture addressed the settlement between the Department of Justice (the "DOJ") and the airlines in the DOJ's antitrust action, which occurred after the filing of the Plaintiffs' original complaint.  *See Fjord*, 502 B.R. at 30.

[3]      The memorandum of law in support of the second motion to amend was only eight pages, consisting largely of boilerplate language (ECF No. 105–1).

seven of the Plaintiffs.[4]  As to the remaining thirteen Plaintiffs, the alleged injuries can be

generally grouped into three categories: personal injuries to the Plaintiffs regarding their own

travel plans, *see, e.g.,* PSASC ¶ 248 (Ms. Fjord purchased tickets for her family departing from

San Francisco rather than Sacramento); injuries to Plaintiffs' travel agencies or travel-related

businesses, *see, e.g.,* PSASC ¶¶ 195, 198–200 (Ms. Jolly lost customers for her annual Paris

group trips); and injuries suffered by the Plaintiffs' clients, *see, e.g.,* PSASC ¶¶ 257–62 (Mr.

Fry's client has paid increased airfare on routes out of Philadelphia).[5]

---

[4]     The PSASC provides no new allegations regarding the following Plaintiffs other than their respective addresses: Katherine R. Arcell, Keith Dean Bradt, Jose M. Brito, Robert D. Conway, Judy Crandall, Pamela Faust, Gabriel Garavanian, Harry Garavanian, Lee M. Gentry, Gail S. Kosach, Michael C. Malaney, Len Marazzo, Lisa McCarthy, Patricia Ann Meeuwsen, L. West Oehmig, Jr., Cynthia Prosterman, Dana L. Robinson, Bill Rubinsohn, Sylvia N. Sparks, June Stansbury, Clyde D. Stensrud, Wayne Taleff, Gary Talewsky, Annette M. Tippetts, Diana Lynn Ultican, J. Michael Walker, and Christine O. Whalen.

At the hearing on the Motion, the Court asked Plaintiffs' counsel whether there were additional allegations regarding personal injuries.  July 17 Hr'g Tr. 76:2–20 (ECF No. 113).  Plaintiffs' counsel explained that all forty individuals have likely suffered personal injuries.  *See id.* at 76:19–20 ("I believe, Your Honor, that all, most, if not all, would be [alleging] both.").  But when Plaintiffs' counsel could not point to specific paragraphs at the hearing, the Court suggested filing a letter after the hearing to highlight the personal injuries alleged by the Plaintiffs.  The Plaintiffs submitted a letter to chambers, but many of the injuries described in the letter pertain to the Plaintiffs who were "undescribed" in the proposed supplemental complaint.  (ECF No. 114).  In any event, the allegations of the PSASC are the relevant touchstone for this Motion.

[5]     There is one other Plaintiff who alleges a harm that is less clearly a personal injury: Ms. Pulfer bought her children tickets for their honeymoon to St. Lucia.  PSASC ¶¶ 205–12.  Additionally, several Plaintiffs allege prospective injuries that may or may not occur.  *See, e.g.,* PSASC ¶¶ 289–90 (discussing expectation of Plaintiffs that the USAir Vacation practice of paying travel agent commissions will be terminated and the impact this would have on Ms. Davis).

## DISCUSSION

### I.    Applicable Legal Standards

A party may amend its pleading as a matter of course within the time limits imposed by Rule 15(a)(1) of the Federal Rules of Civil Procedure.  When a party seeks to amend its pleadings outside of the prescribed time frames, the opposing party must consent or the moving party must obtain leave of the court. Fed. R. Civ. P. 15(a)(2), incorporated in these proceedings by Fed. R. Bankr. P. 7015.  Rule 15(a)(2) provides that "[t]he court should freely give leave [to amend the complaint] when justice so requires." *Id.*  "[S]ummary disposition of all litigation, especially antitrust cases, is not favored and . . . amendments should be freely and liberally granted to the end that all cases are decided on their merits." *Food Basket, Inc. v. Albertson's, Inc.*, 383 F.2d 785, 788 (10th Cir. 1967).  The decision to grant or deny a motion to amend rests within the "sound judicial discretion of the trial court." *Adelphia Recovery Trust v. FPL Grp., Inc. (In re Adelphia Commc'ns Corp.)*, 452 B.R. 484, 489 (Bankr. S.D.N.Y. 2011).  A court may exercise its discretion to deny leave to amend a pleading where: (i) the movant has acted with undue delay, bad faith, or a dilatory motive;  (ii) the movant has repeatedly failed to cure a deficient pleading; (iii) the amendment would unduly prejudice the opposing party; or (iv) the amendment would be futile.  *See, e.g., Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.)*, 503 B.R. 239, 340 (Bankr. S.D.N.Y. 2013) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

The same standard applies to motions to supplement the complaint pursuant to Rule 15(d).  *See Music Deli & Groceries, Inc. v. I.R.S., Dist. of Manhattan*, 781 F. Supp. 992, 997 (S.D.N.Y. 1991) ("Although Rule 15(d) does not include Rule 15(a)'s mandate that leave to amend be freely given when justice so requires, the same standards apply to motions under both of these subdivisions . . . . Thus leave to supplement should be freely granted '[i]n the absence of

6

any apparent or declared reason—such as undue delay, bad faith or dilatory motive . . . .'")

(quoting *Foman*, 371 U.S. at 182) . It is well established that leave to amend or supplement

should be denied if the amendment or supplement would be futile. *Houston Pipeline Co. LP v.*

*Enron Corp. (In re Enron Corp.)*, 367 B.R. 373, 382 (Bankr. S.D.N.Y. 2007); *see also*

*Kalimantano GmbH v. Motion in Time, Inc.*, 939 F. Supp. 2d 392, 403 (S.D.N.Y. 2013). An

amendment is futile when the proposed changes would be subject to 'immediate dismissal' for

failure to state a claim or on some other ground. *See Enron*, 367 B.R. at 382; *see also Health-*

*Chem Corp. v. Baker*, 915 F.2d 805, 810 (2d Cir. 1990). The party opposing an amendment has

the burden to establish that a proposed amendment would be futile. *Velez v. Fogarty*, 2008 U.S.

Dist. LEXIS 96999, at *9 (S.D.N.Y. Nov. 20, 2008) (citations omitted). When a defendant

objects to a proposed amended complaint, therefore, the court may scrutinize that complaint as if

it were subject to a motion to dismiss under Rule 12(b)(6). *Id.* at *10. In such a circumstance,

the court must "assume the truth of the well-pled factual allegations in the complaint and must

draw all reasonable interests against the defendant." *Penn Grp., LLC v. Slater*, 2007 U.S. Dist.

LEXIS 50651, at *11 (S.D.N.Y. 2007). Under Rule 12(b)(6), a court must determine whether

the well-pleaded factual allegations, assumed to be true, "state a claim to relief that is plausible

on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Hayden v. Paterson*,

594 F.3d 150, 160 (2d Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Plausibility "is not akin to a probability requirement," but rather requires "more than a

sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation and

internal quotation marks omitted). Courts do not make plausibility determinations in a vacuum;

it is a "context-specific task that requires the reviewing court to draw on its judicial experience

and common sense." *Id.* at 679 (citation omitted). A claim is plausible when the factual

allegations permit "the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Id.* at 678 (citation omitted). A claim that pleads only facts that are

"merely consistent with a defendant's liability" does not meet the plausibility requirement. *Id.*

(quoting *Twombly*, 550 U.S. at 557). "A pleading that offers 'labels and conclusions' or 'a

formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*,

550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice." *Id.* (citation omitted). "The pleadings must create the

possibility of a right to relief that is more than speculative." *Spool v. World Child Int'l Adoption

Agency*, 520 F.3d 178, 183 (2d Cir. 2008) (citation omitted). "Where a complaint pleads facts

that are merely consistent with a defendant's liability, it stops short of the line between

possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (citation and internal

quotation marks omitted).

## II.     The Motion to Amend Is Futile

When considering whether amendment is appropriate, the Court must determine if the

proposed new allegations allege a plausible claim for damages under antitrust law. As explained

by the Supreme Court in *Associated General Contractors*, Congress "did not intend the antitrust

laws to provide a remedy in damages for all injuries that might conceivably be traced to an

antitrust violation." *Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters*,

459 U.S. 519, 534 (1983) (citation omitted). "The right to pursue private actions for treble

damages under Section 4 has [] developed limiting contours in the thirty years since *Associated

General Contractors* was handed down. These contours are embodied in the concept of

'antitrust standing.'" *Gatt Commc'n, Inc., v. PMC Assocs., L.L.C.*, 711 F.3d 68, 75 (2d Cir.

2013). "'Antitrust standing is a threshold, pleading-stage inquiry. . . .'" *Id.* (quoting *NicSand,*

*Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007)).  When a complaint fails to establish this

requirement, a court must dismiss it as a matter of law.  *Gatt*, 711 F.3d at 75.

To plead antitrust standing, a plaintiff must allege that it suffered an antitrust injury and

that it is an efficient enforcer of the antitrust laws.  *Id.* at 76; *see also DNAML Pty, Ltd. v. Apple

Inc.*, 2014 U.S. Dist. LEXIS 77422, at *9 (S.D.N.Y. June 5, 2014).  For the first requirement of

antitrust injury, a plaintiff must identify the anticompetitive practice complained of and the

reasons why such a practice is or might be anticompetitive, and link the anticompetitive practice

to the actual injury suffered.  S*ee Gatt*, 711 F.3d at 76.  The injury must be of the type of harm

that antitrust laws were intended to prevent.  *Id.*  The plaintiff must allege a direct antitrust

injury, something more than just an injury causally linked to an antitrust violation.  *IBM v.

Platform Solutions, Inc.*, 658 F. Supp. 2d 603, 610–11 (S.D.N.Y. 2009) (citing *G.K.A. Beverage

Corp. v. Honickman*, 55 F.3d 762, 767 (2d Cir. 1995)).  In the Second Circuit, it is not sufficient

to allege an injury that is indirect or derived from injury sustained by another entity with which

the plaintiff has a business relationship.  *IBM*, 658 F. Supp. at 609.

While only a short plain statement of an antitrust claim is required to give notice to the

opposing party, it is improper to assume that defendants "have violated the antitrust laws in ways

that have not been alleged."  *Intellective, Inc. v. Massachusetts Mut. Life Ins. Co.*, 190 F. Supp.

2d 600, 607 (S.D.N.Y. 2002).

The Plaintiffs' original complaint alleged that the proposed merger between American

and US Airways violated Section 7 of the Clayton Act.  Section 7 of the Clayton Act provides:

> No person engaged in commerce or in any activity affecting
> commerce shall acquire the whole or any part of any of the stock . .
> . where the effect of such acquisition may be to substantially lessen
> competition or tend to create a monopoly.

15 U.S.C. § 18.  For this alleged Section 7 violation, the Plaintiffs sought to block the merger

under Section 16 of the Clayton Act.  As the merger has now been consummated, the Plaintiffs'

Motion seeks to add a claim for treble damages pursuant to Section 4 of the Clayton Act, which

provides:

> [A]ny person who shall be injured in his business or property by
> reason of anything forbidden in the antitrust laws may sue therefor
> in any district court of the United States . . . and shall recover
> threefold the damages by him sustained, and the cost of suit,
> including a reasonable attorney's fee.

15 U.S.C. § 15.  The Court must determine whether the proposed supplemental pleadings—the

claim for treble damages—state a claim under Section 4 of the Clayton Act.  If the Plaintiffs fail

to state a claim for treble damages, then the Court should deny leave to supplement the

complaint.  Analysis of the Section 4 claim for treble damages, however, requires evaluation of

the related underlying alleged substantive antitrust violation originally plead by the Plaintiffs

under Section 7.  So while the Court must analyze the proposed supplemental allegations, that

analysis requires a review of the sufficiency of the original allegations as well.[6]

Applying the applicable legal standards here, the Court concludes that the PSASC suffers

from two defects.  First, the PSASC does not plausibly define a relevant market for the alleged

antitrust violation and personal harm to the majority of the Plaintiffs.  Most notably, it fails to

allege cross-elasticity and interchangeability as required by applicable law and its allegations of

a national market are flawed.  Second, the Plaintiffs lack antitrust standing to the extent they seek

damages as travel agents—rather than consumers—because they are not efficient enforcers for

the alleged antitrust violations.

---

[6]     As previously noted by the Court, "the Plaintiffs' jury demand rests upon their proposed new treble
damages claim" and therefore is contingent on whether the PSASC asserts a sufficient basis for the treble damages
allegedly suffered by the individual Plaintiffs.  *Fjord*, 506 B.R. at 373.

### A.  Plaintiffs Fail to Allege a Relevant Market and Harm to that Market from the Merger

#### 1.  Failure to Define the Relevant Market is Fatal

The relevant market definition shapes where the Court must look to determine any actual anticompetitive effects.  Without one, it is impossible to make that determination and identify any damages flowing from an antitrust violation.  *See Re-Alco Indus., Inc. v. Nat'l Ctr. For Health Educ., Inc.*, 812 F. Supp. 387, 392 (S.D.N.Y. 1993) ("Absent an adequate market definition, it is impossible for a court to assess the anticompetitive effect of challenged practices.").  To state a claim under Section 7 of the Clayton Act, a plaintiff must allege a plausible relevant market in which competition will be impaired.[7]  *City of New York v. Group Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011).  "The relevant market must be defined as all products reasonably interchangeable by consumers for the same purposes . . . ."  *Id.* (citations omitted).  The test for a relevant market considers what is reasonably interchangeable for consumers, not what a particular plaintiff considers to be interchangeable.  *See Grp. Health Inc.*, 2010 WL 2132246, at *3; *see also Queen City Pizza v. Domino's Pizza, Inc.*, 124 F.3d 430, 438 (3d Cir. 1997).  In that way, alleging the product market is distinct from alleging antitrust injury, which requires allegations that are specific to the plaintiff.  A plaintiff must provide "at least a theoretically rational explanation" for the boundaries it chooses for the relevant market.  *Gianna Enterprises v. Miss World (Jersey) Ltd.*, 551 F. Supp. 1348, 1354 (S.D.N.Y. 1982).

---

[7]     The requirement to identify a relevant product market is the same across many antitrust statutes.  *See City of New York v. Grp. Health Inc.*, 2010 WL 2132246, at *2 (S.D.N.Y. May 11, 2010), *aff'd*, 649 F.3d 151 (2d Cir. 2011) ("To state claims under any of the statutes identified above [the Clayton Act, the Sherman Act or the Donnelly Act], Plaintiffs must identify the product market in which competition will be impaired.") (collecting cases); *see also Kaplan v. Burroughs Corp.*, 611 F.2d 286, 292 n.2 (9th Cir. 1979) (citing 15 U.S.C. § 18) ("Generally, principles of market definition applicable to cases arising under Sherman Two are also applicable to Sherman One actions, and to merger cases arising under [Section] 7 of the Clayton Act."); *Lektro-Vend Corp. v. The Vendo Corp.*, 500 F. Supp. 332, 349 (N.D. Ill. 1980).  For this reason, the Court cites to cases arising under these statutes in addition to those under Section 7 of the Clayton Act.

Although the PSASC contains over 350 paragraphs, it devotes little time to the relevant market definition.[8]  The definition of the market is contained in two short paragraphs:  "The relevant product and geographic markets for purposes of this action are the transportation of airline passengers in the United States.  Within the relevant market, well-defined submarkets exist which, in themselves, constitute geographic and/or product markets for antitrust purposes and include what are known as 'city pairs.'"  PSASC ¶¶ 32–33.[9]

As a threshold matter, the PSASC does not contain any allegations about interchangeability and cross-elasticity, which is fatal to any claim of any market definition. Indeed, the words "interchangeability" and "cross-elasticity" do not appear anywhere in the PSASC.  "'Interchangeability' looks to the use or function of the given product as compared to other products.  Every product that can be substituted for the same use or purpose should be included within a single product market."  *Intellective*, 190 F. Supp. 2d at 610.  Related to that, "cross-elasticity" looks at the extent to which a change in price of one product might alter demand for another product.  *Id.*  If a change in the price of one product affects demand for the second product, they should be included in the same product market.  *Id.*

"Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient."

---

[8]    Similarly, the Motion states merely that "Plaintiffs allege that they bought airline tickets and ancillary services from the defendants after the merger at the higher prices which were predicted to result from the lessening of competition caused by the merger."  Pls.' Mem. of Law at 12 (ECF No. 106–1).

[9]    By contrast, the DOJ dedicated almost three pages of its significantly shorter complaint to define the relevant product and geographic markets.  *See* DOJ Compl. ¶¶ 24–31.  The DOJ alleged that scheduled air passenger service was the relevant product market and that city-pairs were the relevant geographic market.  *Id.*

*Grp. Health Inc.*, 649 F.3d at 155;[10] *Intellective*, 190 F. Supp. 2d at 610 ("'Interchangeability'

and 'cross-elasticity of demand' are the critical components of a relevant product market.").

Failure to define the market by reference to the rule of interchangeability is, standing alone, valid

grounds for dismissal. *Global Discount Travel Servs., LLC v. Trans World Airlines, Inc.*, 960 F.

Supp. 701, 705 (S.D.N.Y. 1997) (finding that plaintiff failed to define the relevant product

market where they alleged only that the market was "tickets for travel on TWA between certain

city pairs … [and that] when a 'consumer needs to fly from a TWA original city to one of

TWA's destination cities, and wants a certain package (flight time and date, mileage, first class

confirmed seat at full faire price, etc.), only a TWA ticket will do.'") (citing *Ford Piano Supply

Co. v. Steinway & Sons*, 1988 WL 3488, at *2 (S.D.N.Y. Jan. 13, 1988) (dismissing claims

relating to monopoly and exclusive dealing due to failure to define market)); *see also Queen City

Pizza*, 124 F.3d at 436 (motion to dismiss may be granted for failure to define relevant market).

In their briefs and at argument, the Plaintiffs have been steadfast in insisting upon a

national market for airline travel. *See, e.g.,* July 17 Hr'g Tr. 42:17–23; Reply ¶¶ 16, 22–23 (ECF

No. 112). But the definition of a national market is problematic for airfare. An airline passenger

cannot buy a ticket that acts as a pass for travel anywhere within the country. They must buy a

ticket with a specific origin and destination. As the Court noted in the TRO Opinion issued well

---

[10]       In *Group Health Inc.*, the City of New York sued several insurance providers under the Clayton Act, the
Sherman Act, and the Donnelly Act, seeking to prevent them from merging. *See Grp. Health*, 649 F.3d at 154. The
City's complaint defined the relevant market as the "low-cost municipal health benefits market" which included
"only those insurance plans that are inexpensive and that the City selects for inclusion in the Health Benefits
Program." *Id.* The Court of Appeals for the Second Circuit found that that the market alleged in the City's
complaint was "legally insufficient because it [was] defined by the City's preferences, not according to the rule of
reasonable interchangeability and cross-elasticity of demand." *Id.* at 156. The Court of Appeals noted that "[t]he
market alleged in the City's complaint ignores the competition existing among insurance providers for the City's
business, as well as the health insurance market for other large employers in the region. The City does not allege an
factor that would prevent insurance companies other than those it selects for the Health Benefits Program from
proposing competitive products should the merged firm raise its premiums to supracompetitive prices." *Id.*

before the instant Motion was filed, "Plaintiffs' theory of a national market would require a conclusion that all flights compete with each other.  For example, a flight from Los Angeles to New York would compete with a flight from Detroit to Seattle.  Plaintiffs have not explained why that would be true here . . . ."  *Fjord*, 502 B.R. at 40.  Over eight months later, on Plaintiffs' second attempt to amend the complaint, the PSASC still has not alleged why that might be true.  *See Bayer Schering Pharma AG v. Sandoz, Inc.*, 813 F. Supp. 2d 569, 575 (S.D.N.Y. 2011) ("'The relevant market is defined as all products reasonably interchangeable by consumers for the same purposes because the ability of consumers to switch to a substitute restrains a firm's ability to raise prices above the competitive level.'") (quoting *Geneva Pharm. Tech. Corp. v. Barr Labs, Inc.*, 386 F.3d 485, 496 (2d Cir. 2004) (additional internal quotes omitted); *Intellective*, 190 F. Supp. 2d at 610 ("Every product that can be substituted for the same use or purpose should be included within a single product market."); *Pepsico, Inc. v. The Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam) ("Products will be considered to be reasonably interchangeable if consumers treat them as 'acceptable substitutes.'") (internal citations and quotations omitted); *Commer. Data Servers, Inc. v. IBM Corp.*, 166 F. Supp. 2d 891, 896 (S.D.N.Y. 2001) (plaintiff must offer "a theoretically rational explanation" for why the market boundaries are defined as they are) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 893 F. Supp. 1207, 1213 (S.D.N.Y. 1994)).[11]

---

[11]    The Plaintiffs allege that both USAir and American have stated that they compete only in a national market.  *See* PSASC ¶¶ 43–45.  But this does not change the fact that the Plaintiffs must make appropriate allegations of a market for purposes of stating an antitrust complaint and the statements they cite are not determinative of the relevant market.  *See United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1166 (N.D. Cal. 2004) (discounting statements in company's internal documents about competition where inconsistent with evidence in the marketplace); *c.f. A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396, 1402 (7th Cir. 1989) (downplaying utility of statements of senior executives regarding competitive intent).

Indeed, the Plaintiffs' national market theory for the airline industry has been rejected by another court for a similar failure.  In *Malaney v. UAL Corp.*, 2011 WL 6845773 (N.D. Cal. Dec. 29, 2011), the court dismissed the complaint, noting that:

> [P]laintiffs have already enjoyed ample opportunity to develop a substantial record on this question, yet both this Court and the Ninth Circuit have held that their pleadings, at least in their current form, fail to state a viable market.  As both courts have explained, the national market for air transportation does [not] meet *Brown Shoe*'s standard because flights between distant cities are simply not reasonably interchangeable. . . . Plaintiffs have expressly refused to amend their pleadings to cure this defect since denial of the preliminary injunction.

*Id.* at *4; *see id.* at *1 (court referring to prior denial of preliminary injunction where it found, among other things, "no evidentiary support for plaintiffs' position that a New York–Los Angeles flight is a substitute for a Miami–Seattle flight.").  Plaintiffs' counsel in this case also represented the Plaintiffs in *Malaney*.  Thus, these same issues regarding a national market for airline travel should come as no surprise to Plaintiffs' counsel here, particularly as this Court has previously identified this as a problem.  *Fjord*, 502 B.R. at 40.[12]

At oral argument, Plaintiffs' counsel suggested that a national market was evidenced from the "supply side."  *See* July 17 Hr'g Tr. 39:13–40:12.  He posited that most airports do not use slots, and therefore have low barriers to entry.  If a company owns a plane, therefore, an airline simply needs to find a profitable route, "turn [its] airplane and go there."  *Id.*  But this argument goes against logic.  If it is truly this easy to enter the market, the logical conclusion is that there will be low barriers to entry and therefore robust competition in the market.  *See* July

---

[12]    Plaintiffs cite to items such as baggage fees and frequent flyer awards.  *See, e.g.*, PSASC ¶¶ 220.  Policies for such items may be set at a national level, *see, e.g.*, July 17 Hr'g Tr. 93:18–20, but they are not stand-alone products that are purchased without having first purchased an airline ticket.  In fact, the Plaintiffs characterize changes in these policies, such as increased baggage fees, as "tantamount to fare increases . . . ."  PSASC ¶ 221.

17 Hr'g Tr. 90:22–90:24.  If city-pairs have low barriers to entry and cannot sustain lasting

market power, therefore, it is hard to follow Plaintiffs' logic that aggregating the city-pairs would

amount to lasting market power nationally.[13]

While alleging a national market, the PSASC does make numerous references to city-

pairs.  Plaintiffs explain that "the relevant product and geographic markets alleged in the

complaint are the transportation of airline passengers in the United States, within which well-

defined city-pair submarkets also exist."[14]  Reply ¶ 9.  The Plaintiffs' allegations regarding price

increases use city-pairs as a reference.  *See, e.g.,* PSASC ¶ 248 (Ms. Fjord booked tickets from

San Francisco to St. Louis, and compared them to Sacramento-St. Louis tickets).  The Plaintiffs

also rely heavily on the antitrust action filed—and eventually settled—by the DOJ, which

defined the market by city-pairs.  The Plaintiffs even attach the DOJ's chart of relevant city-pairs

to the PSASC, although not all of the city-pairs discussed in the allegations correlate to city-pairs

on the chart.  *See* Opp'n at 21–22 (ECF No. 108).

Unlike a national market, the case law recognizes that city pairs are an appropriate way to

define the market for antitrust purposes in the airline industry.  The court in *Global Discount*

*Travel Services*, recognized city-pairs for all airline tickets as the relevant product market.  960

F. Supp. at 705; *see also In re Northwest Airlines Corp.*, 208 F.R.D. 174, 220 (E.D. Mich. 2002)

(noting that "any broader attack on the use of city-pairs [as the relevant market] surely cannot

succeed, where the airlines themselves, as well as numerous government and academic reports,

have adopted this same general approach to analyzing the air travel industry.").  With city-pairs

---

[13]    At the time, the Court also observed that the "Defendants have raised a legitimate question regarding why,
even if a national market existed, such a market would not be deemed 'highly concentrated' using the prevailing
industry standards."  *Fjord*, 502 B.R. at 40.

[14]    As courts have noted, submarkets are essentially their own product market for antitrust purposes.  *See
Oracle*, 331 F. Supp. 2d at 1118-19 (discussing "the rise (and fall) of the 'submarkets' doctrine.")

as the relevant market, "[f]light times, dates, mileage, and other factors [can be understood as] features that enhance the enjoyment of the product." *Global Discount,* 960 F. Supp. at 705. While a consumer might prefer a certain airline based on flight times or frequent flyer programs, those factors were not a basis to restrict the product market in the *Global Discount* case. *Id.*

Despite the recognized use of city pairs as a relevant market in the case law, the Plaintiffs do not explain how the city-pair "submarkets" are relevant to their proposed national market. Indeed, the Plaintiffs make a point of rejecting a market based on city-pairs by stating that "the effects of the merger have been direct and immediate across the entire country and have not been limited to the 'city pair' submarkets in which the defendants seek to cabin their latest view of the relevant market." Reply ¶ 23. Perhaps not surprisingly then, the Plaintiffs never identify what city-pairs are at issue here. While the PSASC attaches a chart from the DOJ antitrust litigation, it does not explain if the city-pairs in the chart are where the alleged antitrust injuries to the named Plaintiffs took place. The Plaintiffs make some modest allegations that suggest that certain city-pairs are relevant, but they do not define which city-pairs are at issue here, much less analyze the impact on competition in those city-pairs. *See, e.g.,* PSASC ¶¶ 259–62 (describing fare increases paid by Mr. Fry's client for tickets in the city-pairs for Philadelphia-Portland, Philadelphia-San Francisco, Philadelphia-Minneapolis, and Philadelphia-Louisville). As Defendants' counsel has articulated, the complaint lacks "that middle content about what on a market level transpired in this particular [city-pair] market." July 17 Hr'g Tr. 63:8–13. Moreover, many of the allegations relate to city-pairs that are not identified on the DOJ chart, further confusing what city-pairs might be at issue in this litigation. *Compare* PSASC ¶¶ 206–08 (discussing city-pair of Columbus, Ohio to St. Lucia), PSASC ¶¶ 216–18 (discussing city-pair of Dallas–Ft. Worth to Ft. Lauderdale), PSASC ¶ 226 (discussing city-pair of Burbank, California

to Ft. Lauderdale, Florida), PSASC ¶ 227 (discussing city-pair of Santa Barbara, California to Ft.

Lauderdale), *with* DOJ chart attached as Appendix A to PSASC (ECF No. 106–1).  Thus, their

allegations regarding city-pair markets are insufficient.

Even assuming a city-pair market has been identified—which it has not—such a market

in the PSASC would also suffer from the flaw of not alleging cross-elasticity and

interchangeability.  Some allegations in the PSASC hint at cross-elasticity for city-pairs but

appear inconsistent with the Plaintiffs' claims for damages.  For example, Ms. Fjord, based in

Winters, California, bought her family tickets to St. Louis departing from San Francisco because

the airfare from Sacramento was more expensive.  *See* PSASC ¶¶ 243, 248.  Although the

complaint alleges that this was "a great inconvenience," PSASC ¶ 248, and is grounds for

damages, it suggests that Sacramento-St. Louis and San Francisco-St. Louis might be included in

the same market due to cross-elasticity.  But if the product market includes the Sacramento-St.

Louis and San Francisco-St. Louis flights, then it remains unclear how Ms. Fjord suffered any

injury by choosing to fly from the less expensive airport within that market.  *See Hack v.*

*President & Fellows of Yale College*, 237 F.3d 81, 86 (2d Cir. 2000), *abrogated on other*

*grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) (allegations of interchangeability

and cross-elasticity must be plausible).

In fact, much of the Plaintiffs' supplemental allegations boil down to recitations of price

fluctuations for tickets on American.  For example, Ms. Russell complains of price increases for

tickets from Dallas-Fort Worth to Fort Lauderdale.  In October 2013, Ms. Russell purchased a

round-trip ticket on American for travel in March that cost $425.80.  PSASC ¶ 216.  In March

2014, she purchased a ticket on American for travel in June that cost $626.  PSASC ¶ 217.  But

the Plaintiffs do not offer any explanation regarding other flight options on the same route, such

as comparable flights on another airline and their cost.[15]  As other antitrust decisions involving

airlines make clear, such allegations do not suffice to define a relevant market.  *See Global*

*Discount*, 960 F. Supp. at 705-06 ("The rule of reasonable interchangeability dictates that the

relevant product market in this case be at least the market for all airline tickets between the

relevant city pairs, not just tickets on TWA. . . . Because [Plaintiff] cannot define a relevant

product market in a single brand product, it is impossible to assess the anticompetitive effects of

the challenged practices . . . . Plaintiff has made no reasonable showing why TWA airline tickets

for travel between certain cities should be considered a market unto itself, as distinguished from

the market consisting of all airline tickets for travel between the paired cities."); *Grp. Health*

*Inc.*, 649 F.3d at 156 ("A single purchaser's preferences . . . cannot define a market.")[16]

Finally, the Plaintiffs have at times also seemed to suggest that there is also an

international market.  For example, Ms. Pulfer alleges price increases on flights from Columbus,

Ohio to St. Lucia, PSASC ¶¶ 205–13, and Mr. Fry complains of increases on flights from Denver

to Tel Aviv and Denver to Delhi.  PSASC ¶¶ 267–71.  In another part of the PSASC, however,

the Plaintiffs define the relevant market as "the transportation of airline passengers *in the United*

*States*."  PSASC ¶ 32 (emphasis added).  Thus, the PSASC does not allege the existence of an

international market, nor does it provide any facts about that potential market.  There are no

---

[15]    Some discrepancies in price fluctuations are alleged in a way that makes comparison problematic.  The price comparison for Ms. Russell, for example, compares one ticket purchased six months in advance against another ticket purchased only three months in advance, with one ticket for spring travel and the other for summer travel.  PSASC ¶¶ 216–17.

[16]    Some allegations focus on specific airports within a city.  *See, e.g.,* PSASC ¶ 140 (discussing airport pair routes); ¶¶ 216–18 (Ms. Russell purchased tickets from Dallas-Fort Worth to Fort Lauderdale).  The Defendants argue that this is an impermissible market as well, because it ignores alternate airports that might be interchangeable.  *See* Opp'n at 20.  An airport-pair market may be very difficult to define because of interchangeability, although airline tickets are booked this way as a practical matter.  But the Plaintiffs do not allege an airport market, or interchangeability and cross-elasticity for such a market.

allegations about how the merger adversely impacted this international market, other than a

complaint of higher fares, and there are no allegations regarding interchangeability or cross-

elasticity.

### 2. *Failure to Allege Causal Connection Does Not Satisfy* Twombly *Pleading Standard*

Even assuming that the Plaintiffs had properly defined any market, many of their

complaints fail to allege a plausible chain of causation for many of the alleged harms arising out

of the merger.  Simply put, they fail to connect the dots.

As counsel for the airlines explained at the hearing, the PSASC contains allegations

regarding the merger and hundreds of allegations of harm without "any explanation for why in

*Twombly* terms it is plausible to believe that that is the anticompetitive effects of this merger, as

opposed to the millions of other things it might be."  July 17 Hr'g Tr. 63:24–64:5.  Under

*Twombly*, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its

face."  550 U.S. at 570.  In *Twombly*, the Supreme Court considered an antitrust claim for

violation of the Sherman Act, and concluded that the complaint's allegations of parallel conduct

and a bare assertion of conspiracy were insufficient.  *Id.* at 556–57.  "Factual allegations must be

enough to raise a right to relief above the speculative level."  *Id.* at 555.  The Court dismissed the

complaint in *Twombly* because the plaintiffs did not "nudge[] their claims across the line from

conceivable to plausible."  *Id.* at 570.

The PSASC suffers from the same problem in many instances, often failing to move

beyond the realm of possible claims.  As one example, the Court turns to the allegations

regarding Mr. Fry.  The PSASC details how Mr. Fry and his wife have been inconvenienced

since the US Air merger with America West, which has forced them to fly out of Denver rather

than Colorado Springs.  *See* PSASC ¶¶ 265–70.  Most of these allegations concern a flight from

Denver to Tel Aviv in October 2013.  *Id.*  But all of these alleged harms occurred before the

American merger.  Despite the lengthy description of pre-merger inconveniences, Plaintiffs have

failed to allege any plausible explanation as to how the American merger relates to this harm.

Additionally, there are many instances where the PSASC complains of fare increases

where no one is alleged to have even purchased a ticket.  *See, e.g.,* PSASC ¶¶ 246–47

(discussing increased airfare between Sacramento and Toledo, as well as Sacramento to Caracao

[sic], without mention of tickets purchased).  The PSASC also fails to allege higher prices for the

same product.  For instance, the complaint alleges that Ms. Russell "plans to fly on American

Airlines again in the foreseeable future . . . . As of April 29, 2014, a ticket which is the same as

the one she purchased in March 2014 [for travel in June] on American Airlines, sells for

$951.01, and the same ticket if priced using the USAir-American Airlines code share costs

$1517.00."  PSASC ¶ 218.  But as the two tickets were not the same number of days from the

proposed travel—the more expensive ticket was closer—the two tickets are not necessarily

comparable.  Without a comparison of like products, an antitrust injury is not plausibly pled.  *See*

*Gatt*, 711 F.3d at 77 (no Section 4 standing where plaintiff did not allege that it paid higher,

anticompetitive prices for a product).

Moreover, the Plaintiffs often allege injury to the public at large, rather than harm to any

named plaintiff.  For example, in the supplemental allegations, the Plaintiffs include a discussion

of how flight delays and cancellations have increased as a result of decrease in competition

between carriers.  PSASC ¶¶ 342–46.[17]  "Damages claimed in a private antitrust suit must be

---

[17]    *See also* PSASC ¶¶ 347–51 (alleging that since the merger, American and USAir have begun to sell tickets
to customers on the same planes, routes and departure times at substantially different fares, depending on which
carrier the flight was booked through); PSASC ¶¶ 220–21 (discussing changes to baggage programs).

different from those suffered by the general public—i.e. they must be special to the claimant."

*Highland Supply Corp. v. Reynolds Metals Co.*, 327 F.2d 725, 732 (8th Cir. 1964); *see also*

*United States v. Borden Co.*, 347 U.S. 514, 518 (1954) ("The Government seeks its injunctive

remedies on behalf of the general public; the private plaintiff . . . may be expected to exercise it

only when his personal interest will be served."); *Burkhead v. Phillips Petroleum Co.*, 308 F.

Supp. 120, 123 (N.D. Cal. 1970) (Whether private litigant seeks relief in form of injunction or

damages, "suit may not be maintained by the private litigation merely because of violations of

the antitrust laws which have resulted in injury to the public.").

The Court previously highlighted this problem in ruling on Plaintiffs' first motion to

amend, noting that the alleged Section 4 injuries must be personal to the Plaintiffs and cannot

simply be harm suffered by the general public. *See Fjord*, 506 B.R. at 386 ("Plaintiffs' counsel

agreed that a pleading for injury requires allegations that something happened . . . Yet the PAC is

devoid of any such allegations . . . In fact, many allegations in the PAC refer to harm to the

general public or to 'millions of customers,' rather than any specific harm to these individual

plaintiffs.") (internal citations omitted); *Fjord*, 502 B.R. at 33-34 ("The Court has no evidence

whatsoever regarding who the Plaintiffs are, what the nature of their interest in the airline

industry is, or how they will be individually harmed by the proposed merger. . . . [T]he Court

need only consider those injuries plaintiffs advance that are personal to them . . . and cannot

consider any injuries that plaintiffs allege would be suffered by the general air carrier flying

public as a whole. . . .") (internal citations and quotations omitted).  Counsel for the Plaintiffs has

received the same guidance in at least one other antitrust case. *See Malaney v. UAL Corp.*, 2010

WL 3790296, at *13 (N.D. Cal. Sept. 27, 2010) ("In evaluating plaintiffs' purported irreparable

harm as well as the balance of equities, the Court must only consider those injuries plaintiffs

advance that are personal to them were defendants to merge, and cannot consider any injuries

that plaintiffs allege would be suffered by the general air carrier flying public as a whole.").

Despite these repeated admonitions, the Plaintiffs here again level allegations of general harm

without connecting such harms to any named plaintiff.

There are numerous other allegations that similarly do not state a personal harm to

Plaintiffs, including harm from prior mergers, *see e.g.*, PSASC ¶¶ 274, 281, 291 (discussing

results of previous airline mergers); and injuries yet to occur, *see, e.g.*, PSASC ¶¶ 289–90

(discussing expectation of Plaintiffs that the USAir Vacation practice of paying travel agent

commissions will be terminated and the impact this would have on Ms. Davis). It would be

improper to permit amendment of the complaint to add such deficient allegations. *See Reading

Int'l, Inc. v. Oaktree Capital Mgmt. LLC*, 317 F. Supp. 2d 301, 313 (S.D.N.Y. 2003) ("[I]t is

hardly 'absurd' to require that someone in the class of persons that would have standing if

injured actually *be* injured in order for a suit to proceed.").

## B. Plaintiffs Are Not an Efficient Enforcer of Antitrust Laws for the Majority of Their Claims

In addition to alleging a plausible antitrust claim and related injury, *see supra* Section A,

a plaintiff must establish that it is an efficient enforcer of the antitrust laws. As to this second

requirement of an efficient enforcer, courts typically examine the following factors:

(1) the directness or indirectness of the asserted injury;

(2) the existence of an identifiable class of persons whose self-
interest would normally motivate them to vindicate the public
interest in antitrust enforcement;

(3) the speculativeness of the alleged injury; and

> (4) the difficulty of identifying damages and apportioning them
> among direct and indirect victims so as to avoid duplicative
> recoveries.

*Gatt*, 711 F.3d at 78 (citations omitted).

The Plaintiffs here have not shown that they are efficient enforcers of the antitrust laws

for many of their alleged harms.  Of the forty named Plaintiffs, the PSASC only contains specific

allegations as to thirteen.  For these thirteen Plaintiffs, the PSASC includes three classes of

allegedly injured parties who could serve as antitrust plaintiffs:  travel agents, *see, e.g.,* PSASC

¶¶ 195, 198–200 (Ms. Jolly lost customers for her annual Paris group trips); clients of the travel

agents, *see, e.g.,* PSASC ¶¶ 257–62 (Mr. Fry's client has paid increased airfare on routes out of

Philadelphia); and personal injuries to the Plaintiffs, *see, e.g.,* PSASC ¶ 248 (Ms. Fjord

purchased tickets for her family departing from San Francisco rather than Sacramento).  Thus,

the individuals who could serve as plaintiffs for such harms are airline passengers or the travel

agents who act on their behalf.  Of these, airline passengers are the more efficient enforcer of the

alleged antitrust violation here.  Examination of the four relevant factors leads the Court to this

conclusion: directness of the injury; existence of an identifiable class motivated to vindicate the

public interest; speculativeness of the injury; and difficulty apportioning damages to avoid

duplicative recoveries.

With respect to the first factor, "[d]irectness in the antitrust context means close in the

chain of causation."  *Gatt*, 711 F.3d at 78 (citation omitted).  Here, the Plaintiffs' complaint

alleges that due to higher travel costs, consumers are choosing to book directly through airlines

to avoid paying a travel agent's fee.  PSASC ¶¶ 237, 291.  If a consumer books a ticket and

absorbs the higher cost, therefore, it does not appear that the travel agent would suffer any harm.

The travel agents' loss of commissions or fees paid by consumers is further down the chain than

24

any harm suffered directly by the consumers.  Thus, it is clear that the injury alleged by the passengers is more direct.

As to the second factor, Plaintiffs' counsel argued that no other party was suing, and that, therefore, these parties were the proper plaintiffs.  July 17 Hr'g Tr. 14:5–8 ("[W]e are the only ones challenging this merger for damages.  So there is no one else . . . .").  But the fact that no other party is presently bringing suit "does not support recognizing [the travel agents'] standing." *Gatt*, 711 F.3d at 79 (citing *Daniel v. Am. Bd. Of Emergency Med.*, 428 F.3d 408, 444 (2d Cir. 2005)); *see also Associated General Contractors*, 459 U.S. at 542 n.47 ("[I]f there is substance to [the plaintiff's] claim, it is difficult to understand why the[] direct victims of the conspiracy have not asserted any claim in their own right.").  Given that customers exist to challenge any anti-competitive conduct, this second factor weighs against the standing of Plaintiffs to sue as travel agents.

The third factor also weighs against the travel agents.  Their alleged damages are highly speculative when compared to customers.  *See Gatt*, 711 F.3d at 79 (concluding that damages were highly speculative where the plaintiff did not plausibly allege that "in the absence of the alleged scheme, its bids—rather than some other party—would have prevailed.").  Where a travel agent has lost business, it is much more difficult to trace that loss of business to the challenged merger, as compared to a more direct and definable loss suffered by a customer paying a higher fare.  *See, e.g.*, PSASC ¶¶ 224–37 (alleging loss of income and business to Ms. Brown—who works as a travel agent and travel consultant—due to increased fares and fees and decreased service resulting from lessening competition in airline industry due to Defendants' merger).  Other economic factors could greatly affect any losses suffered by travel agents, a concern reflected by allegations in the complaint itself.  *Cf. Gatt*, 711 F.3d at 79 ("[T]he profits

25

Gatt earned under a bid-rigging scheme shed little light on how much Gatt would earn in a competitive bidding environment. Moreover, Vertex had no obligation to authorize Gatt to sell Vertex products in the first place. It is thus entirely uncertain whether, absent the scheme, Vertex would have entered into the Dealer Agreement with Gatt at all.").

Fourth and finally, the issue of apportioning damages and the risk of duplicative recoveries are problematic for any travel agent claim. It is unclear from the PSASC how payments to travel agents are apportioned. But it seems clear that if the travel agent booked and paid for a ticket, the passenger reimbursed the travel agent for the cost of the ticket and paid the agent's fee on top of that. As such, it is unclear how to determine what damages are suffered by a travel agent as distinct from the harm suffered by the passenger. Allowing travel agents to pursue claims based on customers also risks duplicative recovers as passengers have four years to bring such an action on their own behalf. *See* July 17 Hr'g Tr. 35:21–23 (noting that statute of limitations for passenger claims would be four years); *see also Gatt*, 711 F.3d at 79-80 ("[T]he risk of multiple and duplicative recoveries, while perhaps not of primary concern here, provides additional support for rejecting Gatt as an efficient enforcer. As we have observed, other Vertex dealers could assert—just as plausibly as Gatt has asserted in this case—that, had the bidding been independent, they would have bid on and won the . . . contracts. We recognize that other Vertex dealers may not file suit, and that future actions may well be time barred. *See* 15 U.S.C. § 15(b) (establishing four-year statue of limitations for private antitrust suits under 15 U.S.C. § 15). Regardless, this factor too works against Gatt.").

None of these factors weighs in favor of the travel agent Plaintiffs. The Court finds that the travel agent Plaintiffs would not be efficient enforcers and could not sustain a private action

for lack of antitrust standing.  Accordingly, the request to supplement the pleadings with respect

to any allegations regarding the travel agent Plaintiffs would be futile.

### **CONCLUSION**

For the reasons set forth above, the Motion is denied.  The Defendants are directed to

settle an order on three days' notice.

Dated: New York, New York
          March 31, 2015


          */s/ Sean H. Lane*                         
          UNITED STATES BANKRUPTCY JUDGE