LATHAM & WATKINS LLP
    Daniel M. Wall (admitted *pro hac vice*)
    Sadik Huseny (admitted *pro hac vice*)
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Facsimile: (415) 395-8095

HEARING DATE & TIME:  TBD
OBJECTION DEADLINE:   06/09/2017

*Attorneys for Defendant Merged Entity*
*American Airlines Group Inc.*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

In re                         :

                             :    Case No. 11-15463-SHL

                             :

AMR CORPORATION, *et al.*,      :    Chapter 11

                             :

               Debtors.    :    (Jointly Administered)

------------------------------------------------------------x
------------------------------------------------------------x

CAROLYN FJORD, *et al.*,        :    Adversary No. 13-01392-SHL

               Plaintiffs,   :

             vs.             :

                             :

AMR CORPORATION, *et al.*,      :

                             :

               Defendants,   :

------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT AMERICAN AIRLINES GROUP INC.'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*AD/SAT, Div. of Skylight, Inc. v. Associated Press*,
181 F.3d 216 (2d Cir. 1999)................................................................................ 17, 18, 20, 21

*Alberta Gas Chemicals, Ltd. v. E.I. Du Pont de Nemours & Co.*,
826 F.2d 1235 (3d Cir. 1987)................................................................................ 36

*American Federation of State, County & Municipal Employees District Council
37 Health & Security Plan v. Bristol-Meyers Squibb Co.*,
948 F. Supp. 2d 338 (S.D.N.Y. 2013)................................................................................ 39

*American Medical Association v. United Healthcare Corp.*,
No. 00 Civ. 2800 (LMM), 2007 WL 683974 (S.D.N.Y. 2007)............................................ 33

*Amnesty International USA v. Clapper*,
667 F.3d 163 (2d Cir. 2011)................................................................................ 34

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)................................................................................ 10

*Antoine L. Garabet, M.D., Inc. v. Autonomous Technology Corp.*,
116 F. Supp. 2d 1159 (C.D. Cal. 2000)................................................................................ 37

*Bailey v. Allgas, Inc.*,
284 F.3d 1237 (11th Cir. 2002)................................................................................ 22

*Baldwin v. EMI Feist Catalog, Inc.*,
805 F.3d 18 (2d Cir. 2015)................................................................................ 10

*Blue Tree Hotels Investment (Canada) Ltd. v. Starwood Hotels & Resorts
Worldwide, Inc.*,
369 F.3d 212 (2d Cir. 2004)................................................................................ 38, 39

*Broadway Delivery Corp. v. United Parcel Service, Inc.*,
651 F.2d 122 (2d Cir. 1981)................................................................................ 13, 15

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962)................................................................................ 12, 13, 17

*Calderon Enterprises Corp. v. United Artists Theatre Circuit, Inc.*,
454 F.2d 1292 (2d Cir. 1971)................................................................................ 37

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)................................................................................ 10

*Chapman v. New York State Division for Youth*,
546 F.3d 230 (2d Cir. 2008)................................................................................ 18

*Chicago Bridge & Iron Co. N.V. v. F.T.C.*,
534 F.3d 410 (5th Cir. 2008)................................................................................ 14

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

i

*City of Los Angeles v. Lyons,*
   461 U.S. 95 (1983) ................................................................................................ 31, 33

*City of New York v. Group Health, Inc.,*
   649 F.3d 151 (2d Cir. 2011) ................................................................................ 17, 23

*Commercial Data Servers, Inc. v. IBM Corp.,*
   166 F. Supp. 2d 891 (S.D.N.Y. 2001) ...................................................................... 19

*D'Augusta v. Northwest Airlines Corp.,*
   No. 3:08-CV-03007-VRW (N.D. Cal. 2008) .............................................................. 4

*Dayton Superior Corp. v. Marjam Supply Co.,*
   No. 07 CV 5215 DRH WDW, 2011 WL 710450 (E.D.N.Y. Feb. 22, 2011) ...................... 39

*Disenos Artisticos E Industriales, S.A. v. Work,*
   676 F. Supp. 1254 (E.D.N.Y. 1987) ......................................................................... 36

*Doctor's Hospital of Jefferson, Inc. v. Southeast Medical Alliance,*
   123 F.3d 301 (5th Cir. 1997) .................................................................................. 33

*Drs. Steuer and Latham, P.A. v. National Medical Enterprises, Inc.,*
   672 F. Supp. 1489 (D.S.C. 1987) ............................................................................ 22

*Drug Mart Pharmacy Corp. v. American Home Products Corp.,*
   No. 93-CV-5148, 2007 WL 4526618 (E.D.N.Y. Dec. 20, 2007) ....................................... 32

*Emigra Group, LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP,*
   612 F. Supp. 2d 330 (S.D.N.Y. 2009) ...................................................................... 17

*F.T.C. v. Arch Coal, Inc.,*
   329 F. Supp. 2d 109 (D.D.C. 2004) ......................................................................... 29

*F.T.C. v. H.J. Heinz Co.,*
   246 F.3d 708 (D.C. Cir. 2001) ...................................................................... 9, 11, 15

*F.T.C. v. Staples, Inc.*
   970 F. Supp. 1066 (D.D.C. 1997) ............................................................................ 30

*Fjord et al. v. AMR Corp. et al. (In re AMR Corp.),*
   502 B.R. 23 (Bankr. S.D.N.Y. 2013) ........................................................... 4, 5, 15, 19

*Fjord et al. v. AMR Corp. et al. (In re AMR Corp.),*
   506 B.R. 368 (Bankr. S.D.N.Y. 2014) ......................................................................... 5

*Fjord et al. v. US Airways Group, Inc.,*
   4:13-cv-3041-SBA (N.D. Cal. 2013) .......................................................................... 4

*Fjord, et al. v. AMR Corp. et al. (In re AMR Corp.),*
   527 B.R. 874 (Bankr. S.D.N.Y. 2015) .................................................................. *passim*

*Flegel, D.O. v. Christian Hospital, Northeast-Northwest,*
   4 F.3d 682 (8th Cir. 1993) ..................................................................................... 24

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*Gatt Communications, Inc. v. PMC Associates, L.L.C.*,
   711 F.3d 68 (2d Cir. 2013)..................................................................................7

*Global Discount Travel Services, LLC v. Trans World Airlines, Inc.*,
   960 F. Supp. 701 (S.D.N.Y. 1997)....................................................................21

*Grace, et al. v. Alaska Air Group, Inc., et al.*,
   No 3:16-CV-05165-WHA (N.D. Cal. 2016) .......................................................4

*In re Aluminum Warehousing Antitrust Litigation*,
   833 F.3d 151 (2d Cir. 2016)..............................................................................37

*In re AMR Corp.*,
   497 B.R. 690 (Bankr. S.D.N.Y. 2013)...............................................................39

*In re Domestic Airline Travel Antitrust Litigation*,
   MDL No. 2656 (J.P.M.L. Sept. 9, 2015) .............................................................8

*In re Northwest Airlines Corp.*,
   208 F.R.D. 177 (E.D. Mich. 2002) ....................................................................21

*June Fabrics, Inc. v. Teri Sue Fashions, Inc.*,
   194 N.Y.S.2d 877 (N.Y. Sup. Ct. 1948) ............................................................39

*Kentucky Speedway, LLC v. National Association of Stock Car Auto Racing, Inc.*,
   588 F.3d 908 (6th Cir. 2009) .............................................................................22

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)...........................................................................................31

*Malaney v. UAL Corp.*,
   No. 3:10-CV-02858-RS (N.D. Cal. 2010) ...........................................................4

*Malaney v. UAL Corp.*,
   No. C 10-02858 RS, 2011 WL 6845773 (N.D. Cal. Dec. 29, 2011) ..................19

*Mancuso v. Consolidated Edison Co. of New York*,
   130 F. Supp. 2d 584 (S.D.N.Y. 2001)...............................................................31

*Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574
   (1986)................................................................................................................10

*Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*,
   924 F.2d 1484 (9th Cir. 1991) ..........................................................................22

*Nassau County Association of Insurance Agents, Inc. v. Aetna Life & Casualty
   Co.*,
   497 F.2d 1151 (2d Cir. 1974).............................................................................37

*Optivision, Inc. v. Syracuse Shopping Center Associates*,
   472 F. Supp. 665 (N.D.N.Y. 1979) ....................................................................34

*Philip Morris, Inc. v. Grinnell Litographic Co., Inc.*,
   67 F. Supp. 2d 126 (E.D.N.Y. 1999) .................................................................38

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
  124 F.3d 430 (3d Cir. 1997)................................................................................18

*R.C. Bigelow, Inc. v. Unilever N.V.*,
  867 F.2d 102 (2d Cir. 1989)................................................................................34

*Rebel Oil Co., Inc. v. Atlantic Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995)..............................................................................18

*Roosevelt Savings Bank v. Eveready Maintenance Supply Co.*,
  No. 87 Civ. 245, 1987 WL 30194 (E.D.N.Y. Dec. 2, 1987)..............................39

*Saint Alphonsus Medical Center-Nampa Inc. v. St. Luke's Health System, Ltd.*,
  778 F.3d 775 (9th Cir. 2015)..............................................................................14

*SAS of Puerto Rico, Inc. v. Puerto Rico Telephone Co.*,
  48 F.3d 39 (1st Cir. 1995)..................................................................................37

*Schoenkopf v. Brown & Williamson Tobacco Corp.*,
  637 F.2d 205 (3d Cir. 1980)...............................................................................36

*Shain v. Ellison*,
  356 F.3d 211 (2d Cir. 2004)..........................................................................31, 33

*Southeast Missouri Hospital v. C.R. Bard, Inc.*,
  642 F.3d 608 (8th Cir. 2011)..............................................................................23

*State of New York by Abrams v. Anheuser-Busch, Inc.*,
  811 F. Supp. 848 (E.D.N.Y. 1993) ....................................................................22

*Taleff v. Southwest Airlines Co.*,
  No. 3:11-CV-02179-JW (N.D. Cal. 2011)...........................................................4

*TAM Travel, Inc. v. Delta Airlines, Inc.*,
  MDL Dkt. 1561, Case No. 1:03 CV 30001 (N.D. Ohio 2003)............................4

*TAM Travel, Inc. v. Delta Airlines, Inc.*,
  No. 4:03-CV-01502-SBA (N.D. Cal. 2003) ........................................................4

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001)...............................................................................17

*U.S. Healthcare, Inc. v. Healthsource, Inc.*,
  986 F.2d 589 (1st Cir. 1993)..............................................................................22

*United Magazine Co. v. Murdoch Magazines Distribution, Inc.*,
  146 F. Supp. 2d 385 (S.D.N.Y. 2001).................................................................38

*United States v. American Express Co.*,
  838 F.3d 179 (2d Cir. 2016)...............................................................................17

*United States v. Baker Hughes Inc.*,
  908 F.2d 981 (D.C. Cir. 1990) ....................................................................passim

*United States v. Connecticut National Bank*,
    418 U.S. 656 (1974) ................................................................................................ 11

*United States v. E.I. du Pont de Nemours & Co.*,
    353 U.S. 586 (1957) ................................................................................................ 16

*United States v. Falstaff Brewing Corp.*,
    410 U.S. 526 (1973) ................................................................................................ 30

*United States v. General Dynamics Corp.*,
    415 U.S. 486 (1974) ................................................................................................ 13

*United States v. Marine Bancorporation, Inc.*,
    418 U.S. 602 (1974) ......................................................................................... 11, 16

*United States v. Oracle Corp.*,
    331 F. Supp. 2d 1098 (N.D. Cal. 2004) ........................................................ 14, 29, 30

*United States v. Philadelphia National Bank*,
    374 U.S. 321 (1963) ................................................................................................ 12

*United States v. Syufy Enterprises*,
    903 F.2d 659 (9th Cir. 1990) .................................................................................. 30

*United States v. Von's Grocery Co.*,
    384 U.S. 270 (1966) ................................................................................................ 12

*United States v. Waste Management Inc.*,
    743 F.2d 976 (2d Cir. 1984) .............................................................................. 13, 15

## STATUTES

15 U.S.C. § 13(c) ............................................................................................................ 38

15 U.S.C. § 18 ................................................................................................................. 11

N.Y. Penal Law § 180.00 ................................................................................................ 39

## OTHER AUTHORITIES

Carl Shapiro, The 2010 Horizontal Merger Guidelines: From Hedgehog to Fox in
    Forty Years, 77 Antitrust L.J. 49 (2010) ................................................................ 13

U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* (Apr.
    2, 1992, as revised Apr. 8, 1997) ........................................................................... 29

U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* (Aug.
    19, 2010) ...................................................................................... 17, 18, 29, 30

## RULES

Fed. R. Civ. P. 56(a) ...................................................................................................... 10

Fed. R. Civ. P. 56(c) ...................................................................................................... 10

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................ 1

II.  PROCEDURAL HISTORY................................................................................. 3

    A.   INITIAL FILING AND REQUEST FOR TRO; CONSUMMATION OF THE MERGER .......... 4

    B.   PLAINTIFFS' MOTIONS TO AMEND TO ADD A DAMAGES CLAIM ........................... 5

    C.   PLAINTIFFS' ATTEMPT TO ADD UNRELATED SECTION 1 AND 3 CLAIMS ................ 7

    D.   PLAINTIFFS' ATTEMPT TO TRANSFER THIS CASE TO A SEPARATE MDL PROCEEDING ........................................................................... 8

    E.   THE COMPLETION OF DISCOVERY .......................................................... 9

III. LEGAL STANDARDS ..................................................................................... 10

IV.  ARGUMENT ..................................................................................................... 11

    A.   PLAINTIFFS HAVE FAILED TO CONDUCT THE REQUISITE ANALYSIS OF THIS MERGER BASED ON THEIR MISTAKEN AND REJECTED VIEW OF MERGER LAW .......................................................................... 11

    B.   PLAINTIFFS HAVE FAILED TO ESTABLISH A RELEVANT MARKET ....................... 16

        1.   Legal Requirements:  Relevant Market Definition .................................. 16

        2.   The Court Previously Rejected Plaintiffs' Claimed "National Market" and It Remains Infirm ............................... 18

        3.   Plaintiffs Have Not Established Any Relevant City-Pair Markets .......... 20

    C.   PLAINTIFFS HAVE FAILED TO OFFER EVIDENCE OF ANY ADVERSE COMPETITIVE EFFECTS OF THE MERGER ............................................... 24

        1.   There Is No Triable Issue of Adverse Competitive Effects from the Merger. ................................................ 24

        2.   Plaintiffs Have No Evidence that the Merger Will Enhance Airline Market Power .................................... 29

    D.   PLAINTIFFS HAVE FAILED TO OFFER EVIDENCE OF ANY ADVERSE COMPETITIVE EFFECTS ON PLAINTIFFS  THEMSELVES .......................... 31

        1.   Plaintiffs Do Not Fly the Relevant Routes, and Therefore Cannot Satisfy Their Burden of Establishing that They Suffered or Stand to Suffer Any Anticompetitive Injury Due to the Merger ............................................... 31

        2.   None of Plaintiffs' Claimed "Harms" Are Tied to this Merger .............. 33

3.    Plaintiffs' Failure to Prove Adverse Competitive Effects Only
Underscores They Are Not the Appropriate Antitrust Plaintiffs ............. 36

E.    TO THE EXTENT PLAINTIFFS ASSERT A SECTION 2(C) CLAIM,
SUMMARY JUDGMENT IS ALSO WARRANTED ON THAT CLAIM ............................ 37

V.    CONCLUSION .............................................................................................................. 40

TO THE HONORABLE SEAN H. LANE
UNITED STATES BANKRUPTCY JUDGE:

Defendants AMR Corporation, American Airlines, Inc., US Airways Group, Inc., and US Airways, Inc. (now merged as American Airlines Group Inc.) ("Defendants" or "American") hereby move this Court for an order entering summary judgment on Plaintiffs' claims, and respectfully state as follows:

## I.    INTRODUCTION

1.    More than three and a half years have passed since Plaintiffs filed this lawsuit in August 2013. Plaintiffs have had all that time to develop any evidence in support of their contention that the merger between US Airways and American Airlines ("the Merger") has substantially lessened or is likely to substantially lessen competition in a relevant market, in violation of Section 7 of the Clayton Act. What is more, this Court has, on several occasions, informed Plaintiffs of the specific deficiencies of their case and articulated exactly how to remedy them. Plaintiffs have ignored that direction. Discovery is now complete, and Plaintiffs have done nothing to develop their case or even try to address the shortcomings identified by this Court.

2.    The fact is that Plaintiffs' case has not changed one bit since 2013. It remains a case that rails against mergers in general, based on a theory that this Court and the Second Circuit have rejected. The core flaw in Plaintiffs' approach is that they are unable to address and validate any anticompetitive effects that allegedly result from *this* Merger—in the airline industry, with its unique market attributes, and in light of the undeniable growth of competition from Low Cost Carrier airlines ("LCCs") as well as the competition from other powerful hub-and-spoke legacy carriers. The empty structuralism of Plaintiffs' approach, beginning and ending with market share and "HHI" calculations of concentration in various air travel routes, is simply not tenable as a matter of law when this Court is no longer required to accept Plaintiffs' allegations as true.

3.    Only if Plaintiffs could somehow demonstrate through actual evidence that *this* Merger has caused or will cause *these* Plaintiffs actual and antitrust injury, and result in anticompetitive effects from a substantial lessening of competition in a relevant market could

their claims survive summary judgment. They cannot. American respectfully requests that the Court grant summary judgment, for the following reasons:

4.    *First*, Plaintiffs' case is predicated on an anachronistic structural framework that *no* court applies to assess the legality of a merger. Plaintiffs' view, as it has been since the beginning of this case in 2013, is that any indication of increased "concentration" is enough by itself for them to prevail in a merger challenge. That approach was rejected by this Court in its November 2013 Order denying Plaintiffs' motion for a temporary restraining order ("TRO") (an order subsequently affirmed by both the District Court and the Second Circuit). Instead, as the Court found, merger law requires looking beyond mere market structure; rather, to prevail, Plaintiffs must engage in rigorous economic analysis, testing the competitive effects in a defined, relevant market and demonstrate actual consumer harm. Yet Plaintiffs have ignored all this, and the extremely limited evidence Plaintiffs have been able to develop consists of little more than a new round of market share and HHI calculations. They have neither presented any expert testimony that would suggest there were anticompetitive effects caused by the Merger, nor have they conducted any independent analysis of the competitive effects at all. Summary judgment is appropriate for the threshold reason that Plaintiffs have failed to offer a ***complete*** analysis of the Merger as required by current law and the law of this case.

5.    *Second*,  Plaintiffs have not established a cognizable relevant market. A well-defined and cognizable relevant market is the core prerequisite and framework guiding antitrust assessment of a merger. The Court already admonished Plaintiffs on this issue:  in its November 2013 Order denying Plaintiffs' motion for a TRO and again in its March 2015 decision denying Plaintiffs' second motion to amend, the Court held that neither Plaintiffs' national market allegations nor their conclusory list of airport pairs properly plead relevant markets. Nothing has changed. Plaintiffs still have no evidence supporting the previously rejected national market, and they still have no evidence backing up the contention that any of the hundreds of city-pairs that they cite is so protected by barriers to entry or expansion as to qualify as a cognizable antitrust market. And, they have made no effort to identify even a single city pair that is relevant to any of

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

the named Plaintiffs in this case because they have ever actually flown it or even plan to fly it in the future. This matter cannot proceed to trial without a market—relevant both legally and relevant practically to at least one of the plaintiffs—where the effects of the Merger could be assessed.

6.        *Third*, there is no triable issue of actual or likely adverse competitive effects stemming from the Merger. Competitive effects analysis is inherently factual, and ordinarily not a summary judgment issue. But here, Plaintiffs have not been able to offer any genuine competitive effects analysis. Defendants and their experts have, based in part on the performance of the airline industry both before the Merger and in the three and a half years since. Defendants' unrebutted evidence shows that the harms Plaintiffs imagined—about an increase in fares the merged airline would impose, its elimination of discounted connecting fares, and its reduction in capacity— simply have not come true. To the contrary, fares have decreased, the connecting fare discount program has been expanded and is thriving, and there are more passengers and seats available, on newer aircraft, than ever before. Moreover, *none* of the 40 named plaintiffs has shown any real or threatened injury from adverse anticompetitive effects caused by the Merger, *even if* any such effects actually did or might plausibly exist. The Court's decision denying Plaintiffs' TRO, as well as two separate decisions denying their motions to amend due to Plaintiffs' failure to establish standing, addressed this issue—yet after all this time, Plaintiffs still do not have a single piece of evidence showing that any of them is in danger of personally suffering injury by reason of the Merger. Only a handful of Plaintiffs have flown at all since the Merger. And no Plaintiff has any concrete plans to fly on any domestic route (whether on American, or, for that matter, any other airline) in the near future.

7.        The time has come to end this proceeding. Defendants respectfully request that the Court enter summary judgment.

## II.    PROCEDURAL HISTORY

8.        This action is one of many antitrust lawsuits these Plaintiffs have filed against airlines and airline mergers over the past fifteen years. In 2003, travel agencies owned by a

nearly identical group of plaintiffs sued several major airlines over the reduction of travel agent commissions on sales of airline tickets in the United States. They also filed antitrust suits to enjoin the merger of Northwest Airlines and Delta Air Lines in 2008; the merger of United and Continental in 2010; and the merger of Southwest and Air-Tran in 2011.[1]  And most recently, they filed suit to enjoin Alaska Airline's acquisition of Virgin America.[2]  *TAM Travel*,[3] *Malaney*, and *Taleff* were all dismissed on the pleadings; in *D'Augusta* and *Grace*, Plaintiffs were able to extract a quick monetary settlement from the airlines without halting either the Northwest/Delta merger or Alaska's acquisition of Virgin America.

> **A.    INITIAL FILING AND REQUEST FOR TRO; CONSUMMATION OF THE MERGER**

9.      On July 2, 2013, Plaintiffs filed a lawsuit in the U.S. District Court for the Northern District of California, *Fjord et al. v. US Airways Group, Inc.*, 4:13-cv-3041-SBA (N.D. Cal. 2013), naming only US Airways as a defendant and not American Airlines, but seeking to enjoin the Merger between US Airways and American Airlines. Plaintiffs voluntarily dismissed the California action after American threatened a motion to dismiss and a motion for sanctions on the ground that Plaintiffs' decision not to name American was aimed at circumventing the automatic stay provisions of the Bankruptcy Code. *See id.*, Dkt. 9.

10.      Plaintiffs subsequently refiled their Complaint in this Court on August 6, 2013. *See* Adv. Dkt. 1. In November 2013, Plaintiffs sought a TRO to block the proposed merger. This Court denied the TRO. *Fjord et al. v. AMR Corp. et al. (In re AMR Corp.)*, 502 B.R. 23 (Bankr. S.D.N.Y. 2013). The Court concluded that Plaintiffs failed to articulate how they would be irreparably harmed by the impending merger, as there was "no evidence whatsoever regarding who the Plaintiffs are, what the nature of their interest in the airline industry is, or how they will

---

[1] *See TAM Travel, Inc. v. Delta Airlines, Inc.*, No. 4:03-CV-01502-SBA (N.D. Cal. 2003) (later transferred to N.D. Ohio as part of a MDL: *TAM Travel, Inc. v. Delta Airlines, Inc.*, MDL Dkt. 1561, Case No. 1:03 CV 30001 (N.D. Ohio 2003)); *D'Augusta v. Nw. Airlines Corp.*, No. 3:08-CV-03007-VRW (N.D. Cal. 2008); *Malaney v. UAL Corp.*, No. 3:10-CV-02858-RS (N.D. Cal. 2010); *Taleff v. Sw. Airlines Co.*, No. 3:11-CV-02179-JW (N.D. Cal. 2011).

[2] *Grace, et al. v. Alaska Air Group, Inc., et al.*, No 3:16-CV-05165-WHA (N.D. Cal. 2016).

[3] A partial settlement with a few of the defendants was also reached in that case. *See TAM Travel*, No. 1:03 CV 30001, Dkt. 2, 42, 50, 52.

be individually harmed by the proposed merger." *Id.* at 34.  The Court also found that Plaintiffs failed to demonstrate a likelihood of success on the merits.  Specifically, the Court found that Plaintiffs failed to make any showing that the Merger was likely to cause anticompetitive effects. Plaintiffs' "conclusory" submission was insufficient, as it "rel[ied] upon the work of others while presenting little independent analysis," which did not account for the circumstances of the Merger "in the context of the DOJ Settlement." *Id.* at 39, 40.  The Court also expressed serious doubt as to the viability of Plaintiffs' claimed national market, and found problematic Plaintiffs' failure to provide any analysis or allegations regarding "which city-pairs are at issue in light of the New Merger [i.e., after the divestitures of slots and gates required by the DOJ Settlement]." *Id.* at 40.  The Court consequently allowed the Merger to proceed and after Plaintiffs' appeals to the District Court, the Second Circuit and the Supreme Court were unsuccessful, the Merger closed on December 9, 2013.

**B.    PLAINTIFFS' MOTIONS TO AMEND TO ADD A DAMAGES CLAIM**

11.    On January 10, 2014, Plaintiffs filed the first of a series of motions to amend the complaint, seeking to add:  (a) new factual allegations; (b) a claim for treble damages under Section 4 of the Clayton Act; (c) a demand for a jury trial; and (d) modifications to the declaratory relief sought under Section 16 of the Clayton Act.  Adv. Dkt. 91-92.  On March 14, 2014, the Court only permitted the addition of new factual allegations and the modification of the declaratory relief sought, and denied Plaintiffs' request to add a damages claim and a demand for a jury trial.  *See Fjord et al. v. AMR Corp. et al. (In re AMR Corp.),*  506 B.R. 368, 385-86 (Bankr. S.D.N.Y. 2014).  The Court concluded that Plaintiffs' proposed allegations failed to allege "*any* actual injury to the Plaintiffs," and instead referred only to "harm to the general public or to 'millions of consumers.'" *Id.* at 386 (emphasis in original).  Plaintiffs thereafter filed their First Amended Complaint.  *See* Adv. Dkt. 103.

12.    Each subsequent attempt by Plaintiffs to amend the First Amended Complaint has been rejected.  On May 5, 2014, Plaintiffs filed a motion for leave to file a second amended complaint, seeking to add 163 new paragraphs, a claim for damages, and a demand for a jury

trial. Adv. Dkt. 105. Plaintiffs' motion itself contained only boilerplate, and after admonishment from the Court, Plaintiffs withdrew their original motion and filed a more fulsome motion, again seeking to add over 160 new allegations, a claim for damages, and a demand for a jury trial. *See* May 16, 2014 Hr'g Tr. at 14:5-22:25, Adv. Dkt. 107; Adv. Dkt. 106.

13.       On March 31, 2015, the Court issued a lengthy opinion denying the motion. *See Fjord, et al. v. AMR Corp. et al.* (*In re AMR Corp.*), 527 B.R. 874 (Bankr. S.D.N.Y. 2015). The Court noted at the outset that although 40 plaintiffs are named in this case, the proposed second amended complaint, just as before, "still . . . fail[s] to allege any information regarding twenty-seven of the Plaintiffs." *Id.* at 879. Three fundamental deficiencies were fatal to the proposed second amended complaint: (1) it failed to plausibly define a relevant market in which any of Plaintiffs allegedly suffered personal harm; (2) it did not satisfy *Twombly*'s pleading standard because of its failure to allege a causal connection for the supposed harms arising out of the Merger; and (3) to the extent Plaintiffs sought to recover damages in their capacity as travel agents rather than as customers, they lacked antitrust standing to do so. *Id.* at 883.

14.       On the relevant market issue, the Court concluded that "[a]s a threshold matter, the [proposed complaint] does not contain any allegations about interchangeability and cross-elasticity, which is fatal to any claim of any market definition." *Id.* at 884. The Court further rejected Plaintiffs' claimed national market for airline travel, as "[a]n airline passenger cannot buy a ticket that acts as a pass for travel anywhere within the country." *Id.* at 885. As for appropriate city-pair markets, the Court found that Plaintiffs' proposed complaint did "not define which city-pairs are at issue[,] . . . much less analyze the impact on competition in those city-pairs." *Id.* at 887. Critically, the Court found the mere allegations of "price fluctuations for tickets on American" were deficient, because there were no allegations "regarding other flight options on the same route, such as comparable flights on another airline and their cost." *Id.* at 888.

15.       Likewise, the Court rejected the allegations under *Twombly* because they "fail[ed] to allege a plausible chain of causation for many of the alleged harms arising out of the merger." *Id.* at 888-89. Many of the allegations of harm were of "pre-merger inconveniences," without

any plausible explanation as to how those claimed harms related to the Merger. *Id.* at 889.
Other allegations were of "injury to the public at large, rather than harm to any named plaintiff."
*Id.* These allegations failed to "connect the dots" from any specific antitrust injury any of the
Plaintiffs might have experienced as a result of the Merger. *Id.*

16.      Last, the Court concluded that the proposed amendments to the complaint did not
contain allegations sufficient to establish that Plaintiffs could be efficient enforcers of the antitrust
laws, as required by the Second Circuit's decision in *Gatt Communications, Inc. v. PMC
Associates, L.L.C.*, 711 F.3d 68 (2d Cir. 2013). Of the 40 plaintiffs, only 13 of them bothered to
cite any specific allegations at all, and what few specific allegations of harm were mentioned made
clear that Plaintiffs were complaining of harms suffered in their capacity as travel agents, rather
than as actual airline passengers. Applying the four-factor test for antitrust standing under *Gatt*,
the Court concluded that "the travel agent Plaintiffs would not be efficient enforcers and could not
sustain a private action for lack of antitrust standing." *In re AMR Corp.*, 527 B.R. at 892.

### C.      PLAINTIFFS' ATTEMPT TO ADD UNRELATED SECTION 1 AND 3 CLAIMS

17.      Undaunted, Plaintiffs kept trying. On August 19, 2015, in the aftermath of a DOJ
announcement that it was investigating the domestic airline industry, a number of antitrust cases
were filed against American, United, Delta, and Southwest around the country, alleging collusion
under Sections 1 and 3 of the Sherman Act (the "MDL Actions"). Plaintiffs thereafter filed yet
another motion to amend the complaint in this case—technically their fourth. *See* Adv. Dkt. 118.
Unlike their prior attempts, in that motion to amend Plaintiffs sought to add claims identical to
those that had been alleged in the separate MDL actions. Those cases (now consolidated in a
separate MDL proceeding) involve entirely different claims and facts—specifically, that four U.S.
air carriers, including American, allegedly colluded to reduce capacity and thereby fix the price of
airfares. Though this case is, and has always been, a challenge to the Merger between US Airways
and American, Plaintiffs sought to transform the case into an entirely different one by seeking to
add new, unrelated conspiracy claims like those asserted in the MDL actions.

18.     After American objected, Plaintiffs shifted course again, opting to "move before the MDL panel to have this case transferred in its entirety."  Adv. Dkt. 120.  This Court expressed skepticism with Plaintiffs' proposed amendments, as it seemed like "a new chapter in the litigation" and "a new case." Sept. 9, 2015 Hr'g Tr. at 10:13-14; 12-2, Adv. Dkt. 121.  But the Court stayed its decision on Plaintiffs' motion to amend pending resolution of their motion to transfer this case to the MDL.  Sept. 9, 2015 Hr'g Tr. at 18:4-25.

D.    **PLAINTIFFS' ATTEMPT TO TRANSFER THIS CASE TO A SEPARATE MDL PROCEEDING**

19.     On September 14, 2015, Plaintiffs filed a Notice of Related Action with the Judicial Panel on Multidistrict Litigation ("JPML"), representing that this case was a "Related Action" and requesting that all such actions be transferred for coordinated pretrial proceedings in the Northern District of California.  Notice of Related Action, *In re Domestic Airline Travel Antitrust Litig.*, MDL No. 2656 (J.P.M.L. Sept. 9, 2015), Dkt. 237.  On October 15, the Clerk of that Court entered an order noting that this case "is not appropriate for inclusion in th[e] MDL. " Notice to Counsel, MDL No. 2656, Dkt. 278.

20.     In the intervening period, the JPML had begun transferring numerous related actions to Judge Colleen Kollar-Kotelly in the U.S. District Court for the District of Columbia (the "Transferee Court").  *See, e.g.*, Consent to Transferee Court, MDL No. 2656, Dkt. 276; Transfer Order, MDL No. 2656, Dkt. 277; Conditional Transfer Order, MDL No. 2656, Dkt. 279. Plaintiffs had, by that point, filed a separate case on the issues and claims involved in the MDL, and so were part of the process.  Nevertheless, on November 16, 2015, Plaintiffs filed a motion to transfer this case to the Transferee Court, asserting that the Sections 1 and 3 claims they sought to add as part of their pending motion to amend involved the same operative facts as the other cases consolidated into the MDL.  *See* Mot. for Transfer, MDL No. 2656, Dkt. 287.

21.     On February 4, 2016, the JPML denied Plaintiffs' motion to transfer, because the operative complaint "does not assert a claim under the Sherman Act relating to an alleged conspiracy by the Airlines to fix prices for domestic airline tickets by restricting domestic flight

capacity.  Rather, Plaintiffs challenge the Merger of American Airlines and US Airways under Section 7 of the Clayton Act—a *very different dispute* from that being litigated in MDL No. 2656."  Order Denying Transfer at 1, MDL No. 2656, Dkt. 301.  The JPML was also unwilling to transfer a case based on claims in "a hypothetical complaint" and because "[t]ransfer . . . would disrupt the proceedings in *Fjord* and unnecessarily inject additional factual and legal issues into the centralizing proceedings."  *Id.* at 1-2.

22.    This history shows that Plaintiffs have not really wanted to litigate the merger challenge they originally filed.  Anything but.  However, that is the only case before the Court, because it is the only case they can now pursue.

### E.    THE COMPLETION OF DISCOVERY

23.    Following Plaintiffs' unsuccessful attempt to transfer and consolidate this case with the MDL, Plaintiffs agreed to move forward solely on the Section 7 claim on the Merger, as set forth in the First Amended Complaint.  *See* Sept. 7, 2016 Joint Ltr. to Chambers; *see also* Notice, Consent, and Reference of a Civil Action, Adv. Dkt. 129.

24.    In closing out discovery, Plaintiffs have done just three things:  (1) they deposed Andrew Nocella, former Senior Vice President of Network, Alliance, and Sales at American; (2) they produced a single expert report, by a Dr. Carl Lundgren, limited solely to updating the HHI[4] numbers for 1,008 city-pairs contained in Appendix A that had been attached to Plaintiffs' original complaint—a list Plaintiffs had lifted whole-cloth from the DOJ's separate complaint challenging this Merger.  *See generally* Declaration of Sadik Huseny in Support of Motion for Summary Judgment,[5] Ex. 1 (Mar. 1, 2017 Lundgren Report).  There is no competitive effects analysis in Dr. Lundgren's report, just new HHI calculations, because Plaintiffs previously elected not to bother with an expert analysis of the effects of the Merger; and (3) they deposed

---

[4] "HHI" stands for Herfindahl-Hirschman Index, a commonly used metric for determining concentration in a market; the index number is computed by adding the squares of the market share for each firm. *F.T.C. v. H.J. Heinz Co.*, 246 F.3d 708, 716 (D.C. Cir. 2001).

[5] All citations to Exhibits throughout this Motion are to those attached to the Declaration of Sadik Huseny in Support of this Motion.

Defendants' experts on their reports.[6]  Defendants' experts—whose analysis is undisputed and who also provided expert reports for the merging parties during the DOJ litigation—are Dr. Dennis Carlton, a Professor of Economics at the University of Chicago, who analyzes the competitive effects of the Merger; Dr. Janusz Ordover, a Professor of Economics (Emeritus) at New York University, who analyzes the likelihood of coordinated effects stemming from the Merger; and Mr. Daniel Kasper, who provides historical context on the competitive landscape of the airline industry over time, including before and after this Merger.

## III.    LEGAL STANDARDS

25.    Summary judgment is appropriate when the record establishes no "genuine dispute as to any material fact," thereby entitling the movant to "judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the initial burden of establishing the basis for summary judgment, and in particular, demonstrating the absence of a genuine dispute of any material fact. Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party can satisfy its burden by establishing an "absence of evidence to support the nonmoving party's case."  *Celotex*, 477 U.S. at 325.

26.    To defeat summary judgment, the non-moving party must proffer specific facts establishing a genuine issue that necessitates moving to trial.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986).  A "genuine issue" for trial exists if, but only if, there is sufficient evidence for a jury to return a verdict for the non-movant.  That evidence cannot be merely "colorable" and must be "significantly probative"; otherwise, summary judgment is appropriate.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "A fact is material if it 'might affect the outcome of the suit under the governing law.'"  *Baldwin v. EMI Feist Catalog, Inc.*, 805 F.3d 18, 25 (2d Cir. 2015) (quoting *Anderson*, 477 U.S. at 248).

---

[6] As for American, they had previously deposed three of the named Plaintiffs, and recently deposed five more.  Of those eight plaintiffs, Plaintiffs identified six (Lisa McCarthy, Rosemary D'Augusta, Jan Marie Brown, Don Freeland, Gabriel Garavanian, and Valarie Ann Jolly) as being the only ones who would provide testimony at trial or summary judgment.

## IV.    ARGUMENT

27.    Section 7 of the Clayton Act bars mergers whose effect "may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18.  To prevail on a § 7 claim, a plaintiff must prove, by a preponderance of the evidence:  (1) a cognizable relevant antitrust market; and (2) that the effect of the merger is to substantially diminish competition within that relevant market.  15 U.S.C. § 18; *United States v. Connecticut Nat'l Bank*, 418 U.S. 656, 669 (1974).  The plaintiff bears the burden of establishing each of these elements.  *See H.J. Heinz Co.*, 246 F.3d at 715; *United States v. Baker Hughes Inc.*, 908 F.2d 981, 985 (D.C. Cir. 1990). Plaintiffs have utterly failed to meet these burdens.

28.    Because the "[d]etermination of the relevant product and geographic markets is a necessary predicate to deciding whether a merger contravenes the Clayton Act," *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 618 (1974) (internal quotation marks omitted), market definition is ordinarily the first step in a merger analysis, after which one turns to competitive effects and the ultimate question of "whether the challenged acquisition is likely to hurt consumers." *Baker Hughes*, 908 F.2d at 990 n.12.  We depart from that sequence in this motion due to the unusual nature of the Plaintiffs' argument.  In short, Plaintiffs are putting forth a strictly structural case, with no meaningful competitive effects argument.  They do not have *any* expert testimony on competitive effects, because it is their position that they don't need any. We therefore begin by explaining how Plaintiffs cannot meet their burden of proof with their purely structural approach.  Later, we demonstrate that Plaintiffs have failed to prove relevant markets or anticompetitive effects from this Merger that threaten these Plaintiffs with any injury.

### A.    PLAINTIFFS HAVE FAILED TO CONDUCT THE REQUISITE ANALYSIS OF THIS MERGER BASED ON THEIR MISTAKEN AND REJECTED VIEW OF MERGER LAW

29.    From the outset of this case, Plaintiffs have thumbed their noses at the contemporary legal analysis for assessing mergers under Section 7.  They have advanced, and remain wedded to, a purely structural analysis focused on "concentration" alone—one explicitly based on outdated case law—all while ignoring the need to even discuss, assess, or (now) offer

any evidence whatever relating to the competitive effects of the Merger.  They have left no doubt about this; the Court has heard and remarked on Plaintiffs' legal theory.  Order Denying Pls.' App. for TRO at 18-19 & n.12, Adv. Dkt. 72 (stating that "a quick review of the relevant antitrust case law suggests that antitrust law has evolved since the 1960s to encompass a more flexible, industry-specific analysis").  Most recently, Plaintiffs' counsel had the temerity to question Defendants' economic experts—who not only have conducted a thorough and complete competitive effects analysis, but who were instrumental in the development of the contemporary competitive effects analysis now applied by all courts—as to why they didn't follow "the decisions by the Supreme Court of United States in the late '60s and early '70s" instead.  *See* Ex. 2 (Ordover Dep. Tr.) at 32:16-25; Ex. 3 (Carlton Dep. Tr.) at 23:18-25:12 ("Q: Do you disagree with any of the economic analyses that were made by the Supreme Court in their merger decisions?"); *see also id.* at 129:20-130:13 ("Q:  Yes. But was there any suggestion [among the members of the Antitrust Modernization Commission] that the decisions and the reasoning of the decisions by the Supreme Court in the famous '60s and '70s cases should be changed?").

30.     Plaintiffs' facile approach to antitrust theory simply does not apply in this day and age.  In 2017, a merger analysis that consists simply of market shares and HHIs is incomplete and insufficient as a matter of law.  Summary judgment is therefore appropriate based solely on Plaintiffs' failure to even *offer* a complete analysis of this Merger.

31.     Mergers can potentially raise a variety of antitrust questions, but the main concern is that they might enhance the exercise of *market power* by encouraging price increases, output reduction, diminishment of innovation, and so on.  *See infra* Section IV.C.2.  Half a century ago, merger policy was driven by the notion that structure alone determined market power and thus even small changes in market structure could be problematic.  *See Brown Shoe Co. v. United States*, 370 U.S. 294 (1962).  Merely pointing to modest combined market shares, or moderately increased concentration, resulting from a merger (all that Plaintiffs here even try to do) was sometimes sufficient to set forth a viable claim.  *See, e.g.*, *id.*; *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321 (1963); *United States v. Von's Grocery Co.*, 384 U.S. 270 (1966).

32.    But the law has evolved and merger analysis today is much different from what it was decades ago. *United States v. General Dynamics Corporation*, the last Supreme Court merger decision, made clear that a merger analysis must focus on the "structure, history and probable future" of the market.  415 U.S. 486, 498 (1974) (quoting *Brown Shoe*, 370 U.S. at 322 n.38). Since *General Dynamics*, antitrust analysis of mergers has become much less structural (i.e., focused on market shares alone) and much more concerned with plausible economic theories of whether a merger is harmful to consumers—what antitrust practitioners call "competitive effects analysis."  *See Baker Hughes*, 908 F.2d at 990 ("*General Dynamics* began a line of decisions differing markedly in emphasis from the Court's antitrust cases of the 1960s.  Instead of accepting a firm's market share as virtually conclusive proof of its market power, the Court carefully analyzed defendants' rebuttal evidence.").[7]  The Second Circuit noted this trend in *Broadway Delivery Corp. v. United Parcel Service, Inc.*, 651 F.2d 122, 128 (2d Cir. 1981), an action brought by a plaintiff represented by the Alioto firm in which market share was offered as the singular proof of monopoly power.  The court acknowledged older Supreme Court decisions that might have supported that approach, but wrote:  "In more recent decisions in the merger context, the Court has reaffirmed its *unwillingness* to base market power determinations simply on market share data."  *Id*. (emphasis added).

33.    The Second Circuit also applied *General Dynamics* in finding that ease of entry into local trash collection markets destroyed the probative value of high market shares:

> [U]nder *General Dynamics*, a substantial existing market share is insufficient to void a merger where that share is misleading as to actual future competitive effect. In that case, long-term contracts and declining reserves negated the inference of market power drawn from the existing market share.  In the present case, a market definition artificially restricted to existing firms competing at one moment may yield market share statistics that are not an accurate proxy for market power when substantial potential competition able to respond quickly to price increases exists.

*United States v. Waste Management Inc.*, 743 F.2d 976, 982 (2d Cir. 1984).

---

[7] For a history of the increasing role of competitive effects analysis in merger review, *see* Carl Shapiro, The 2010 Horizontal Merger Guidelines: From Hedgehog to Fox in Forty Years, 77 Antitrust L.J. 49, 50-60 (2010).

34.     Today, mergers are reviewed pursuant to a burden-shifting approach whereby, with only minor variations among the Circuits, structure is a starting point, and the analysis must turn quickly and primarily to competitive effects.  *See, e.g.*, *Baker Hughes*, 908 F.2d at 990; *Chi. Bridge & Iron Co. N.V. v. F.T.C.*, 534 F.3d 410, 423 (5th Cir. 2008); *Saint Alphonsus Med. Ctr- Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015).  Courts condemn mergers today only after a rigorous competitive effects analysis indicates a substantial probability of consumer harm.  As this Court held in its Order denying Plaintiffs' request for a TRO, "Plaintiffs must show that the Merger is reasonably likely to cause anticompetitive effects.  Section 7 deals in probabilities, not 'ephemeral possibilities.' . . . [P]laintiffs must show a loss of competition that is 'sufficiently probable and imminent.'"  Order Denying Pls. App. for TRO at 19, Adv. Dkt. 72 (citing *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1109-10 (N.D. Cal. 2004)).

35.     Plaintiffs' case unquestionably fails under this framework.  This is because they reject the framework entirely, so do not even try to follow it.  They are not presenting *any* probative evidence of anticompetitive effects.  They have provided no expert reports or testimony on competitive effects, nor any other evidence that might establish a genuine issue of material fact as to whether this Merger has caused or will cause any of the claimed anticompetitive effects.  As noted, they criticize Defendants' experts for not simply following the 1960s cases.  That leaves the competitive effects testimony of the defense experts (summarized in Section IV.C, below) entirely unrebutted and undisputed.

36.     Plaintiffs will likely argue that market share statistics alone establish a *prima facie* case sufficient to defeat summary judgment.  That is incorrect, for two reasons.  First, contemporary decisions do not accept market statistics alone, without *some* validation of their significance, as *prima facie* proof of anything.  *See Saint Alphonsus*, 778 F.3d at 785-86 (noting that because "'statistics concerning market share and concentration, while of great significance, [a]re not conclusive indicators of anticompetitive effects,' . . . plaintiffs in § 7 cases generally present other evidence as part of the *prima facie* case") (quoting *General Dynamics*, 415 U.S. at

486); *see also Broadway Delivery Corp.*, 651 F.2d at 128 ("[T]he true significance of market share data can be determined only after careful analysis of the particular market."). No such "careful analysis of the particular market" has been or can be offered by these Plaintiffs; they have nothing more than numbers, just numbers.

37.    Second, whenever there is evidence "showing that the market-share statistics do not accurately demonstrate the merger's probable effects on competition in the relevant market," it becomes the plaintiff's burden to prove probable anticompetitive effects by other, non-statistical means. *In re AMR Corp.*, 502 B.R. at 38 (citing *Baker Hughes*, 908 F.2d at 982). Even a "substantial existing market share is insufficient to void a merger where that share is misleading as to actual future competitive effect." *Waste Management*, 743 F.2d at 982. The plaintiff bears the burden of proof on every element of a claim under Section 7, and it is the plaintiff who must thus ultimately demonstrate the likelihood of anticompetitive effects from the Merger. *See H.J. Heinz Co.*, 246 F.3d at 715; *Baker Hughes*, 908 F.2d at 983, 985.

38.    It has already been established that national market shares are legally meaningless in this case and even city-pair market statistics are insufficient to demonstrate the Merger's probable competitive effects because of the low barriers to entry in all city-pairs without meaningful gate or slot restrictions. *See In re AMR Corp.*, 527 B.R. at 885. This Court addressed the latter point in the context of the Plaintiffs' effort to combine city-pair markets with low barriers to entry into an exploitable national market:

> At oral argument, Plaintiffs' counsel suggested that a national market was evidenced from the supply side. He posited that most airports do not use slots, and therefore have low barriers to entry. If a company owns a plane, therefore, an airline simply needs to find a profitable route, turn [its] airplane and go there. But this argument goes against logic. *If it is truly this easy to enter the market, the logical conclusion is that there will be low barriers to entry and therefore robust competition in the market.*

*Id.* at 886 (citing July 17 Hr'g Tr. 39:13-40:12 and emphasis added).

39.    This is the exact logic by which the Second Circuit rejected a statistics-based attack on the *Waste Management* merger. *See Waste Management*, 743 F.2d at 982 ("[A] market definition artificially restricted to existing firms competing at one moment may yield market share

statistics that are not an accurate proxy for market power when substantial potential competition able to respond quickly to price increases exists."). Therefore, whether the Court chooses to look at it as an indication that Plaintiffs have failed to make out a *prima facie* case, or ease of entry into city-pairs rebuts any such *prima facie* case, Plaintiffs' market share statistics, standing alone, do not satisfy their burden of offering significant probative evidence of likely adverse competitive effects. And, since they have nothing else, there is no need for a trial to resolve this case. There are no competing economic analyses of the Merger to be weighed at trial. Nor is there any competing expert testimony on competitive effects to be assessed. On the entire issue of whether the Merger is likely to cause anticompetitive effects (and thus violate Section 7), there is essentially no case to try.[8] Plaintiffs' dogged adherence to the inappropriate merger framework, and their consequent and absolute failure to offer any evidence required under the appropriate legal framework for analyzing a merger, is fatal to their claims. Summary judgment is warranted on that basis alone.

### B.    PLAINTIFFS HAVE FAILED TO ESTABLISH A RELEVANT MARKET

40.    Plaintiffs claim two types of markets in this case: (i) a "national" market for the transportation of airline passengers anywhere in the United States, and (ii) 785 "airport pair" markets drawn from the 1,008 airport pairs originally listed in Appendix A of the operative complaint, a list that was initially cut and pasted from the separate DOJ complaint and has since been slightly reduced by Plaintiffs. These markets both fail, for the reasons this Court has previously stated.

### 1.    Legal Requirements:  Relevant Market Definition

41.    The "[d]etermination of the relevant product and geographic markets is a 'necessary predicate' to deciding whether a merger contravenes the Clayton Act." *Marine Bancorporation*, 418 U.S. at 618; *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 593 (1957). A

---

[8] We lay out the one-sided nature of the evidence that does exist—Defendants' evidence showing no anticompetitive effects—in greater detail in Section IV.C below.

relevant market lays the foundation for this entire legal inquiry, because it "shapes where the Court must look to determine any actual anticompetitive effects." *AMR Corp.*, 527 B.R. at 883.

42.    In defining a cognizable relevant market, the Second Circuit employs the Hypothetical Monopolist Test developed for the DOJ and FTC *Merger Guidelines. See, e.g., United States v. Am. Express Co.*, 838 F.3d 179, 198 (2d Cir. 2016); *Todd v. Exxon Corp.*, 275 F.3d 191, 202 (2d Cir. 2001); *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 228 (2d Cir. 1999). The central question under this approach is whether a proposed market "contain[s] enough substitute products so that it could be subject to post-merger exercise of market power significantly exceeding that existing absent the merger." U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* § 4.1.1 (Aug. 19, 2010) (hereinafter, "*Merger Guidelines*"); *see also Am. Express*, 838 F.3d at 198-99 ("If the sales of other producers substantially constrain the price-increasing ability of the hypothetical [monopolist], these others are part of the market."); *Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP*, 612 F. Supp. 2d 330, 352 (S.D.N.Y. 2009) ("[A] market is properly defined under the [DOJ Horizontal Merger] Guidelines 'when a hypothetical profit-maximizing firm selling all of the product in that market could charge significantly more than a competitive price, *i.e.,* without losing so many sales to other products that its price became unprofitable.'") (citations omitted).

43.    Practically speaking, this requires an analysis of reasonable interchangeability and cross-elasticity of demand, the foundational market definition principles since *Brown Shoe. See* 370 U.S. at 325 ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."); *City of New York v. Group Health, Inc.*, 649 F.3d 151, 155 (2d Cir. 2011) (relevant market must include "all products reasonably interchangeable by consumers for the same purposes"). The principal demand-side question here is whether airport-pairs or even city-pairs (combining the airports in two regions) are in the same or separate markets. Airport-pairs often have clear substitutes, e.g., EWR-SFO and JFK-SFO are certainly in the same market, and sometimes city-pairs have substitutes as well.

44.        Cross-elasticity of *supply* is also relevant to market definition—particularly in the airline industry, given the admitted ability of airlines to change their routes, entering and exiting city-pairs in search of profit opportunities.  *See AD/SAT*, 181 F.3d at 227; *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1436 (9th Cir. 1995) ("A reasonable market definition must also be based on 'supply elasticity.'" (citation omitted)).  The Second Circuit described cross-elasticity of supply in *AD/SAT*:

> Also relevant to the delineation of a relevant product market is cross-elasticity of supply, which depends on the extent to which producers of one product would be willing to shift their resources to producing another product in response to an increase in the price of the other product.  Where there is cross-elasticity of supply, a would-be monopolist's attempt to charge supracompetitive prices will be thwarted by the existence of firms willing to shift resources to producing the product, thereby increasing supply and driving prices back to competitive levels.[9]

181 F.3d at 227 (citation omitted).

45.        The failure to define markets consistent with these legal principles is fatal to any antitrust claim requiring proof of market power.  *See, e.g.*, *Chapman v. New York State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) ("Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient." (quoting *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997)); *Rebel Oil Co.*, 51 F.3d at 1436 (failure of plaintiffs' expert to consider supply elasticity in attempting to define a narrow market required rejection of his testimony and grant of summary judgment for defendant).

      2.        <u>The Court Previously Rejected Plaintiffs' Claimed "National Market" and It Remains Infirm</u>

46.        Throughout this case, Plaintiffs have asserted that a "national" market exists for

---

[9] The *Merger Guidelines* implement this principle by estimating market shares for "[f]irms that are not current producers in a relevant market, but that would very likely provide rapid supply responses" in the event of a merger-related price increase.  *Merger Guidelines* § 5.1.

the transportation of airline passengers in the United States.[10]  The Court has twice rejected this argument:  once in its decision denying Plaintiffs' motion for a temporary restraining order and again in denying Plaintiffs' second motion to amend.  *See In re AMR Corp.*, 502 B.R. 23; *In re AMR Corp.*, 527 B.R. 874.  Each time, Plaintiffs' failure to provide any evidence or allegations supporting that overly simplistic market definition resulted in the rejection of their national market.  Mem. of Decision at 13-16, Adv. Dkt. 115.  The Court noted that "Plaintiffs' national market theory for the airline industry ha[d] been rejected by another court for a similar failure." *Id.* at 15 (citing *Malaney v. UAL Corp.*, No. C 10-02858 RS, 2011 WL 6845773 (N.D. Cal. Dec. 29, 2011)).

47.     The reason there is no national market is straightforward.  Airline passengers buy tickets between specific origins and destinations, not for national travel generally.  *See In re AMR Corp.*, 527 B.R. at 885-87; *see also Malaney v. UAL*, 2011 WL 6845773 at *4 ("[T]he national market for air transportation does [not] meet *Brown Shoe*'s standard[.]").  Flights between specific origins and destinations are therefore, quintessentially, *not* substitutable or interchangeable with flights between other cities.  *See In re AMR Corp.*, 527 B.R. at 885; *see also In re AMR Corp.*, 502 B.R. at 40.

48.     Despite having had years to address the concerns raised by this Court and the *Malaney* court, Plaintiffs still cannot offer any "theoretically rational explanation" for why a national market definition is appropriate.  *Commer. Data Servers, Inc. v. IBM Corp.*, 166 F. Supp. 2d 891, 896 (S.D.N.Y. 2001).  Their expert says nothing on the topic.  The only argument Plaintiffs can muster (as before) is that existing airlines could theoretically point one of their planes toward a new city and begin flying a new route at any point.  That may be true, but it undermines rather than supports Plaintiffs' position.  Indeed, under the Hypothetical Monopolist

---

[10] *See, e.g.*, First Amended Complaint: "The relevant product and geographic markets for purposes of this action are the transportation of airline passengers in the United States."  FAC ¶ 31.  Plaintiffs also seemed to maintain the existence of a "national market" for air travel in the briefing and oral argument for their second motion to amend.  Pls.' Reply Mem. in Further Support of Pls.' Am. Mot. for Leave to Amend ¶¶ 16, 22–23, Adv. Dkt. 112; July 17 Hr'g Tr. at 42:17–23.

Test, "a would-be monopolist's attempt to charge supracompetitive prices [would] be thwarted by the existence of firms willing to shift resources to producing the product " (*AD/SAT*, 181 F.3d at 227), or in this case, other airlines who would easily be able to point one of their planes toward that same city, so to speak, to offer a lower price on any such route.  In other words, it means only that barriers to entry are low, and competition robust, among numerous airport pairs throughout the country.  It does not mean that a flight from Nashville to Philadelphia is in the same market as a flight from New York to San Francisco.[11]

49.     The bottom line is that a "national airline market" defies economic reality and is untenable as a matter of law.  *See In re AMR Corp.*, 527 B.R. at 885.[12]  This Court has previously so held, and nothing has changed since those rulings were issued.

### 3.    Plaintiffs Have Not Established Any Relevant City-Pair Markets

50.     Unable to rely on a "national market," to survive summary judgment, Plaintiffs would have to identify and establish at least one city pair among the 785 allegedly "concentrated" airport pairs they cite where the Merger has caused anticompetitive harm.  They cannot.

51.     As an initial matter, discovery has confirmed that the Plaintiffs have not flown, post-merger, on the 785 city-pairs listed in Dr. Lundgren's report.[13]  Nor does any Plaintiff have any concrete plans to fly any of those routes in the future.  That means that the routes listed in

---

[11] It is worth noting that Plaintiffs cannot provide any evidence whatsoever of high concentration in general, or by American, in any "national" market.  This is not surprising, given the prevalence of low cost carriers ("LCCs") in the airline industry and the fact that Southwest, not American, is by far the largest domestic airline.  *See* Ex. 6 (Mar. 31, 2017 Kasper Report) ¶ 3.  The truth is that concentration figures for a national market are well below the level necessary to be deemed "highly concentrated."  Merger Guidelines § 5.3; Ex. 5 (Mar. 31, 2017 Ordover Report) ¶ 50.

[12] Similarly, Plaintiffs have advanced nothing to support a relevant market that includes international flights.  Plaintiffs have attempted to define a relevant market as that for "the transportation of airline passengers in the United States."  *See* FAC ¶ 31.  They have never claimed or attempted to premise their Section 7 on any international market for air travel.  *See also In re AMR Corp.*, 527 B.R. at 888.  Accordingly, any international flights that any of the named plaintiffs have actually flown or plan to fly in the future are irrelevant to the relevant market analysis.

[13] Of the forty named Plaintiffs, only one—Valarie Ann Jolly—claims to have flown *any* of the 785 routes at all (two flights from Dallas Fort Worth airport).  Ex. 12 (Jolly Dep.) at 24:25-25:9; 26:15-21.  And as Ms. Jolly herself has admitted, these flights are easily substituted by flights from Dallas Love Field airport— only miles away—and therefore cannot be relevant city-pair markets in this case. *Id.* at 47:10-21.  Likewise, as Ms. Jolly recognized, Ft. Lauderdale and Palm Beach airports may serve as substitutes.  *Id.* at 46:13-10.

Plaintiffs' new Exhibit C bear no connection to the named Plaintiffs in this case. No one—not the Defendants and not the Court—should have to conduct merger analyses with respect to irrelevant potential city-pair markets.

52.     Even were that not the case, Plaintiffs cannot make out a cognizable city-pair market. As this Court previously recognized, in the airline industry, city pairs are an appropriate way to think about and define *potential* antitrust markets in the airline industry. *In re AMR Corp.*, 527 B.R. at 886; *see also Global Discount Travel Servs., LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701, 705 (S.D.N.Y. 1997); *see also In re Nw. Airlines Corp.*, 208 F.R.D. 177, 220 (E.D. Mich. 2002). City pairs make sense *from the demand-side*, capturing flights consumers are likely to consider interchangeable. But city pairs are not *always* relevant markets, because cross-elasticity of supply must be considered as well, and, in the absence of capacity constraints such as scarce slots or gates, the ability of other airlines to enter in response to supracompetitive pricing makes it impossible to profitably monopolize any given city pair. Again, as explained above in Section IV.B.2, without constraints on moving supply into a given city pair, "a would-be monopolist's attempt to charge supracompetitive prices will be thwarted by the existence of firms willing to shift resources to producing the product, thereby increasing supply and driving prices back to competitive levels." *AD/SAT*, 181 F.3d at 227.

53.     For that reason, simply pointing to a chart of city pairs as Plaintiffs have done is not sufficient to establish hundreds of relevant markets. At a bare minimum, they also should have adduced some probative evidence that these city pairs were so insulated from the threat of airline repositioning such that post-merger price increases were likely to be imposed without fear of competition. There may be exceptional cases where particular city pairs are susceptible to the exercise of market power; the remedy the DOJ obtained in connection with the Merger is premised on the notion that scarce gates at one or both ends of a route, or slot restrictions at an airport, might allow an airline to exercise market power on that route. *See United States v. US Airways Group, Inc. et al.*, Competitive Impact Statement, Case No. 1:13-cv-01236-CKK, at *6-7 (D.D.C. filed Nov. 12, 2013), Dkt. 148. But, since the significant slot and gate issues relevant to

21

the Merger were addressed by the DOJ remedy, there is no basis for the assumption Plaintiffs

draw that city pairs generally are relevant markets.

54.     Plaintiffs have provided no route-specific analysis of whether any of the 785 city

pairs identified could be profitably monopolized.  Plaintiffs have resisted:  (1) articulating (much

less proving) what constitutes reasonably interchangeable substitutes for purposes of defining a

city-pair market; and (2) offering any analysis of cross-elasticity of demand and supply.

55.     Most notably, they have offered absolutely no expert economic testimony or,

indeed, any evidence at all on these issues.  A relevant market inquiry is a highly technical

question and, in reality, requires expert testimony.  *See, e.g.*, *Bailey v. Allgas, Inc.*, 284 F.3d 1237,

1246 (11th Cir. 2002) ("Construction of the relevant market and a showing of monopoly power

must be based on expert testimony." (citation omitted)); *U.S. Healthcare, Inc. v. Healthsource,

Inc.*, 986 F.2d 589, 599 (1st Cir. 1993) ("In practice, the frustrating but routine question how to

define the product market is answered in antitrust cases by asking expert economists to testify.");

*Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1490 (9th Cir. 1991)

(market definition is a "highly technical economic question"); *Kentucky Speedway, LLC v. Nat'l

Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 919 (6th Cir. 2009) (lay testimony rather than

expert testimony "does not provide a sound economic basis for assessing the market . . . the way

that a proper interchangeability test would").  And the "[f]ailure to adduce expert testimony on

competitive issues such as market definition augurs strongly in favor of granting summary

judgment against an antitrust plaintiff." *Drs. Steuer and Latham, P.A. v. Nat'l Med. Enter., Inc.*,

672 F. Supp. 1489, 1512 n. 25 (D.S.C. 1987), *aff'd mem*, 846 F.2d 70 (4th Cir. 1988); *see also

State of N.Y. by Abrams v. Anheuser-Busch, Inc.*, 811 F. Supp. 848, 871 (E.D.N.Y. 1993)

("[N]umerous conditions contributed to the State's failure to prove its proposed market

boundaries, the least of which was not the State's unwillingness to adhere to a single geographic

market theory and its inability to offer any expert testimony on any of its theories.").

56.    In place of economic analysis, Plaintiffs have only their chart of routes they claim are concentrated.[14]    However, Dr. Lundgren's work, standing alone, does not establish a relevant market.  There is no market definition analysis in Dr. Lundgren's report.  He fails even to identify which routes are relevant to these Plaintiffs, repeating an error this Court has already called out. *See In re AMR Corp.*, 527 B.R. at 887 (noting that while Plaintiffs "attach[ ] a chart from the DOJ antitrust litigation, it does not explain if the city-pairs in the chart where the alleged antitrust injuries to the named Plaintiffs took place").  And he does absolutely nothing to establish that these 785 routes are actually properly defined city-pair markets that rest on (1) a sound analysis of the reasonable interchangeability of flights from nearby airports and/or other carriers, and (2) the appropriate supply side considerations.[15]

*            *            *

57.    By ignoring this Court's direction, Plaintiffs remain unable to present sufficient evidence of a cognizable relevant market.  Summary judgment should be granted on this basis alone.  *See Group Health*, 649 F.3d at 155 (affirming grant of summary judgment based on lack of  a relevant market definition); *Se. Mo. Hosp. v. C.R. Bard, Inc.*, 642 F.3d 608, 617-18 (8th Cir. 2011) (affirming grant of summary judgment due to plaintiffs' failure to adduce sufficient

---

[14] Two months ago, Plaintiffs' expert, Dr. Lundgren, purported to update the HHI numbers predicted by the DOJ in Appendix A to its Complaint.  He concluded that, with FY 2016 data from the Department of Transportation's Airline Origin and Destination Survey (DB1B) database, 785 of the 1008 routes in Appendix A have HHIs greater than 2,500, and a change in HHI relative to 2012 exceeding 200.  *See* Ex. 1 (Mar. 1, 2017 Lundgren Report) at 15 & Ex. C.  In other words, Dr. Lundgren found that 223 of the routes (roughly one-quarter) actually did *not* have a relevant increase in concentration (any many in fact had a *decrease*).  He nonetheless maintained that 785 of the routes exhibited a relevant increase in concentration.

[15] A few examples illustrate the issue.  Named Plaintiff Gabriel Garavanian testified that a future "harm" he stands to suffer due to the merger is unspecified price increases for airfare between Boston and Miami. *See* Ex. 14 (Garavanian Dep.) at 122:4-8.  But there is no evidence as to why flights from Boston to Ft. Lauderdale or West Palm Beach are not reasonably interchangeable substitutes for customers considering flights to Miami.  Indeed, Mr. Garavanian *himself* recognizes they likely are, as Jet Blue operates out of Ft. Lauderdale, *id.* at 122:2-3, and "[p]eople are going - - actually flying into West Palm Beach and driving down [to Miami]," *id.* at 122:8-9.  Similarly, Mr. Garavanian claimed that after the merger, prices on American between Boston and "Hawaii" "are now one of the highest," but  himself acknowledged the availability of flights offered by JetBlue as a fungible alternative, a carrier that "now . . . is going out there [to Hawaii] one or two flights a day, and . . . coming in [at a] lower [price]."  *Id.* at 122:15-19.

evidence to establish substitutability and support for their claimed relevant product submarket);

*Flegel v. Christian Hosp., Ne.-Nw.*, 4 F.3d 682, 690 (8th Cir. 1993) ("Like any other issue, market definition is subject to summary judgment if the plaintiffs fail to provide sufficient evidence from which a jury could reasonably find in their favor.").

### C.    PLAINTIFFS HAVE FAILED TO OFFER EVIDENCE OF ANY ADVERSE COMPETITIVE EFFECTS OF THE MERGER

58.     Even if Plaintiffs could somehow establish a cognizable relevant market, they have not offered any evidence of adverse competitive effects.  Evidence and testimony by American's experts and witnesses unequivocally meet Defendants' Rule 56 *Celotex* burden on this issue, since there simply have been no adverse competitive effects from the Merger.  Moreover, there is no evidence that any individual plaintiff has suffered, or stands to suffer, antitrust injury as a result of the Merger.

### 1.    There Is No Triable Issue of Adverse Competitive Effects from the Merger.

59.     In support of this Motion, Defendants submit three expert declarations addressing competitive effects, summarized below.  In addition, Plaintiffs deposed Mr. Andrew Nocella, former Senior Vice President of Marketing and Planning at American, and much of his testimony relates to competitive effects.  Collectively, this testimony more than meets Defendants' *Celotex* burden, requiring Plaintiffs to come forward with significant probative evidence of adverse competitive effects in order to survive summary judgment.  They cannot do so.

### a.    Expert Dr. Dennis W. Carlton

60.     American's first expert, University of Chicago economist Dennis W. Carlton, analyzed the competitive effects of the Merger and found that the Merger resulted in procompetitive effects on consumers.  Ex. 4 (Mar. 31, 2017 Carlton Report) ¶ 17.

61.     In a retrospective study published in October 2016, Professor Carlton compared the effects on routes on which potential anticompetitive effects could be considered most likely (given market concentration from the Merger) with a group of control routes.  Ex. 4 (Mar. 31, 2017 Carlton Report) at Annex B.  Professor Carlton found that on non-stop routes served only by US

Airways and American (referred to as "2-to-1 overlap routes") and routes served by only US Airways, American, and one other carrier (referred to as "3-to-2 overlap routes"), fares declined by 12.3 percent, output increased by 20.2 percent, and capacity increased by 19.6 percent. *Id.* at 8 n.19 & Annex B at 18-19. This trend of decreased fares, increased output, and increased capacity post-merger similarly held on the non-stop overlap routes that Professor Carlton examined for the Delta Air Lines-Northwest Airlines and United Airlines-Continental Airlines mergers. *Id.*

62. These findings coincided with and confirmed Professor Carlton's prospective analysis of the Merger conducted on the eve of the Merger (in November, 2013), in which he concluded that the Merger would likely result in procompetitive output expansion and increased consumer welfare. *See* Ex. 4 (Mar. 31, 2017 Carlton Report) at Annex A. In that analysis, Professor Carlton found that specific features of the airline industry, including the existence of LCCs on many of the overlapping US Airways and American Airlines routes, as well as the ease of entry on many routes, reduced the likelihood of anticompetitive effects from the then-pending Merger. *Id.* ¶ 13. Relatedly, Professor Carlton concluded that LCCs were the disruptive force for pricing in the airline industry. *Id.* ¶ 14.

63. Indeed, despite the initial concern expressed by the DOJ and parroted by Plaintiffs that the Merger would result in the elimination of US Airways' Advantage Fares pricing, the low cost ticketing option that US Airways had offered to undercut the prices of rivals' nonstop routes with lower prices on US Airways' connecting routes, this did not in fact occur. *Id.* ¶¶ 29-33. Quite the contrary, both US Airways and American Airlines maintained and expanded the Advantage Fares pricing model post-merger. *Id.* And, in fact, other legacy carriers, Delta Air Lines and United Airlines, implemented similar pricing. *Id.*

64. Professor Carlton also concluded that nothing in Dr. Lundgren's report affected his assessment of the competitive benefits from the Merger. *Id.* ¶ 12. That is because Dr. Lundgren's report, which consists solely of updated HHI numbers, represents only the first step in the analysis of potential competitive effects; it lacks any consideration of additional factors. *Id.* ¶ 24. By contrast, Professor Carlton directly analyzed the competitive effects of the Merger, and confirmed

his conclusion from November, 2013—that the Merger did result in procompetitive benefits for consumers.  *Id.* ¶ 17.

b.    Expert Dr. Janusz Ordover

65.    American's second expert, NYU economist (emeritus) Dr. Janusz A. Ordover, responds to Plaintiffs' claim that the Merger engenders the risks of coordinated effects (FAC ¶¶ 157, 158)—a claim that Plaintiffs still have not substantiated with any actual evidence. Dr. Ordover concluded that "the airline industry was highly competitive prior to the merger, and remains so after the merger."  Ex. 5 (Mar. 31, 2017 Ordover Report) ¶ 5.

66.    According to Dr. Ordover, there are two main reasons for this finding.  First, "the airline industry is not readily susceptible to coordinated behavior.  The airline industry is behaving in a manner that is consistent with effective competition, and the transaction did not elevate the risks of successful coordination."  *Id.* ¶ 6.  Second, LCCs play a "continued central role" in "driving the key dimensions of competition in the airline industry."  *Id.*  "The divestitures, agreed to in the DOJ Settlement, further enhanced the competitive presence and vitality of the LCCs.  These highly competitive airlines would disrupt any form of coordination on prices or other competitive dimensions, were it even attempted."  *Id.*

67.    On the first point—that the airline industry is not readily susceptible to coordinated behavior—the setting of airfares and the determination of the number of seats to offer at each fare and at each time is highly complex.  This complexity consequently impedes successful and lasting coordination.  *Id.* ¶¶ 13-17.  Further, the fare information posted in ATPCO—the entity that collects and distributes airline fare data—is incomplete and not conducive to coordination.  *Id.* ¶¶ 18-27.  Finally, airlines do not publicly display the number of tickets they offer for sale in each fare class, so it is difficult for rivals to discern actual fares paid by passengers.  This further impedes the ability to assess whether competitors are "cheating" on any putative price agreement regarding airfare.  *Id.* ¶ 29.

68.    Professor Ordover conducted a detailed empirical analysis of actual fares after the Merger, and confirmed that there was no indication of price coordination.  *Id.* ¶ 35.  Further, the

DOJ settlement ameliorated any potential concerns about coordinated effects, because the resultant divestiture of slots at airports to LCCs enhances the ability of LCCs to enter and expand on routes *beyond* those airports at which divestitures occurred. *Id.* ¶¶ 55-59. Professor Ordover also concluded that additional claims made by Plaintiffs regarding ancillary fees and price increases are unsubstantiated and do not indicate that coordination can or does occur. Ancillary fees are not only an efficient pricing mechanism, but they also impede putative coordination in the airline industry. *Id.* ¶ 49. Indeed, there were *more* successful price increase attempts by airlines in the two years *before* the merger than in the two years after it. *Id.* ¶¶ 53-54.

### c.    Expert Daniel Kasper

69.    American's third expert, Daniel M. Kasper, is an industry expert who provides historical context on competition in the airline industry after deregulation in the 1970s, and concludes that "[t]he U.S. airline industry pre-merger was intensely competitive, and remained so following the merger of American and US Airways." Ex. 6 (Mar. 31, 2017 Kasper Report) ¶ 52.

70.    Mr. Kasper concludes that low-cost airlines carriers "have been—and will continue to be—the dominant competitive force and primary determinant of prices in the U.S. domestic airline industry." *Id.* ¶ 32. The expanding market presence of LCCs—39% of domestic airline passengers traveled on LCCs in the third-quarter of 2016, up from 7% in 1990—corresponds with a steady decline in fares, which have fallen 39% (based on price per mile) over that same period. *Id.* ¶ 14. The prevalence of LCCs and, particularly, the rise of *ultra-low cost carriers* such as Spirit and Allegiant, "effectively dictate fares for the vast majority of U.S. domestic passengers." *Id.* ¶¶ 15-18. And while LCCs now "serve 76% of legacy carrier hub-to-hub routes" (*id.* ¶ 32), they are now also penetrating the market for business travelers, one historically served by the legacy airlines (*id.* ¶ 18). Continued expansion by LCCs undermines Plaintiffs' suggestion that entry barriers in the airline industry preclude effective competition. *Id.* ¶¶ 22-32.

71.    Mr. Kasper further concludes that enhanced competition from LCCs, economic shocks such as the Great Recession in 2008-2009, increased fuel prices, and large losses in part from legacy carriers' high operating costs, challenged the economic viability of legacy carriers,

thereby resulting in reduced capacity. *Id.* ¶¶ 33-44. While capacity by legacy airlines fell between 2000 and 2013, the capacity by low-cost carriers has increased by 113% during that same period. *Id.* ¶ 45. Over the past few years, however, with "firmer financial footing, broader network scope achieved through mergers and the strengthening of the U.S. economy (and hence, demand for airline services), American and other large network carriers have been increasing capacity." *Id.*

72.     Mr. Kasper further found that American's larger network post-merger benefits passengers of all types, and especially business and time-sensitive travelers who desire a larger network. *Id.* ¶¶ 46-51. This has enabled the new American to effectively compete with the large network carriers for those passengers, by increasing American's "appeal to travelers and enhanc[ing] the competitiveness of the merged carrier." *Id.* ¶ 52.

73.     Mr. Kasper's ultimate conclusion is that "[i]ncreased competition from the new American and continued vigorous competition from the other dozen or so U.S. domestic airlines—both legacy carriers and LCCs—has maintained robust competition in the domestic U.S. passenger air service market." *Id.*

d.     Andrew Nocella

74.     Deposition testimony by Andrew Nocella, former Senior Vice President of Network, Alliance, and Sales at American, also confirms the procompetitive effects of the Merger.

75.     According to Mr. Nocella, after the Merger, American "had more hubs and could serve more traffic in the country and around the globe." Ex. 7 (Nocella Dep. Tr.) at 12:11-13. This opened up new regions for "American fliers to be able to connect into that they wouldn't have been able to do as effectively pre-merger." *Id.* at 12:15-17. Consequently, the "merger provided a platform that allowed [American] to catch up across the board that each individual airline [i.e., US Airways and AA] did not have." *Id.* at 15:18-20.

76.     Mr. Nocella further explained that since the Merger, American's "fares on average have been lower." *Id.* at 34:16-17; 35:23-24 ("[F]ares are lower today than they have been in the

past since the merger.").  Against those decreasing fares, capacity on American has in fact

increased.  *Id.* at 86:8-12 ("American's mainline capacity has increased. . . .  American offers

more capacity today than it did at the time of the merger.").  And moreover, contrary to the

prediction of Plaintiffs pre-merger, American continued its Advantage Fares program.  *Id.* at

102:22-23 ("After the merger it continued and was expanded.").

> 2.    Plaintiffs Have No Evidence that the Merger Will Enhance Airline
>         Market Power

77.    The potential anticompetitive effect to be examined is primarily whether the

exercise of market power will be enhanced as a result of a merger.  *See Merger Guidelines* § 1

("A merger enhances market power if it is likely to encourage one or more firms to raise price,

reduce output, diminish innovation, or otherwise harm customers as a result of diminished

competitive constraints or incentives.").  The premise for Plaintiffs' case rests entirely on the

notion that this Merger enhances the airline's market power through what are called "coordinated

effects."  Their theory based on outdated caselaw no longer applied by the courts is that the

Merger could  "diminish competition by 'enabling the firms . . . more likely, more successfully, or

more completely to engage in coordinat[ed] interaction.'"  *Oracle*, 331 F. Supp. 2d at 1112

(quoting U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* § 2.1 (Apr.

2, 1992, as revised Apr. 8, 1997)).

78.    The key issues in a "coordinated effects" case are whether the relevant market has

the set of economic conditions that renders it vulnerable to coordinated conduct and whether there

is a credible basis on which to conclude that a merger is likely to enhance that vulnerability.  *See,*

*e.g.*, Merger Guidelines § 7.1.  Coordinated effects are unlikely unless post-merger market

conditions allow competing firms to reach terms of coordination, detect deviations from those

terms, and punish such deviations.  *F.T.C. v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 142 (D.D.C.

2004) (Coordinated interaction "requires both that firms reach terms of coordination that are

profitable and that they be able detect and punish deviations from the coordinated interaction.").

Simple and transparent pricing is generally necessary for an adverse coordinated effects finding

because complicated and opaque pricing makes it difficult to reach and enforce terms of coordination. *Oracle Corp.*, 331 F. Supp. 2d at 1166 ("Without homogeneity or [price] transparency, the market conditions are not conducive to coordinated effects, either tacit or express."). A coordinated effects determination also requires a relatively stable market structure, without "particularly aggressive competitor[s]," *F.T.C. v. Staples, Inc.*, 970 F. Supp. 1066, 1083 (D.D.C. 1997), or easy entry, since "[i]n the absence of significant barriers, a company probably cannot maintain supracompetitive pricing for any length of time," *Baker Hughes*, 908 F.2d at 987 (citing *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 532-33 (1973)).

79.    These are the issues that Dr. Ordover and Professor Carlton studied. Dr. Ordover's empirical analyses of actual fares after the Merger shows that "available fares do not move in a systematic and parallel manner that might be consistent with coordination." Ex. 5 (Mar. 31, 2017 Ordover Report) ¶ 35. To the contrary, "the diversity in contemporaneous prices and price dynamics is what one would expect to see in an industry in which firms are behaving unilaterally and are responding to a multitude of supply and demand factors, some of which are common to some rivals and some of which are idiosyncratic." *Id.*

80.    Professor Carlton provides powerful, uncontested evidence that the Merger has had a *positive* effect on competition. The Merger has resulted in lower fares, increased output and increased capacity. Ex. 4 (Mar. 31, 2017 Carlton Report), Annex B at 18-19 (on "2-to-1" and "3-to-2" overlap routes, fares declined by 12.3 percent, output increased by 20.2 percent, and capacity increased by 19.6 percent after the Merger); Ex. 7 (Nocella Dep. Tr.) at 35:23-24 (American's "fares are lower today than they have been in the past since the merger."); *id.* at 12:11-13 (after the Merger, American "had more hubs and could serve more traffic in the country and around the globe"). Not surprisingly, such post-consummation evidence regarding the competitive effects is given substantial weight in assessing whether a merger violates the antitrust laws. *See United States v. Syufy Enters.*, 903 F.2d 659, 666-69 (9th Cir. 1990) (affirming judgment in favor of defendant where post-acquisition evidence demonstrated insignificant barriers to entry and actual entry of new competitors); *Merger Guidelines* §2.1.1 (listing "Actual

Effects Observed in Consummated Mergers" as evidence considered in an adverse competitive effects analysis and noting, for example, that "[e]vidence of observed post-merger" price changes or effects on consumers "is given substantial weight").

81.    There is nothing on the other side of the ledger.  To avoid summary judgment, Plaintiff must offer at least *some* evidence of adverse competitive effects stemming from the Merger.  They cannot meet that burden.  There is no triable issue here.

### D.    PLAINTIFFS HAVE FAILED TO OFFER EVIDENCE OF ANY ADVERSE COMPETITIVE EFFECTS ON PLAINTIFFS THEMSELVES

1.    <u>Plaintiffs Do Not Fly the Relevant Routes, and Therefore Cannot Satisfy Their Burden of Establishing that They Suffered or Stand to Suffer Any Anticompetitive Injury Due to the Merger</u>

82.    A further critical infirmity with Plaintiffs' case is that *none* of the individual plaintiffs themselves have suffered, or stand to suffer, any anticompetitive injury as a result of the Merger.

83.    At summary judgment, Plaintiffs can no longer rely on mere allegations in their complaint that the Merger has caused, or will cause, future harm; they must set forth *evidence* that raises a genuine issue of material fact as to whether they stand to suffer adverse competitive effects, or in other words, basic injury (and thus standing), as a result of the Merger.  *See, e.g.*, *Mancuso v. Consolidated Edison Co. of N.Y.*, 130 F. Supp. 2d 584, 588 (S.D.N.Y. 2001) ("[P]laintiff bears the burden of providing sufficient evidence of standing to survive a motion for summary judgment.").  There must be "'specific facts' by affidavit or other evidence." *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

84.    Further, because Plaintiffs seek injunctive relief under Section 16 of the Clayton Act, there must be actual evidence that Plaintiffs are "immediately in danger of sustaining some direct injury as a result of the challenged . . . conduct.'" *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983)).  There is no such evidence in the record.

85.     Of the forty named Plaintiffs, only Don Freeland, Wayne Taleff, Gabriel
Garavanian, Jan Marie Brown, Valarie Ann Jolly and Michael Malaney have flown on *any airline*
after the Merger.  One Plaintiff, Rosemary D'Augusta, has not even flown on a commercial
airline since at least 2009.  *See* Ex. 11 (D'Augusta Dep. Tr.) at 23:20-24:11.  Though past injury
would not be enough to establish a likelihood of future injury, here, the Plaintiffs' lack of any past
injury severely undercuts the plausibility of any future harm.  Indeed, "when the allegedly
anticompetitive conduct has been ongoing for a sufficient period of time . . . the plaintiff's failure
to demonstrate actual injury gives rise to a reasonable presumption that, absent a change in
circumstances, the conduct at issue also does not create a risk of future antitrust injury."  *Drug
Mart Pharmacy Corp. v. American Home Products Corp.*, No. 93-CV-5148, 2007 WL 4526618,
at *6 (E.D.N.Y. Dec. 20, 2007).

86.     As for future harm, not a single named Plaintiff has any concrete plans to fly
domestically, on *any* airline, in the future.  Specifically, nearly four years into this case (and after
the Merger):

- Plaintiff Don Freeland has no immediate plans to fly domestically on any airline,
  including American, and expects only to fly a single international flight on
  Swissair in the future.  *See* Ex. 8 (Freeland Dep. Tr.) at 67:24-68:12; 59:18-20.

- Plaintiff Michael Malaney, a travel agent, stated that American and US Airways
  "remain a possible travel choice for me and my clients."  Ex. 9 (Pls.' Resp. to
  Defs.' 1st Set of Interrogatories) at 25 ¶ (t).  But he subsequently admitted that he
  had no plans to fly those airlines and had not booked any tickets on them for
  future travel.  *See* Ex. 10 (Malaney Dep. Tr.) at 55:23-56:1.[16]

- Plaintiff Rosemary D'Augusta testified that future air travel on any route is "[a]
  possibility," but she has "nothing confirmed."  Ex. 11 (D'Augusta Dep. Tr.) at
  48:13-15.  She clarified that "[n]othing is booked.  Nothing is concrete at the
  moment."  *Id.* at 53:10.

- Plaintiff Valarie Ann Jolly testified that she had "no specific travel plans" with
  regard to domestic air travel on American Airlines and had not booked any
  tickets.  Ex. 12 (Jolly Dep. Tr.) at 81:9-16.

---

[16] *Id.* ("Q: . . .    [Y]ou have no plans right now or haven't booked any tickets for future travel; correct? A:
That is correct.").

- Plaintiff Wayne Taleff testified that he had "some trips coming up, but more so, I imagine - - I mean, we plan on - - I want to go take trips to other destinations - - *nothing planned right now* - - but more extensively upon retirement."  Ex. 13 (Taleff Dep. Tr.) at 77:16-20 (emphasis added).

- Plaintiff Brenda Davis merely "expect[s] to continue flying on American in the future."  Ex. 9 at 17 ¶ (j).  But Plaintiffs have presented no evidence of any concrete travel plans for Ms. Davis.

- Plaintiff Gabriel Garavanian identified American flights between Boston and Dallas as some that would be negatively impacted by the merger.  *See id.* at 20 ¶ (n).  But when asked if he had specific plans to actually fly that route in the future, he testified:  "I would like to, if there is a reason for me to go to Dallas."  Ex. 14 (Garavanian Dep. Tr.) at 116:22-23.  He further confirmed that he had no future plans to fly on the numerous routes identified in the First Amended Complaint (at FAC ¶¶ 139-40) as those that allegedly would be affected by the merger.  *See id.* at 89:22-24 ("Q  Do you intend to fly any of these routes in the near future?  A  On most of those paths, no, I doubt it.").

87.     Plaintiffs are not active consumers of air travel—at least not on any cognizable relevant routes—and therefore do not face any threat, imminent or even remote, of an antitrust injury.  *See Doctor's Hosp. of Jefferson, Inc. v. Se. Med. Alliance*, 123 F.3d 301, 305 (5th Cir. 1997) (antitrust injury for standing purposes "should be viewed from the perspective of the *plaintiff's position in the marketplace*, not from the merits-related perspective of the impact of a defendant's conduct on overall competition") (emphasis added).  Absent concrete future plans to fly at all, Plaintiffs' unsupported allegations of "increases in prices," "curtail[ment] of capacity," and "further concentrat[ion] [of] the industry toward ultimate monopoly," FAC ¶ 3, amount to nothing more than the kind of abstract, conjectural, threatened injury that is insufficient to confer standing.  *Lyons*, 461 U.S. at 107; *Shain*, 356 F.3d at 215; *see also Am. Med. Ass'n v. United Healthcare Corp.*, No. 00 Civ. 2800 (LMM), 2007 WL 683974, at *6 (S.D.N.Y. 2007) ("[P]laintiffs have antitrust standing under Section 16 only when faced with a 'significant threat' of injury.").

### 2.     None of Plaintiffs' Claimed "Harms" Are Tied to this Merger

88.     As this Court has already held, not every random complaint about the airline industry is to be considered an adverse effect of this Merger.  *See In re AMR Corp.*, 527 B.R. at

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
San Francisco

888-89.  "The threshold issue in an antitrust case brought under Section 16 . . . is whether the private plaintiff is threatened with loss or damage . . . of the type the antitrust laws were designed to prevent *and that flows from that which makes defendants' act unlawful.*"  *R.C. Bigelow, Inc. v. Unilever N.V.*, 867 F.2d 102, 107 (2d Cir. 1989) (emphasis added).  "[A] party seeking injunctive relief under [Section] 16 must demonstrate that the injury he . . . is threatened with[] proximately results from the antitrust violation."  *Optivision, Inc. v. Syracuse Shopping Ctr. Assocs.*, 472 F. Supp. 665, 671 (N.D.N.Y. 1979).

89.    None of the named Plaintiffs has been able to adequately describe *any* real connection between any "injuries" they supposedly suffered and the Merger.  For example, Plaintiff Michael Malaney, one of the named trial witnesses designated to support their case, was unable to provide an example of personal harm suffered as a result of the Merger:

> Q. . . . : Mr. Malaney, you're aware that the merger of US Airways and American closed on December 9, 2013; correct?
>
> A.    Yes.
>
> Q.    And since that time, you have not personally been damaged or harmed because of the merger, have you? . . .
>
> [A.]    Well, I think there's a lot of fear that we have of only having three legacy carriers and how it will affect travel. So not having been damaged, yeah, I'm scared to death.
>
> Q. . . . : So taking them one at a time, you have not been damaged or harmed personally since the closing of the merger as of this point; correct?
>
> A.    Correct.

Ex. 10 (Malaney Dep. Tr.) at 55:8-22.  The mere "fear" that the Merger could "affect travel" does not raise a genuine issue of fact over whether it actually poses an imminent threat to competition.  *See Amnesty Int'l USA v. Clapper*, 667 F.3d 163, 179 (2d Cir. 2011) ("[P]laintiffs only profess a *fear* of [unlawful conduct], which is plainly insufficient to establish standing.") (emphasis in original).

90.    Similarly, for the few instances in which any of the named Plaintiffs claimed to have paid a higher price for flights on a certain route or experienced some other tangible injury, the supposed harms they were able to identify were unrelated to the Merger.  For example, Gabriel Garavanian claimed that airfare increases were due to the decrease in flights between Manchester and Baltimore after the Merger, but then clarified during his deposition that the increases in price he apparently endured actually began in 2005 or 2006, six years *before* the Merger:

> Q  . . . [T]ell me whether you recall the price you paid for each of those flights before and after the merger.
>
> A  Before the merger, I had done Southwest and US Air, Manchester to Baltimore. And when Southwest first got in the market, we were paying probably about 130 bucks round trip. And then, then they went up a little bit and started becoming around $200 round trip.
>
> Q  This was before the merger, right?
>
> A  Before the merger. We're talking 2005, 2006. Okay. That's why I was a little confused.  After the merger, the only ones that really had a Manchester/Baltimore for that 250 to $300 price, if not a little bit cheaper, was Southwest. It was never really available on the US Air/American, or it's now American obviously.

Ex. 14 (Garavanian Dep. Tr.) at 103:1-17.  When pressed on whether they could actually tie any of their claimed "harms" to the Merger, numerous other Plaintiffs admitted that they could not. For example:

- Plaintiff Rosemary D'Augusta:  "Q  So have you personally experienced any harm because of the U.S. Airways and American Airlines merger?  . . .  A  No." Ex. 11 (D'Augusta Dep. Tr.) at 64:8-15.

- Plaintiff Jan Marie Brown:  "Q . . . [S]itting here today, you have no facts to support that [your inability to rebook flights for your clients] was actually, in fact, because of the merger? . . . [A]  I guess not." Ex. 15 (Brown Dep. Tr.) at 138:6-10; *see also id.* at 94:11-17 ("Q . . . Can[] [you] cite a specific flight that you've actually flown on in which you've experienced higher fares because of the US Airways/American Airlines merger? . . . THE WITNESS:  I cannot say specifically, no.")

- Plaintiff Lisa McCarthy:  "Q. Can you give me a specific fact of how the American Airlines-US Airways merger has harmed your business today? . . . [A.] I don't have a fact in front of me right now. I have nothing in front of me on the table to give you today." Ex. 16 (McCarthy Dep. Tr.) at 61:3-21.

- Plaintiff Don Freeland:  "Q . . . [Y]ou can't point to any specific instance of harm that you've experienced because of the merger between US Airways and American Airlines?  A.  I can't point to a specific instance, no."  Ex. 8 (Freeland Dep. Tr.) at 65:1-5.

91.     The Clayton Act does "not constitute a broad restitutionary scheme for injuries not closely related to the violation but caused by other effects, desirable or not . . . ."  *Alberta Gas Chemicals, Ltd. v. E.I. Du Pont de Nemours & Co.*, 826 F.2d 1235, 1240 (3d Cir. 1987).  Courts "do not extend a carte blanche to those unaffected and untouched by the substantive [antitrust] violation.  The ability to pursue injunctive relief under section 16 is dependent on a showing of threatened loss or injury *from the alleged antitrust violation*. Proximity between the plaintiff's injury and the antitrust violation, albeit necessary to a lesser degree, is still required."  *Schoenkopf v. Brown & Williamson Tobacco Corp.*, 637 F.2d 205, 210 (3d Cir. 1980).

92.     Just as they failed to do at the pleadings stage, Plaintiffs still cannot produce any evidence to "connect the dots" even with the benefit of discovery.  Summary judgment is appropriate.  *See Disenos Artisticos E Industriales, S.A. v. Work*, 676 F. Supp. 1254, 1280 (E.D.N.Y. 1987) (granting summary judgment on plaintiff's Section 16 claim for failing "to allege, much less demonstrate, any significant threat of injury *resulting* from counterdefendants' alleged price-fixing scheme" (emphasis added)).

3.     <u>Plaintiffs' Failure to Prove Adverse Competitive Effects Only
Underscores They Are Not the Appropriate Antitrust Plaintiffs</u>

93.     Plaintiffs' failure to adduce any evidence of adverse competitive effects, much less those that caused (or threatened to cause) actual antitrust injury, only reinforces how they are not the proper antitrust plaintiffs.  Despite purporting to be consumers, Plaintiffs are actually, first and foremost, a group of current and former travel agents.  Their inability to demonstrate any adverse competitive effects, and thus anticompetitive injury, is attributable to the fact that they attempt to stand in the shoes of consumers despite harboring economic incentives far removed from that of a typical air traveler.  *See* Ex. 18 (Plaintiff Taleff stating that he did not "know that he would notice

if a fare went up $10 or $20," but that he "thinks it's a great idea."); *see also* Ex. 13 (Taleff Dep. Tr.) at 85:17-86:10.[17]

94.    The Second Circuit has "drawn a line excluding those who have suffered economic damage by virtue of their relationships with 'targets' . . . , rather than by being 'targets' themselves." *Calderon Enters. Corp. v. United Artists Theatre Circuit, Inc.*, 454 F.2d 1292, 1295 (2d Cir. 1971); *see also Nassau County Ass'n of Ins. Agents, Inc. v. Aetna Life & Cas. Co.*, 497 F.2d 1151, 1154 (2d Cir. 1974), *cert. denied*, 419 U.S. 968 (1974) (associations of insurance agents that "neither do business with the defendant insurance companies nor compete with them" lacked standing to challenge the termination of agency contracts with insurance agents). Under Section 16, "a plaintiff must still demonstrate that injunctive relief is necessary to prevent injury to *its* interests *rather than those of others*." *Antoine L. Garabet, M.D., Inc. v. Autonomous Tech. Corp.*, 116 F. Supp. 2d 1159, 1170 (C.D. Cal. 2000) (emphasis added)). As discussed above, Plaintiffs cannot do so. Plaintiffs do not in fact have antitrust standing to advance these claims— and their effort to champion the interests of other consumers not present before the Court should be rejected. *See In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 160 (2d Cir. 2016) (antitrust standing requires a plaintiff to be "a participant in 'the very market directly distorted by the antitrust violation.'" (quoting *SAS of P.R., Inc. v. P.R. Tel. Co.*, 48 F.3d 39, 46 (1st Cir. 1995))).

E.    **TO THE EXTENT PLAINTIFFS ASSERT A SECTION 2(C) CLAIM, SUMMARY JUDGMENT IS ALSO WARRANTED ON THAT CLAIM**

95.    Finally, we must briefly address what has been a complete afterthought in Plaintiffs' case since inception—a purported violation of Section 2(c) of the Robinson-Patman

---

[17] Plaintiffs' interests are, if anything, *at odds* with those who would have standing to challenge the Merger—the consumer traveling the affected routes. As many of them admitted in deposition, as travel agents first, their primary economic interests lie not in affordable airfare or better competition in the airline industry, but the sustainability of commissions and/or surcharges paid to travel agents. *See, e.g.*, Ex. 10 (Malaney Dep.) at 50:1-4 ("Since the day they eliminated commissions that they pay travel agents, I calculated my loss at $40 a ticket. So that's what I started charging, and I haven't changed."); Ex. 8 (Freeland Dep.) at 76:2-5 ("Q. You started charging service fees to compensate for the commission you weren't receiving from the airlines? A. Correct.").

Act, 15 U.S.C. § 13(c), which prohibits false commissions or brokerage fees as a disguised form of price discrimination.  The *only* mention of this "claim" in the entirety of the Complaint is in the introductory preamble, which states in part that Plaintiffs brought this action "to prevent a threatened violation of Section 2(c) of the Clayton Antitrust Act [sic]."  Plaintiffs do not include a separate "cause of action" or "violation alleged" in their Complaint, yet when asked by counsel just yesterday to confirm that they are not bringing a separate claim under Section 2(c), insisted that they are.  To the extent the Court finds that Plaintiffs have even pled such a claim, it should also be summarily adjudicated in Defendants' favor.

96.    First, Plaintiffs have never articulated what exactly they are challenging under Section 2(c), much less adduced evidence to support such a claim under the law.  The best we can surmise is that Plaintiffs' Section 2(c) claim is related to the severance payment made to former American Airlines CEO Thomas Horton.  *See* FAC ¶¶ 69-71.  That, however, makes little sense as Section 2(c) prohibits false commissions or brokerage fees; it was enacted to address a specific practice of using "dummy brokerages" whereby large retail buying groups mandated that suppliers pay fees to "dummy brokers" that served to effectively reduce the price the retailer paid for the goods.  *See* 15 U.S.C. § 13(c); *Blue Tree Hotels Inv. (Canada) Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 221 (2d Cir. 2004).  A severance agreement for executive services indisputably and actually rendered by American Airlines' ("AA") former CEO—an agreement fully disclosed, fully public, and analyzed at length throughout the American bankruptcy proceeding, as this Court knows—literally has nothing to do with the core conduct prohibited under Section 2(c).

97.    Second, Plaintiffs also cannot establish any violation of Section 2(c) based on a theory of "commercial bribery," even if such a theory were allowable under the Robinson-Patman Act.[18]  "Commercial bribery" is specifically limited to, and defined as, 'confer[ring], or offer[ing]

---

[18]   The Second Circuit has not reached the question of whether a "commercial bribery" theory can form the basis of a claim under Section 2(c).  *Blue Tree Hotels*, 369 F.3d at 221.  But some district courts in the Circuit have recognized that it can, under limited circumstances.  *See, e.g.*, *Bristol-Meyers Squibb Co.*, 948 F. Supp. 2d at 357-59; *United Magazine Co. v. Murdoch Magazines Distribution, Inc.*, 146 F. Supp.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

or agree[ing] to confer, any benefit upon any employee, agent or fiduciary ***without the consent of the latter's employer or principal***, with intent to influence his conduct in relation to his employer's or principal's affairs.'" *Id.* at 221-22 (quoting N.Y. Penal Law § 180.00) (emphasis added); *Am. Fed'n of State, County and Mun. Employees Dist. Council 37 Health & Sec. Plan v. Bristol-Meyers Squibb Co.*, 948 F. Supp. 2d 338, 357 (S.D.N.Y. 2013) ("The essence of commercial bribery is the corruption of the duty that an agent owes his principal.").

98.     Plaintiffs have no evidence to support these elements.  It is undisputed that Mr. Horton's severance was paid *with* the unequivocal consent from the full board of directors of his employers. Ex. 17 (Horton Dep. Tr.) at 17:25-18:20.  The inclusion of his severance in the Bankruptcy Plan was "approved by the creditors committee[,] . . . [the] boards of both companies, and as part of the merger agreement it was approved by the shareholders of US Airways and the creditors of American Airlines." *Id.* at 17:25-18:15.  This alone is dispositive as a matter of law on any conceivable claim of commercial bribery.  *See Dayton Superior Corp. v. Marjam Supply Co.*, No. 07 CV 5215 DRH WDW, 2011 WL 710450, at *3 (E.D.N.Y. Feb. 22, 2011) (dismissing Section 2(c) counterclaim premised on a theory of commercial bribery for failure to allege a lack of employer consent); *June Fabrics, Inc. v. Teri Sue Fashions, Inc.*, 194 N.Y.S.2d 877, 882 (N.Y. Sup. Ct. 1948) (interpreting predecessor statute and noting "[i]t would seem there could be no violation of the statute if the principal or employee had knowledge and either approved or condoned the act of his employee or agent").

99.     In addition, as this Court is aware, Mr. Horton's severance was openly and publicly addressed in the lead up to the confirmation of the Chapter 11 Plan.  And while the Court ultimately excluded Mr. Horton's severance from the Plan, *see In re AMR Corp.*, 497 B.R. 690, 699 (Bankr. S.D.N.Y. 2013), it did so because it did not see a need to approve a severance

---

2d 385, 397 (S.D.N.Y. 2001); *Philip Morris, Inc. v. Grinnell Litographic Co., Inc.*, 67 F. Supp. 2d 126, 130-31 (E.D.N.Y. 1999) (noting that § 2(c) has been construed "to cover cases of commercial bribery involving a breach of a fiduciary duty by the buyer's agent, a situation akin to the one at bar"); *Roosevelt Sav. Bank v. Eveready Maint. Supply Co.*, No. 87 Civ. 245, 1987 WL 30194, at *1 (E.D.N.Y. Dec. 2, 1987) (same).

package when, post-merger, the board of directors of the newly formed company could decide to provide one. That is in fact what happened: after the Merger, the board of the newly formed American Airlines Group fully vetted and consented to a severance package that Mr. Horton ultimately received. Ex. 17 (Horton Dep. Tr.) at 18:15-20. This in no way resembles the paradigmatic types of duplicitous, concealed, commercial bribery necessary to support a Section 2(c) claim. This "claim" fails as a matter of law.

## V.    **CONCLUSION**

100.    For the reasons set forth above, Defendants respectfully requests that this Court grant summary judgment on Plaintiffs' claims.

Dated:  May 12, 2017

By:   /s/ Sadik Huseny
　　　　Daniel M. Wall (admitted *pro hac vice*)
　　　　Sadik Huseny (admitted *pro hac vice*)
　　　　LATHAM & WATKINS LLP
　　　　505 Montgomery Street, Suite 2000
　　　　San Francisco, CA 94111-6538
　　　　Telephone: (415) 391-0600
　　　　Facsimile: (415) 395-8095

　　　　*Attorneys for Defendant Merged Entity*
　　　　*American Airlines Group Inc.*