Joseph M. Alioto (SBN 42680)
*Admitted Pro Hac Vice*
Jamie L. Miller (SBN 271452)
*Admitted Pro Hac Vice*
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, CA  94104
Telephone: (415) 434-8900
Facsimile: (415) 434-9200
Email:  jmalioto@aliotolaw.com
          jmiller@aliotolaw.com

HEARING DATE & TIME: TBD
OBJECTION DEADLINE:   7/28/17

*Attorneys for the Clayton Act Plaintiffs*
[ADDITIONAL COUNSEL LISTED ON LAST PAGE]

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE:                                                  ) | |
| )| |
| **AMR CORPORATION, et al.**                 ) | **Case No:  11-15463-SHL** |
| )| |
| Debtors,                    ) | **Chapter 11** |
| )| |
| )| **(Jointly Administered)** |
| **CAROLYN FJORD, ET AL.,**                ) | |
| )| **Adversary No. 13-01392-SHL** |
| Plaintiffs,              ) | |
| )| |
| v.                          ) | |
| )| |
| **AMR CORPORATION, AMERICAN**      ) | |
| **AIRLINES, and US AIRWAYS GROUP,**   ) | |
| **INC. and US AIRWAYS, INC.,**              ) | |
| )| |
| Defendants.               ) | |
| )| |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

ARGUMENT ......................................................................................................... 2

I.      STANDARD OF REVIEW ......................................................................... 2

II.     SUPREME COURT PRECEDENT REQUIRES THIS COURT TO GRANT
SUMMARY JUDGMENT IN PLAINTIFFS' FAVOR ............................... 3

      A.     Because Congress Intended to Encourage Private Plaintiffs to Seek
Divestiture as a Remedy, Section 16 Must be Construed and
Applied with that Purpose in Mind ................................................... 3

      B.     Congress Intended to Arrest a Trend Towards Concentration in its
Incipiency ......................................................................................... 4

      C.     Under Long-Standing Supreme Court Precedent, Plaintiffs Have
Established the Irrebuttable Presumption that the Elimination of USAir
Has Resulted in and Will Continue to Result in the Lessening of
Competition and Will Tend to Create a Monopoly ........................... 5

III.    EVEN UNDER A "MODERN VIEW" PLAINTIFFS HAVE ESTABLISHED A
*PRIMA FACIE* CASE ............................................................................... 12

      A.     Plaintiffs Have Shown Evidence of Substantial Adverse
Competitive Effects from the Merger, as Well as Evidence That
Lessening of Competition Will Have Continuing
Anticompetitive Effects on the Market ............................................ 13

IV.    DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON
RELEVANT MARKET ............................................................................. 30

      A.     Defendants' Motion Makes No Distinction Between a Product Market and
a Geographic Market ....................................................................... 31

      B.     The Lack of a Precisely Defined Geographic Market is not an Adequate
Ground on Which to Grant Summary Judgment in a Section 7 Case..
.......................................................................................................... 33

      C.     Defendants Admit that the National Market is a Relevant Geographic
Market for Antitrust Purposes ......................................................... 34

D.      Because Plaintiffs Have Not Alleged "Airport Pairs" as Proposed Geographic Markets in this Case, Defendants Arguments are Irrelevant ........................................................................................ 38

V.      PLAINTIFFS HAVE STANDING TO BRING THIS ACTION ................ 42

A.      Section 16 of the Clayton Act Requires Only a Threat of Injury .... 42

B.      Plaintiffs are Consumers of Air Travel in the United States and are Threatened with Injury to Themselves ............................................. 43

C.      Plaintiffs are Threatened with the Type of Injury that the Antitrust Laws were Intended to Prevent ....................................................... 46

D.      Plaintiffs Have Standing as Travel Agents ...................................... 52

VI.     THE PUBLIC INTEREST CAN ONLY BE SERVED BY DIVESTITURE ........................................................................................... 54

VII.    DEFENDANTS VIOLATED SECTION 2(C) OF THE ROBINSON-PATMAN ACT WHEN THEY PAID HORTON $20 MILLION TO AGREE TO THE MERGER ....................................... 55

A.      The $20 Million Payment Was Not Earned by Horton.................... 58

B.      The Payment was Made in Exchange for Horton's Agreement to the Merger ..................................................................................... 59

C.      The Illegal Payment was Approved and Paid by the New Company, not by Horton's Employer ...................................... 59

CONCLUSION ................................................................................................. 60

# TABLE OF AUTHORITIES

## *CASES*

*AGC. Sullivan v. DB Invs., Inc.,*
   667 F.3d 273 (3d Cir. 2011)...................................................................52

*Amnesty Am. v. Town of W. Hartford,*
   361 F.3d 113 (2d Cir. 2004) ....................................................................3

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986)................................................................................3

*Binder & Binder PC v. Barnhart,*
   481 F.3d 141 (2d Cir. 2007) ...............................................................3, 31

*Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.,*
   369 F.3d 212 (2d Cir. 2004)..............................................................56, 57

*Brown Shoe Co. v. United States,*
   370 U.S. 294 (1962) .......................................................................passim

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
   429 U.S. 477 (1977) .............................................................................46

*Calderon Enters. Corp., v. United Artists Theatre Circuit, Inc,.*
   454 F.2d 1292 (2d Cir. 1971)...............................................................52

*California v. American Stores,*
   492 U.S. 1301 (1989)...........................................................................47

*California v American Stores,*
   495 U.S. 271 (1990).......................................................................passim

*Cargill, Inc. v. Monfort of Colo., Inc.,*
   479 U.S. 104 (1986)........................................................................43, 53

*Concord Associates, L.P., v. Entertainment Properties Trust,*
   817 F.3d 46 (2d Cir. 2016)....................................................................41

*Continental Airlines v. American Airlines,*
   Case Nos. Civ. A. Nos. G–92–259, G–92–266,
   1993 WL 379396 (S.D. Tex. 1993) .................................................33, 35

*Dayton Superior Corp. v. Marjam Supply Co. Inc.,*
   No. 07-cv-5215 (E.D.N.Y. Feb. 22, 2011) ...........................................57

*Drug Mart Pharmacy Corp., v. American Home Products Corp.,*
   2007 WL 4526618 (E.D.N.Y. Dec. 20, 2007) .......................................43

*Freedom Holdings, Inc. v. Cuomo,*
    592 F.Supp.2d 684 (S.D.N.Y. 2009) ....................................................................42

*F.T.C. v. H.J. Heinz Co.*,
    246 F.3d 708 (D.C. Cir. 2001) .............................................................................23

*FTC v. University Health, Inc.,*
    938 F.2d 1206 (1991).............................................................................................23

*Hayden Pub. Co. v. Cox Broadcasting Corp.*,
    730 F.2d 64 (2d Cir. 1984)....................................................................................31

*Hospital Corp. of America v. Federal Trade Commission,*
    807 F.2d 1381 (7th Cir. 1986) .............................................................................11

*In re Air Passenger Computer Reservation Systems,*
    694 F.Supp. 1443 (C.D. Cal. 1988) .....................................................................35

*In re AMR Corp.*,
    497 B.R. 690 (Bankr. S.D.N.Y. 2013)..................................................................58

*In re AMR Corp.,*
    527 B.R. 874 (Bankr. S.D.N.Y. 2015)..................................................................41

*In re Domestic Air Transportation Antitrust Litigation,*
    137 F.R.D. 677 (N.D. Ga. 1991)...........................................................................32

*In re Domestic Airline Travel Antitrust Litigation,*
    --- F.Supp.3d ----2016 WL 6426366, *12 (D.DC. October 28, 2016)....................33

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    593 F. Supp. 2d 29 (D.D.C. 2008) ........................................................................53

*Kraft v. Staten Island Boat Sales, Inc.*
    715 F. Supp. 2d 464 (S.D.N.Y. 2010)....................................................................3

*Malaney v. UAL Corp., United Airlines, Inc.,*
    2011 WL 6845773 (N.D. Cal. Dec. 29, 2011) .......................................................32

*Mathias v. Daily News, L.P.*,
    152 F. Supp.2d 465 (S.D.N.Y. 2001)..............................................................47, 51

*Michael Anthony Jewelers, Inc. v. Peacock Jewelry, Inc.,*
    795 F.Supp. 639 (S.D.N.Y. 1992) ........................................................................36

*Monsieur Touton Selection v. Future Brands, LLC,*
    2006 WL 2192790 (S.D.N.Y. August 1, 2006) .....................................................58

*Nader v. Air Transport Association of America*,
    426 F.Supp. 1035 (S.D.N.Y. 1977) ................................................................. 42, 45

*New Hampshire v. Maine*,
    532 U.S. 742 (2001) .............................................................................................41

*Reilly v. Hearst Corp.*,
    107 F.Supp.2d 1192 (N.D.Cal. 2000) ............................................................45, 46

*Reilly v. MediaNews Group, Inc.*,
    2007 WL 1068202 (N.D. Cal. Apr. 10, 2007) ......................................................46

*Stanley Works v. FTC*,
    469 F.2d 498 (2d Cir. 1972)...................................................................4, 11, 12, 50

*St. Alphonsus Medical Center v. St. Lukes Health System Ltd*,
    778 F.3d 775 (9th Cir. 2015) ...............................................................................4, 16

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*,
    512 F.2d 1264 (9th Cir.1975) ...............................................................................36, 41

*United States v. US Airways Group, Inc.*,
    Case No. 1:13-cv-1236-CKK (2013) ...................................................................17

*United States v. Aluminum Company of America*,
    377 U.S. 271 (1964)...........................................................................................4, 7

*United States v. Baker Hughes, Inc.*,
    908 F.2d 981 (D.C.Cir.1990) ............................................................................... 16

*United States v. Continental Can Co.*,
    378 U.S. 441 (1964)...........................................................................................7, 8, 32

*United States v. Falstaff Brewing Corp.*,
    410 U.S. 526 (1973)........................................................................................... 9, 10

*United States v. Pabst Brewing Co.*,
    384 U.S. 546 (1966)...........................................................................................9, 34

*United States v. Phila. Nat'l Bank*,
    374 U.S. 321 (1963)...................................................................................... passim

*United States v. Topco Associates*,
    405 U.S. 596 (1972) ...........................................................................................54

*United States v. Von's Grocery Co.*,
    384 U.S. 270 (1966)...........................................................................................4, 8

*Zenith Radio Corp.* v. *Hazeltine Research, Inc.*,
    395 U.S. 100 (1969) .................................................................................. 43 46, 54

## *RULES AND STATUTES*

Fed. R. Civ. P. 56(a) ............................................................................................. 3

Fed. R. Evid. 201(b)(2) and (c)(2) ..................................................................... 33

Fed. R. Evid. 702(b) and 703 ............................................................................. 19

§ 7 of the Clayton Antitrust Act, 15 U.S.C. § 18 ......................................... passim

§ 16 of the Clayton Antitrust Act, 15 U.S.C. § 26 ....................................... passim

§ 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c) ..................................... 55

## *OTHER AUTHORITY*

1 Callmann on Unfair Comp., Tr. & Mono. § 4:49, Enforcement of private rights—Standing to sue, (4th Ed.) .................................................................................................... 42

1 Callman on Unfair Comp., Tr. & Mono. § 4:24 (4th Ed.) ............................... 54

TO THE HONORABLE SEAN H. LANE
UNITED STATES BANKRUPTCY JUDGE:

Plaintiffs *Carolyn Fjord, et al.* ("Plaintiffs"), hereby move this Court for an Order

entering Summary Judgment in favor of the Plaintiffs, and further, hereby oppose Defendants'

Motion for Summary Judgment as follows:

## **INTRODUCTION**

The law of competition in this country, as mandated by Congress and as applied by the

Supreme Court, has consistently and repeatedly repudiated attempts by rivals to eliminate actual

or potential competition among themselves, whether by acquisition, merger, or by other

contrivance.  It has always been and even now remains the intent of Congress, as interpreted by

the Supreme Court, to favor business growth through competition over unbridled expansion

through acquisition or merger.[1]   This resolve was and is based on sound and constructive

economic, social and political policies and principles:

> Internal expansion is more likely to be the result of increased demand for the
> company's products and is more likely to provide increased investment in
> plants, more jobs and greater output. Conversely, expansion through merger is
> more likely to reduce available consumer choice while providing no increase
> in industry capacity, jobs or output. It was for these reasons, among others,
> Congress expressed its disapproval of successive acquisitions. Section 7 was
> enacted to prevent even small mergers that added to concentration in an
> industry." *Brown Shoe Co. v. United States*, 370 U.S., 294, 346 fn.72 (1962)

In order to further these important goals, Congress granted extraordinary power to private

plaintiffs to challenge any such acquisition if threatened with potential harm under Section 7.

That authority grants to an individual the power and the right to seek the extreme remedy of

divestiture, if necessary, to eliminate the harm. When lower courts have questioned Congress'

intent to grant such power to individuals to compel divestiture, questioning their right to second

---

[1] As Judge Alsup of the Northern District of California recently observed in the challenge before him to the acquisition of Virgin America by Alaska Airlines: "I don't see -- you are acting like you got some kind of God-given right to close this merger. You don't. The public -- the public may have an interest in enjoining this." *Grace, et al. v. Alaska Airlines, et al.*, United States District Court for the Northern District of California, Case No. 3:16-cv-05165-WHA, Dkt. No. 27 at p. 28:5-8.  (October 19, 2016, Hearing.)

1

guess antitrust law enforcement agencies like the FTC or the Department of Justice, the Supreme Court has unanimously and soundly reversed the lower courts.

In *California v American Stores*, 495 U.S. 271, 284 (1990) the Supreme Court wrote in unmistakable and unequivocal language that "Private enforcement [of Section 7] of the Act was in no sense an afterthought: it was an integral part of the congressional plan for protecting competition. [cite omitted] Congress also made express its view that divestiture was the most suitable remedy in a suit for relief from a §7 violation." The Court declared that "the plain text of §16 authorizes divestiture decrees to remedy §7 violations" (495 U.S. at 282-283) and that, "We have recognized when construing §16 that it was enacted 'not merely to provide private relief, but … to serve as well the high purpose of enforcing the antitrust laws.'" [cite omitted] The Court continued, "by construing §16 to encompass divestiture" the other provisions of §16 "manifest a clear intent to encourage private litigation against anticompetitive mergers …. To show that a merger is unlawful, a plaintiff need only prove that its effect 'may be substantially to lessen competition.'" The Court dispelled the notion that divestiture may be difficult to administer by stating: "Divestiture has been called the most important of antitrust remedies. It is simple, relatively easy to administer, and sure. It should always be in the forefront of a court's mind when a violation of §7 has been found."

Finally, a unanimous Court specifically and clearly held that "Section 16, construed to authorize a private divestiture remedy when appropriate in light of equitable principles, fits well in a statutory scheme that favors private enforcement, subjects mergers to searching scrutiny, and regards divestiture as the remedy best suited to redress the ills of an anticompetitive merger." *American Stores*, 495 U.S. at 272.

## ARGUMENT

### I.    STANDARD OF REVIEW

Summary judgment is proper only "if the movant shows that there is no genuine dispute

2

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court "'is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments.'" *Kraft v. Staten Island Boat Sales, Inc.* 715 F. Supp. 2d 464, 472 (S.D.N.Y. 2010) (quoting *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 122 (2d Cir. 2004); *accord Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). "[I]f there is any evidence in the record from any source from which a reasonable inference in the [non-moving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment." *Binder & Binder PC v. Barnhart,* 481 F.3d 141, 148 (2d Cir. 2007) (internal quotations omitted).

## II.    SUPREME COURT PRECEDENT REQUIRES THIS COURT TO GRANT SUMMARY JUDGMENT IN PLAINTIFFS' FAVOR

### A.    Because Congress Intended to Encourage Private Plaintiffs to Seek Divestiture as a Remedy, Section 16 Must be Construed and Applied with that Purpose in Mind

That divestiture is, in fact, the kind of injunctive relief available to private plaintiffs within the meaning of Section 16 has been decided by the Supreme Court. *American Stores*, 495 U.S. at 275. The Court went on to observe that the divestiture provisions of the Act have become an important part of Congress' plan for enforcement of the antitrust laws because the Act encouraged suits by private plaintiffs:

> The Act's other provisions manifest a *clear intent to encourage vigorous private litigation against anti-competitive mergers*. Section 7 itself creates a relatively expansive definition of antitrust liability: To show that a merger is unlawful*, a plaintiff need only prove that its effect "may be substantially to lessen competition."* Clayton Act §7, 38 Stat. 731, 15 U. S. C. §18 (emphasis supplied). See *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962) . . ..

> Section 16, construed to authorize a private divestiture remedy when appropriate in light of equitable principles, *fits well in a statutory scheme that <u>favors private enforcement</u>, subjects mergers to <u>searching scrutiny</u>, and regards divestiture as the remedy best suited to redress the ills of an anticompetitive merger."*

3

*Id.* at 284-285.  [emphasis added].

###### B.  Congress Intended to Arrest a Trend Towards Concentration in its Incipiency

Section 7 of the Clayton Antitrust Act provides in pertinent part as follows: "No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital … where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition *may be substantially to lessen competition*, or *tend to create a monopoly*." 15 U.S.C. § 18.  [emphasis added].  In enacting §7 of the Clayton Act, "Congress sought to preserve competition among many small businesses *by arresting a trend towards concentration in its incipiency* before that trend developed to the point that a market was left in the grip of a few big companies." *United States v. Von's Grocery Co.*, 384 U.S. 270, 277 (1966).  [emphasis added].  "Lessening of competition" has been interpreted as the elimination of a competitor.  *American Stores*, 495 U.S. 271, and "substantial lessening" has been interpreted as the elimination of as little as 1.3% of the market.  *United States v. Aluminum Company of America (Alcoa)*; *see also*, *Brown Shoe Company v. United States,* 370 U.S. at 297 (1962) (2% of the market); *Stanley Works v. FTC*, 469 F.2d 498 (2d Cir. 1972) (1% of the market).

Furthermore, the Clayton Act prohibits an acquisition when the effect of such acquisition "*may be*" substantially to lessen competition.  Congress purposefully used the phrase "may be" because the Clayton Act was designed to "arrest restraints of trade in their incipiency and before they develop into full-fledged restraints." *Brown Shoe*, 370 U.S. at 323 n.39.  Indeed, Section 7 requires "a prediction, and doubts are to be resolved against the transaction." *American Stores,* 495 U.S. at 282 n.8. [2]

---

[2] Recently, in 2015, the Ninth Circuit held in *St. Alphonsus Medical Center v. St. Lukes Health System Ltd*, 778 F.3d 775 (9th Cir. 2015) that "Section 7 does not require proof that a merger or other acquisition has caused higher prices in the affected market. All that is necessary is that the merger create an appreciable danger of such consequences in the future." *Id.* at 788.

4

Transactions that result in "undue" concentration in a relevant market are presumed to be unlawful. *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 363 (1963). "[I]f concentration is already great, the importance of preventing even slight increases in concentration and so preserving the possibility of eventual deconcentration is correspondingly great." *Id*. at 365 n.42. The line of Supreme Court cases relying upon these fundamental merger principles has never been overruled and has remained controlling since 1962.

### C.    Under Long-Standing Supreme Court Precedent, Plaintiffs Have Established the Irrebuttable Presumption that the Elimination of USAir Has Resulted in and Will Continue to Result in the Lessening of Competition and Will Tend to Create a Monopoly

*Brown Shoe* was the first case to come before the Supreme Court based upon a violation of the Clayton Act after that act had been amended in 1950.  In *Brown Shoe,* 370 U.S. at 297, the government filed suit in 1955 in the Eastern District of Missouri to enjoin the merger between Brown Shoe Co., the third largest shoe seller and retailer in the United States, and Kinney, the eighth largest shoe seller and retailer in the United States.  The complaint sought injunctive relief under § 15 of the Clayton Act to restrain completion of the merger.  The Government's motion for a preliminary injunction *pendente lite* was denied and the companies were permitted to merge provided that their businesses would be operated separately and that their assets would be kept separately identifiable. The merger was effected on May 1, 1956.  In November of 1959, the District Court held that the merger violated 7 of the Clayton Act and ordered complete divestiture.

That order of divestiture was affirmed by the Supreme Court in 1962.  Brown Shoe Co. was only the third largest shoe manufacturer in the marketplace and possessed only a 6% share. Nationwide, the four largest shoe manufacturers controlled just 23% of the shoe market. Nevertheless, notwithstanding Brown Shoe's argument that, both at the manufacturing and at the retail levels, the shoe industry enjoyed "healthy competition" that would not be diminished by

the proposed merger since Kinney, the acquired company, "manufactured less than 0.5% and retailed less than 2% of the Nation's shoes," (*Brown Shoe,* 370 U.S. at 298), the district court found a "'definite trend' among shoe manufacturers to acquire retail outlets" (*Id*. at 301) and "another definite trend" toward a "decrease in the number of plants manufacturing shoes." (*Id*. at 302). The Supreme Court held that such a trend compelled divestiture. *Id*. at 345. [emphasis added].

In the present case, the top four airlines control over 85% of the domestic air passenger market, with pre-merger American controlling 13% and USAir controlling 8%[3], and there has been an ineluctable trend toward concentration over the last 20 years. These percentages are far greater, and the percentage of competition foreclosed far greater, than the market percentages found violative of the act in *Brown Shoe*. There is no question but that the *Brown Shoe* Court would support divestiture in this case.

The very next year the Supreme Court decided the case of *United States v. Philadelphia National Bank*, 372 U.S. at 330-31. In that case the defendants proposed to merge the second and third largest banks in a four-county area in Pennsylvania in order to create the largest bank in the market, with 36% of all assets. The merger would have resulted in greater concentration in the market, with the first and second largest firms gaining 58% of the market share and the top four firms controlling 77%. *Id*. at 331. The merger was concluded in November 1960. In February 1961, the DOJ filed suit to prevent the acquisition. The merger was held in abeyance pending the outcome of the trial. After the District Court for the Eastern District of Pennsylvania entered judgment for the defendants in June 1963, the Supreme Court reversed and remanded to the district court with directions to enter judgment enjoining the proposed merger. The Court again noted the significance of the trend in the market toward concentration:

---

[3]*See* Annex B, pp. 39 and 43.

> The present size of both PNB and Girard is in part the result of mergers. Indeed, the trend toward concentration is noticeable in the Philadelphia area generally, in which the number of commercial banks has declined from 108 in 1947 to the present 42. Since 1950, PNB has acquired nine formerly independent banks and Girard six . . . During this period, the seven largest banks in the area increased their combined share of the area's total commercial bank resources from about 61% to about 90%.

*Id*. at 331.

The court went on to hold that the resultant market share of the combined firm, *as well as the significant increase in concentration in the market,* were both so high as to be *presumptively illegal*: "It is no answer that, among the three presently largest firms (First Pennsylvania, PNB, and Girard), there will be no increase in concentration. If this argument were valid, then once a market had become unduly concentrated, further concentration would be legally privileged. On the contrary, if concentration is already great, the importance of preventing even slight increases in concentration and so preserving the possibility of eventual deconcentration is correspondingly great." *Phila. Nat'l Bank*, 372 U.S. 321 at 362, n.42.  [emphasis added].  Like Philadelphia National Bank, the pre-merger sizes of both American and US Air are themselves the result of mergers.

The following year, in *United States v. Aluminum Company of America (Alcoa)*, 377 U.S. 271 (1964), divestiture was required by the Supreme Court where nine firms controlled 95% of the aluminum produced in the United States and the top four largest firms controlled 76% of the market pre-merger.  The District Court, after a trial, held that there was no violation and dismissed the complaint. In its 1964 opinion, the Supreme Court reversed the district court and, concluding that there must be divestiture, remanded the case for proceedings in conformity with its opinion.  The acquisition of target-company Rome (which controlled *only 1.3%* of the market) was held to be "reasonably likely to produce a substantial lessening of competition within the meaning of Section 7." *Id*. at. 281.

 And again, similarly, in *United States v. Continental Can Co.,* 378 U.S. 441 (1964),

where the second largest competitor, Continental Can, acquired the sixth largest competitor, Hazel-Atlas, Continental Can's post-merger market share only rose from 21.9% to 25%, but the Supreme Court ordered divestiture.

Two years later, in *United States vs. Von's Grocery Co.*, 384 U.S. 270 (1966), the Supreme Court confronted the acquisition of Shopping Bag, a grocery chain with a 4.2% market share, by Von's, a grocery chain with only a total of 4.7% of the market.  The United States had brought suit in 1960 to enjoin the merger, but the District Court for the Southern District of California refused to grant the government's motion for a temporary restraining order and allowed Von's to proceed with the merger.  In 1964, district court entered judgment for Von's. In 1966, the Supreme Court reversed.  The Supreme Court found that the merger tended to substantially lessen competition because the merger took place in a market characterized by a long and continuous trend toward fewer and fewer owner-competitors.   In 1958, Von's retail sales ranked third in the market and Shopping Bag was sixth.  The merged entity would have jumped to number 2 in the market with a 7.5% share of sales in 1960.  *Id*. at 272.  The Court weighed the defendant's market share, against the increased concentration of grocery chains and the shrinking number of independently-owned stores and held that "*these facts* alone are enough to cause us to conclude … that the Von's-Shopping Bag merger did violate §7."  *Id.* at 274. [emphasis added].  The *Von's* Court also held that, "What we have … is simply the case of two already powerful companies merging in a way which makes them even more powerful than they were before.  If ever such a merger would not violate §7, certainly it does when it takes place in a market characterized by a *long and continuous trend toward fewer and fewer owner-competitors which is exactly the sort of trend which Congress, with power to do so, declared must be arrested.*"  *Id.* at 278.  [emphasis added].

In the case at bar, the evidence shows that there has been a persistent and extreme pattern and *trend* toward concentration and reduction of competition in the U.S. airline industry over the

past several years.  The Supreme Court in *Von's*, held that such a pattern or trend of concentration alone violates §7 of the Clayton Act.

And once again in *United States v. Pabst Brewing Co.*, 384 U.S. 546 (1966), the Supreme Court extended its longstanding reliance upon market trend as a driving force behind its merger analysis.  In *Pabst*, the Supreme Court reversed the District Court of Washington and ordered divestiture of the merged entity that had combined only the 10th (Pabst) and 18th (Blatz) largest brewers in the United States, and which, when combined, resulted in only the 5th largest brewer in the United States, with just 4.49% of all domestic beer sales, all for the purpose of arresting the "rising tide" of concentration in the market as Congress had encouraged it to do.[4]  The Court found that the evidence showed the tell-tale trend of a 30-year decline in the number of brewers and a sharp rise in the percentage share of the market controlled by leading brewers.  *Id*. at 550-551.

In our case, American and USAir were large competitors and rivals.  Prior to the merger, they were 4th and 5th nationally.  The combination of American and USAir has now resulted in a much larger market share than that which was prohibited by the Supreme Court in *Pabst Brewing Co.*, 384 U.S. 546.

And again, in *United States v. Falstaff Brewing Corp.*, 410 U.S. 526 (1973), the Supreme Court reversed the District Court of Rhode Island where the effect of the proposed acquisition would have been to eliminate a potential competitor from the market, even though the acquiring company had never even competed in, nor ever professed to have any intention of entering, the target company's market, other than by acquisition.

---

[4] "[Congress] passed and amended section 7 on the premise that mergers do tend to accelerate concentration in an industry. Many believe that this assumption of Congress is wrong, and that the disappearance of small businesses with a correlative concentration of business in the hands of a few is bound to occur whether mergers are prohibited or not. But it is not for the courts to review the policy decision of Congress that mergers which may substantially lessen competition are forbidden, which in effect the courts would be doing should they now require proof of the congressional premise that mergers are a major cause of concentration. *We hold that a trend toward concentration in an industry, whatever its causes, is a highly relevant factor in deciding how substantial the anti- competitive effect of a merger may be.*" *Id.* at 552-553.  [emphasis added].

9

In 1965, Falstaff had agreed to acquire Naragansett Brewing Co.  Before the acquisition was accomplished, the United States brought suit alleging that Falstaff's purchase of Narragansett would violate § 7 because its effect may be to substantially lessen competition in the production and sale of beer in the New England market.  The merger was completed after the government's motion for preliminary injunction was denied by the district court.  Falstaff thereafter agreed to operate Narragansett as a separate subsidiary until otherwise ordered by the court.

Narragansett, the acquired firm, was the largest seller of beer in New England at the time of its acquisition, with approximately 20% of the market.  The fourth largest producer of beer in the United States at the time of acquisition, Falstaff was a regional brewer with 5.9% of the Nation's production in 1964.  As of January 1965, Falstaff sold beer in 32 States, but did not sell in the Northeast, an area composed of New England and States such as New York and New Jersey.  Between 1955 and 1966, the company's net sales and net income almost doubled, and in 1964 it was planning a 10-year, $35 million program to expand its existing plants. Nationally, the number of brewers had decreased from 663 in 1935 to 140 in 1965.  After a trial on the merits in 1971, the district court dismissed the complaint and in 1973 the Supreme Court reversed, emphasizing the unmistakable trend toward concentration.  *Falstaff*, 410 U.S. at 531.

None of these Supreme Court cases[5] have ever been overruled nor even diminished by later opinions.   In 1986, even Judge Posner, one of the architects of the Chicago school of antitrust analysis[6], deferred to the unequivocal rulings of the Supreme Court and acknowledged

---

[5] *See* Annex A, attached, Chart of Supreme Court Cases.
[6] There is currently a trend away from the Chicago School of antitrust analysis.  One of the tenets of Chicago School theory is that American businesses ought to be insulated from rigorous antitrust analysis so that it might more efficiently compete with larger, world competition.  The argument, or so it has been verbalized, was that big firms were not a threat to domestic growth and prosperity. This argument, of course, holds no grip in this case since the competitive domestic airline routes in issue are already protected from foreign competition.  It is ironic, however, that the Chicago School has now begun to fret about the lack of domestic competition in all industries, not just the airlines.  There is an "emerging consensus among economists" that competition in the domestic economy is sorely lacking.  And that is bad news because it means that domestic firms may not need to innovate and may spend less on investment and wages.  Apparently, the tide has begun to turn – profits are abnormally high and fewer smaller firms are being created.  The domestic airlines have been targeted by these new economists as an industry in

that a continuous line of Supreme Court precedent, taken together, prohibited "*any nontrivial*

acquisition of a competitor."  He further observed that "the elimination of a *significant* rival was

thought by itself to infringe the complex of social and economic values conceived by a majority

of the Court to inform the statutory words 'may . . . substantially . . . lessen competition.'"

*Hospital Corp. of America v. Federal Trade Commission*, 807 F.2d 1381, 1385 (7th Cir. 1986).

[emphasis added.]

     If Congress had wanted to change the way that the Supreme Court has analyzed section 7,

it has had ample opportunity to do so, but never has.  As a result, these Supreme Court decisions

remain the law of the land and it is not for this Court to review the policy decisions of Congress.

     These Supreme Court decisions have in fact been followed by the Second Circuit in

*Stanley Works v. FTC*, 469 F.2d 498 (2d Cir. 1972), where Stanley, which controlled more than

22% of the cabinet hardware market and which was one of four firms that together controlled 49-

50% of the market, acquired a competitor with only 1% share in 1966.  The FTC held that

violated Section 7 of the Clayton Act and ordered divestiture in May of 1971.  Upon review, the

Second Circuit ordered that the FCC's order of divestiture be enforced in October of 1972:

> The law is clear in its teaching that in an already concentrated industry with few
> sellers, in which the four leading companies dominate approximately 50% of the
> market, a merger involving the leading firm, controlling 22-24% of the market, with
> a firm like Stanley, would seriously threaten substantial anticompetitive
> consequences. This merger cannot survive in the face of the Clayton Act and its
> history. Accordingly, we affirm the Commission's order and direct its enforcement.

*Id*. at p. 508.

     The court wrote that the continued independence of firms with small market shares is

crucial to the health and vitality of a market threatening to become oligopolistic and quoted from

the seminal Supreme Court merger cases:

---

which "successive waves of mergers" have Frankensteined an industry whose profits are over 50% higher than in other developed countries.  The antitrust laws are now being viewed as prod to resuscitate ailing competition endemic to the country. The Economist, *The University of Chicago worries about a lack of competition,* Print Edition, April 12, 2017.

> The Supreme Court noted in *United States v. Aluminum Co. of America*, 377 U.S.
> 271, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964), that central to the underlying philosophy
> of § 7, as amended, is the principle "that competition will be most vital 'when there
> are many sellers, none of which has any significant market share.' *United States v.
> Philadelphia National Bank*, 374 U.S. at 363, 83 S.Ct. 1715, 10 L.Ed.2d 915."
> *United States v. Aluminum Co. of America*, *supra*, 377 U.S. at 280, 84 S.Ct. at 1289.
> But the greater the concentration in the market 'the greater is the likelihood that
> parallel policies of mutual advantage, not competition, will emerge. That tendency
> may well be thwarted by the presence of small but significant competitors.' *Ibid.* 19.

*Stanley Works,* 469 F.2d at 507.

Here, the elimination of USAir will result in the single largest airline in the United States

with over 22% of the scheduled air passenger service market in an already highly concentrated

market. The biggest four airlines' currently share approximately 85% of the domestic market.

Such a concentration of market share in four firms (and 90% in five firms if Alaska Airlines is

included[7]) is presumptively illegal according to the Supreme Court and, coupled with the clear

trend in the market toward concentration, conclusively establishes the requisite elements of a

violation of Section 7 under controlling precedent.

## III.    EVEN UNDER A "MODERN VIEW" PLAINTIFFS HAVE ESTABLISHED A *PRIMA FACIE* CASE

The elimination of USAir from the market violates section 7 of the Clayton Antitrust

Act.  This merger is unlawful because the combination has resulted in market concentrations

dramatically in excess of both longstanding governmental guidelines for permissible

concentrations in relevant geographic markets and, the Supreme Court's longstanding decisions

prohibiting non-trivial combinations between significant rivals that may tend to increase

concentration in any relevant market, thereby lessening competition.  In addition, given the

current pernicious trend toward consolidation in the domestic air passenger transportation

industry, Defendants' own admissions make clear that this transaction has – and will continue to

---

[7] *See* Annex B, pp. 39.

– result in a substantial increase in concentration, which has harmed and will continue to harm the Plaintiffs and consumers in general.

> **A.  Plaintiffs Have Shown Evidence of Substantial Adverse Competitive Effects from the Merger, as Well as Evidence That Lessening of Competition Will Have Continuing Anticompetitive Effects on the Market**

Defendants' suggestion that there have been no adverse competitive effects from the merger and no evidence that any Plaintiff has suffered antitrust injury is both demonstrably false and misses the point.

> 1.  There are Many Undisputed Facts Which Show a Lessening of Competition Resulting from the Merger Such That Defendants' Motion for Summary Must be Denied and Plaintiffs' Cross-Motion for Partial Summary Judgment Granted.

Compelling evidence exists to show that the merger has already substantially lessened competition and threatens to do so in the future.  Contrary to Defendants' experts' statistical prestidigitation, the *facts* are clear.  The lessened competition resulting from the merger has caused the following:

- the former USAir has disappeared as a competitor;

- in 723 of the original 1008 city pair markets identified by the DOJ as presumptively illegal after the merger, from 2012 through fiscal year 2016,[8] average airfares have increased significantly.  Lundgren Decl. ¶¶ 3,12, Annex A;

- in 351 of those 723 city pair markets, passenger growth decreased, while airfares increased.  *Id.*;

- in 371[9] of those 723 city pair markets, passenger growth increased, while airfares also increased.  *Id.*;

- ████████████████████  Ex. P, Kasper Dep. T. 95:21-96:8;

- On May 4, 2017, American began "flying" the so-called "Premium Economy"

---

[8] "Fiscal year 2016" refers to DOT/BTS data through the third quarter of 2016.
[9] One pair had exactly the same number of passengers.

class "with an average upsell of over $350." Ex. O, BOA Merrill Lynch 2017
Transportation Conference p. 15;

- ███████████████████████████████████████████ Ex. P, Kasper
  Dep. T. 97:11-16;

- ████████████████████████████████████
  ██████████ Ex. P, Kasper Dep. T. 104:9-12;

- █████████████████████████████████
  ████████████████ Ex. P, Kasper Dep. T. 97:11-16;

- contrary to pre-merger assurances, service from American's – formerly
  USAir's main – hub in Phoenix has been cut and the hub shrunken.  Ex. I,
  Arizona Republic  (Dec. 27, 2016), <u>American Airlines is shrinking at its
  Phoenix hub;</u>

- ████████████████████████████████████████
  ████████████ Phoenix (Ex. J, Nocella Dep. T. 110:25); Los Angeles (*Id.* at
  T. 80:21-25; 111:1-2); Dallas (*Id.* at T. 80:21-25; 111:3-5), Philadelphia (*Id.* at
  T. 111:3); Miami (*Id.* at T. 111:12); and Boston (*Id.* at 139:9-11);

- barriers to new entry into the domestic airline industry were extremely high
  before the merger (there has not been a significant new entrant in 10 years, since
  Virgin America) and the merger has significantly increased barriers to entry in
  the following ways:

  – new entrants are unable to raise or cover their cost of capital in order to
    enter the market or acquire aircraft or expand their fleets.  Ex. CC, Parker
    Congressional Test. (March 19, 2013) pp. 20, 43; Ex. BB, GAO Report
    (June 2014) pp. 44-45;

  – potential entrants cannot gain access to key airports.  *Id.* at pp. 42-43;

  – consolidation in the industry prevents new airport construction and
    improvements.  *Id.* at p. 43;

  – smaller communities served by regional carriers are facing pilot shortages
    as pilots move to the remaining network carriers.  Ex. DD, MIT White
    Paper # 1, p. 18;

  – the larger, more potent, airline loyalty – or frequent flyer – program
    resulting from the merger is a significant barrier to entry.  Ex. BB, GAO
    Report (June 2014) p. 45;

  – potential entrants cannot gain access to key airports.  Ex. BB, GAO Report
    (June 2014) pp. 42-43;

  – consolidation in the industry prevents new airport construction and

14

improvements.  Ex. BB, GAO Report (June 2014) p. 43;

- like all consumers, Plaintiffs have been injured by the merger by reason of the foregoing.  See Plaintiffs' Statement of Undisputed Material Facts in Support of Their Cross-Motion for Partial Summary Judgment # 75-80; Response to Defendants' Statement of Undisputed Material Facts # 13, 67, 74, 80, 85, 88, 89, 90.

The anticompetitive effects of the AMR-USAir merger are manifold: (1) the city pairs identified as presumptively illegal after the merger remain so; (2) concentrations in many city pairs have increased post-merger even beyond those originally projected by the DOJ; (3) from 2012 through fiscal year 2016, average airfares have increased in 723 city pair markets across the country; (4) ancillary fee charges (*e.g.*, for checking bags, changing a reservation, etc.) have been  increased; (5) seats are smaller with less recline; (6) more seats (and thus passengers) are being squeezed into aircraft; (7) overhead storage is now at a premium; (8) comfortable legroom is now a premium upgrade; (9) priority boarding in order to gain access to overhead storage bins is now a premium upgrade; (10) what used to be traditional coach service is now analogous to what was known as "steerage" when traveling by sea; (11) service from the new American's hubs has been cut; (12) routes and frequencies of flights have been cut; (13) fares for multi-city air travel itineraries have skyrocketed; (14) flight delays and cancellations have increased; (15) American is now the most complained of airline by travelers in the country; (16) capacity growth by American is far below AMR's and USAirs' projections; and (17) barriers to new entry into the industry are now insurmountable by reason of the merger.

      a.    <u>Defendants' Expert Dennis Carlton's Report is Inherently Unreliable Because it is Based Upon Data From Time Periods that Are Not Reliable and it Ignores Critical Anticompetitive Effects of the Merger.</u>

Defendants experts' reports are based upon data that predate the expiration of the three- and five-year restriction periods imposed on American pursuant to the terms of the settlement with the State plaintiffs in the DOJ's action to enjoin the merger. Ex. Z, Stipulated Order.  The

Defendants' experts conflate DOT statistics to create the false impression that fares have

generally declined and output increased.  Their analyses are selective and erroneous.

Plaintiffs' expert, Dr. Lundgren, marshaled the DOT's statistics – the same as those

relied upon by Defendants' experts – and found that out of the 1,008 city pair markets which

Plaintiffs and the DOJ alleged would be presumptively illegal following the merger because

the city pairs were already highly concentrated with HHIs over 2,500, and the merger would

increase the HHI in each by more than 200 points, average airfares increased in 723 city pairs.

Those 723 are mostly small- to mid-sized city pair markets, precisely as the MIT White Paper

# 3 predicted.  Lundgren Decl. ¶¶ 3,12, Annex A; Ex. AA, MIT White Paper # 3, pp. 3-4.[10]

As a percentage, from 2007-2012, domestic flights were cut 26.2% at small-hub and

non-hub airports.   Ex. DD, MIT White Paper # 1 <u>Trends and Market Forces Shaping Small</u>

<u>Community Air Service in the United Sta</u>tes, p. 6 ("MIT White Paper # 1").  Most of these

capacity cuts at small- to mid-sized communities were due to decisions made by network

carriers, not LCCs.  *Id.* at pp. 7-8.  From 2012 through fiscal 2016, not only have airfares risen in

such communities, but passenger growth has declined in many.  Lundgren Decl., Annex A.  As

American's (now United's) Andrew Nocella testified, ████████████████████

████████  Ex. J, Nocella Dep. T. 35:3-7.  Dr. Carlton chose not to look at the 723

markets which did not support his conclusion.

Nowhere in the Defendants' expert reports are the effects of the highly restrictive terms

of American's settlement with the states in the DOJ case reflected.  Even Carlton's so-called

---

[10] The Herfindahl-Hirschman Index ("HHI") measures and grades market concentration by adding the squared market share percentages of each competitor in the market. The threshold for a "highly concentrated" market is an HHI index of 2,500. Transactions that increase the HHI index in highly concentrated markets by more than 200 points are presumed likely to enhance market power under the Horizontal Merger Guidelines issued by the Department of Justice and the Federal Trade Commission. Here, the market concentrations in hundreds of city pairs across the country will substantially exceed that number.  A high HHI establishes a *prima facie* violation of Section 7.  *St. Alphonsus Medical Center v. St. Lukes Health System Ltd.*, 778 F.3d 775 (9th Cir) 2015 ("The extremely high HHI on its own establishes the prima facie case.  See *Heinz*, 246 F.3d at 716; *United States v. Baker Hughes, Inc.*, 908 F.2d 981, 982-83 & n. 3 (D.C.Cir.1990)").  *Id.* at 788.

"retrospective study" published in October 2016 – which was intended to show actual effects of

the merger – was issued based upon data *before* the settlement's three year restrictions expired

in November 2016, and two years before the five-year restrictions are due to expire.

Ex. Z, Supplemental Stipulated Order in *United States v. US Airways Group, Inc.,* Case No.

1:13-cv-1236-CKK (Doc. 151) ("Stipulated Order") pp. 3-6.  The restrictions are highly

significant and material.  Their omission from Defendants' experts' analyses render their

conclusions about the competitive effects of the merger – prospectively and retrospectively

– unreliable.

i.       <u>The Stipulated Order's Three-Year Restrictions.</u>

In order to achieve a settlement with the state plaintiffs in the DOJ case, AMR and

USAir agreed to restrictions on their ability to make any material change in the operation of

their seven largest hubs for three years after the settlement.  The Stipulated Order provides as

follows:

> IV. HUBS
>
> A.  Following completion of the merger, and until the third anniversary of the
> date on which a Stipulation and Final Judgment incorporating these terms, both
> customary in form, are filed with the Court (the "Effective Date"), New American will
> maintain in a manner generally consistent with historical operations its hubs at
> Charlotte Douglas International Airport, John F. Kennedy International Airport, Los
> Angeles International Airport, Miami International Airport, Chicago O'Hare
> International Airport, Philadelphia International Airport, and Phoenix Sky Harbor
> International Airport.

This clause required that the hubs, including USAir's home hub at Phoenix Sky

Harbor, be maintained consistent with pre-merger operations" until November 12, 2016.

Carlton's October 2016 retrospective study of the market is necessarily and artificially skewed

due to these restrictions which expired in November 2016.  Immediately after they expired,

American announced on December 27, 2016, major cuts at Phoenix Sky Harbor.  Ex. I, The

Arizona Republic (12/27/16) <u>American Airlines is Shrinking at its Phoenix hub</u>.

██████████████████████████ (Ex. J, Nocella Dep. T. 110:25) ████████████████

████████████████████████ Los Angeles (*Id.* at T. 80:21-25; 111:1-2); Dallas (*Id.* at T.

80:21- 25; 111:3-5), Philadelphia (*Id.* at T. 111:3); Miami (*Id.* at T. 111:12); and Boston (*Id.*

at 139:9- 11).

ii.    <u>The Stipulated Order's Five-Year Restrictions</u>

In an obvious effort to mitigate the anticompetitive harm from the merger to small- and

mid-sized communities, the States required American to continue service to 46 communities,

most of which are smaller markets, for a period of five years after the merger. Ex. Z,

Stipulated Order pp. 4-6. Those restrictions will expire on November 12, 2018, at which time

it is reasonable to expect that service will be cut or canceled to many of those markets, much

as service was cut immediately after the expiration of the three-year restrictions.

In 2016, after the agreed divestitures required by the DOJ's settlement, and while the

restrictions in the Stipulated Order remained in effect, there were 785 city pairs where the HHI

exceeded 2,500 and then increased by more than 200 following this merger. There are 447 city

pair markets in DOJ's initial list of 1,008 in which the 2016 concentration numbers are *worse*

*after the settlement* than DOJ predicted they would be *without any settlement.* These markets

average a post-merger HHI of 4,868, with an average change in HHI of 1,379. The other 561

city pair markets average a post-merger HHI of 4,379, with an increase in HHI of 473 points.

Overall, of the DOJ's initial list of 1,008 city pairs in which the merger was considered

presumptively illegal under Horizontal Merger guidelines, the post-merger HHI in 2016 was

4,606 and the average increase was 875 points. Ex. F, Lundgren Report, pp. 15-16. They

remain presumptively illegal.

b.    <u>Average Airfares Have Increased in 723 City Pair
Markets From 2012 Through Fiscal 2016 and Passenger
Usage is Down in Many.</u>

Dr. Carlton's facile approach to measuring changes in airfares, capacity and passenger usage is unreliable for the reasons related to the particular effects of the Stipulated Order and because he elected to avoid mentioning those 723 city pair markets in which airfares have risen between 2012 and 2016, and where passenger usage has decreased.  Lundgren Decl. ¶¶ 3, 12, and Annex A.  For example, in the Charleston, West Virginia - New York city pair, airfare growth averaged 55.5% from 2012 to 2016.  During the same period, passengers decreased from 31,750 on non-stop or one-stop flights in 2012 to 12,480 in fiscal 2016.  This city pair is a relevant market and a "section of the country" for section 7 purposes, as are all the 723 city-pair markets in which fares rose from 2012 to 2016, and those in which passenger traffic decreased.

        c.    <u>Anticompetitive Effects Resulted From the Temporary Discontinuance of Advantage Fare Pricing and its Replacement by a Simultaneous Onerous Increase in Multi-City Fares by American, United and Delta and by the Disappearance of AMR as a Competitor in "Cross-Market Initiatives."</u>

Carlton's analysis regarding USAir's Advantage Fares is largely unsupported and it is misleading.  First, it is based upon his "understanding" without factual support: ▮



▮ Def. Ex. 4 Carlton Report, ¶ 31; ▮ *Id.* ¶ 32; ▮ *Id.* ¶ 33; ▮ ▮ *Id.*; ▮ *Id.*; ▮ *Id.*

Carlton's "understanding" without more should be disqualifying.  An expert's opinion must be "based on sufficient facts or data."  Fed. R. Evid. 702(b) and 703.

    What is admitted is that American eliminated Advantage Fares from January 2016 through March 2016 (*Id.* ¶ 33) and it was during that period of time that American, along with United and Delta, simultaneously fixed the airfare rules for multi-city itineraries through ATPCO in order to jack up prices for such travel by hundreds and thousands of dollars.  Exs. K, L, M, and Ex. N, Letter from Sen. Robert Menendez to Secretary of Transportation (April 6,

2016).

███████████████████████████████████████████

█████████████████████████████████████  Ex. J, Nocella Dep.

(Exhibit 4).  This common ownership and control of ATPCO post-merger has permitted an

extraordinary level of coordination in the making of airfare rules and prices, which became

evident when the three simultaneously announced the change in the multi-city

fare pricing through ATPCO.

        d.      <u>Competitive Cross-Market Initiatives Between
AMR and USAir Have Been Eliminated.</u>

"Cross-market initiatives" were an important component of competition in the domestic

airline industry.  They showed that the airlines do, in fact, price against each other in markets

*across the country.*  Before the merger, a cross-market initiative would have involved ████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████  Ex. J, Nocella Dep. T. 137:1-12.  In addition to showing that the

airlines compete across a national market as well as in city pairs, the merger had the effect of

removing USAir from cross-market initiative competition against AMR and the other airlines.

        e.      <u>Defendants' Expert Janusz Ordover's Report is Inherently
Unreliable Because it is Also Based Upon Data From
Time Periods that Are Not Reliable and it Misstates or
Ignores Critical Facts Tending to Establish the
Anticompetitive Effects of the Extraordinary
Consolidation Following the Merger.</u>

Dr. Ordover's opinion that the merger does not engender risks of coordinated behavior is

oblivious to undisputed facts, history of the industry, and controlling case law.  In addition,

Ordover's "empirical analysis of actual fares after the Merger" suffers from the same defect as

Carlton's because it is based on a market which is distorted by the constraints still in effect by

reason of the Stipulated Order in the DOJ case.

Ordover erroneously concludes that ████████████████████████████

████████████████ Def. Ex. 5 Ordover Report ¶ 6.

Although Defendants' experts repeatedly downplay the importance of the very high

concentrations that existed before the merger and have continued and worsened since the

merger, those HHI figures are a tool for merger analysis precisely because extremely high

concentrations in an industry, coupled with previous attempts to collude, and prompt

observance of initiatives by rivals, evidence a market that is vulnerable to coordinated

conduct, such as the domestic airline industry.

As an initial matter, "[m]ergers resulting in highly concentrated markets [HHI above

2500] that involve an increase in HHI of more than 200 points are presumed likely to

enhance market power." Ex. H, DOJ Horizontal Merger Guidelines (Aug. 19, 2010) § 5.3.

"A market typically is more vulnerable to coordinated conduct if each competitively

important firm's significant competitive initiatives can be promptly and confidently

observed by that firm's rivals." *Id.* § 7.2. And "Regular monitoring by suppliers of one

another's prices or customers can indicate that the terms offered to customers are relatively

transparent." *Id.* § 7.2.

One result of the merger was the ascendancy to majority ownership by American, United

and Delta of ATPCO, the firm that set airfares rules and publishes airfares. This power

manifested itself in the three airlines' coordinating a simultaneous increase in prices on multi-

city routes in March 2016, and enables them to monitor each other's conduct such that their

fares are often "similar" or "identical." Ex. X, Decl. of Timothy Lyon in *Prosterman v. Airline

Tariff Publishing Company* ¶¶ 12, 13 (The airlines closely monitor each other's fares through

ATPCO and "often have similar (if not identical) fares on particular routes.") According to

Lyon, "American knew about similar changes made by rival airlines because it monitors the

ATPCO 'rules queue' to assess any changes that competitors are making in the marketplace."

*Id.* ¶ 12.  According to American's CEO Doug Parker, "my understanding is ███████████

██████████████████████████  Ex. V, Parker DOJ Dep. T. 79:5-6 and 79:14-17.  Nicholas

Anderson, the manager of USAir's Strategy and Long-Range Planning Group testified that the

airlines ████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████  Ex. Y, Anderson DOJ. Dep. 13:19-14:14; 55:7-56:1.  This

evidence from the Defendants of matching fares directly undercuts Ordover's assertion that it is

difficult for rivals to discern each other's actual fares.  The fact that the airlines have access to

each other's *potential* fares and then price fares that are similar or identical to each other can

lead only to the conclusion that they are coordinating their behavior.

Finally, Ordover's assertion that LCCs continue to play a "central role" in "driving the

key dimensions of competition in the airline industry" (Defs. Ex. 5, ¶ 6) ignores the reality of

the current state of the industry.  LCCs do not drive competition in the airline industry.  They

operate point-to-point service as distinguished from American, Delta, and United which

operate hub and spoke networks.[11] LCCs', and especially Southwest's, ability to disrupt prices

(i.e., drive competition), the so-called "Southwest Effect," has been greatly diminished and

following the mergers of Delta with Northwest and USAir with America West, Southwest led

price increases in the industry which were greater than average price increases overall.  Ex. E,

GAO Report (June 6, 2013), p. 8.  Moreover, LCCs often charge additional ancillary fees

which do not fully permit fare comparisons. Ex. AA, MIT White Paper # 3 <u>Evolving Trends of</u>

---

[11] As recently as March 15, 2017, Doug Parker sought to allay fears among airline investors about recent capacity increases in Chicago and other hubs by American and United. According to Parker, such increases are acceptable to the airlines because, "these are routes being added into hubs by hub-and-spoke carriers. It's nothing like trying to open a new hub [or] take someone else's share.  These are hub carriers adding capacity into hubs.  We don't get overly alarmed when someone decides to have routes in and out of their hubs."  Ex. SS, https://www.thestreet.com/story/14044755/1/american-ceo-to-investors-don-t-worry-about-unite   d-s-capacity-growth-at-chicago-o-hare html (accessed June 4, 2017).

U.S. Domestic Airfares: TheImpacts of Competition, Consolidation, and Low-Cost Carriers,

p. 4 ("MIT White Paper #3").

From 2007 through 2012, three of the airports with the largest increases in average

fares–Chicago Midway International Airport, Love Field in Dallas, and William P. Hobby

Airport in Houston – each had a significant percentage of their flights operated by Southwest

Airlines. Since changes in capacity were relatively low at these airports, a widespread pattern

of price increases by Southwest Airlines helps to explain the *increases* in average fare at these

airports. *Id.* at p. 9.

Contrary to Ordover's claim, LCCs are not playing a central role in driving airline

competition by the hub and spoke airlines, and they are exerting even less pressure on fares. Ex.

BB, GAO Report (June 2014), p. 33.

Ordover also ignores the insurmountable barriers to entry created by this merger that

foster further coordination.  "The combination of a concentrated market and barriers to entry is a

recipe for price coordination."  *F.T.C. v. H.J. Heinz Co.*, 246 F.3d 708, 724 (D.C. Cir. 2001)

(*citing FTC v. University Health, Inc.*, 938 F.2d 1206, 1218 n. 24 ("Significant market

concentration makes it 'easier for firms in the market to collude, expressly or tacitly, and thereby

force prices above or farther above the competitive level.'" [citation omitted from original])).

Barriers to entry for new entrants into the domestic airline industry are high and make

new entry virtually impossible, hampering competition and enabling incumbent firms to charge

higher prices without fear that doing so will attract new competitors.  Ex. BB, GAO Report

(June 2014) p. 42.  The last major airline to enter the market was Virgin America in 2007,

which was acquired by Alaska Airlines in 2016, and will shortly disappear from the scene.

*Id.* at 42.

As discussed above- barriers to new entrants include being unable to raise capital or

cover the cost of capital to acquire aircraft or expand their fleets, gain access to key airports and

offer comparable network travel and loyalty programs. Moreover, consolidation in the industry limits new airport construction and improvements and smaller communities served by regional carriers are facing pilot shortages as pilots move to network carriers.

It can take years before the effects of an airline merger on city pairs can be accurately evaluated (Ex. BB, GAO Report (June 2014) p. 21) especially where the market remains distorted by the extant Stipulated Order.  In the meantime, coordination through ATPCO continues apace, average fares in the most vulnerable markets have dramatically increased and passenger traffic decreased in many city pairs since the merger.  Lundgren Decl., Annex A.  In the seven major hubs which American agreed not to disturb for three years after the merger, service has now been materially cut.  The preservation of service to the 46 communities listed in the Stipulated Order will expire in November 2018, and it is expected that service to many of those communities will be cut or terminated at that time.

Finally, Ordover's unsupported statement that the imposition of ancillary fees is unsubstantiated is discussed below.

> f.    Defendants' Expert Daniel Kasper's Report is Inherently Unreliable Because it is Also Based Upon Data From Time Periods that Are Not Reliable and it Misstates or Ignores Critical Facts Tending to Establish the Anticompetitive Effects of the Merger and the Lessening of Competition in the Future.

Again, the marketplace studied by Kasper was skewed by reason of the Stipulated Order in the DOJ case.  The last fare data used by him was through the third quarter of 2016, *before* the three-year period to preserve service at the seven hubs had expired.  Even so, the question remains whether the merger has lessened or may in the future substantially lessen competition in the domestic air passenger transportation industry in any section of the country.

The removal of USAir from the marketplace has had many anticompetitive effects that Kasper and the other Defendants' experts chose to ignore in their reports.

It is demonstrably not the case that airfares have been uniformly reduced across the country.   To the contrary, they have increased in 723 city pairs that were already highly concentrated and many have experienced significant decreases in passenger traffic.  While initially claiming city pairs to be the relevant  market in this case, inconvenient data have caused Defendants to abandon that tack and instead analyze the market as if it were essentially fungible.  When questioned at his deposition, Kasper acknowledged many of the anticompetitive effects that are not touched upon in his report.

██████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████   *Id.* 83:17-84:24.

The May 4, 2017, implementation by American of "Premium Economy" class "with an average upsell of over $350," is not factored into his or the others' fare analyses.  Ex. O, BOA  Merrill Lynch 2017 Transportation Conference p. 15.  ████████████████  is ████████████████████████████ Ex. P, Kasper Dep. T. 97:11-16.  ███████████████

██████████████████████████████████████████████████

██████████████████████████ Ex. P, Kasper Dep. T. 97:11-1.

When calculating average prices, █████████████████████ in his calculations.  *Id.* T. 88:20-23. There is no transparency in airfare disclosures *to consumers,* severely limiting their ability to shop comparatively and make informed decisions about their travel purchases. Ex. BB, GAO Report (June 2014) p. 46.  Ancillary fees for things such as baggage, itinerary  changes, legroom, and priority boarding, are not fully disclosed to consumers. Ex. BB, GAO  Report (June 2014) p. 46.  The average fares published by the DOT's Bureau of Transportation  Statistics (from which all the experts derived their data) do not include all ancillary fees charged consumers.  Ex. BB, GAO Report (June 2014) pp. 17, 34.  When ancillary fees (*e.g.*, for checked bags, reservation changes, additional leg room, priority boarding, food,

25

beverage, entertainment, etc.) are taken into account, prices to consumers have increased.  In

2016, airfares were $125.2 billion, comprising 74.5% of airlines' operating revenue, meaning

25.5% of revenues were derived from undisclosed ancillary fees and other sources.  Ex. TT, BTS

Statistics Release: 2016 Annual and 4th Quarter Airline Financial Data, pp. 2, 14.  Baggage fees

accounted for $4.2 billion in revenue and change fees, $2.9 billion.  *Id.*  The other ancillary

charges "cannot be identified separately."  *Id.* at p. 2.  This information is in the possession of the

Defendants and it is not disclosed in their experts' reports.

     The GAO used DOT's T-100 data for domestic airlines in 2013 to determine

industry market share.  Ex. BB, GAO Report (June 2014) p. 2, n. 3.  In 2013, 85% of

passengers in the U.S. flew on American, Delta, Southwest and United.  Ex. BB, GAO

Report (June 2014) pp. 2-3.  Kasper uses an arbitrary 1990 baseline for his opinions and data

which stops short of the 3-year restriction period imposed by the Stipulated Order.  For air

travel during the period of the most recent mergers (2007-2012), capacity restraint resulted

in higher airfares with average one-way domestic fares increasing 9% from 2007 to 2012

for the network airlines, and 17% for LCCs, not including taxes and other fees.  Ex. BB,

GAO Report (June 2014) pp. 16-17.

     Although the merger may have benefitted some high-fare business travelers at the large

network hubs, it had the opposite effect in the small- to mid-sized communities where airfares,

on average, increased from 2012 through fiscal 2016 across 723 city pair markets.

Lundgren Decl., Annex A.  Business travelers are "high-fare" passengers and leisure travelers

are "low-fare" passengers (Defs. Ex. 4, Carlton Report, Annex A, pp.19, 36).  Leisure travelers

outnumber business travelers by a factor of 4 to 1 (80,526,350 versus 20,786,454) (*Id.* at 20,

Table 2).  ███████████████████████████████████████

███████████████████████████  *Id.* at 18.  Of these estimated benefits,

████████████████████████████████████████████████████████████████████

██████████████████████████████████████    *Id.* at 21, Table 3.  Put differently, 21% of

travelers will receive 96% of these supposed benefits.  This illustrates how the network carriers

channel benefits to their high-fare customers and why the majority of the traveling public in

smaller communities suffer higher fares and reduced service.

> g.    Andrew Nocella's Testimony Shows That Hubs Did Not
> Increase, Fares Did Not Decrease, Nor Did Capacity
> Increase as a Result of the Merger.

Contrary to Defendants' argument, the merger did not result in more hubs.  Def. Br. 28.

████████████████████████████████████████    Ex. J, Nocella Dep. T. 12:11-17.

The two airlines ████████████████████████████████████████████████

████████    Ex. J, Nocella Dep. T. 94:24-95:25.  In fact, it is likely that the merger will result █

██████████████████████████████.  Ex. Y, Anderson DOJ Dep. 108:14-24.  As discussed

previously, promptly after the expiration of the three-year portion of the Stipulated Order,

American substantially cut its service at Phoenix Sky Harbor and Nocella verified other service

cuts at American's hubs.

It is not accurate that Mr. Nocella testified that "fares on average" have been lower

since the merger.  Nocella testified ██████████████████████████████████████

██████████████████████████    Ex. J. Nocella Dep. T. 35:3-8.  When asked the basis, he

testified: ████████████████████████████████████████████████████████████

██████████████    *Id.* at T. 36:12-15.  Moreover, airfares that were increased due ██████████

████████████████████████████████████████████████████    Ex. J, Nocella

Dep. T. 37:10-16.  In fact, American has declined to pass along the dramatic drop in fuel costs

to consumers, preferring instead to add the $5 billion per year savings to its "bottom line."  Ex.

S, Transcript Earnings Call (Jan 27, 2015), p. 9.

AMR's bankruptcy standalone plan contemplated American growing capacity by 20% over five years after emerging from Chapter 11, ███████████████████ Ex. V, Parker DOJ Dep. T. 249:8-20. Instead, following the merger, ███████████ ████████████. Ex. J, Nocella Dep. at T. 99:8-15. In fact, American's Form 10-K dated February 22, 2017, reveals that from 2014-2015, American increased it total capacity ("ASM") only 1.2%, and in 2015-2016, 1.7%, far less than Nocella believed. Ex. W, American Form 10-K (Feb. 22, 2017), p. 54. The airlines continue to exercise "capacity discipline" in order not to take competitors' market share by reducing prices. It is unlikely that any of the three remaining network airlines will break ranks with respect to capacity discipline to take market share from competitors and will instead add little non-stop capacity thereby relegating less desirable connecting service to smaller airports. Ex. T, MIT White Paper # 2, p. 22.

        h.      <u>The Merger has Resulted and is Likely to Further Result in Flight Delays and Cancellations</u>

In an Audit Report by the Office of the Inspector General of the DOT on the subject of "Reductions in Competition Increase Airline Flight Delays and Cancellations" delivered to the Federal Aviation Administrator on April 23, 2014 (Ex. Q), the Inspector General concluded that:

> There has...been considerable industry consolidation since 2005 with mergers between Delta and Northwest in 2008, United and Continental in 2010, and *American and US Airways in 2013*. Public concerns over a possible relationship between the quality of airline service and industry consolidation led to congressional hearings and requests to the accountability community to review these issues.

*Id.* at 1. [emphasis added].

The Inspector General determined that reductions in competition had increased the percentage of late flights and the length of delays. Reduction of competition increased flight

cancellation rates.  Airline service quality depended on the initial level of competition."  *Id.* at

2.  When airline markets became less competitive, "the length of delays in the market

increased by 25.3 percent."  This increase was "statistically significant and sizeable."  *Id.*

Moreover, it was determined that "cancellation rates increased to an extent that was both

highly statistically significant and substantial in size.  We estimated that a market that went

from being served by three airlines to two experiences nearly a 7 percent increase in the flight

cancellation rate due to the loss of competition."  *Id.*

The sample was constructed of more than 32.2 million flights with flight performance

information from 70 U.S. airports.  In determining the levels of competition to use in the

study, the Inspector General measured competition by HHI levels.  *Id.* at 4.  The market

definition covered more than 95 percent of passengers.  *Id.*  "The relationship of reduced

competition to increases in the average length of flight delays was substantial and statistically

significant" (*Id.* at 4) and "the impact of competition on cancellation rates was large and

highly statistically significant" with a 7 percent increase in cancellations due to the loss of

competition resulting on average in 70,000 additional cancelled flights annually due to the

reduction from three airlines to two in a market (*Id.* at 9 and n.21).

In those markets where the HHI is highest, the increase in the length of flight delays was

25.3% when the number of airlines serving a market decreased from three to two.  *Id.* at 5.

Similarly, in a market with many airlines, reducing competition had less of an impact on the

percentage of cancelled flights than did a similar reduction in a market with little competition.

In other words cancellation rates increase as HHI increases.  *Id.* at 11-12 and Figure 8.

To underscore the validity of the Inspector General's analysis, on June 14, 2017, the

DOT released a report showing that for the same period in 2016, complaints about airline

service from consumers were up 70%, canceled flights were up 56%, on-time arrivals were

down 6%, complaints about the treatment of disabled passengers and discrimination were up, as

was the rate of mishandled baggage.  Ex. R, DOT Airline Consumer Complaints Up From

Previous Year, March 2017.

These significant decreases in the quality of service are tantamount to increases in price

and are to be expected following the merger of two competing major airlines, yet they are

completely ignored in the Defendants' analyses.

Plaintiffs' expert, Dr. Lundgren, has identified 723 city pair markets in which average

airfares rose 2012 through 2016.  Lundgren Decl. ¶ 3, 12, Annex A.  Defendants' flawed

estimates of a decline in average airfares across the country fail to account for the harm caused

consumers in the 723 city pairs where fares increased as a result of the merger.

At his deposition, Kasper acknowledged that American now has received the greatest

number of customer complaints of all airlines ████████████████████████████████

███████████████████████████████████  Although he studied this information, he

omitted it from his report.  Ex. P, Kasper Dep. 121:12-123:3.[12]

These significant measures of the decrease in the quality of service post-merger, which

was predicted to occur, is the natural consequence of the merger of two of the largest airlines

into a behemoth that now tops the industry.  Yet, these facts are completely – and conveniently

– ignored in the Defendants' analyses.

## IV.    DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON RELEVANT MARKET

Defendants claim that "summary judgment should be granted on [relevant market]

alone," because the national market for the transportation of airline passengers and the 1,008

"airport pairs[13]" set forth by Plaintiffs are not "cognizable relevant markets[s]."  (Dkt. No. 140

---

[12] He acknowledged that American was first in number of complaints per million passengers, first in mishandling of baggage, third in involuntary bumping passengers and first among the network carriers in that category.  Id.

[13] As a point of clarification, Plaintiffs have proposed city pairs as relevant geographic markets, in addition to a national

at 16 and 23).  Defendants have offered no evidence in support of their relevant market

arguments, nor have the airlines proposed any alternative relevant product market or geographic

market.  Although Plaintiffs will "have the burden at trial of establishing the relevant [] market,"

Plaintiffs "[do] not have that burden for the purposes of the defendants' motion for summary

judgment."  *Hayden Pub. Co. v. Cox Broadcasting Corp*., 730 F.2d 64 (2d Cir. 1984).  Since the

only evidence in the record, "is evidence from which a reasonable inference in the

[Plaintiffs'/nonmoving party's] favor may be drawn, the moving party [Defendants] simply

cannot obtain a summary judgment." *Binder & Binder PC v. Barnhart,* 481 F.3d 141, 148 (2d

Cir. 2007) (internal quotations omitted).

> ### A.    Defendants' Motion Makes No Distinction Between a Product Market and a Geographic Market

Relevant market has two components: a product market and a geographic market.  *Brown

Shoe*, 370 U.S. at 324.  The first step in relevant market analysis is to determine the "line of

commerce" or the relevant product market.  15 U.S.C. § 18.  The "outer boundaries of a product

market are determined by the reasonable interchangeability of use or the cross-elasticity of

demand between the product itself and substitutes for it.  However, within this broad market,

well-defined submarkets may exist which, in themselves, constitute product markets for antitrust

purposes." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).

The boundaries of a market, "may be determined by examining such practical indicia as

industry or public recognition of the submarket as a separate economic entity, the product's

peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices,

sensitivity to price changes, and specialized vendors." *Brown Shoe Co*., 370 U.S. at 325.  It is

"improper 'to require that products be fungible to be considered in the relevant market.'" *United*

---

geographic market.  While Defendants' brief erroneously uses the terminology "airport pair" and "city pair" interchangeably, Defendants' arguments are actually directed toward "airport pairs" only, which Plaintiffs have not proposed as a relevant geographic market in this case.  These distinctions are discussed above.

*States v. Continental Can Company*, 378 U.S. 441, 449 (1964). The rules of [i]nterchangeability

of use and cross-elasticity of demand are not to be used to obscure competition but to 'recognize

competition where, in fact, competition exists.'" *Id*. at 326.

Plaintiffs' proposed relevant product market is the "transportation of airline passengers."

Ex. A, FAC ¶ 31. Defendants' brief is silent as to Plaintiffs' proposed product market because it

makes no distinction between a "line of commerce" (product market) and a "section of the

country" (geographic market).[14] By incorrectly conflating product market and geographic, the

airlines argue that "airport pairs" and/or "city pairs" and the "national market" cannot be relevant

markets because "flights between specific origins and destinations are…*not* substitutable or

interchangeable with flights between other cities." (Dkt. No. 140 at 19.) City pairs and the

national market are places consumers can turn to for Defendants products (geographic markets),

not "lines of commerce." 15 U.S.C. § 18.

Notwithstanding the Defendants' failure to identify *any* relevant product market in this

case, air passenger transportation as a cognizable relevant product market has already been

decided in prior litigation in which the Defendants have been parties. *First*, Defendants

American and US Airways were also defendants in *In re Domestic Air Transportation Antitrust*

*Litigation*, 137 F.R.D. 677 (N.D. Ga. 1991). The *Domestic Air* court held that, " …[D]efendants

offer equivalent products and [] there is an order in the many pricing alternatives offered by

defendants…the Court finds air passenger service a standardized product consisting of the

transport of a passenger from an origin to a destination aboard an aircraft." *Id*. at 687-688. The

defendants in the *Domestic Air* case made the very same arguments that the Defendants make

here, that the "product" sold is not fungible. The *Domestic Air* court dismissed those arguments,

finding that, "…defendants' continued insistence that the product at issue here is not 'fungible' or

'homogeneous' somewhat disingenuous and overly simplistic. While the actual ticket from city

---

[14] The court's decision in *Malaney*, 2011 WL 6845773 (N.D. Cal. Dec. 29, 2011) suffers from the same analytical error.

A to city B is not necessarily interchangeable with a ticket from city C to city D, the service being offered by each defendant, which amounts to the product, is essentially the same.[15]" *Id.* at 687.

*Second*, in *Continental Airlines v. American Airlines*, Case Nos. Civ. A. Nos. G–92–259, G–92–266 (S.D. Texas), Continental Airlines and Northwest Airlines brought an action against American Airlines and AMR Corporation for violating the Sherman Act.  The jury in the *Continental Airlines* litigation was instructed as follows:

> A relevant market for antitrust purposes is any economically meaningful market or markets. There are two aspects to an economically meaningful market. The first is the relevant *service* market; the second is the relevant *geographic* market. *In this case, the relevant service market is the market for air transportation services at issue in this case.*

Ex. XX, *Continental Airlines v. American Airlines* (S.D. Tex. 1993), Jury Instructions, p. 2.[16] [emphasis added].

Lastly, the Defendants admit that the market for air transportation service is a relevant product market in their Hart-Scott Rodino filings.  In its Hart-Scott Rodino application, submitted to the Department of Justice, Defendant AMR admitted that it ████████████ ████████████  Ex. FF, Notification and Report Form for Certain Mergers and Acquisitions, p. 5.

Defendants' admissions with regard to the relevant product market for air passenger transportation are just the type of "practical indicia [such] as industry or public recognition" that the Supreme Court relied upon in *Brown Shoe*, to define a relevant product market.  *Brown Shoe*, 370 U.S. at 325.

    **B.**    **The Lack of a Precisely Defined Geographic Market is not an Adequate Ground on Which to Grant Summary Judgment in a Section 7 Case**

---

[15] The reasoning articulated by the *In re Domestic Air Transportation Antitrust Litigation* court was also acknowledged by the United States District Court for the District of Columbia in *In re Domestic Airline Travel Antitrust Litigation*, --- F.Supp.3d ---- 2016 WL 6426366, *12 (D.DC. October 28, 2016).

[16] Under Fed. R. Evid. 201(b)(2) and (c)(2) these jury instructions are properly subject to judicial notice.

To establish a violation of § 7 of the Clayton Act, it is not necessary to show a relevant

geographic market "in the same way the corpus delicti must be proved to establish a crime."

*Pabst*, 384 U.S. at 549.   Section 7 "does not call for the delineation of a 'section of the country'

by metes and bounds as a surveyor would lay off a plot of ground." *Id.* That Plaintiffs have not:

> prove[n] by an army of expert witnesses what constitutes a relevant 'economic' or
> 'geographic' market is not an adequate ground on which to dismiss a s 7 case.[17] (citation
> omitted) Congress did not seem to be troubled about the exact spot where competition
> might be lessened; it simply intended to outlaw mergers which threatened competition in
> any or all parts of the country. Proof of the section of the country where the
> anticompetitive effect exists is entirely subsidiary to the crucial question in this and every
> s 7 case which is whether a merger may substantially lessen competition anywhere in the
> United States."

*Id.* at 549-550. [emphasis added].  The relevant geographic market is the location "where,

within the area of competitive overlap, the effect of the merger on competition will be direct and

immediate." *Philadelphia Nat'l* Bank, 374 U.S. at 357.  The "area of effective competition in the

known line of commerce must be charted by careful selection of the market area in which the

seller operates, and to which the purchaser can practicably turn for supplies." *Id.* at 359 (citation

omitted).  The relevant geographic market must "'correspond to the commercial realities' of the

industry.'" *Brown Shoe,* 370 U.S. at 336.

### C.    Defendants Admit that the National Market is a Relevant Geographic Market for Antitrust Purposes

Defendants contend that the reason there is no national relevant geographic market is

that "flights between specific origins and destinations are…not substitutable or interchangeable

with flights between other cities."  (Dkt. No. 140 at 19.)  However, a national geographic market

for air transportation is not established on the basis of whether a flight from City A to City B is

interchangeable with a flight from City C to City D; rather, the proper relevant geographic

---

[17] This point refutes Defendants' arguments at ¶ 55 of the brief.  No economic analysis is necessary.  But even if was, the court's determination in *In re Domestic Air Transportation Antitrust Litigation* was supported by economic testimony, which is equally applicable here.

market inquiry is the "section of the country" or the areas in which the defendants operate and

where consumers can turn.[18]  *Phila. Nat'l Bank*, 374 U.S. at 359.  Because consumers can turn to

cities A, B, C, and D, for Defendants' products, they all should be included in the relevant

geographic market.

Like relevant product market, these Defendants have, in prior litigation, admitted to and

relied upon the existence of a national relevant geographic market.  In *Continental Airlines v.*

*American Airlines*, Case Nos. Civ. A. Nos. G–92–259, G–92–266 (S.D. Texas), Continental

Airlines and Northwest Airlines brought an action against American Airlines and AMR

Corporation.  American took the position that the relevant geographic market in that case was the

national market:

> Defendants [American and AMR] claim that the national United States air passenger
> service market includes all air passenger service within the United States. Defendants
> [American and AMR] also claim that, for purposes of analyzing their national pricing
> actions, hubs and regions are not relevant markets separate from the national market that
> contains them… *[Y]ou may conclude that a relevant market exists only for the entire
> United States, or you may conclude that relevant markets exist both for the entire United
> States and for particular hubs within or regions of the United States.*

Ex. XX, *Continental Airlines v. American Airlines* (S.D. Tex. 1993), Case Nos. Civ. A. Nos. G–

92–259, G–92–266, Jury Instructions, p. 2.  [emphasis added].

Further, in *In re Air Passenger Computer Reservation Systems,* 694 F.Supp. 1443, 1467

(C.D. Cal. 1988), USAir took the position that the relevant geographic market was national in

scope:

> The USAir plaintiffs have acknowledged that the national market is the only relevant air
> transportation market in this case. USAir Plaintiffs' Statement of the Case, Dec. 30, 1985
> at 7 ("the air transportation market is national in scope ..."); PSA's Brief in Opposition to

---

[18] Defendants also incorrectly argue that "Plaintiffs cannot provide any evidence whatsoever of high concentration in general, or by American, in any "national" market."  (Dkt. No. 140 at 20, fn 11.)  In *Stanley Works v. FTC*, 469 F.2d 498, 504 (2d. Cir. 1972), the Second Circuit held that, "We have indicated that the four leading firms in the cabinet hardware industry dominated 49-51% of the market. The Examiner and the Commission thought these figures reflected market concentration. We agree that the industry is sufficiently concentrated to invoke the proscriptive sanction of the Clayton Act under the circumstances of this case."  Post-acquisition, the leading four firms in the U.S. air passenger transportation industry, American, United, Delta, and Southwest, now control 75% of the market. Ex. P, Kasper Dep. at T.124:6-11.  These figures far surpass the statistics cited in *Stanley Works* for an industry to be "sufficiently concentrated to invoke the proscriptive sanction of the Clayton Act…"

American's Motion for Summary Judgment, April 22, 1985 at 3–4.

Defendants American and US Airways acknowledged publicly and within the industry that there is a national market for air transportation. This is precisely the type of evidence used to establish relevant geographic market, as articulated in *Brown Shoe*.

Notwithstanding Defendants' admissions in previous litigation, application of the rule of cross-elasticity of supply compels the conclusion that the relevant geographic market for air transportation in this case is national in scope. *Michael Anthony Jewelers, Inc. v. Peacock Jewelry, Inc.,* 795 F.Supp. 639, 645-656 (S.D.N.Y. 1992) citing, *Twin City Sportservice, Inc. v. Charles O. Finley & Co.,* 512 F.2d 1264, 1271 (9th Cir.1975), ("Where the degree of substitutability in production is high, cross-elasticities of supply will also be high, and ... the two commodities in question should be treated as part of the same market.") In his deposition testimony in this case, current American and former USAir Chief Executive Officer, William Douglas Parker, conceded this point:



Ex. D, Parker Dep. T. 44:14-22; 45:20-46:8. Because the *existing* major airlines in the United States can "service America anywhere," the rule of cross-elasticity of supply dictates that the geographic relevant market must be expanded to include the capability of the defendant airlines

to service America anywhere, not just the routes they currently serve[19].

Further, Parker, other airline executives, and even Defendants' own expert, Dennis Carlton, made a number of other admissions about the industry which evidence the existence of a national relevant geographic market.  Former American Airlines and US Airways President Scott Kirby, admitted, ███████████████████████████████████████

███████████████████████████████  Ex. YY, Kirby Dep. T. 38:14-16.

Former American Airlines Chairman, President, and CEO, Tom Horton acknowledged:

Q. ████████████████████████████████████████████

*** 

Q. ████████████████████████████████

A. ████████████████████████████████

Ex. U, Horton Dep. T.  68:6-7 and 69:7-10.  Mr. Horton also testified as to ████████████

████████████████████████  *Id.* at T. 37:1-43:24.

Even Defendants' expert, Dennis Carlton, acknowledged a national geographic market:



Ex. GG, Carlton  Dep. T. 46:23-47:15.

Defendants also concede that the major airlines in the United States institute fee and fare changes on a "system-wide" or national level:

---

[19] These arguments are equally applicable to Plaintiffs' proposed product market.



Ex. YY, Kirby Dep. T. 176:18-21;

Ex. D, Parker Dep. T. 136:22-24]);

*Id.* T. 36:22 – 37:2);

*Id.* T. 37:14-16);

*Id.* T. 38:4-8);

*See also*, Ex. D, Parker Dep. T. 39:5-6 and 40:11-12; Ex. YY, Kirby Dep. T. 145:14-23; and Ex.

J, Nocella Dep. T. 137:1-13. Summary judgment cannot and should not be granted in favor of

the Defendants on the issue of relevant geographic market. *Pabst*, 384 U.S. at 549. But even if

it was a basis for granting summary judgment, there is substantial evidence in the record that a

national market is cognizable for antitrust purposes; Defendants have submitted no evidence to

the contrary.

> ### D.    Because Plaintiffs Have Not Alleged "Airport Pairs" as Proposed Geographic Markets in this Case, Defendants Arguments are Irrelevant

Defendants erroneously state that Plaintiffs have alleged "airport pairs" in the FAC.

Rather, Plaintiffs' FAC alleges "city pairs," not airport pairs, as relevant markets.  (Dkt. No. 103

at Appendix A.)  Defendants' Motion later calls them city pairs, but appears to erroneously refer

to airport pairs and city pairs interchangeably.  (Dkt. No. 140 at 20)[20].  Airport pairs are routes from airport to airport and fail to account for competition from nearby airports.  City pairs, on the other hand, include airports in the particular city markets and nearby airports, where relevant. Ex. F, Lundgren Report, p. 5-10.  Defendants' arguments are directed to airport pairs (flights between specific airports), not city pairs, as Plaintiffs have alleged.

By way of example, Defendants argue that because Plaintiff Valarie Jolly admitted that, "flights (from Dallas/Forth Worth to Salt Lake City) are easily substituted by flights from Dallas Love Field (to Salt Lake City)" that these, "cannot be relevant city-pair markets in this case." (Dkt. No. 140 at 20.)  But this is a false argument because the Dallas-Salt Lake City city pair relevant market that Defendants refer to already includes both airports as substitutable: Dallas/Fort Worth Airport and Dallas Love Field.  Ex. F, Lundgren Report, p. 10.  Because Defendants' arguments refer to airport pairs, not city pairs as Plaintiffs have proposed, Defendants' analysis on those points is entirely erroneous and should be disregarded by the Court.

By way of further example, Defendants argue that Plaintiffs have provided no evidence as to "why flights from Boston to Ft. Lauderdale or West Palm Beach are not reasonably interchangeable substitutes for customers considering flights to Miami."  (Dkt. No. 140 at 23, fn 15.)  To the contrary, Plaintiffs' proposed city pair market definition already does include flights from Boston to Miami and to Fort Lauderdale.  Ex. F, Lundgren Report, p. 10.  Yet again, Defendants confuse city pairs with airport pairs.  Plaintiffs' city pair definitions already include nearby airports in cities where customers might find them adequate substitutes because that is the

---

[20] Of the 1,008 city-pairs originally identified, Plaintiffs' expert, Dr. Carl Lundgren, has determined that 785 of those city-pairs are presumptively illegal post-acquisition.  Plaintiffs allege that each of those city-pairs is a relevant market for antitrust purposes.  These Plaintiffs are consumers of air travel in the United States.  Some are members of Defendants' loyalty programs. Some fly on overlapping routes/city pairs affected by the acquisition. Some have flown over a hundred fights on American since 2009.  Many intend to travel by air in the future.  The relevant market in an antitrust action is not defined by where any of these Plaintiffs have or will fly in the future.  It is defined on the basis of competitive overlap of the Defendants.

definition of a city pair relevant geographic market.[21]

      Defendants' arguments are belied by their own admissions and previous determinations

by the courts that "city pairs" for air passenger transportation are relevant markets for antitrust

purposes.  Thomas Horton, the former president, chairman, and CEO of AMR Corporation,

admitted at his deposition that ███████████████████████████████████████████

███████



Ex. U, Horton Dep. T. 65:18-25.  Scott Kirby, the former president of USAir and former

president of the "New" American Airlines, ██████████████████████████████████



██████████████████████████ Ex. ZZ, Kirby DOJ Dep. T. 17:3-7; see 17:16 –

22:20.

      Even Defendants' expert, Dennis Carlton, ████████████████████████████ in

his deposition testimony and in his report:



---

[21] Defendants further note that flights by JetBlue are a fungible alternative going to Hawaii.  But like the examples above, those alternatives are necessarily included in any city pair calculation.



Ex. GG, Carlton Dep. T. 66:2-10; (Def. Ex. 4, Carlton Report, ¶¶ 23; 24; Annex A, ¶ 13; Annex

B, pp. 14-17).

Notwithstanding Defendants' admissions, numerous courts have recognized city pairs as

relevant geographic markets for antitrust purposes, including this Court[22]:

> [T]he case law recognizes that city pairs are an appropriate way to define the market for
> antitrust purposes in the airline industry. The court in *Global Discount Travel
> Services,* recognized city-pairs for all airline tickets as the relevant product market. 960
> F.Supp. at 705; *see also In re Northwest Airlines Corp.,* 208 F.R.D. 174, 220
> (E.D.Mich.2002)…

*In re AMR Corp.*, 527 B.R. 874, 886 (Bankr. S.D.N.Y. 2015).

Further, Defendants have already conceded city pairs as a relevant market earlier in these

proceedings, which was accepted by this Court in its November 27, 2013, Memorandum Opinion

(Dkt. No. 72 at 20), "While the Defendants accept that city-pairs are the properly defined market,

*see* Reply at 37 n.10 (Adv. Pro. ECF No. 64), neither Mr. Bush's report nor the Plaintiffs'

pleadings identify which city-pairs are at issue in light of the New Merger." Defendants are now

judicially estopped from taking a "clearly inconsistent position" later in these same proceedings.

*See New Hampshire v. Maine*, 532 U.S. 742 (2001).

Defendants turn the burden for granting summary judgment on its head. The burden is on

Defendants to show there is no genuine issue of material fact as to Plaintiffs' proposed relevant

---

[22] Defendants argue that cross-elasticity of supply prevents a city-pair from being a relevant market for antitrust purposes because "a would-be monopolist's attempt to charge a supracompetitive price will be thwarted by the existence of firms willing to shift resources to producing the product." (Dkt. No. 140 at 20.) Rather, "Where the degree of substitutability in production is high, cross-elasticities of supply will also be high, and ... the two commodities in question should be treated as part of the same market." *Twin City Sportservice, Inc. v. Charles O. Finley & Co.,* 512 F.2d 1264, 1271 (9th Cir.1975). In addition, under the hypothetical monopolist test (which is found nowhere in the *Brown Shoe* factors, in any event), "[A] market consists of an area where sellers, "if unified by a hypothetical cartel or merger, *could profitably raise prices* significantly above the competitive level." *Concord Associates, L.P., v. Entertainment Properties Trust,* 817 F.3d 46, 52 (2d Cir. 2016). [emphasis in original]. Because there are just four major domestic airlines in the United States controlling, 85% of the market, these airlines could profitably raise prices if "unified by a hypothetical cartel or merger" whether the relevant geographic market is national or a city pair.

markets, not on Plaintiffs.  Defendants offer no evidence or propose an alternative relevant

market to support their arguments; and having offered no evidence to the contrary, summary

judgment cannot be granted in favor of Defendants on the issue of relevant market.  This Court

must accept as true that a national relevant market, as well as relevant city pair submarkets, are

the correct markets for antitrust purposes.  With respect to the existence of city pair markets, that

issue has been previously settled by this Court and by Defendants' earlier successful arguments

to that effect.

### V.    PLAINTIFFS HAVE STANDING TO BRING THIS ACTION

#### A.    Section 16 of the Clayton Act Requires Only a Threat of Injury

Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26, provides that, "Any person, firm,

corporation or association shall be entitled to sue for and have injunctive relief…against

*threatened* loss or damage by a violation of the antitrust laws…" [emphasis added].  Under § 16

of the Clayton Antitrust Act, 15 U.S.C. § 26, "[t]he requirements for standing to seek such

injunctive relief are much less restrictive than for monetary relief."  1 Callmann on Unfair

Comp., Tr. & Mono. § 4:49, Enforcement of private rights—Standing to sue, (4th Ed.); *See*,

*Freedom Holdings, Inc. v. Cuomo*, 592 F.Supp.2d 684, 693-694 (S.D.N.Y. 2009) (Holding that,

"The antitrust standing analysis is more flexible and less demanding for claims for injunctive

relief than it is for those seeking money damages, because 'one injunction is as effective as 100,

and ... 100 injunctions are no more effective than one (citations omitted)," and that

"the standing inquiry is more flexible, reflecting greater concern for the public interest and

reduced risk of duplicative recovery.")  Thus, "[n]o proof of actual past injury is required; only a

causal connection to the antitrust violation, and at least a threat of *future* injury."  1 Callmann on

Unfair Comp., Tr. & Mono. § 4:49, Enforcement of private rights—Standing to sue, (4th Ed.)

[emphasis in original]; *see, Nader v. Air Transport Association of America*, 426 F.Supp. 1035,

1038 (S.D.N.Y. 1977).  In a suit for equitable relief under § 16 of the Clayton Act, the plaintiff

must also establish an antitrust injury, although the injury need only be threatened. *See Zenith Radio Corp. v. Hazeltine Research, Inc.* 395 U.S. 100, 130 (1969); *see also Cargill, Inc. v. Monfort of Colo., Inc.,* 479 U.S. 104, 122 (1986).

### B. Plaintiffs are Consumers of Air Travel in the United States and are Threatened with Injury to Themselves

Defendants first argue that of the, "forty named Plaintiffs, only Don Freeland, Wayne Taleff, Gabriel Garavanian, Jan Marie Brown, Valarie Ann Jolly, and Michael Malaney have flown on *any airline* after the merger."[23]  (Dkt. No. 140 at 32.)  They go on to claim that, "Plaintiffs are not active consumers of air travel."  (Dkt. No. at 33.)  As a matter of clarification, Defendants elected to depose just eight Plaintiffs in this case.  Three of those Plaintiffs, Mike Malaney, Wayne Taleff, and Lisa McCarthy, were deposed just shortly after the merger, on March 24, 2014, and April 12, 2014, and March 24, 2014, respectively, and not deposed again.  Five were deposed later after Plaintiffs identified them as possible witnesses in a non-binding, good faith designation.  Ex. JJ, Letter from Messina to Huseny.  The five designated Plaintiffs corresponded to the same number of witnesses that Plaintiffs deposed.  Counsel also agreed that if other Plaintiffs submitted declarations in connection with the summary judgment motions or were designated as trial witnesses, Defendants would be permitted to take their depositions.  Messina Decl. ¶ 6[24]

Notwithstanding Defendants' contrary assertions, this Court will find that Plaintiffs are, in fact, consumers of air travel[25]:

---

[23] Last year, Plaintiff Annette Tippetts passed away.

[24] Defendants also scheduled the deposition of Plaintiffs' expert, Dr. Carl Lundgren, but they chose not to proceed with it.

[25] Defendants cite *Drug Mart Pharmacy Corp., v. American Home Products Corp.*, 2007 WL 4526618, *6 (E.D.N.Y. Dec. 20, 2007) for the proposition that "when allegedly anticompetitive conduct has been ongoing for a sufficient period of time," a failure to show "actual injury" gives rise to a "rebuttable presumption that, absent a change in circumstances, the conduct at issue does not create a risk of future injury."  By its own admission, this line of reasoning has *never* been accepted by the Second Circuit. *Id.*  Further, *Drug Mart* is inapposite because *Drug Mart* is not a § 7 case.  This "requires not merely an appraisal of the immediate impact of the merger upon competition, but a prediction of its impact upon competitive conditions in the future…" *United States v. Phila. Nat'l Bank,* 374 U.S. 321, 362 (1963).  Further, the Defendants have been under material, competitive restrictions since the closing of the merger, some of which have only recently expired and the remainder are not due to expire until November 2018.  The full extent of the anticompetitive effects caused by this merger will not be known for years to come.

- The Plaintiffs have traveled on and/or purchased over 2,000 flights since 2009.[26]

- The Plaintiffs have traveled on and/or purchased flights since the merger closed in 2013.[27]

- The Plaintiffs have traveled on and/or purchased flights on American or US Airways since 2009.[28]

- The Plaintiffs have traveled on and/or purchased flights on American since the merger closed.[29]

- The Plaintiffs have flown and/or will fly on the city pairs identified in Exhibit C to the Expert Report of Carl Lundgren.[30]

- The Plaintiffs are members of the American Airlines AAdvantage Mileage program and/or the US Airways Dividend Mileage Program.[31]

- The Plaintiffs plan to travel on airlines, including on American, in the future.[32]

Defendants single out seven Plaintiffs' future travel plans and draw the conclusion that

"not a single named Plaintiff has any concrete plans to fly domestically, on any airline, in the

future." (Dkt. No. 140 at 32). *First*, Defendants claim that no Plaintiff has paid for future travel.

---

[26] (Davis Dec., ¶ 6); (Fjord Dec., ¶¶ 4, 5); (Whalen Dec., ¶ 3, 4); (Pulfer Dec., ¶ 5); (Freeland Dec., ¶ 5); (Fry Dec., ¶ 3, 4, 5); (G. Garavanian Dec. ¶ 4); (Talewsky Dec., ¶ 3); (Brito Dec., ¶ 6); (Stansbury Dec., ¶ 3, 4); (Arcell Dec., ¶ 4, 7); (McCarthy Dec., ¶ 3); (Malaney Dec., ¶ 3); (Russell Dec., ¶ 5); (Rubinsohn Dec., ¶ 5); (D'Augusta Dec., ¶ 5); (Jolly Dec., ¶ 5); (Taleff Dec., ¶¶ 3, 4, 5); (Def. Ex. 9, Resp. to ROGS, subsection (c), Bradt at 8; subsection (d), Bray at 9; subsection (h), Crandall at 14; subsection (k), Faust at 17; subsection (o), H. Garavanian at 20-21; subsection (p), Gardner at 22; subsection (s), Kosach at 25; subsection (u), Marazzo at 27; subsection (w), Meeuwsen, at 28-29; subsection (x), Oehmig, at 29-30; subsection (y), Prosterman at 30; subsection (bb), Rosenthal at 34; subsection (kk), Ward at 44; subsection (ll), Walker at 45-46).

[27] (Davis Dec., ¶ 6); (Fjord Dec., ¶¶ 4, 5); (Fry Dec., ¶ 3, 4, 5); (Whalen Dec., ¶ 5); (Pulfer Dec., ¶ 5); (Freeland Dec., ¶ 5); (G. Garavanian Dec. ¶ 4); (Talewsky Dec., ¶ 6); (Brito Dec., ¶ 6); (Stansbury Dec., ¶ 3, 5); (Arcell Dec., ¶¶ 4, 5); (McCarthy Dec., ¶¶ 3, 4); (Malaney Dec., ¶ 5); (Faust Dec., ¶ 5); (Russell Dec., ¶ 5); (Rubinsohn Dec., ¶ 5); (D'Augusta Dec., ¶ 5); (Jolly Dec., ¶ 5); (Taleff Dec., ¶ 4).

[28] (Davis Dec., ¶ 6); (Fjord Dec., ¶¶ 4, 5); (Whalen Dec., ¶ 4); (Freeland Dec., ¶ 5); (Fry Dec., ¶ 3, 4, 5); (G. Garavanian Dec. ¶ 4); (Talewsky Dec., ¶¶ 4, 5, 7); (Brito Dec., ¶ 6); (Stansbury Dec., ¶ 4); (Arcell Dec., ¶ 4); (McCarthy Dec., ¶¶ 3, 4, 5); (Faust Dec., ¶ 7); (Russell Dec., ¶ 5); Rubinsohn Dec., ¶ 5); (Jolly Dec., ¶ 5); (Taleff Dec., ¶ 3); (Def. Ex. 9, Resp. to ROGS, subsection (d), Bray at 9; subsection (o), H. Garavanian at 20-21; subsection (u), Marazzo at 27; subsection (x), Oehmig, at 29-30; subsection (bb) Rosenthal at 34; subsection (kk), Ward at 44; subsection (ll), Walker at 45-46).

[29] (Davis Dec. ¶ 6); (Fjord Dec., ¶¶ 4, 5); (Pulfer Dec., ¶ 5); (Ex. EE, Freeland Dep. T. 46:19-25); (Fry Dec., ¶ 3, 4, 5); (G. Garavanian Dec. ¶ 4); (Talewsky Dec., ¶ 4, 5, 7); (Brito Dec., ¶ 6); (Stansbury Dec., ¶ 5); (Arcell Dec., ¶¶ 4,5); (McCarthy Dec., ¶ 5); (Malaney Dec., ¶ 5); (Russell Dec., ¶ 5); (Rubinsohn Dec., ¶ 5); (Jolly Dec., ¶ 5); (Taleff Dec., ¶ 4).

[30] (Arcell Dec., ¶¶ 6,7); (Brito Dec., ¶ 7); (Brown Dec., ¶ 7); (Davis Dec., ¶ 9); (Fjord Dec., ¶¶ 8, 9); (Freeland Dec., ¶ 6); (Fry Dec., ¶ 8); (Garavanian Dec., ¶¶ 4, 5); (Jolly Dec., ¶ 5); (Malaney Dec., ¶ 3); (McCarthy Dec., ¶ 6, 7); (Rubinsohn Dec., ¶ 7); (Russell Dec., ¶ 6); (Stansbury Dec., ¶ 7); (Taleff Dec., ¶ 6); (Talewsky Dec., ¶ 2); (Whalen Dec., ¶ 6).

[31] (Davis Dec., ¶ 4); (Freeland Dec., ¶ 7); (Garavanian Dec., ¶ 9); (Jolly Dec., ¶ 19); (Rubinsohn Dec., ¶¶ 9, 10); (Russell Dec., ¶ 9); (Stansbury Dec., ¶ 21); (Talewsky Dec., ¶¶16, 17).

[32] (Brito Dec., ¶ 17); (Arcell Dec., ¶ 6); (Brown Dec., ¶ 7); (D'Augusta Dec., ¶¶ 6, 7); (Davis Dec., ¶¶ 6, 11); (Fjord Dec., ¶ 6); (Freeland Dec., ¶¶ 4, 5, 6); (Fry Dec., ¶¶ 6, 8); (Garavanian Dec., ¶¶ 4, 7, 8); (Jolly Dec., ¶ 4); (Malaney Dec., ¶ 8); (McCarthy Dec., ¶¶ 8, 9); (Pulfer Dec., ¶¶ 4, 5, 6, 21); (Rubinsohn Dec., ¶ 20); (Russell Dec., ¶¶ 6, 20); (Stansbury Dec., ¶¶ 8, 9); (Taleff Dec., ¶¶ 7, 16, 17); (Talewsky Dec., ¶¶ 9, 10); (Whalen Dec., ¶ 7).

The record demonstrates otherwise, *see, supra*. But even assuming that claim was correct (even though it is not), Defendants pervert the standard under § 16 of the Clayton Act. To the extent Plaintiffs have "concrete" plans to fly (having already paid for flights), they have suffered "actual injury." Since a threat of injury is all that § 16 requires, it would be improper to require Plaintiffs to demonstrate "actual injury" vis-à-vis "concrete," paid tickets to fly. *Second*, the excerpts from two of those Plaintiffs, Mike Malaney and Brenda Davis, were taken from responses to Interrogatories served in November 2013, almost four years ago; and in any event, Defendants never asked Plaintiffs in those interrogatories whether they had future plans to fly. Both Mike Malaney and Brenda Davis do plan to fly in the future. (Malaney Dec., ¶ 8); (Davis Dec., ¶¶ 6, 11). *Third*, in the deposition of Don Freeland, the Defendants asked whether he had "booked" any flights, not whether he planned to fly in the future. (Freeland Dep. T. 67:24, 67:11). Mr. Freeland plans to fly in the future. (Freeland Dec., ¶¶ 4, 5, 6). *Fourth*, in the deposition of Valarie Jolly, Defendants asked if she had "booked" travel on American or had "specific plans." She testified that she did intend to fly on American in the future. [Jolly Dep. T. 81:1-3.] She was not asked what her travel plans were generally in the future. Ms. Jolly does intend to fly in the future. She does so personally and professionally. (Jolly Dec., ¶ 4). *Fifth*, in the deposition of Rosemary D'Augusta, she testified that she intended to travel to New York for personal travel because she has family there. (D'Augusta Tr., 48:18-49:9); (D'Augusta Dec., ¶ 6). *Sixth*, as to Plaintiffs Wayne Taleff and Gabriel Garavanian, the Defendants yet again, attempt to hold them to a standard unsupported by § 16 of the Clayton Act. In any event, Mr. Taleff and Mr. Garavanian do have plans to fly in the future. (Taleff Dec., ¶¶ 7, 16, 17) (Garavanian Dec., ¶¶ 4, 7, 8).

Section 16 of the Clayton Act was intended to confer standing on consumers of air travel, like the Plaintiffs here. *Nader v. Air Transport Association of America*, 426 F.Supp. 1035, 1040 (D.D.C. 1977). By way of example in *Reilly v. Hearst Corp.*, 107 F.Supp.2d 1192, 1194-1195

(N.D.Cal. 2000), the court reviewing the merger of two newspapers in San Francisco, held that

the plaintiff, who was a "consumer of newspaper news, features, and opinions" was "entitled to

prove that the challenged transactions cause injury to competition for readers." The plaintiff in

that case had purchased one copy of defendant Examiner's newspaper but was also a "potential

purchaser." The Plaintiffs here, as consumers of air travel, not only purchased flights on US

Airways and American, but they are also "potential purchasers." *See also*, *Reilly v. MediaNews*

*Group, Inc.,* 2007 WL 1068202 (N.D. Cal. Apr. 10, 2007).

Contrary to Defendants' characterizations, these Plaintiffs are consumers of air travel in

the United States and in the particular city pair relevant markets identified in Exhibit C attached

to the Expert Report of Carl Lundgren. Accordingly, they have standing.

### C. Plaintiffs are Threatened with the Type of Injury that the Antitrust Laws were Intended to Prevent

Antitrust plaintiffs must have "antitrust injury," *i.e.*, "injury of the type the antitrust laws

were intended to prevent and that flows from that which makes defendants' acts unlawful."

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). The "injury should

reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible

by the violation. It should, in short, be 'the type of loss that the claimed violations . . . would be

likely to cause.'" *Id.* (quoting *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 125

(1969)).

Defendants argue that "none of the Plaintiffs has been able to adequately describe any

real connection between any 'injuries' they supposedly suffered and the Merger." (Dkt. No. at

34.) To the contrary, Plaintiffs have described various types of injuries flowing from the merger

and the increased concentration in the industry, including fare increases, ancillary fee increases,

reductions in service/capacity, and reduction in the quality of service. These threatened injuries

are precisely the type of harm the antitrust laws were intended to prevent. *California v.*

*American Stores Co.*, 492 U.S. 1301, 1304 (1989).

The court's holding in *Nader v. Air Transport Association,* 426 F.Supp. 1035, 1038 (D.DC. 1977) is instructive.  In *Nader*, an air traveler brought an action under the Clayton Act against a trade association of air carriers and 19 individual airline corporations, alleging that defendants had entered into an anticompetitive agreement with respect to the practice of overbooking flights.  The plaintiff Nader alleged that, "(1) he 'is and reasonably expects to be a frequent user of air transportation services in the United States...' (2) he 'utilizes air transportation in traveling from scheduled meetings and on professional and personal business, and the unavailability of reliable airlines reservations or failure by an air carrier to honor a reservation system imposes upon him significant expenses, loss of time, and inconvenience…" The court determined that Nader had shown "particularized personal injuries arising from the alleged antitrust violations." *Id.*  Because Plaintiffs here have shown injuries substantially similar to Nader's, they too have a claim under § 16.

### 1.    Fare Increases

One type of harm Plaintiffs have experienced and will continue to experience is that air fares have increased since the merger.  "[T]he prototypical example of antitrust injury is an allegation by consumers that they have had to pay higher prices (or experienced a reduction in the quality of service) as a result of a defendant's anticompetitive conduct." *Mathias v. Daily News, L.P.*, 152 F. Supp.2d 465, 478 (S.D.N.Y. 2001).  These harms flow from the anticompetitive effects of the merger.

Plaintiffs have experienced (and will experience in the future) air fare increases across the country after the merger for a variety of merger-related reasons, such as increased concentration and cuts in service at certain airports.[33]  By way of example, Plaintiff Kathy Arcell

---

[33] (Arcell Dec., ¶¶ 6, 8); (Brito Dec., ¶¶ 7, 8, 13, 16); (D'Augusta Dec., ¶ 7); (Davis Dec., ¶ 9); (Faust Dec., ¶ 8); (Fjord Dec., ¶¶ 6, 9); (Freeland Dec., ¶¶ 6, 13, 14, 15); (Fry Dec., ¶ 10); (G. Garavanian Dec., ¶¶ 6, 10, 13, 14, 16, 17); (Jolly Dec, ¶¶ 12, 13, 16);

47

travels from New Orleans to Hartford.  She has experience flying that route and is familiar with the fares.  Before the acquisition she was able to pay less than $300 roundtrip.  In April, she paid $184.30 for a one-way ticket to Hartford.  (Arcell Dec., ¶¶ 6, 8).  This route is one of the city pairs identified in Exhibit C to the Expert Report of Carl Lundgren where the merger was presumptively illegal.  Based on data from the Department of Justice DB1B database, the average fare has increased on that route post-merger by 8.4% from $225.08 to $244.05, even though the price of fuel which is tied to the price of crude oil--the largest expense for airlines— has dropped 50% since the merger closed.  Lundgren Dec., Annex A, line 440; and Ex W, American Form 10-K (February 22, 2017), p. 10.

By way of further example, Jose Brito has traveled on three city pairs identified in Exhibit C, attached to the Lundgren Report where the merger was presumptively illegal (Brito Dec., ¶¶ 7, 8): (1) Dallas, TX – Reno, NV; (2) Miami, FL – Phoenix, AZ; and (3) Boston, MA - Phoenix, AZ.  (Brito Dec., ¶¶ 7, 8).  Average airfares on those routes have increased since the merger closed, by 14.5%, 3.5% and 11.5%, respectively.  Lundgren Dec., Annex A, lines 245, 624, and 340.

Where, as here, Plaintiffs have shown that concentration in the industry has increased, including on routes where concentration increased to presumptively illegal levels *and* average fares also increased on those routes, there can be no clearer connection between Plaintiffs' injuries and that which makes Defendants' merger illegal.

## 2.    Ancillary Fee Increases

Another type of harm Plaintiffs have experienced is ancillary fee increases, including

---

(Malaney Dec., ¶ 10); (McCarthy Dec., ¶¶ 8, 10, 15, 16); (Pulfer Dec., ¶¶ 11, 14, 16, 19, 20, 21); (Rubinsohn Dec., ¶¶ 13, 14, 18, 19); (Russell Dec., ¶¶ 12, 15); (Stansbury Dec., ¶¶ 14, 23); (Taleff Dec., ¶¶ 10, 12, 13, 16, 17); (Talewsky Dec., ¶¶ 27, 28, 29); (Whalen Dec., ¶¶ 13, 14).

increased baggage fees, change fees, seat assignment fees, among others.[34]

One example of a post-merger ancillary fee is a seat assignment charge. As explained by Plaintiff Brenda Davis, "Seat assignment fees were virtually unheard -of prior to the merger, but now are common-place. On a recent trip to Fort Lauderdale, FL on American Airlines, my husband and I declined to pay an additional fee for a pre-flight seat assignment. As a result, we were forced to sit in the rear of the aircraft where there was less legroom and overhead baggage space was limited." (Davis Dec., ¶ 10).

Another example of fee increases is given by Plaintiff Gary Talewsky, "Prior to the merger, it used to cost $150 to change a ticket now it is a minimum of $200 to change a domestic ticket, and international has gone up even more. Like most business people I have to change my travel plans often and have personally paid many of the higher change fees since the merger. My informed estimate is that since the merger I have paid in excess of $1000 per year for change fees, which is considerably higher than before the merger." (Talewsky Dec., ¶ 18).

American's CEO Douglas Parker recently admitted that American intends to continue increasing ancillary fees in the future: "We have recently instituted, and intend to institute in the future, changes to our business model to increase revenues and offset costs. These measures include premium economy service, basic economy service *and charging separately for services that had previously been included within the price of a ticket and increasing other pre-existing fees*. We may introduce additional initiatives in the future…" Ex. W, American Form 10-K (Feb. 22, 2017). [emphasis added]. American warns its investors that if other carriers do not match these fee changes it could, "provide a significant competitive advantage to other carriers that determine not to institute similar charges." *Id.* Implicit in American's promise to investors

---

[34] (Arcell Dec., ¶¶ 5, 8); (Brito Dec., ¶ 8); (D'Augusta Dec., ¶ 7); (Davis Dec., ¶ 10); (Fjord Dec., ¶ 6); (Freeland Dec., ¶¶ 8, 9); (Fry Dec., ¶ 11); (Jolly Dec., ¶¶ 9, 16); (McCarthy Dec., ¶ 16); (Pulfer Dec., ¶ 8, 21); (Rubinsohn Dec., ¶ 9); (Russell Dec., ¶ 8); (Stansbury Dec., ¶¶ 16, 18); (Taleff Dec., ¶ 18); (Talewsky Dec., ¶¶ 15, 16, 18, 19); (Whalen Dec., ¶ 16).

to increase ancillary fees is that it expects the other major airlines in the United States to match these increases.  This same type of policy articulated by American was determined to pose a threat to competition by the Second Circuit.  In *Stanley Works v. F.T.C.*, 469 F.2d 498 (2d. Cir. 1972), the acquiring company, Stanley, which was the leading firm in the cabinet hardware product market and a price leader in the industry had created a long-range report, stating, "'As the largest firm in the industry, the Hardware Division must continue to show leadership in the important area of pricing policy. As conditions warrant, we must continue to take the initiative and corresponding risks of being the first within the industry to raise prices and attempt to keep them at such higher levels.'"  *Id*. at 504.   The Second Circuit found that such a policy, "undoubtedly presented a threat to the future competitive vitality of the industry, which had recently experienced price decreases."  *Id*.  The same is true here; such coordinated behavior is just the kind of conduct §§ 7 and 16 were intended to prevent.

### 3.    Reductions in Service/Capacity

Plaintiffs have also experienced service cuts following the elimination of USAir as a competitor in the United States market.[35]  Plaintiff Pamela Faust explains that, "Prior to the merger of American Airlines and USAir, US Air offered service out of Dayton as an alternative to service out of Cincinnati.  After the merger, however, many of the flights previously offered by US Air were discontinued by the merged entity.  Consequently, when I wish to travel I have less flights [sic] options and I feel that I frequently pay higher fares."  (Faust Dec., ¶ 8).

Plaintiff Carolyn Fjord talks about service cuts at Sacramento Airport after the merger. "There is no longer a non-stop flight from Sacramento to Philadelphia.  It now takes many more hours of time to leave from Sacramento, because of connections…Since the merger of American

---

[35] (Arcell Dec., ¶ 8); (Brito Dec., ¶ 8); (D'Augusta Dec., ¶ 7); (Davis Dec., ¶¶ 4, 5, 7, 8); (Faust Dec., ¶ 8); (Fjord Dec., ¶¶ 8, 9, 10, 11); (G. Garavanian Dec., ¶¶ 8, 9, 10, 12, 13-17, 19); (Jolly Dec., ¶¶ 12, 13);  (McCarthy Dec., ¶ 10); (Pulfer Dec., ¶ 11); (Rubinsohn Dec., ¶ 13); (Russell Dec., ¶ 12); (Stansbury Dec., ¶¶ 17, 21); (Taleff Dec., ¶ 17); (Talewsky Dec., ¶¶ 24, 25, 26, 27); (Whalen Dec., ¶ 14).

and US Air, the only feasible flight from Sacramento to St. Louis on American involves a connection through Dallas each way; this itinerary takes twice as long as a non-stop and now costs over $900." (Fjord Dec., ¶¶ 8, 9).

Reductions in service have led to a host of other problems, "I have had to pay out of pocket for my alternate transportation, when segments of flights are cancelled for myself or my tour customers.  There is no backup from the originating carrier or alternate carriers when flights are reduced from smaller cities."  (Jolly Dec., ¶ 13).

Reduction in service at airports following the elimination of USAir directly flow from the "lessening of competition" caused by the merger because reduction in service to mid-sized and smaller-communities as a result of the acquisition was predicted by a study by Ex. AA, MIT White Paper # 3, pp. 3-4.

### 4.      Reduction in the Quality of Service

Another harm experienced by Plaintiffs following the merger is the reduction in the quality of service offered by the Defendants.[36]

Reduction in the quality of service is a "prototypical" example of antitrust injury. *Mathias v. Daily News, L.P.*, 152 F. Supp.2d 465, 478 (S.D.N.Y. 2001).  To illustrate, Plaintiff Carolyn Fjord explains that, "For example, since the merger of American and USAir, I have seen cabin comfort decrease substantially.  Recently, the distance between seats has been reduced from 32 to 29 inches.  Bathroom size has also been reduced, and is very tight, even for me at 5"4" and 138 pounds.  I now find in-flight drinks and meals, once complimentary, to be very expensive."  (Fjord Dec., ¶ 7).

Plaintiff Don Freeland explains that since the merger, "It is no longer possible to check

---

[36] (Arcell Dec., ¶ 8); (Brito Dec., ¶¶ 8, 11, 12, 15, 16); (Brown Dec., ¶ 8); (D'Augusta Dec., ¶ 7); (Davis Dec., ¶ 8); (Fjord Dec., ¶ 7); (Freeland Dec., ¶ 10); (Fry Dec., ¶ 12); (G. Garavanian Dec., ¶¶ 11, 20, 21); (Jolly Dec., ¶¶ 10, 19, 20); (Malaney Dec., ¶¶ 18, 19, 20); (McCarthy Dec., ¶¶ 20, 21); (Pulfer Dec., ¶¶ 9, 19); (Rubinsohn Dec., ¶¶ 10, 11, 20); (Russell Dec., ¶¶ 9, 10); (Stansbury Dec., ¶¶ 15, 18, 20); (Taleff Dec., ¶¶ 12, 17); (Talewsky Dec., ¶¶ 20, 21, 22, 23); (Whalen Dec., ¶ 17).

bags through to a final destination when flying on two different airlines. I cannot purchase a

ticket from American and then continue on another airline to a destination that American doesn't

fly. These changes occurred after the merger in the past three years." (Freeland Dec., ¶ 10). He

goes on to explain that, "It used to be that it only took one carrier out of eight or so carriers not to

match a change in fares or change in policy to have that policy or fare increase rolled back. Now

the changes only have to be matched by two other carriers for them to stick." (Freeland Dec., ¶

12).

Plaintiff Bill Rubinsohn talks about the merger's impact on his frequent flier miles,

"Since May of 1986, I have accrued over 2 million miles on my American AAdvantage

account… and you would think that AA would value my loyalty. I receive fewer benefits now

than I did before the merger and I don't have the option of using either USAIR or American

points to fly on the two carriers. In fact, before the merger, USAIR was in the Star Alliance

which gave me several more opportunities to use points to international destinations than

American does in its One World Alliance. USAIR automatically upgraded me if space was

available. Now I have to check a box on a website at AA.com to be 'listed' for an upgrade."

(Rubinsohn Dec., ¶ 10). Reduction in the quality of service, as these Plaintiffs have shown, is a

well-recognized antitrust injury that flows from the elimination of USAir as a competitor in the

market.

### D.    Plaintiffs Have Standing as Travel Agents

Lastly, Defendants incorrectly argue that Plaintiffs do not have standing as travel agents

because they are not "targets" themselves. (Dkt. No. 140 at 36-37). In support of this argument,

they cite *Calderon Enters. Corp., v. United Artists Theatre Circuit, Inc,*. 454 F.2d 1292, 1295 (2d

Cir. 1971), a § 4 case. Plaintiffs' claim for injunctive relief under Section 16 of the Clayton Act

is not properly analyzed under the standards for § 4. *AGC. Sullivan v. DB Invs., Inc*., 667 F.3d

273, 316–17 (3d Cir. 2011) (en banc) (Section 16 "has been applied more expansively, both

because its language is less restrictive than that of § 4 . . . and because the injunctive remedy is a more flexible and adaptable tool for enforcing the antitrust laws than the damage remedy. . . .") (internal quotes and citations omitted).  As the Supreme Court has said, "many" of the prudential standing factors "are not relevant to the [antitrust] standing inquiry" because the issuance of an injunction raises no threat of multiple lawsuits or duplicative recoveries. *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 110–11, nn.5-6 (1986); s*ee also In re Rail Freight Fuel Surcharge Antitrust Litig.*, 593 F. Supp. 2d 29, 41 (D.D.C. 2008) ("'[E]fficient enforcement factors' identified in *AGC* do not apply to [Section 16] claims").  Instead, courts require simply the demonstration of (1) a significant "threatened loss or injury cognizable in equity" which (2) "proximately results from the alleged antitrust injury."

Plaintiffs complain of a variety of harms to their travel agency businesses related to the merger, including losing clients, having to close their businesses, spending additional time searching for fares, changing tickets, and trying to explain the airlines' new post-merger policies and fees to clients.[37]  For example, Lisa McCarthy describes losing a long-time, pre-merger client:  "A North Carolina based corporate client who had previously flown primarily on US Airways from Charlotte, Greensboro, and Raleigh voiced concern due to higher airfares post AA/US Airways merger.  The client asked if we were not checking as hard for the lower airfares that we had been able to deliver for them pre-AA/US Airways merger.  When told those lower fares were harder to secure, even with extra time spent checking and rechecking, the client stopped flying their key people as frequently and eventually stopped working with the agency. We had been working with this client since 1999."  (McCarthy Dec., ¶ 19iii).

To obtain injunctive relief, it is not necessary for Plaintiffs to show that they are the

---

[37] (Brito Dec., ¶¶ 3, 14); (Brown Dec., ¶ 9); (Fjord Dec., ¶ 13); (Jolly Dec., ¶¶ 11, 13, 14, 15, 17, 18, 20); (Malaney Dec., ¶¶ 11, 12, 13, 15); (McCarthy Dec., ¶¶ 19, 20, 21); (Pulfer Dec., ¶¶ 10, 11, 12, 13, 15, 16, 17, 18); (Rubinsohn Dec., ¶ 12); (Russell Dec., ¶¶ 11, 13, 14, 16, 17, 18); (Stansbury Dec., ¶¶ 18, 19, 22); (Talewsky Dec., ¶¶ 15, 30, 31, 32, 33); (Whalen Dec., ¶¶ 15, 18, 19).

"target" of Defendants' anticompetitive conduct.  They simply need to demonstrate that their harms flow from that which makes the merger unlawful.  They have done so.

## VI.    THE PUBLIC INTEREST CAN ONLY BE SERVED BY DIVESTITURE

The antitrust laws are the foundation of our free enterprise system.  Economic and legal principles enunciated and dating from Adam Smith to today have uniformly held that competition – whether it be in the marketplace of goods and services or the concomitant marketplace of ideas – best serves the public interest.  As Justice Thurgood Marshall stated, "Antitrust laws . . . are the Magna Carta of free enterprise.  They are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms."  *United States v. Topco Associates*, 405 U.S.  596, 610 (1972)

One cannot put a genie back in the bottle and restore competition to the marketplace once a competitor has been eliminated except through the remedial vehicle of divestiture.  The public interest strongly favors the effective enforcement of the antitrust laws and the preservation of competition whenever and wherever possible, and this has long been recognized.[38]  As the Supreme Court stated in *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969) "…the purpose of giving private parties treble-damage and injunctive remedies was not merely to provide private relief, but was to serve as well the high purpose of enforcing the antitrust laws…Section 16 should be construed and applied with this purpose in mind…."  *Id.* at 130-31.

In this case, the Section 7 violation is indisputable.  Most of these anticompetitive

---

[38] "In principle, any practice that impedes or otherwise interferes with the natural flow of interstate commerce, even if there is no evident harm to the economy as a whole, because the victim's business is so minimal that its destruction made little impression upon the economy, is nonetheless injurious to the public interest.  Accordingly, public injury necessarily results whenever there is an assault upon the principle of free and unhampered competition, as expressed in the antitrust laws . . .  Therefore, the complaint need not allege injury to the public; the allegation is superfluous."  1 Callman on Unfair Comp., Tr. & Mono. § 4:24 (4th Ed.).

consequences alleged in the FAC were predicted to occur and they have already occurred –

demonstrably so.  The others are predicted to occur by those agencies and experts who have

forecasted the probable effects of this merger.  If the elimination of competition between

American and USAir is countenanced, American will have obtained its substantial market share,

both nationwide and in hundreds of city pair markets, by acquisition rather than by competition,

and substantial rivals and competitors that could have provided a counterbalance to the

mounting concentration in the U.S. airline industry will be eliminated and foreclosed.  This

acquisition has been shown to be much more than the "non-trivial acquisition of a competitor"

and meets the criteria required to make out a violation of Section 7 under both United States

Supreme Court and Second Circuit authority.

    Economic and legal principles uniformly underscore and confirm what we habitually

take for granted in our everyday lives: competition best serves the public.  As the Supreme

Court has said, the antitrust laws are the charter of economic freedom. If divestiture is not

granted, competition will be lessened, monopoly encouraged, and the Plaintiffs and public will

be damaged to an extent that will not be remediable.

## VII.    DEFENDANTS VIOLATED SECTION 2(C) OF THE ROBINSON-PATMAN ACT WHEN THEY PAID HORTON $20 MILLION TO AGREE TO THE MERGER

    Plaintiffs contend that Tom Horton, former President, Chairman, and CEO of AMR, was

paid an illegal, unearned fee of approximately $20 million in exchange for his acquiescence to

the merger of American and USAir, in violation of Section 2(c) of the Robinson-Patman Act.

Ex. A, FAC ¶¶ 68-73.  The relevant facts are as follows:



Ex. U, Horton
Dep. T. 50:10-51:9.

Ex. U, Horton Dep. T. 53:16-54:2.

██████████████████████████████████████████

████████████████████████████    Ex. U, Horton Dep. T. 190:20-190:23

(and Ex. 6, p. 62, attached to transcript).

██████████████████████████████████████████

████████████████    Ex. U, Horton Dep. T. (Ex. 3 attached to transcript).

██████████████████████████████████████████

████████████    Ex. U, Horton Dep. T. (Ex. 5, p. 16, attached

to transcript [Bates No. US-FJORD-00013622]).

On February 13, 2013, American and Horton enter into the Chairman's Letter
Agreement.  Under that agreement Horton was to be paid $19,875,000, 50 percent in
cash, 50 percent in American's common stock.  Ex. HH, Chairman's Letter Agreement;
Ex. U, Horton Dep. T. 19:23-20:8.

On February 14, 2013, the American-USAir merger was announced.  Ex. U, Horton Dep.
T. 251:9-11.

On April 11, 2013, this Court first rejected the $20 million payment to Horton.  *In re
AMR Corporation, et al.,* Case No. 11-15463-shl, "Memorandum of Decision" at p. 4
(Bankr. S.D.N.Y. April 11, 2013).

On September 13, 2013, this Court again rejected the $20 million payment to Horton.  *In
re AMR Corporation, et al.*, 497 B.R. 690, 699 (Bankr. S.D.N.Y. 2013).

██████████████████████████████████████████

████████████    Ex. U, Horton Dep. T. 23:6-
23:25.

On December 9, 2013, the same date the merger closed, Horton and the new company,
American Airlines Group (signed by Parker), entered into a "Transition Agreement,"
whereby Horton was paid about the same amount he was to be paid under the Chairman's
Letter Agreement.  Ex. II, Transition Agreement; Ex. U, Horton Dep. T. 17:2-19:22.

As the Second Circuit has observed, Section 2(c) of the Robinson-Patman Act, codified

at 15 U.S.C. § 13(c), "appears to parse out as follows"[39]:

---

[39] Defendants claim, "Plaintiffs have never articulated what exactly they are challenging under Section 2(c)." (Dkt. No. 140 at
38.)  To the contrary, in the deposition of Thomas Horton, Defendants defense counsel Mr. Majoras, acknowledged Plaintiffs'
2(c) claim:  "MR. MAJORAS:   If you want to explain to me why Mr. Horton's compensation affects an HHI or market share, or
anything else that's related to claims in your case, I'd like to hear it. MR. ALIOTO: Well, we made a complaint, as you probably

It is unlawful for any person to

(1) pay (or receive)-

    a. anything of value as a commission, brokerage, or other compensation, *or*

    b. any allowance or discount in lieu of brokerage, *except* for services rendered in connection with a sale or purchase of goods,

(2) when the payment is made to (or by)

    a. the other party to the transaction, or

    b. an agent, representative or other intermediary where the intermediary is

    (i) acting for or in behalf of, or

    (ii) subject to the direct or indirect control of any party to the transaction other than the person by whom the compensation is paid.

*Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.,* 369 F.3d 212, 218 (2d Cir.2004).

Defendants first argue that § 2(c) applies exclusively to "dummy brokers," and not to commercial bribery. The Second Circuit has declined to enforce the rigid interpretation Defendants put forward. *Blue Tree Hotels Inv.,* 369 F.3d at 221. "While district courts within the Circuit appear split on the issue, the majority of courts addressing the issue have held — or have at least assumed *arguendo* — that Section 2(c) does encompass claims of commercial bribery." *Dayton Superior Corp. v. Marjam Supply Co. Inc.*, No. 07-cv-5215 (E.D.N.Y. Feb. 22, 2011). The "*sine qua non* of a § 2(c) violation, however, is an improper payment, *i.e.,* a payment of a commission, brokerage, or discount other than for services actually rendered." *Blue Tree Hotels, Inv.*, 369 F.3d at 223. A party "must at a minimum allege that payments were made with the 'intent to influence improperly the conduct of another by bestowing a benefit, [as] the

---

know, we made a claim in the complaint under Section 2(c) of the Clayton Act. MR. MAJORAS: I understand that. That's not related to anything with Mr. Horton's compensation. MR. ALIOTO: Yes, it is, that's exactly what it is." Ex. U, Horton Dep. T. 25:5-18.

essence of bribe receiving is in the agreement or understanding that the recipient's conduct will be influenced by the benefit.'" *Monsieur Touton Selection v. Future Brands, LLC*, 2006 WL 2192790 *4 (S.D.N.Y. August 1, 2006).

### A.     The $20 Million Payment Was Not Earned by Horton

Mr. Horton was to be paid approximately $20 million, half in cash and half in stock of the new company, as provided for in a "Chairman's Letter Agreement." Ex. HH, "Chairman's Letter Agreement;" Ex. U, Horton Dep. T. 17:2-7; 17:25-18:3. This Court is familiar with the payment because it prohibited the payment in bankruptcy proceedings--twice. *See In re AMR Corporation, et al.,* Case No. 11-15463-shl, "Memorandum of Decision" at p. 4 (Bankr. S.D.N.Y. April 11, 2013); and *In re AMR Corporation, et al.*, 497 B.R. 690, 699 (Bankr. S.D.N.Y. 2013). In those decisions, this Court acknowledged that the payment was not earned, finding, "And in fact, the Debtors entered into a pre-petition agreement with Mr. Horton whereby he was to receive a maximum of $15.3 million dollars if the company was involved in a merger. (citation omitted). It is unclear why Mr. Horton would receive $4.5 million more now than was contemplated when he took the reins of the Debtors on the eve of the Chapter 11 filing less than two years ago, presumably negotiating that prior agreement with these bankruptcy cases in mind." *In re AMR Corporation, et al.*, 497 B.R. at 699.

After this Court rejected Horton's unearned payment, ██████████████████ ████████████████████████████████████████████ Ex. U, Horton Dep. T. 23:6-18. After the merger closed, the new company paid Horton approximately the same amount. Ex. II, Transition Agreement; Ex. U, Horton Dep. T. 17:2-19:22. It is undisputed that Horton was paid by the new company, and not by his employer AMR. *See* Dkt. No. 140 at 40.

Even though Defendants' brief refers repeatedly to the Horton payment as a severance, that is a mischaracterization. A severance payment is an amount paid to an employee upon

dismissal or discharge from employment.[40]  American Airlines Group, the newly formed

corporation, paid Horton, not his former employer, AMR Corporation.  Ex. U. Horton Dep. T.

18:12-20, Ex. II, Transition Agreement.  Horton was never an employee of American Airlines

Group.  In addition, after this Court prohibited the payment, ███████████████████

██████  Ex. U, Horton Dep. T. 18:12-16.  Horton's withdrawal of his claim to that payment

constitutes an admission that the payment was never earned by him in the first place.

### B.    The Payment was Made in Exchange for Horton's Agreement to the Merger



███████████████  Ex. U, Horton Dep. T. 132:25-134:18 (and Ex. 3 attached to transcript.)

Horton believed that after emerging from bankruptcy ████████████████████████

█████████████████  Ex. U, Horton Dep. T. (Ex. 3, attached to transcript.) ████████

███████████████████████████████████████████████  Ex. U,

Horton Dep. T. 48:18-49:7.  Before the announcement of the payment to Horton, ████████

██████████████████████  Ex. U, Horton Dep. T. 50:17 – 51:9.  Parker/USAir objected

███████████████████████████████████████████████

██████  Ex. D, Parker Dep. T. 98:15-21 (and Ex. 21 at p. 33, attached to transcript [Bates No.

US-FJORD-00013622.])

Parker continued to push for a merger between American and USAir, musing that, "I find

it noteworthy that the only opposition that seems to exist to this merger is the senior management

at American. [Horton].  I don't want to guess why it is that they don't support it. But we are

hopeful that we can get their support at some point in the future.[41]"  It was not until the payment

of $20 million to Horton was announced, that the AMR CEO did an about face.

### C.  The Illegal Payment was Approved and Paid by the New Company, not by
### Horton's Employer

---

[40] https://en.wikipedia.org/wiki/Severance_package
[41] https://www.thestreet.com/story/11623895/1/us-airways-ceo-everybody-wants-a-merger-except-for-amr-bosses.html

Lastly, Defendants claim that Plaintiffs cannot prove commercial bribery because it cannot be proved that the payment was made "without the consent of the latter's employer or principal." (Dkt. No. 140 at 39.)  Defendants' arguments on these points are unpersuasive because the severance payment was not paid by Horton's employer, AMR Corporation. ████

████████████████████████████████████████████████████████████ Ex. U, Horton Dep. T. 18:12-20; Ex. II, Transition Agreement.

Notwithstanding the label given to the payment, Plaintiffs can prove that Horton was paid an unearned amount that falls within the text of Section 2(c) of the Robinson-Patman Act:  $20 million was paid to Horton, an amount not paid or approved by his employer, in exchange for his agreement to end his opposition to the AA-USAir merger, not for his service.

## <u>CONCLUSION</u>

For these reasons, the Court should adjudge the merger a violation of § 7 of the Clayton Antitrust Act and grant Plaintiffs' Cross-Motion for Summary Judgment, deny Defendants' Motion for Summary Judgment, and issue an order of divestiture that will restore competition to the level prevailing before the merger and allow American to operate as a standalone airline able to aggressively compete and expand capacity and USAir and the other airlines can compete against it to the ultimate benefit of air travelers, the industry and the country.

Respectfully submitted:

Dated: June 23, 2017

By:   s/ Joseph M. Alioto
_____
Joseph M. Alioto (SBN 42680)
*Admitted Pro Hac Vice*
Jamie L. Miller (SBN 271452)
*Admitted Pro Hac Vice*
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, CA  94104
Telephone: (415) 434-8900
Facsimile: (415) 434-9200

*Attorneys for the Clayton Act Plaintiffs*

## COUNSEL FOR PLAINTIFFS

Joseph M. Alioto (SBN 42680)
*Admitted Pro Hac Vice*
Jamie L. Miller (SBN 271452)
*Admitted Pro Hac Vice*
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, CA  94104
Telephone: (415) 434-8900
Facsimile: (415) 434-9200
Email:  jmalioto@aliotolaw.com
         jmiller@aliotolaw.com


Gil D. Messina (SBN 029661978)
*Admitted Pro Hac Vice*
MESSINA LAW FIRM, P.C.
961 Holmdel Road
Holmdel, NJ 07733
Telephone: (742) 332-9300
Facsimile: (742) 332-9301
Email: gmessina@messinalawfirm.com


Christopher A. Nedeau (SBN 81297)
*Admitted Pro Hac Vice*
NEDEAU LAW FIRM
154 Baker Street
San Francisco, CA 94117
Telephone:  415-516-4010
Email:  cnedeau@nedeaulaw.net

**ANNEX A**

| SUMMARY/COMPARISON OF KEY SECTION 7 CASES | | | | | |
|---|---|---|---|---|---|
| **CASE** | **MARKET(S)** | **ACQUIRING COMPANY: MARKET SHARE PRIOR TO MERGER** | **ACQUIRED COMPANIE(S): MARKET SHARE PRIOR TO MERGER** | **MARKET SHARE OF MERGED ENTITY** | **MARKET CONCENTRATION** |
| *Brown Shoe Company, Inc., v. United States,* 370 U.S. 294 (1962) | Nationwide: 1) Manufacturing of shoes<br><br>2) Retail sales of shoes | Brown Shoe Company: 1) #3 in Market with 6% share | Kinney Shoe: 1) #12 in Market with .05% share<br><br>2) 2% share | 1) #3 in Market with 6% share<br><br>2) #2 in Market with 9.5% share | Nationwide: 4 largest Firms controlled 23% of Manufacturing Market |
| United States v. Philadelphia National bank, et al., 374 U.S. 321 (1963) | Philadelphia Four Country Area | Philadelphia National Bank; #2 in Market | Girard Trust Corn Exchange Bank: #3 in Market | #1 in Market with 36% share (of assets) | Post-merger: 4 Largest Firms would have 78% of Market |
| *United States v. Aluminum Company of America, et al.,* 377 U.S. 271 (1964) | Aluminum Conductor | Aluminum Company (Alcoa):<br><br>#1 in Market with 27.8% share | Rome Cable Company:<br><br>#9 in Market with 1.3% share | 29.1% share | Addition of Rome Cable Corp. added only 1.3% to Alcoa's share of Market; the 4 Largest Firms controlled 76% of the Market prior to merger |
| *United States v. Pabst Brewing Company, et al.,* 384 U.S. 546 (1966) | 1) Nationwide<br><br>2) Tri-State (Wisconsin, Illinois, Michigan)<br><br>3) Wisconsin | Pabst Brewing Company: 1) #10 in Market<br><br>2) #7 in Market with 5.48% share<br><br>3) #4 in Market | Blatz Brewing Company: 1) #18 in Market<br><br>2) #6 in Market with 5.84% share<br><br>3) #1 in Market | 1) #5 in Market with 4.49% share<br><br>2) 11.32% share<br><br>3) #1 in Market with 23.95% share | Nationwide: 4 Largest Firms controlled 58.93% share |
| *United States v. Von's Grocery Company, et al.,* 384 U.S. 270 (1966) | Retail Grocers in Los Angeles area | Von's Grocery Company: #3 in Market with 4.7% share | Shopping Bag: #6 in Market with 4.2% share | #2 in Market with 7.5% share | Market share of 4 Largest Companies: Prior to merger: 24.4% Post-merger: 28.8% |
| *United States v. Falstaff Brewing Corporation,* 410 U.S. 526 (1973) | Beer in New England (Six States) | Falstaff Brewing Corp.: 0% in New England<br><br><br>5.9% Nationally (4th Largest in U.S.) | Narragansett Brewing Co.: 20% in New England (Largest seller of Beer in New England) | 20% in New England | Five years preceding merger: Market share went from 50% to 61.3% of 4 Largest Sellers in New England; Number of brewers decreased from 32 in 1935, to 11 in 1957, & to 6 in 1964 |
| *Hospital Corporation of America v. Federal Trade Commission,* 807 F.2d 1381 (7th Cir. 1986) | Hospitals in Chattanooga, Tennessee | Hospital Corporation of America, Inc.: 14% share - owned 1 of 11 area Hospitals | Hospital Affiliates Int'l, Inc.: Managed 2 of 11 area Hospitals Health Care Corp.: Owned 2 of 11 Hospitals | #2 in Market with 26% share (owned or managed 5 of 11 Hospitals) | Market share of 4 Largest Companies: Prior to merger: 79% Post-merger: 91% |

# ANNEX B

# Rankings of Top U.S. Airlines
## Total Operating Revenue, 2007*



* Sources: http://web.mit.edu/airlinedata/www/2016%2012%20Month%20Documents/
Revenue%20and%20Related/Total%20Revenue/System%20Total%20Operating%20Revenue.htm,
https://www.transtats.bts.gov/Data_Elements_Financial.aspx?Data=7

# Rankings of Top U.S. Airlines
## Total Operating Revenue, 2008*



*Sources: http://web.mit.edu/airlinedata/www/2016%2012%20Month%20Documents/
Revenue%20and%20Related/Total%20Revenue/System%20Total%20Operating%20Revenue.htm,
https://www.transtats.bts.gov/Data_Elements_Financial.aspx?Data=7

PAGE002

# Rankings of Top U.S. Airlines
## Total Operating Revenue, 2009*



* Sources: http://web.mit.edu/airlinedata/www/2016%2012%20Month%20Documents/
Revenue%20and%20Related/Total%20Revenue/System%20Total%20Operating%20Revenue.htm,
https://www.transtats.bts.gov/Data_Elements_Financial.aspx?Data=7

# Rankings of Top U.S. Airlines
## Total Operating Revenue, 2010*



* Sources: http://web.mit.edu/airlinedata/www/2016%2012%20Month%20Documents/
Revenue%20and%20Related/Total%20Revenue/System%20Total%20Operating%20Revenue.htm,
https://www.transtats.bts.gov/Data_Elements_Financial.aspx?Data=7

# Rankings of Top U.S. Airlines
# Total Operating Revenue, 2011*



* Sources: http://web.mit.edu/airlinedata/www/2016%2012%20Month%20Documents/
Revenue%20and%20Related/Total%20Revenue/System%20Total%20Operating%20Revenue.htm,
https://www.transtats.bts.gov/Data_Elements_Financial.aspx?Data=7

# Rankings of Top U.S. Airlines
## Total Operating Revenue, 2012*



*Sources: http://web.mit.edu/airlinedata/www/2016%2012%20Month%20Documents/
Revenue%20and%20Related/Total%20Revenue/System%20Total%20Operating%20Revenue.htm,
https://www.transtats.bts.gov/Data_Elements_Financial.aspx?Data=7

# Rankings of Top U.S. Airlines
## Total Operating Revenue, 2013*



* Sources: http://web.mit.edu/airlinedata/www/2016%2012%20Month%20Documents/
Revenue%20and%20Related/Total%20Revenue/System%20Total%20Operating%20Revenue.htm,
https://www.transtats.bts.gov/Data_Elements_Financial.aspx?Data=7

# Rankings of Top U.S. Airlines
## Total Operating Revenue, 2014*



* Sources: http://web.mit.edu/airlinedata/www/2016%2012%20Month%20Documents/
Revenue%20and%20Related/Total%20Revenue/System%20Total%20Operating%20Revenue.htm,
https://www.transtats.bts.gov/Data_Elements_Financial.aspx?Data=7

# Rankings of Top U.S. Airlines
## Total Operating Revenue, 2015*



*Sources: http://web.mit.edu/airlinedata/www/2016%2012%20Month%20Documents/
Revenue%20and%20Related/Total%20Revenue/System%20Total%20Operating%20Revenue.htm,
https://www.transtats.bts.gov/Data_Elements_Financial.aspx?Data=7

# Rankings of Top U.S. Airlines
## Total Operating Revenue, 2016*



* Sources: http://web.mit.edu/airlinedata/www/2016%2012%20Month%20Documents/
Revenue%20and%20Related/Total%20Revenue/System%20Total%20Operating%20Revenue.htm,
https://www.transtats.bts.gov/Data_Elements_Financial.aspx?Data=7

# Rankings of Top U.S. Airlines
## Net Income, 2007*



* Sources: https://www.transtats.bts.gov/Data_Elements_Financial.aspx?Data=7,
http://web.mit.edu/airlinedata/www/2015%2012%20Month%20Documents/Profitability,%20Balance%20Sheet
%20&%20Cash%20Flow/Individual%20Carriers%20SEC%20Data/Northwest%20Airlines%20Corp.htm,
https://www.yumpu.com/en/document/view/27598919/continental-airlines-inc-2009-form-10-k-united-airlines,
https://www.last10k.com/sec-filings/lcc/0000950134-09-003177.htm#110

# Rankings of Top U.S. Airlines
## Net Income, 2008*



* Sources: https://www.transtats.bts.gov/Data_Elements_Financial.aspx?Data=7,
http://web.mit.edu/airlinedata/www/2015%2012%20Month%20Documents/Profitability,%20Balance%20Sheet
%20&%20Cash%20Flow/Individual%20Carriers%20SEC%20Data/Northwest%20Airlines%20Corp.htm,
https://www.yumpu.com/en/document/view/27598919/continental-airlines-inc-2009-form-10-k-united-airlines,
https://www.last10k.com/sec-filings/lcc/0000950134-09-003177.htm#110

# Rankings of Top U.S. Airlines
## Net Income, 2009*



*\* Sources: https://www.transtats.bts.gov/Data_Elements_Financial.aspx?Data=7,*
*https://www.yumpu.com/en/document/view/27598919/continental-airlines-inc-2009-form-10-k-united-airlines*
*https://www.last10k.com/sec-filings/lcc/0001193125-14-074631.htm#tx671157_10*

# Rankings of Top U.S. Airlines
## Net Income, 2010*



* Sources: https://www.transtats.bts.gov/Data_Elements_Financial.aspx?Data=7,
https://www.last10k.com/sec-filings/lcc/000119312514-074631.htm#tx671157_10

# Rankings of Top U.S. Airlines
## Net Income, 2011*



*\* Sources: https://www.transtats.bts.gov/Data_Elements_Financial.aspx?Data=7,
https://www.last10k.com/sec-filings/lcc/000119312514-074631.htm#tx671157_10*

# Rankings of Top U.S. Airlines
## Net Income, 2012*



* Sources: https://www.transtats.bts.gov/Data_Elements_Financial.aspx?Data=7,
https://www.last10k.com/sec-filings/lcc/0001193125-14-074631.htm#tx671157_10

# Rankings of Top U.S. Airlines
## Net Income, 2013*



* Sources: https://www.transtats.bts.gov/Data_Elements_Financial.aspx?Data=7,
https://www.last10k.com/sec-filings/lcc/000119312514-074631.htm#tx671157_10

# Rankings of Top U.S. Airlines
## Net Income, 2014*



* Sources: https://www.transtats.bts.gov/Data_Elements_Financial.aspx?Data=7

# Rankings of Top U.S. Airlines
## Net Income, 2015*



* Sources: https://www.transtats.bts.gov/Data_Elements_Financial.aspx?Data=7

# Rankings of Top U.S. Airlines
## Net Income, 2016*



*Sources: https://www.transtats.bts.gov/Data_Elements_Financial.aspx?Data=7*

# Rankings of Top U.S. Airlines
## Revenue Passenger Miles, 2007*



*Sources: https://www.transtats.bts.gov/Data_Elements_Financial.aspx?Data=7,
http://web.mit.edu/airlinedata/www/2015%2012%20Month%20Documents/Profitability,%20Balance%20Sheet
%20&%20Cash%20Flow/Individual%20Carriers%20SEC%20Data/Northwest%20Airlines%20Corp.htm,
https://www.yumpu.com/en/document/view/27598919/continental-airlines-inc-2009-form-10-k-united-airlines,
https://www.last10k.com/sec-filings/lcc

# Rankings of Top U.S. Airlines
## Revenue Passenger Miles, 2008*



* Sources: https://www.transtats.bts.gov/Data_Elements_Financial.aspx?Data=7,
http://web.mit.edu/airlinedata/www/2015%2012%20Month%20Documents/Profitability,%20Balance%20Sheet
%20&%20Cash%20Flow/Individual%20Carriers%20SEC%20Data/Northwest%20Airlines%20Corp.htm,
https://www.yumpu.com/en/document/view/27598919/continental-airlines-inc-2009-form-10-k-united-airlines,
https://www.last10k.com/sec-filings/lcc

# Rankings of Top U.S. Airlines
## Revenue Passenger Miles, 2009*



* Sources: https://www.transtats.bts.gov/Data_Elements_Financial.aspx?Data=7,
https://www.yumpu.com/en/document/view/27598919/continental-airlines-inc-2009-form-10-k-united-airlines,
https://www.last10k.com/sec-filings/lcc

# Rankings of Top U.S. Airlines
## Revenue Passenger Miles, 2010*



* Sources: https://www.transtats.bts.gov/Data_Elements_Financial.aspx?Data=7,
https://www.last10k.com/sec-filings/lcc

# Rankings of Top U.S. Airlines
## Revenue Passenger Miles, 2011*



* Sources: https://www.transtats.bts.gov/Data_Elements_Financial.aspx?Data=7,
https://www.last10k.com/sec-filings/lcc

# Rankings of Top U.S. Airlines
## Revenue Passenger Miles, 2012*



* Sources: https://www.transtats.bts.gov/Data_Elements_Financial.aspx?Data=7,
https://www.last10k.com/sec-filings/lcc

# Rankings of Top U.S. Airlines
## Revenue Passenger Miles, 2013*



* Sources: https://www.transtats.bts.gov/Data_Elements_Financial.aspx?Data=7,
https://www.last10k.com/sec-filings/lcc

# Rankings of Top U.S. Airlines
## Revenue Passenger Miles, 2014*



*Sources: https://www.transtats.bts.gov/Data_Elements_Financial.aspx?Data=7

# Rankings of Top U.S. Airlines
## Revenue Passenger Miles, 2015*



* Sources: https://www.transtats.bts.gov/Data_Elements_Financial.aspx?Data=7

# Rankings of Top U.S. Airlines
## Revenue Passenger Miles, 2016*



*Sources: https://www.transtats.bts.gov/Data_Elements_Financial.aspx?Data=7*

# Rankings of Top U.S. Airlines
## Market Share (Based on Total Operating Revenue), 2014*



* *Source: https://www.transtats.bts.gov/Data_Elements_Financial.aspx?Data=7*

# Rankings of Top U.S. Airlines
## Market Share (Based on Total Operating Revenue), 2015*



* Source: https://www.transtats.bts.gov/Data_Elements_Financial.aspx?Data=7

# Rankings of Top U.S. Airlines
## Market Share (Based on Total Operating Revenue), 2016*



26% American Airlines
26% Delta Air Lines
23% United Airlines
13% Southwest Airlines
12% Other

* *Source: https://www.transtats.bts.gov/Data_Elements_Financial.aspx?Data=7*

# Rankings of Top U.S. Airlines
## Market Share (Based on Net Income), 2014*



- American Airlines
- Southwest Airlines
- United Airlines
- Delta Air Lines
- Other

American Airlines 24%
Southwest Airlines 21%
United Airlines 20%
Delta Air Lines 13%
Other 22%

* Source: https://www.transtats.bts.gov/Data_Elements_Financial.aspx?Data=7

# Rankings of Top U.S. Airlines

## Market Share (Based on Net Income), 2015*



- United Airlines
- American Airlines
- Delta Air Lines
- Southwest Airlines
- Other

*United Airlines: 31%*
*American Airlines: 30%*
*Delta Air Lines: 20%*
*Southwest Airlines: 9%*
*Other: 10%*

* Source: https://www.transtats.bts.gov/Data_Elements_Financial.aspx?Data=7

# Rankings of Top U.S. Airlines

## Market Share (Based on Net Income), 2016*



- Delta Air Lines — 32%
- American Airlines — 20%
- United Airlines — 17%
- Southwest Airlines — 16%
- Other — 15%

*Source: https://www.transtats.bts.gov/Data_Elements_Financial.aspx?Data=7*

# Rankings of Top U.S. Airlines
## Market Share (Based on Revenue Passenger Miles), 2014*



* Source: https://www.transtats.bts.gov/Data_Elements_Financial.aspx?Data=7

# Rankings of Top U.S. Airlines
## Market Share (Based on Revenue Passenger Miles), 2015*



* Source: https://www.transtats.bts.gov/Data_Elements_Financial.aspx?Data=7

# Rankings of Top U.S. Airlines

## Market Share (Based on Revenue Passenger Miles), 2016*



Legend:
- American Airlines
- Delta Air Lines
- United Airlines
- Southwest Airlines
- Other

* Source: https://www.transtats.bts.gov/Data_Elements_Financial.aspx?Data=7

# Rankings of Top U.S. Airlines
## Market Share, 2007*



- American Airlines
- Southwest Airlines
- Delta Air Lines
- United Airlines
- Northwest Airlines
- Continental Airlines
- US Airways
- Other

*Source: http://www.aci-na.org/sites/default/files/airline_snapshot-march2012.pdf*

# Rankings of Top U.S. Airlines
## Market Share, 2010*



Legend:
- Southwest Airlines
- Delta Air Lines
- American Airlines
- US Airways
- United Airlines
- Continental Airlines
- Other

*17%*, *14%*, *10%*, *7%*, *7%*, *5%*, *40%*

*Source: https://www.quora.com/What-is-the-domestic-market-share-of-the-top-US-airlines*

# Rankings of Top U.S. Airlines
## Market Share, 2011*



- Southwest Airlines
- Delta Air Lines
- United Airlines
- American Airlines
- US Airways
- Other

*Source: http://www.aci-na.org/sites/default/files/airline_snapshot-march2012.pdf

# Rankings of Top U.S. Airlines
## Market Share, 2013*



- Delta Air Lines
- United Airlines
- Southwest Airlines
- American Airlines
- US Airways
- Alaska Airlines
- Other

*Source: https://centreforaviation.com/insights/analysis/american-airlines-and-us-airways-merger-plans-proceed-as-the-silly-macho-battle-ends-138997

*Data represents August 2012 - July 2013

# Rankings of Top U.S. Airlines
## Market Share, 2015*



Legend:
- Southwest Airlines
- American Airlines
- Delta Air Lines
- United Airlines
- Alaska Airlines
- Other

*Source: http://www.fi-aeroweb.com/Top-100-US-Airlines.html

# Rankings of Top U.S. Airlines
## Market Share, 2016*



- American Airlines
- Southwest Airlines
- Delta Air Lines
- United Airlines
- Alaska Airlines
- Other

*Source: https://www.transtats.bts.gov

*Data represents March 2016 - February 2017

# WTI Crude Oil Spot Price *



*\* Source: "U.S. Shale Oil Puts Heat on OPEC," The Wall Street Journal, May 25, 2017*