Joseph M. Alioto (SBN 42680)
*Admitted Pro Hac Vice*
Jamie L. Miller (SBN 271452)
*Admitted Pro Hac Vice*
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, CA 94104
Telephone: (415) 434-8900
Facsimile: (415) 434-9200
Email: jmalioto@aliotolaw.com
        jmiller@aliotolaw.com

HEARING DATE & TIME: TBD

*Attorneys for the Clayton Act Plaintiffs*
[ADDITIONAL COUNSEL LISTED ON LAST PAGE]

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: ) | |
| ) | |
| **AMR CORPORATION, et al.** ) | **Case No: 11-15463-SHL** |
| ) | |
| **Debtors,** ) | **Chapter 11** |
| ) | |
| ) | **(Jointly Administered)** |
| **CAROLYN FJORD, ET AL.,** ) | |
| ) | **Adversary No. 13-01392-SHL** |
| **Plaintiffs,** ) | |
| ) | |
| v. ) | |
| ) | |
| **AMR CORPORATION, AMERICAN** ) | |
| **AIRLINES, and US AIRWAYS GROUP,** ) | |
| **INC. and US AIRWAYS, INC.,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## PLAINTIFFS REPLY MEMORANDUM OF LAW IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... III

ARGUMENT IN REPLY ................................................................................... 1

I.      THE SUPREME COURT DECISIONS ARE THE LAW AND THE COURT MUST EITHER ACCEPT OR REJECT THEM .......................................... 1

II.     DEFENDANTS HAVE FAILED EVEN TO REBUT THE PRESUMPTIVELY ILLEGAL EFFECTS OF THE MERGER .................................................... 2

III.    HIGHER PRICES AND REDUCED SERVICE POST-MERGER SUPPORT THAT COMPETITION HAS B E E N  LESSENED ................ 3

IV.    PLAINTIFFS HAVE ESTABLISHED RELEVANT MARKET ................ 5

         A.      Barriers to Entry in the Industry are not Low ................... 6

         B.      Industry Recognition is the Type of "Practical Indicia" the Brown Shoe Court Used to Define Relevant Market.................. 8

         C.      Defendants Misapply the Hypothetical Monopolist Test ............... 10

V.     PLAINTIFFS HAVE ESTABLISHED STANDING ................................. 12

         A.      Defendants' 72-page Chart is Improper and Omits Material Facts.................................................................. 12

         B.      Plaintiffs Have Met and Exceeded Their Burden to Show Standing ................................................................ 13

         C.      Plaintiffs are Consumers of Air Travel ............................ 13

         D.      Plaintiffs Need Not Purchase an Airline Ticket for Travel on a Future Date to Show a Threat of Future Harm ........................ 15

         E.      Because Plaintiffs Have Shown that They Have Flown on and Will Fly on City-Pairs Where the Merger Both Increased Concentration to Presumptively Illegal Levels and Average Air Fares Post-Merger, They Have Standing to Bring this Action.......................................................... 16

         F.      The Past Post-Merger Activity of the Airlines is a Highly Relevant Indicator Used to Predict Future Post-Merger Behavior ...................................................................... 19

i

G.    Increased Fees and Reductions in Service are the Type
of Injuries the Antitrust Laws are Intended to Prevent ................... 21

1.    New and Increased Fees are the Result of Presumptive
Collusion ............................................................................... 21

2.    Reductions in Service are Just the Type of Injury the
Antitrust Laws were Intended to Prevent ............................ 23

3.    Decreases in Quality of Service ........................................... 24

H.    The Travel Agent's Lost Business is the Type of Injury the
Antitrust Laws were Intended to Prevent ......................................... 24

I.    Defendants' Complaints that Plaintiffs' Declarations were
Submitted at the "Eleventh Hour" are Groundless .......................... 25

VI.    SUMMARY JUDGMENT SHOULD BE GRANTED ON PLAINTIFFS
2(C) CLAIM .............................................................................................. 26

CONCLUSION ................................................................................................................ 27

# TABLE OF AUTHORITIES

**Cases**

*Beatrice Foods Co. v. FTC*,
    540 F.2d 303 (7th Cir. 1976) .................................................................................... 10

*Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*,
    369 F.3d 212 (2d Cir. 2004) ...................................................................................... 27

*Bowsher v. Synar*,
    478 U.S. 714(1986) ................................................................................................... 13

*Brown Shoe Company v. United States*,
    370 U.S. 294 (1962) .............................................................................. 1, 5, 9, 10, 19

*Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*,
    429 U.S. 477 (1977) ................................................................................................... 21

*California v. American Stores Co.*,
    495 U.S. 271 (1990) ............................................................................................ 16, 22

*Cargill, Inc. v. Monfort*,
    479 U.S. 104 (1986) ................................................................................................... 24

*Cash & Henderson Drugs, Inc. v. Johnson & Johnson*,
    799 F.3d 202 (2d Cir. 2015) ................................................................................. 19, 20

*Clinton v. City of New York*,
    524 U.S. 417 (1998) ................................................................................................... 13

*Continental Airlines v. Am. Airlines, Inc.*,
    824 F.Supp. 689 (S.D. Tex. 1993) .............................................................................. 8

*Ex parte Bollman*,
    8 U.S. 75 (1807) ...................................................................................................... 1, 2

*Flyers Rights Educ. Fund, Inc. v. FAA*,
    864 F.3d 738 (D.C. Cir. July 28, 2017) ...................................................................... 4

*Fritzsche v. Albuquerque Municipal School Dist.*,
    194 F.Supp.2d 1194 (D.N.M. 2002) ......................................................................... 12

*F.T.C. v. H.J. Heinz Co.*,
    246 F.3d 708 (D.C. Cir. 2001) .................................................................................... 3

*FTC v. Whole Foods Market,*
  548 F.3d 1028 (D.C.Cir. 2008) .................................................................................. 12

*Funeral Consumers Alliance, Inc. v. Service Corp. Intern.,*
  695 F.3d 330 (5th Cir. 2010) .................................................................................... 16

*Hawaii v. Standard Oil Co. of Cal.,*
  405 U.S. 251 (1972) .................................................................................................. 13

*H. L. Moore Drug Exchange, Div. of Levitt Industries, Inc. v. Eli Lilly and Co.,*
  1978 WL 1347 (S.D.N.Y. June 6, 1978) ..................................................................... 9

*Hospital Corp. of America v. Federal Trade Commission,*
  807 F.2d 1381 (7th Cir. 1986) ............................................................................... 1, 3

*In re Air Passenger Computer Reservation Systems Antitrust Litigation,*
  694 F.Supp. 1443 (C.D. Cal. 1988) ........................................................................ 8, 9

*In re Domestic Air Transportation Antitrust Litigation,*
  137 F.R.D. 677 (N.D. Ga. 1991) ....................................................................... 5, 9, 10

*In re Fosamax Prods. Liab. Litig.,*
  707 F.3d 189 (2d Cir. 2013) ..................................................................................... 26

*In re New Jersey Title Insurance Litigation,*
  2010 WL 2710570 (D.N.J. June 6, 2010) ........................................................... 14, 15

*In re Old Carco LLC,*
  470 B.R. 688 (Bankr. S.D.N.Y. 2012) ...................................................................... 13

*Lucas Automotive Engineering, Inc. v. Bridgestone/Firestone, Inc.,*
  140 F.3d 1228 (9th Cir. 1998) ........................................................................... 14, 15

*Malaney v. UAL Corp.,*
  2010 WL 3790296 (N.D.Cal. September 27, 2010) ........................................... 14, 15

*Malaney v. UAL Corp.,*
  2011 WL 6845773 (N.D. Cal. December 29, 2011) .................................................. 10

*Mathias v. Daily News, L.P.,*
  152 F. Supp.2d 465 (S.D.N.Y. 2001) ....................................................................... 24

*Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown,*
  567 F.3d 521 (9th Cir.2009) .................................................................................... 13

*New York ex rel. Schneiderman v. Actavis PLC,*
  787 F.3d 638 (2d Cir. 2015) ............................................................................... 16, 22

iv

*Preminger v. Peake,*
552 F.3d 757 (9th Cir.2008) ......................................................................................13

*Reilly v. Medianews Group, Inc.,*
2007 WL 1068202 (N.D. Cal. August 10, 2007).............................................. 14, 15

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.,*
792 F.2d 210 (D.C. Cir. 1986) ....................................................................................8

*Slockish v. U.S. Federal Highway Admin.,*
682 F.Supp.2d 1178 (D.Or. 2010) ............................................................................13

*St. Alphonsus Med. Center-Nampa, Inc. v. St. Luke's Health Sys., Ltd.,*
778 F.3d 775 (9th Cir. 2015) ...................................................................3, 17, 20, 22

*Twin City Sport service, Inc. v. Charles O. Finley & Co.,*
512 F.2d 1264 (9th Cir.1975) ......................................................................................7

*United States v. Aetna,*
2017 WL 325189 (D.D.C. January 23, 2017).........................................................11

*United States v. Aluminum Company of America (Alcoa),*
377 U.S. 271 (1964) .....................................................................................................1

*United States v. Baker Hughes, Inc.,*
908 F.2d 982 (D. C. Cir. 1990)...................................................................................3

*United States v. Bethlehem Steel Corp.,*
168 F.Supp. 576 (S.D.N.Y. 1958). ........................................................................6, 7

*United States v. Continental Can Co.,*
378 U.S. 441 (1964)..............................................................................................1, 7

*United States v. Falstaff Brewing Corporation,*
410 U.S. 526 (1973)....................................................................................................1

*United States v. General Dynamics Corp.,*
415 U.S. 486 (1974)....................................................................................................1

*United States v. Grinnell Corp.,*
384 U. S. 563 (1966) ...................................................................................................9

*United States v. H. & R. Block,*
833 F.Supp.2d 36 (D.D.C. 2011)..................................................................3, 17, 22

*United States v. Pabst Brewing Co.,*
384 U.S. 546 (1966)............................................................................................1, 5, 6

*United States v. Von's Grocery Co.*,
    384 U.S. 270 (1966)............................................................................................1

*Village of Arlington Heights v. Metro. Housing Develop. Corp.*,
    429 U.S. 252 (1977)..........................................................................................13

## RULES AND STATUTES

§ 7 of the Clayton Antitrust Act, 15 U.S.C. § 18........................................*passim*

§ 16 of the Clayton Antitrust Act, 15 U.S.C. § 26......................................*passim*

## ARGUMENT IN REPLY

## I.    THE SUPREME COURT DECISIONS ARE THE LAW AND THE COURT MUST EITHER ACCEPT OR REJECT THEM

The Plaintiffs have maintained from the outset of this case that the proofs and legal analysis *must* proceed in accordance with the long-standing decisions of the United States Supreme Court.  The Supreme Court cases cited by the Plaintiffs in their Cross-Motion are absent from Defendants' Opposition.  The cases are *Brown Shoe Company v. United States*, 370 U.S. 370 U.S. 294 (1962); *United States v. Aluminum Company of America (Alcoa)*, 377 U.S. 271 (1964); *United States v. Continental Can Co.*, 378 U.S. 441 (1964); *United States v. Von's Grocery Co.*, 384 U.S. 270 (1966); *United States v. Pabst Brewing Co.*, 384 U.S. 546 (1966); and *United States v. Falstaff Brewing Corporation*, 410 U.S. 526 (1973).  Defendants no longer consider them valid and do not even mention them.  Yet, even proponents of the "Chicago School" acknowledge the duty to adhere to the Supreme Court's precedents which,

> seemed, taken as a group, to establish the illegality of any nontrivial acquisition of a competitor, whether or not the acquisition was likely either to bring about or shore up collusive or oligopoly pricing. The elimination of a significant rival was thought by itself to infringe the complex of social and economic values conceived by a majority of the Court to inform the statutory words 'may...substantially...lessen competition.'

*Hospital Corp. of America v. FTC*, 807 F.2d 1381, 1385 (7th Cir. 1986) (Posner, J.).  As Judge Posner correctly noted, "None of these decisions has been overruled."  *Id.*  Defendants rely primarily on *United States v. General Dynamics Corp.*, 415 U.S. 486 (1974) to support their argument that the American Airlines-US Air merger does not violate Section 7 of the Clayton Act.  Yet, even Judge Posner distinguished *General Dynamics* in *Hospital Corp.* from the controlling Supreme Court cases.  *Hospital Corp., supra* at 1385-86.

We take Defendants' silence as a concession that, on the basis of the Supreme Court's decisions, they lose. "Again let it be asked, is not the law to be considered as settled by these repeated decisions? Are we still, as to this most important point, afloat on the troubled ocean of

opinion...? If so, deplorable indeed is our condition." *Ex parte Bollman*, 8 U.S. 75, 93 (1807).

## II.   DEFENDANTS HAVE FAILED EVEN TO REBUT THE PRESUMPTIVELY ILLEGAL EFFECTS OF THE MERGER

Although the Supreme Court cases dictate that the merger violates § 7, the Defendants also fail to meet their burden under other, lesser authority that they believe better fits their view of antitrust law and have done nothing to rebut the anti-competitive effects of the merger.

Plaintiffs have shown the anti-competitive effects by specific references to the record. In their opening brief in support of their Cross-Motion at p.15, Plaintiffs list and summarize the anticompetitive effects of the merger. They are all supported by the references to the record at pp. 13-15, 19-20 and 28-30 of Plaintiffs' brief.[1] (See also, PSUF # 13, 14, 15, 18, 20, 22, 23, 30, 38, 39, 50-56, 61, 69-80).

Initially, there were 1008 city-pairs where HHI concentrations were projected by the DOJ and Plaintiffs to exceed 2,500 and increase by more than 200 points as a result of the merger, signifying that the merger would be presumptively illegal under the DOJ's Horizontal Merger Guidelines.[2] Dr. Lundgren's report brought the post-merger HHI's of the 1008 city-pairs current through fiscal year 2016. Messina Decl. Ex. F.[3] He found that 785 of those city-pair markets have HHIs indicating presumptive illegality.[4] In 447 of these markets, average post-merger HHI is 4,868, and the average increase in HHI was 1,379. PSUF # 13-18.

The Defendants were obligated – but failed – to rebut the fact of presumptive illegality and, consequently, the merger must be deemed to violate § 7 because Plaintiffs have

---

[1] Defendants complain at page 12 of their Opposition brief about a lack of citations to facts at page 15 of Plaintiffs' brief. That complaint is baseless. The summary of the anticompetitive results of the merger listed there (#(1)-(12) and (17)) are all factually supported in detail by the references to the record at pages 13-15, and with respect to items (13), (14), (15) and (16), the record evidence is cited on pages 19-20 and 28-30 of Plaintiffs' brief, as well as in the Plaintiffs' Statement of Undisputed Material Facts in Support of their Cross-Motion ("PSUF"). (Dkt. No.149-2).

[2] See Section IV below where Plaintiffs' establish the relevant markets, despite Defendants' Opposition.

[3] Alpha-designated exhibits, such as "Ex. A," refer to the Messina Declaration in Support of the Cross-Motion.

[4] Defendants' expert, Dennis Carlton, conceded as much at his deposition. (Ex. GG, Tr. 65:5-66:17).

established a *prima facie* case. *St. Alphonsus Med. Center-Nampa, Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 788 (9th Cir. 2015) (holding "extremely high HHI on its own establishes the *prima facie* case.") (*citing FTC v. H.J. Heinz Co.,* 246 F.3d 708, 716 (D.C. Cir. 2001); *United States v. Baker Hughes, Inc.*, 908 F.2d 981, 982-83 & n. 3 (D.C. Cir.1990).) Once a *prima facie* case is established, "the burden is on the defendants to produce evidence of 'structural market barriers to collusion' specific to this industry that would defeat the 'ordinary presumption of collusion' that attaches to a merger in a highly concentrated market. *United States v. H. & R. Block*, 833 F.Supp.2d 36, 74 (D.D.C. 2011) (*quoting Heinz, supra* 725). Defendants have not done so.

### III.    HIGHER PRICES AND REDUCED SERVICE POST-MERGER SUPPORT THAT COMPETITION HAS B E E N LESSENED

"'Section 7 does not require proof that a merger or other acquisition has caused higher prices in the affected market. All that is necessary is that the merger create an appreciable danger of such consequences in the future.'" *St. Alphonsus Med. Ctr. - Nampa, Inc. v. St. Luke's Health Sys.*, 778 F.3d 775 at (*quoting Hosp. Corp. of Am. v. FTC*, 807 F.2d at1389). Although higher prices need not be shown, the Declaration by Dr. Lundgren shows that higher prices have occurred in 723 city-pairs where, post-merger, average prices increased by at least 10%. PSUF # 13 (Lundgren Decl. ¶¶ 3, 15, Annex A).[5]

Moreover, Plaintiffs have shown that Defendants' service has decreased since the merger, in particular, immediately following the expiration of the three-year restrictions in the Stipulated Order entered into by the Defendants with the plaintiff States in the DOJ case, service was cut substantially in Phoenix.[6]  Moreover the overall quality of regular coach service before the

---

[5] Defendants complain that Dr. Lundgren's Declaration is an improper expert report and is not admissible.   They are incorrect. This is discussed in Plaintiffs' Reply to Defendants' Objections in their Counterstatement to Plaintiffs' Statement of Undisputed Facts # 19, 58 at p. 2.

[6]  The evidence in support of this is at PSUF # 20, 53, 54, 55, and it is admissible.  (See, Plaintiffs' Reply to Defendants' Objection in their Counterstatement to Plaintiffs' Statement of Undisputed Facts # 20, 53, 54, 55

merger has since deteriorated to a level that Defendants' expert, Mr. Kasper, analogized to what was once "steerage" on ships.  (PSUF # 23).

Defendants suggest that cuts in service have been offset by the use of larger planes into which more passengers can be crammed.[7]  (Defs'. Opp.at 16).  But sitting in a smaller seat, on a bigger plane that arrives at or leaves an airport less frequently is not the same level of service; not for someone who needs to depart or arrive at times during which AMR no longer offers service. AMR's former Senior Vice President of Network, Alliances and Sales, Andrew Nocella, testified about cutting flights between Dallas and Los Angeles by more than one-third (Ex. J, Tr.80:21-25); the Defendants' Dallas hub has 20 or 30 fewer flights (*Id.* Tr.111:3-5); Philadelphia and Phoenix flights were cut by "more than a few" (*Id.* Tr.111:1-3).

AMR had a plan to increase capacity by 20% over five years after it emerged from bankruptcy as a standalone company (Ex. V, Parker DOJ Dep. Tr. 249:8-20), but USAir opposed this.  Following the merger, from 2014-2015, American increased total capacity only 1.2%, and in 2015-2016, 1.7%, with capacity on its mainline routes increasing even less, at 0.8% and 1.0%, respectively.  ( Ex. W, American Form 10-K (Feb. 22, 2017), p. 54.  PSUF # 36-39).  In their response to PSUF # 39, Defendants do not rebut these facts.

At bottom, the fact of presumptively illegal increases in HHI in 785 of the at-risk 1008 city-pairs has not been rebutted.  Neither has the fact that average prices to consumers have increased by at least 10%, and capacity has increased at levels well below those projected by the Defendants before the merger.  None of these facts has been rebutted.[8]

---

at p. 5.)

[7] In a recent decision by the D.C. Circuit, the FAA was ordered to determine whether the airlines' decrease  in seat sizes now poses a safety hazard to passengers. *Flyers Rights Educ. Fund, Inc. v. FAA*, 864 F.3d 738, 740 (D.C. Cir. July 28, 2017) ("This is the Case of the Incredible Shrinking Airline Seat. As many have no doubt noticed, aircraft seats and the spacing between them have been getting smaller and smaller, while American passengers have been growing in size.").

[8] Plaintiffs argued that the Defendants' expert reports are unreliable because they failed to account for the   restrictions imposed on the Defendants by the Stipulated Order in the DOJ case which remain in effect. In their Response to the

## IV.    PLAINTIFFS HAVE ESTABLISHED RELEVANT MARKET

Plaintiffs' Cross-Motion sets forth a proposed relevant product market, air passenger transportation, a national relevant geographic market, and 785 presumptively illegal city-pair relevant markets identified in Exhibit C to the Expert Report of Carl Lundgren.[9]  Defendants' response is that Plaintiffs "advance" relevant markets "on the same flawed grounds" as earlier in these proceedings. (Defs' Opp. at 6).  Defendants made no effort to correct the fatal flaw in their own relevant market analysis, failing to differentiate between a relevant product market and a relevant geographic market.[10]  Indeed, what is most telling about Defendants' Opposition are the arguments in Plaintiffs' Cross-Motion that they choose to ignore, in the apparent hope that the issues will go away.  As examples, Defendants ignore that:

1. Relevant market has two components: a product market and a geographic market. *Brown Shoe*, 370 U.S. at 324.  Plaintiffs submitted evidence that the market for air passenger transportation is the relevant *product* market in this case.  Plaintiffs submitted evidence that the relevant *geographic* markets in this case are the national market and the 785 presumptively illegal city-pairs identified in Exhibit C to the Expert Report of Carl Lundgren.  (Pls' Cross-Mot. at 32).  Defendants erroneously conflate product and geographic markets and their brief does nothing to correct this.

2. The court's holding in *In re Domestic Air Transportation Antitrust Litigation*, 137 F.R.D. 677 (N.D. Ga. 1991) found that, " …[D]efendants [including American and USAir] offer equivalent products and [] there is an order in the many pricing alternatives offered by defendants…the Court finds air passenger service a standardized product consisting of the transport of a passenger from an origin to a destination aboard an aircraft." *Id.* at 687-688.  (Pls' Cross-Mot. at 32-33).  Defendants ignore this case entirely.

3. The Supreme Court has held that plaintiffs not "*prove[ing] by an army of expert witnesses what constitutes a relevant 'economic' or 'geographic' market is not an adequate ground on which to dismiss a s 7 case*. (citation omitted)… Proof of the section of the country where the anticompetitive effect exists is entirely subsidiary to the crucial question in this and every s 7 case which is whether a merger may

---

PSUF, Defendants' references to the record confirm that these    important restrictions did not enter into their experts' analyses. ( See Reply to Defendants' Objections in their Counterstatement to Plaintiffs'    Statement of Undisputed Facts # 57 at p. 4).

[9] In addition, of the 1008 city-pairs identified in the FAC, Plaintiffs' Cross-Motion shows 723 city-pair markets where average air fares increased post-merger.

[10] Defendants mischaracterize their market admissions in their Hart-Scott Rodino filings by incorrectly claiming that Plaintiffs used it to show that AMR admitted "the national market for air passenger travel is a relevant market." (Defs' Opp. at 8, fn.7).  Again, Defendants confuse product market and geographic market.  The Hart-Scott Rodino filing shows industry recognition for Plaintiffs' proposed product market, air passenger transportation.

substantially lessen competition _anywhere_ in the United States." _Pabst_, 384 U.S. at 549-550 (emphasis added). Defendants have response and instead, urge this Court to do what the Supreme Court proscribes. (Defs' Opp. at 25-26).

### A.  Barriers to Entry in the Industry are not Low

Defendants next claim, echoing this Court, that, "If city-pairs have low barriers to entry and cannot sustain lasting market power" then "aggregating the city-pairs would [not] amount to lasting market power nationally." (Defs' Opp. at 8). But that conclusion is premised on a misunderstanding of barriers to entry, market power, and city-pairs. _First_, while it is true that it is easy for an _existing_ major airline to enter a city-pair market that is not slot- or gate-constrained, the same cannot be said for a _new_ airline wanting to enter the national or city-pair markets. Defendants have admitted that barriers to entry for new airlines are high. (Pls' Cross-Mot. at 13, "new entrants are unable to raise or cover their cost of capital in order to enter the market, acquire aircraft or expand their fleets. Ex. CC, Parker Congressional Test. (March 19, 2013) pp. 20, 43; Ex. BB, GAO Report (June 2014) pp. 44-45; potential entrants cannot gain access to key airports. _Id._ at pp. 42-43; consolidation in the industry prevents new airport construction and improvements. _Id._ at p. 43").

_Second_, Defendants incorrectly assume that because other major airlines are able to enter a city-pair market, Defendants could not maintain "lasting market power nationally."[11] Plaintiffs submitted evidence in the Cross-Motion that the top four airlines control 75% of the United States market. (Pls' Cross-Mot. at 5, fn. 18). Defendants have offered no evidence that the figure is likely to diminish. Further, just because other airlines have the ability to enter a city-pair market does not mean they do so, especially in an oligopoly such as exists in the airline

---

[11] Defendants also argue that because barriers to entry are low "competition is robust between numerous airport pairs." (Defs' Opp. at 8). It has already been established that barriers to entry in the industry are not low. Further, the conclusion drawn by Defendants that "competition is robust between numerous airport pairs" is nonsensical. What Defendants may have meant to say is that competition must be robust within city-pairs. But even that conclusion is not borne out by the evidence. (See, _infra_, at pp. 10-12).

industry. *United States v. Bethlehem Steel Corp.,* 168 F.Supp. 576, 607 (S.D.N.Y. 1958) (Weinfeld, J.) ("'Tend to create a monopoly' clearly includes aggravation of an existing oligopoly situation."). In such a concentrated market, it is more likely that the major network carriers will refrain from entering a competitive city-pair market because entering new markets typically drop fares substantially to stimulate demand. Instead, it is more profitable -- and much more likely in this highly concentrated market -- that the major airlines will agree (expressly or tacitly) to increase fares and fees on an industry-wide basis. They have, in fact, done so post-merger. (See, *infra*, at pp. 7-8).

*Third,* cross-elasticity of supply is not used to defeat a proposed relevant market definition, but to recognize competition where it exists. *See, United States v. Continental Can Co.*, 378 U.S. 441, 453 (1964). "Where the degree of substitutability in production is high, cross-elasticities of supply will also be high, and again the two commodities in question should be treated as part of the same market." *Twin City Sportservice, Inc. v. Charles O. Finley & Co.,* 512 F.2d 1264, 1271 (9th Cir.1975).

*Fourth,* the network carriers, including AMR, are much more than an "aggregation" of their city-pairs. As Defendants' expert Dennis Carlton acknowledged, ████████████████

██████████████████████████████████████████████

████████████████████████████████ (Ex. GG, Carlton Dep. T. 47:11-14). The ability to shift or add destinations from hubs as necessary, as the major network carriers do, is a competitive advantage over point-to-point carriers. An expanded network entrenches market power and it is erroneous to evaluate it as simply an "aggregation" of "city-pairs."

*Fifth*, Defendants ignore the evidence that these airlines increase fees on a system-wide or national basis. (Pls' Cross-Mot. at 37-38). For example, in American's 2016 10-K, it admitted:

> We have recently instituted, and intend to institute in the future, changes to our business

model to increase revenues and offset costs. These measures include premium economy service, basic economy service and charging separately for services that had previously been included within the price of a ticket and increasing other pre-existing fees. We may introduce additional initiatives in the future… Also, any new and increased fees might ….provide a significant competitive advantage to other carriers that determine not to institute similar charges.[12]

American explains that it has started charging for services that were previously included in the price of a ticket, in other words, instituting a "small but significant non-transitory increase in price."  American then admits it intends to impose more fee increases in the future, but that if other carriers do not match the increases, those carriers will have a "significant competitive advantage."  As for earlier fees that were successfully imposed by American, the implication is that the other carriers matched them.  The further implication is that it expects other carriers to match such increases in the future.  American has thus acknowledged that it has imposed, and can in the future successfully impose, price increases on a national level.

### B.  Industry Recognition is the Type of "Practical Indicia" the *Brown Shoe* Court Used to Define Relevant Market

Defendants ignore the multiple admissions that there is a national geographic market.  (Defs' Opp. at 37-38).  Such "practical indicia" of market boundaries may be viewed as evidentiary proxies for proof of substitutability and cross-elasticities of supply and demand.  *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.,* 792 F.2d 210, 218 (D.C.Cir.1986).

Next, Defendants claim that the authority cited by Plaintiffs, *Continental Airlines v. Am. Airlines, Inc.*, 824 F.Supp. 689 (S.D. Tex. 1993) and *In re Air Passenger Computer Reservation Systems Antitrust Litigation*, 694 F.Supp. 1443 (C.D. Cal. 1988), is "inapposite" because the claims there were brought under the Sherman Act, not § 7 of the Clayton Act.[13]  But  relevant

---

[12] (Pls' Cross-Mot. at 49).  Plaintiffs' Cross-Motion cites to Exhibit W, American's 10-K. Exhibit W inadvertently omitted page 26, which is cited again here.  It is publicly available on Defendants' website (on page 26) at: http://phx.corporate-ir.net/phoenix.zhtml?c=117098&p=irol-SECText&TEXT=aHR0cDovL2FwaS50ZW5rd2l6YXJkLmNvbS9maWxpbmcueG1sP2lwYWdlPTExNDEyMjg5Jk RTRVE9MCZTRVE9MCZTUURFU0M9U0VDVElPTl9FTlRJUkUmc3Vic2lkPTU3

[13] Defendants claim that, "Plaintiffs cite, *Continental Airlines v. Am. Airlines Inc.*[]" (Defs' Opp. at 7).  Plaintiffs did _not_ cite that decision.  Rather, Plaintiffs submitted jury instructions (which are properly subject to Judicial Notice) from that case to show that AMR took the position that the relevant geographic market was national in scope.  (Ex.

market analysis is the same, whether a case is brought under the Sherman or the Clayton Act:

> Although *Brown Shoe* involved violations of § 7 of the Clayton Act, which prohibits corporate acquisitions 'where in any line of commerce in any section of the country, the effect of such acquisition may be . . . to tend to create a monopoly,' 15 U. S. C. § 18, the Supreme Court has stated that there is "no reason to differentiate between 'line' of commerce in the context of the Clayton Act and 'part' of commerce for the purposes of the Sherman Act." *United States v. Grinnell Corp.,* 384 U. S. 563, 573 (1966) (secondary cite omitted).

*H. L. Moore Drug Exchange, Div. of Levitt Industries, Inc. v. Eli Lilly and Co.,* 1978 WL 1347, *8, fn.1 (S.D.N.Y. June 6, 1978). That these were Sherman Act cases makes no difference to the relevant market analysis.

Further, Plaintiffs submitted jury instructions from the *Continental* case in which AMR took the position that the relevant market was "national." The jury instructions are relevant:

> Defendants [American and AMR] claim that the national United States air passenger service market includes all air passenger service within the United States. Defendants [American and AMR] also claim that, for purposes of analyzing their national pricing actions, hubs and regions are not relevant markets separate from the national market that contains them…

(Ex. XX, *Continental Airlines v. American Airlines* (S.D. Tex. 1993), Case Nos. Civ. A. Nos. G–92–259, G–92–266, Jury Instructions, p. 2). This is the same type of "practical indicia" and industry recognition relied upon in *Brown Shoe* to define a relevant market.

Although Defendants complain that they took that position in *Continental* 25 years ago and that it "bears nothing on relevant market definition here," Defendants cannot explain why a national market for air transportation is any less cognizable in today's *oligopoly* than it was then. The same is true of *In re Air Passenger Computer Reservation Systems Antitrust Litigation*, where USAir insisted a national market for air transportation was the *only* relevant market. 694 F.Supp. at1467.

Defendants ask this Court to reject such practical indicia and industry recognition

---

XX.) Further, Defendants ignore the holding in *In re Domestic Air Transportation Antitrust Litigation*, 137 F.R.D. 677 (N.D. Ga. 1991).

because it comes from other cases. (Defs' Opp. at 9). However, these are admissions by them

and findings by courts that within the airline industry there exists a relevant national market for

air passenger transportation. Defendants can offer *no* authority for this Court to disregard this

highly relevant evidence of industry recognition, and the scant authority they do offer supports

Plaintiffs' case. For example, in *Beatrice Foods Co. v. FTC*, 540 F.2d 303, 308 (7th Cir. 1976),

the proper quote reads, "Considering these indicia [from *Brown Shoe*] in the context of the

instant case…" The Court must consider the evidence of practical indicia and industry

recognition and apply it to this case.

Another incorrect claim by Defendants is that, "Plaintiffs conveniently omit…*Malaney v.*

*UAL Corp*., 2011 WL 6845773 (N.D. Cal. December 29, 2011)." To the contrary, Plaintiffs

cited *Malaney* (Pls' Cross Mot. at 32, fn. 14) and explained that *Malaney* also erroneously

conflated product market analysis and geographic market analysis, as Defendants do. They also

incorrectly argue that "Plaintiffs have offered no legal authority to undermine the reasoning in

*Malaney* or this Court's prior holdings on this issue." (Defs' Opp. at 8). *In re Domestic Air*

*Transportation Antitrust Litigation, supra*, 137 F.R.D. 677, is such authority.

### C.    Defendants Misapply the Hypothetical Monopolist Test

Defendants' Opposition does nothing to correct its own errors in (1) confusing "airport

pairs" with "city-pairs"; and (2) misapplying the basic definition of a city-pair. (Pls' Cross-

Mot. at 38-39). Defendants claim that by pointing out their analytical blunders, Plaintiffs'

arguments are just a "sideshow" and "make no sense." (Defs' Opp. at 9-10). Defendants make

the same errors in their Opposition, arguing that, "from a demand perspective consumers are

likely to consider flights between certain city-pairs to be interchangeable." (Def's Opp. 10).

The city-pair market definition already includes nearby airports that consumers view as

interchangeable. That is why, as Defendants admit, city-pairs are recognized relevant

geographic markets for antitrust purposes.

Next, they argue that, "Plaintiffs have neither identified, nor established even a single city pair." (Def's Opp. at 3 and 9). Exhibit C to the Expert Report of Dr. Lundgren identifies 785 city-pairs where post-merger concentrations increased to presumptively illegal levels. A high HHI establishes a *prima facie* violation of § 7. (See pp. 3 above).

Yet, even if anticompetitive effects in these city-pair markets were not presumed, the evidence shows there were significant fare increases in many of those markets. In 723 of the 1008 city-pairs alleged in the FAC, average airfares increased. (Annex A, Lundgren Decl.). As the DOJ's Horizontal Merger Guidelines acknowledge, "Evidence of observed post-merger price increases or other changes adverse to customers is given substantial weight" in defining a relevant market (2010 Horizontal Merger Guidelines, at 2.1.1) and, "For example, evidence that a reduction in the number of significant rivals offering a group of products causes prices for those products to rise significantly can itself establish that those products form a relevant market." (2010 Horizontal Merger Guidelines, at 4). That average airfares have risen in these city-pairs post-merger also establishes the relevant market.

Lastly, Defendants argue that "absent…supply constraints, a given city-pair is not a cognizable relevant market because 'a would be monopolist's attempt to charge supracompetitive prices will be thwarted by the existence of firms willing to shift resources to producing the product, thereby increasing supply and driving prices back to competitive levels." (Defs' Opp. at 10). The hypothetical monopolist test was explained recently in *United States v. Aetna*, 2017 WL 325189, *11 (D.D.C. January 23, 2017):

> To determine whether a group of products could be an antitrust market, the hypothetical monopolist test asks whether a hypothetical monopolist of all the products within a proposed market would likely impose a "small but significant and non-transitory increase in price" (SSNIP)—typically of five or ten percent—on at least one product in the market, including one sold by the merging firms. See Guidelines §§ 4.1.1, 4.1.2. Whether the hypothetical monopolist can profitably impose the price increase depends, in part, on the amount of substitution outside the proposed market. "If enough consumers are able to substitute away from the hypothetical monopolist's product to another product and thereby make a price increase unprofitable, then the relevant market cannot include only

the monopolist's product and must also include the substitute goods." *Sysco*, 113 F.Supp.3d at 33. *But if substitution outside the proposed market is relatively low, then the hypothetical monopolist would likely impose the price increase without sacrificing a large number of sales. In that case, the price increase might be profitable, and the hypothetical monopolist's products would constitute the proper antitrust market. See id*. at 33; *Whole Foods*, 548 F.3d at 1052 (Kavanaugh, J., dissenting). [emphasis added.][14]

As discussed above, average prices increased in 723 of the 1008 city-pair markets. (Annex A, Lundgren Decl.) "Supracompetitive prices" were not "thwarted by the existence of firms willing to shift resources to producing the product." Plaintiffs have established a *prima face* case as to the 785 city-pair markets where post-merger concentration is presumptively illegal, and a *prima facie* case as to the 723 city-pair markets identified in Annex A to the Lundgren Decl. where average airfares increased. These city-pairs are proper relevant markets, and Defendants have not and cannot rebut this.

## V.    PLAINTIFFS HAVE ESTABLISHED STANDING

Defendants' standing arguments mischaracterize the facts, the statements made in Plaintiffs' Declarations in support of their Cross-Motion, and the law. To correct the record, Plaintiffs' analyze each erroneous claim made by Defendants, *ad seriatim*.

### A.    Defendants' 72-page Chart is Improper and Omits Material Facts

In support of their Cross-Motion for Summary Judgment, Plaintiffs submitted twenty declarations. (Dkt. Nos. 149-5 through 149-25). In response, Defendants offered only the arguments of counsel and an improper 72-page chart containing more argument. (Dkt. No. 161-1). The "argument of counsel is not evidence, and therefore does not provide a proper basis for denying summary judgment." *Fritzsche v. Albuquerque Mun. School Dist*., 194 F.Supp.2d 1194, 1206 (D.N.M. 2002). Defendants' deceptively named chart, "Plaintiffs' Specific Allegations of Injury," purports to list each Plaintiff's injuries. It does not. The chart omits facts from each

---

[14] The hypothetical monopolist test is not articulated in *Brown Shoe*. While Plaintiffs believe *Brown Shoe* sets forth the proper relevant market analysis, they nevertheless respond to Defendants' arguments regarding the hypothetical monopolist test. Under both tests, Plaintiffs have proven city-pairs as relevant geographic markets.

Plaintiff's declaration regarding their activities as consumers of air travel: their past and future flights. In Reply, Plaintiffs submit their own chart, including specific objections to Defendants' chart and the threatened injuries in the Plaintiffs' declarations Defendants omitted. (Ex. 4, Alioto Decl., "Plaintiffs' Reply to Defendants' Statement of Plaintiffs' Injuries.")

### B.      Plaintiffs Have Met and Exceeded Their Burden to Show Standing

Plaintiffs have already met and exceeded their burden to show standing under § 16 of the Clayton Act. This is because, "As a general rule, in an injunctive case this court need not address standing of each plaintiff if it concludes that one plaintiff has standing." *Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 523 (9th Cir.2009); *In re Old Carco LLC*, 470 B.R. 688, 697 (Bankr. S.D.N.Y. 2012) (holding, "This court may entertain a suit as long as one plaintiff has standing and need not establish whether other plaintiffs also have standing before proceeding to the merits of a case. *Bowsher v. Synar,* 478 U.S. 714, 720 [](1986)"); *Slockish v. U.S. Federal Highway Admin*., 682 F.Supp.2d 1178, 1201 (D.Or. 2010) (holding, "If any of these [Plaintiffs] have standing to bring any of the claims that can be fairly read to assert a legal right they possess, that claim must survive even though the remaining plaintiffs lack standing."); *see Clinton v. City of New York*, 524 U.S. 417, 431 n. 19 (1998); *Village of Arlington Heights v. Metro. Housing Develop.Corp*., 429 U.S. 252, 264 n. 9 (1977); *Preminger v. Peake*, 552 F.3d 757, 764 (9th Cir. 2008).

Plaintiffs are not required to prove standing forty times over. "One injunction is as effective as 100, and, concomitantly, that 100 injunctions are no more effective than one." *Hawaii v. Standard Oil Co. of Cal*., 405 U.S. 251, 261 (1972).

### C.      Plaintiffs are Consumers of Air Travel

Defendants' distortion of § 16 authority is no coincidence; that is because the law weighs

heavily in Plaintiffs' favor.[15]  Defendants have no answer to the court's decision in *Reilly v. Medianews Group, Inc.,* 2007 WL 1068202, *5 (N.D. Cal. April 10, 2007), that evidence of plaintiff as "an active consumer in [the newspaper] market" was "sufficient under *Lucas* to defeat summary judgment."[16]

Even the authority cited by Defendants supports Plaintiffs' standing.  (Defs' Opp. at 25). *In re New Jersey Title Insurance Litigation*, 2010 WL 2710570 (D.N.J. July 6, 2010) cited *Reilly v. Medianews Group, Inc., supra,* noting that, unlike in *Reilly*, the *New Jersey Title* plaintiffs were not "frequent consumers" of title insurance and did not claim that they intended to purchase title insurance in the future.  *Id.* at *6.  The same is not true here.  Plaintiffs have established that they are consumers of air travel in the United States and in the city-pair markets identified in Exhibit C to the Lundgren Report. (Pls' Cross-Mot. at 43-46).[17]

Further, the standing of many of the Plaintiffs to sue for injunctive relief under § 16 of the Clayton Act was confirmed in *Malaney v. UAL Corp*., 2010 WL 3790296, *12 (N.D.Cal. Sept. 27, 2010).  The *Malaney* plaintiffs submitted affidavits stating they had "purchased, or [had] plans to purchase, commercial airline tickets" in the future.  *Id*.  The court found that, "[a]s consumers of airline tickets" the "plaintiffs have established standing such that they are permitted to attempt to prove that the proposed merger will substantially lessen competition. *See Reilly,* 107 F.Supp.2d at 1195."

Defendants' next assertion, that Plaintiffs do nothing more in their declarations than "claim[] to fly," is belied by the record.  Plaintiffs' past and future travel was cited in *great* detail in Plaintiff's Cross-Motion at 43-46.  For instance, Mr. Freeland, has paid for or taken over 120

---

[15] Throughout the Opposition Brief, Defendants cite this Court's decision on Plaintiffs' motion to amend the complaint to add a § 4 damages claim, not a § 16 claim for injunctive relief.  For that reason and the reasons cited in Plaintiffs' Cross-Motion, it is distinguishable.  (Pls' Cross-Mot. at 52-53).

[16] This case was cited in Pls' Cross-Mot. at 46, but it is missing from Defendants' Opposition.  The *Lucas* case is, *Lucas Automotive Engineering, Inc. v. Bridgestone/Firestone, Inc.,* 140 F.3d 1228 (9th Cir. 1998).

[17] The three other cases cited by Defendants are not antitrust cases and they are irrelevant.  (Defs' Opp. at 24).

domestic and international flights from January 17, 2009, to September 15, 2017, including twenty on American. (Freeland Decl., ¶¶ 5-6). He travels to Toledo and expects to fly American there in the future, since only American flies there nonstop. *Id.* In addition, Mr. Freeland flies on one of the routes identified in Exhibit C to the Lundgren (PSP-DTW) and will do so in the future to visit his mother in Toledo. *Id.* Mr. Freeland is an "active" consumer of domestic air travel. As in *Reilly*, this is sufficient to demonstrate a threat of future injury from the merger. The same is true of the other Plaintiffs. (See Pls' Cross-Mot. at 43-46 and Ex. 4, Alioto Decl.).

The rulings in *Reilly*, *Malaney, Lucas*, and the authority cited by Defendants, *In re New Jersey Title Insurance Litigation*, directly contradict Defendants' contention (Defs' Opp. at 25, fn. 18) that the fact that "Plaintiffs have flown" is not "sufficient" to establish they are threatened with harm from the merger. The convoluted analysis by the Defendants does not conform to any of the relevant case law on this issue.

### D.    Plaintiffs Need Not Purchase an Airline Ticket for Travel on a Future Date to Show a Threat of Future Harm

Defendants argue that Plaintiffs' future "plans to fly" are general, not "concrete" and "insufficient."[18] However, Defendants' characterization of what constitutes a "concrete" *threat* of injury and what courts have *actually* determined to be a threat of injury, diverge substantially. When Defendants use the term "concrete," they mean that Plaintiffs' must show they have already purchased flights for future travel. (Pls' Cross-Mot. at 44-45). But having already purchased a ticket for future air travel is an *actual* injury because they have already paid the supracompetitive price. It is enough to show that Plaintiffs are consumers of air travel, which they have done.

---

[18] Defendants claim that Plaintiffs "suggest[] it was improper that Mr. Freeland was asked 'whether he had 'booked' any flights'" for future travel. (Defs' Opp. at 24, fn.17). Not so. Rather, Plaintiffs claim it was improper for Defendants to ask *only* whether Mr. Freeland had *booked* any flights and, on that basis, to draw the erroneous conclusion that he has no plans to fly on any airline in the future. One can know one will fly in the future, as does Mr. Freeland (Freeland Decl. ¶¶ 5-6), and thus be threatened with injury without having already purchased a ticket.

In further support of their false argument, Defendants cite *Funeral Consumers Alliance, Inc. v. Service Corp. Intern*., 695 F.3d 330, 343 (5th Cir. 2010). The plaintiffs in *Funeral Consumers Alliance* do not compare to the Plaintiffs here. In *Funeral Consumers Alliance*, a consumer group sought damages and injunctive relief under §§ 1 and 2 of the Sherman Act against a casket manufacturer, Batesville, and three of its distributors. The court found that the plaintiffs did not face a threat of future harm because, "[consumers] cite no evidence that they specifically sought out a Batesville casket or confined their casket purchase to a [particular] funeral home in the past." *Id*. at 343. By contrast, the record here is filled with evidence of Plaintiffs' air travel purchases, including over 2,000 flights since 2009.

Plaintiffs' future air travel plans are more specific and immediate than Defendants want the Court to believe. For example, when Lisa McCarthy drafted her declaration, her paid-for airfare from Ft. Myers to Atlanta on June 10, 2017, was for future travel. (McCarthy Decl. ¶ 8). Ms. McCarthy stated that she intends to fly in the future, including on American. (McCarthy Decl. ¶ 9). She specifically stated plans to fly from Miami to Charlotte; Miami to Philadelphia; and to Chicago and New York. McCarthy Decl. ¶ 9. For the convenience of the Court, Plaintiffs have prepared a chart listing Plaintiffs' future plans to fly. (See, Ex., 1, Alioto Decl., "Plaintiffs' Future Flights").

### E. Because Plaintiffs Have Shown that They Have Flown on and Will Fly on City-Pairs Where the Merger Both Increased Concentration to Presumptively Illegal Levels and Average Air Fares Post-Merger, They Have Standing to Bring this Action

Notwithstanding Defendants' arguments, "'[t]hreaten[ed] economic harm to ... *consumers* ... is plainly sufficient to authorize injunctive relief'" under § 16 of the Clayton Act. *New York ex rel. Schneiderman v. Actavis PLC,* 787 F.3d 638, 661 (2d Cir. 2015), citing *California v. American Stores Co.,* 495 U.S. 271, 283 (1990). [emphasis added]. Here, the threat of harm is not theoretical. Plaintiffs' Cross-Motion shows that Plaintiffs have flown on city-pairs where

post-merger changes in concentration are presumed illegal.  (Pls' Cross-Mot. at 44 and fn.30).

Upon a showing of a *prima facie* case, "traditional economic theories of the competitive effects

of market concentration" are presumed.  *United States v. H. & R. Block*, 833 F.Supp.2d 36, 71-73

and 77 (D.D.C. 2011).[19]  Fare increases are presumed on any of the presumptively illegal city-

pair markets on which Plaintiffs have traveled or will travel.  The evidence shows that average

air fares have increased on those city-pairs.  (Pls' Cross-Mot. at 47-48).

Defendants' brief also erroneously claims that, "there are only eight allegations of

apparent actual or threatened injury" on one of the 785 routes listed in Dr. Lundgren's Exhibit

C.[20]  (Defs' Opp. at 26).  Not so.  To facilitate the Court's review, Plaintiffs have compiled two

charts.  The first chart lists all the city-pairs Plaintiffs have flown and/or will fly in the future

where the post-merger concentrations are presumptively illegal.  (Ex. 2, Alioto Decl., "Plaintiffs'

Travel and Presumptively Illegal City Pairs").  The second chart lists the city-pairs where

Plaintiffs have flown or intend to fly in the future and where average fares, post-merger, have

increased.  (Ex. 3, Alioto Decl., "Plaintiffs' Travel and City Pair Average Fare Increases).

Plaintiffs have flown and/or intend to fly in the future on many more than eight of the city-pairs

where the merger is illegal.[21]  (Pl's Cross-Mot. at 44 and fn.30 and Ex. 2, Alioto Decl.).  Post-

merger, average air fares have increased in about three-quarters of these city-pairs.  (Lundgren

Decl., Annex A and Ex. 3, Alioto Decl).  There is no clearer way to "connect the dots" between

the threat of economic harm to Plaintiffs and the anticompetitive effects of Defendants' merger.

Next, Defendants select seven Plaintiffs, claiming their injuries "do not suffice."

Plaintiffs address those claims with regard to each of the seven:

- **Katherine Arcell**:  Katherine Arcell has flown on the New Orleans-Hartford City
  pair in the past and flew that city-pair in July 2017.  (Arcell Decl. ¶ 6).  This is a
  city-pair where concentration has increased to presumptively illegal levels, post-
  merger. (Ex. C, Lundgren Report).  In this city-pair, average air fares have

---

[19] Extremely high HHI establishes the *prima facie* case.  *See St. Alphonsus Med. Center, supra.*
[20] Defendants' footnote 19 at p. 27 is incomprehensible.
[21] The discrepancy is likely due to the Defendants' refusal to differentiate between a city-pair and an airport pair.

increased 8.4% post-merger. (Annex A, Lundgren Decl.). These facts "tie" the price increases (the actual harm and the threat of harm) to the merger. (Def's Opp. at 27). These average air fare increases are consistent with Ms. Arcell's observation that pre-merger she could pay less than $300 roundtrip and post-merger she paid $184 for a one-way ticket. (Arcell Decl. ¶ 6). Defendants have submitted no evidence to rebut these facts.

• **Jose Brito**: Jose Brito has flown or has plans to fly in the future on the Dallas-Reno, Miami to Phoenix and Boston to Phoenix city-pairs. (Brito Decl. ¶ 7). In these city-pairs, concentration has increased to presumptively illegal levels post-merger. (Ex. C, Lundgren Report.) In these city-pairs, post-merger average air fares have increased 14.5%, 3.5%, and 11.5%, respectively. (Annex A, Lundgren Decl.). These facts "tie" the price increases to the merger. (Def's Opp. at 27). Defendants have submitted no evidence to rebut these facts.

• **Don Freeland**: Don Freeland has flown on the Palm Springs (PSP) to Detroit (DTW) city-pair and intends to do so in the future. He lives in Palm Springs and regularly travels to the area to visit his mother. (Freeland Decl. ¶ 6.) This is a city-pair where concentration has increased to presumptively illegal levels, post-merger. (Ex. C, Lundgren Report), and where average air fares have increased 26.2%. (Annex A, Lundgren Decl.) These average air fare increases are consistent with Mr. Freeland's observation that fares on the "PSP-DTW" city-pair have increased since the merger. (Freeland Decl. ¶ 6.) These facts "tie" the price increases (the actual harm and the threat of harm) to the merger. (Def's Opp. at 27). Defendants have submitted no evidence to rebut these facts.

• **Lisa McCarthy**: Lisa McCarthy has flown and/or has plans to fly in the future on the Ft. Myers, FL (RSW) to San Francisco, CA (SFO) and the Ft. Myers, FL (RSW) to San Diego (SAN). (McCarthy ¶ 7). In these city-pairs, concentration has increased to presumptively illegal levels, post-merger. (Ex. C, Lundgren Report) and average air fares have increased 9.2%, and 12.8%, respectively. Annex A, Lundgren Decl. These facts "tie" the price increases (the actual harm and the threat of harm) to the merger. (Def's Opp. at 27). Defendants have submitted no evidence to rebut these facts.

• **Carolyn Fjord**: Carolyn Fjord has flown and/or will fly on the Sacramento (SMF) to St. Louis, MO (STL) city-pair. (Fjord Decl. ¶ 9). This is a city-pair where concentration has increased to presumptively illegal levels, post-merger. (Ex. C, Lundgren Report) and average air fares have increased 6.5%. (Annex A, Lundgren Decl.) This is consistent with Ms. Fjord's observation that fares have increased. (Fjord Decl. ¶ 9). These facts "tie" the price increases (the actual harm and the threat of harm) to the merger. (Def's Opp. at 27-28). Defendants have submitted no evidence to rebut these facts.

• **Brenda Davis:** Brenda Davis lives 30 miles from the Dallas-Fort Worth Airport (DFW), an American hub. Post-merger, USAir was eliminated as a competitive choice out of DFW. She has also been a member of the American Airlines Advantage program for many years. (Davis Decl. ¶ 4). She has flown 6 flights on American after the merger. (Davis Decl. ¶ 4). She has flown on the

presumptively illegal city-pair, Dallas to Las Vegas, "before and after the merger." (Davis Decl. ¶ 10.)  Since American's prices were no longer competitive on that city-pair, she could not use American, which was her preferred carrier because she wanted to use her American miles.  Instead, she flew Virgin America and could not use her American miles.  (Davis Decl. ¶ 10).  Defendants argue that "Ms. Davis provides no explanation for how "foregoing American miles" or flying on Virgin America constitutes an injury (Def's Opp. at 28), but what Ms. Davis described is an elimination of consumer choice, a recognized antitrust injury. *See Brown Shoe Co. v. United States*, 370 U.S., 294, 346 fn.72 (1962).  (Davis Decl. ¶¶ 7, 10).  Defendants have submitted no evidence to rebut these facts.

- **Deborah Pulfer:** Defendants cherry-pick various quotes from Ms. Pulfer's declaration and then conclude, with no support, that they are not antitrust injuries. Ms. Pulfer has paid/and or flown on 33 flights since June 2010.  She flew as recently as June 15/22 on a roundtrip flight on American from Dayton to Colorado Springs.  (Pulfer Decl. ¶ 5).  Ms. Pulfer observed that "The cost of flying on American has increased tremendously because the allotment of lower priced seats has been reduced so it is almost impossible to purchase lower priced tickets." (Pufler Decl. ¶ 14).  This observation is consistent with the deposition of Defendants' own expert, Dennis Carlton, who testified that ██████████████ ██████████████████████████████████████████████ (Huseny Decl. in Support of Defs. Motion for Summary Judgment Ex. 4, p. 15, n. 38).  Ms. Pulfer has established that she is threatened with economic harm as a consumer as a result of the merger.  Defendants have submitted no evidence to rebut these facts.

Defendants say that since Plaintiffs cannot show "past injury," they cannot show a probability of future injury.  (Defs' Opp. at 25-26).  As discussed above, Plaintiffs have shown they have flown on city-pairs where concentrations have increased to illegal levels *and* average airfares have increased. This establishes "past injury" and a threat of future injury.

Defendants cite *Cash & Henderson Drugs, Inc. v. Johnson & Johnson*, 799 F.3d 202, 215 (2d Cir. 2015) in support of their "past injury" arguments.   *First*, *Cash* is inapposite because Plaintiffs have demonstrated past injury.  In addition, *Cash* involves subsections 2(a), 2(d), and 2(f) of the Robinson–Patman Act, not § 7 of the Clayton Act.  Because *Cash* involves violations of the Robinson-Patman Act, the court did not conduct a § 7 analysis which requires making "predictions" about the Defendants' future conduct.  *Cash* does not apply to a § 7 case, for that reason.  *Second*, the court in *Cash* also determined that the "Plaintiffs have offered no argument

that future conditions will change in such a way as to make the injuries they claim to have suffered more pronounced than currently alleged." *Cash*, at 215. The Plaintiffs here have shown the kind of "future conditions" that may make their injuries "more pronounced." As argued in Pls' Cross-Mot. at 16-17, Defendants were and are under competitive restrictions for three and five years, the three-year restrictions only recently expired. The three-year restrictions required Defendants to maintain hubs "consistent with historical operations." *Id.* Immediately after they expired, American made significant cuts at its Phoenix hub. *Id.* The five-year restrictions require American to maintain service to 46 smaller communities. Those restrictions will expire on November 12, 2018, at which time it is reasonably expected that service will also be cut or canceled in many of those markets. *Id.* at 18.

### F.    The Past Post-Merger Activity of the Airlines is a Highly Relevant Indicator Used to Predict Future Post-Merger Behavior

Defendants contend that "harms occurring before the Merger cannot be caused by the Merger." (Def's Opp. at 29.) However, statements, history, and past actions of merging parties are *highly relevant* indicators of probable future conduct under § 7. *Saint Alphonsus Medical Center-Nampa Inc. v. St. Luke's Health System, Ltd.,* 778 F.3d at 787-788, citing *Hospital Corp. of America*, 807 F.2d at 1388–89. They are relevant to determine the *threat* of harm to Plaintiffs from this merger.

For example, Defendants cite Christine Whalen's Declaration that, "American no longer offers nonstop service to St. Louis since the merger with TWA in 2001, and they have continued to ignore this city since the merger despite their newfound strength." (Whalen Decl. ¶ 14). While this harm arose from a prior merger, the facts are relevant to predict the threat of harm from *this* merger. This is consistent with the MIT reports submitted by Plaintiffs predicting that the airlines, post-merger, will reduce service to small and mid-sized cities. (Ex. AA, MIT White Paper # 3, pp. 3-4). That report looked at the changes in St. Louis from 2007 to 2012 resulting

from industry consolidation and the airlines' "capacity discipline." *Id.* at p. 24. It found that the average STL one-way airfare from 2007 to 2012 had increased 6%. Over that same period, the number of flights decreased 27% and the number of available seats decreased 20%. *Id.* Whalen intends to fly to St. Louis in June 2018. Thus, she is threatened with future harm by service reductions and increases in fares from the elimination of another airline.

The same is true for Pamela Faust. She stated that after the Delta-Northwest merger, "Delta ceased to use Cincinnati as a hub" and the result was a loss of service for Cincinnati consumers. (Faust Decl. ¶¶ 6-8). This is consistent with the MIT reports predicting that the airlines, post-merger, will reduce service in small and mid-sized cities. (Ex. AA, MIT White Paper # 3, pp. 3-4). That report also reviewed changes in Cincinnati from 2007 to 2012 resulting from the airlines' consolidation and capacity discipline. *Id.* at 24. The report found that the number of flights decreased 64% and that available seats decreased 62%. *Id.* at 24. Ms. Faust is threatened with the same harm as Ms. Whalen.

The facts contained in the other Plaintiffs' declarations with regard to harms from prior mergers are highly relevant evidence of Plaintiffs' threatened injuries from this acquisition. (Brito Decl. ¶¶ 8, 15; Faust Decl. ¶¶ 6, 7, 8; Freeland Decl. ¶ 10; Russell Decl. ¶ 12).

### G. Increased Fees and Reductions in Service are the Type of Injuries the Antitrust Laws are Intended to Prevent

Defendants next contend that because some of Plaintiffs' injuries occurred after the merger, they were not necessarily *caused* by the merger and that these harms are not antitrust injuries. (Defs' Opp. at 31). Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489 (1977). These Plaintiffs have shown that their injuries "flow from that which makes defendants' acts unlawful."

### 1. New and Increased Fees are the Result of Presumptive Collusion

Defendants claim that even though American started charging seat assignment fees and increased fees to change a ticket post-merger, Plaintiffs have not shown that these increased fees flow from that which makes defendants' acts unlawful. (Opp. at 31). *First*, increased fees are the type of injury the antitrust laws are intended to prevent. "'Threaten[ed] economic harm to ... *consumers* ... is plainly sufficient to authorize injunctive relief'" under § 16 of the Clayton Act. *New York ex rel. Schneiderman,* 787 F.3d at 661, citing *California v. American Stores Co.,* 495 U.S. at 283 [emphasis added].

*Second*, Defendants ignore that Plaintiffs have established a *prima facie* case. *St. Alphonsus Med. Center-Nampa, Inc.,* 778 F.3d at 788 (holding that, "The extremely high HHI on its own establishes the prima facie case." [and cases cited]). Once Plaintiffs established a *prima facie* case, collusion was presumed. *United States v. H. & R. Block*, 833 F.Supp.2d at 74 (holding that, once a *prima facie* case has been established, "the burden is on the defendants to produce evidence of 'structural market barriers to collusion' specific to this industry that would defeat the 'ordinary presumption of collusion' that attaches to a merger in a highly concentrated market. *See Heinz,* 246 F.3d at 725.") Increased fees and fees for services that used to be included in the price of a ticket result from increased coordination among the airlines. Defendants admitted as much in their 2016 10-K statement:

> "We have recently instituted, and intend to institute in the future, changes to our business model to increase revenues and offset costs. *These measures include premium economy service, basic economy service and charging separately for services that had previously been included within the price of a ticket and increasing other pre-existing fees.* We may introduce additional initiatives in the future…" Ex. W, American Form 10-K (Feb. 22, 2017). [emphasis added]. American warns its investors that if other carriers do not match *these fee changes it could, "provide a significant competitive advantage to other carriers that determine not to institute similar charges." Id.* Implicit in American's promise to investors to increase ancillary fees is that it expects the other major airlines in the United States to match these increases."

(Pls' Cross-Mot. at 49-50) [emphasis added]. American also implicitly admitted that the new fees it *already* imposed (like seat assignment fees and increased baggage fees) were matched by

other carriers, because if they had not been, the non-matching carriers would have a "significant competitive advantage." That is coordinated behavior. Harm in the form of new fees for services that used to be included in the price of a ticket, as Plaintiffs' cite, are harms that flow from that which makes the Defendants' merger unlawful.

### 2. Reductions in Service are Just the Type of Injury the Antitrust Laws were Intended to Prevent

Defendants claim that service cuts at airports do not flow from the anticompetitive effects of the merger. (Defs' Opp. at 31). Lessening of competition is exactly the kind of irreparable injury that injunctive relief under section 16 of the Clayton Act was intended to prevent. Reduction of flights at airports is less competition, and because Plaintiffs have established a *prima facie* case, such effects are presumed.

Defendants note the reduction in service experienced by Ms. Faust in Dayton, stating that "many of the flights previously offered by US Air were discontinued by" American post-merger. (Defs' Opp. at 31). This is consistent with the MIT reports predicting that the airlines, post-merger, would reduce service to small and mid-sized cities. (Ex. AA, MIT White Paper # 3, pp. 3-4). That report specifically looked at the changes in Dayton from 2007 to 2012 resulting from industry consolidation and the airlines' "capacity discipline." *Id.* at p. 25. The report found that the average DAY one-way airfare from 2007 to 2012 had increased 6%. Over that same period, the number of flights decreased 21% and the number of available seats decreased 13%. *Id.* This is consistent with the illegal concentration levels in Dayton city-pair markets where anticompetitive effects are presumed.[22] Decreased service at Dayton flows from that which makes Defendants' merger unlawful: illegal concentration.

In addition, Ms. Fjord complains that there is no longer a non-stop flight from

---

[22] Of the 785 city-pair markets where the acquisition is presumptively illegal identified in Exhibit C to the Expert Report of Carl Lundgren, Dayton is included in what is known as the Cincinnati city-pair market.

Sacramento to Philadelphia.  Sacramento to Philadelphia is one city-pair market where the post-merger concentration increased to levels presumed illegal.  (Ex. C, Lundgren Report).  Post-merger HHI in that city-pair is 3,299, an increase of 763.   Because anticompetitive effects such as decreased service are presumed in that city-pair, the harm to Ms. Fjord flows from that which makes Defendants' merger unlawful.

### 3.   Decreases in Quality of Service

Defendants also argue that decreases in quality of service, like "in-flight drinks and meals, once complimentary, [being now] rather expensive" and that "it is no longer possible to check bags through to a final destination when flying on two different airlines" are not sufficient harms.  (Defs' Opp. at 32.)  However, "the prototypical example of antitrust injury is an allegation by consumers that they have had to pay higher prices (or experienced a reduction in the quality of service) as a result of a defendant's anticompetitive conduct." *Mathias v. Daily News, L.P.*, 152 F. Supp.2d 465, 478 (S.D.N.Y. 2001).   Because Plaintiffs have shown presumptively illegal concentrations, reduction in the quality of service is presumed.

### H.   The Travel Agent's Lost Business is the Type of Injury the Antitrust Laws were Intended to Prevent

Defendants argue that by asserting standing as travel agents, Plaintiffs do not assert injury that is "personal to them" and it does not flow from that which makes the merger unlawful. (Defs' Opp. at 33).

Plaintiffs, as travel agents and distributors of Defendants' products, do not face the difficulties demonstrating antitrust injury that competitors do.  The antitrust laws require that courts protect small business from "the loss of profits from practices forbidden by the antitrust laws." *Cargill, Inc. v. Monfort,* 479 U.S. 104, 116 (1986).  Loss of business or customers is recognized antitrust injury and here it is connected to that which makes this merger illegal. Plaintiffs have established a *prima facie* case in which anticompetitive effects are presumed.

Because travel agents' businesses are inextricably linked to the airlines, service reductions, cuts in capacity, and price increases impact Plaintiffs' businesses. For example, Lisa McCarthy describes:

> A … corporate client who had previously flown primarily on US Airways from Charlotte, Greensboro and Raleigh voiced concern due to higher airfares post AA/US Airways merger. The client asked if we were not checking as hard for the lower airfares that we had been able to deliver for them pre-AA/US Airways merger. When told those lower airfares were harder to secure, even with extra time spent checking and rechecking, the client stopped flying their key people as frequently and eventually stopped working with the agency. We had been working with this client since 1999.

> A Michigan based tech company starting working with our agency for travel services…. The firm started…flying primarily American (AA) served routes a few months prior to the AA/US merger. After the AA/US Airways merger the client's CEO requested a meeting with us to discuss the expensive airfares he had been noticing…, mostly on AA flights. On the next few travel requests from this firm, the clients became further irritated by the lack of availability on AA flights they wanted to Mexico City and Phoenix and did not accept the explanation of lack of availability for the better rates and eventually moved away from the agencies services.

(McCarthy Decl. ¶¶19(iii) and 19(iv)). Ms. McCarthy lost two clients due to price increases and reductions in capacity, presumed anticompetitive effects of this merger. Plaintiff's Cross-Motion cites other Plaintiffs' injuries to their businesses. (Pls' Cross-Mot. at 52-54). Plaintiffs need not quantify their losses, as in a § 4 case. It is enough to show loss of business by reason of the presumed anticompetitive effects: increased prices and reductions in capacity and service. (Pl's Cross-Mot. at 52-54).

## I.    Defendants' Complaints that Plaintiffs' Declarations were Submitted at the "Eleventh Hour" are Groundless

Defendants complain that Plaintiffs' Declarations have been filed at the "eleventh hour" after fact discovery closed.[23]    Defendants also complain that Plaintiffs suggest that "their lack of evidence of future harm should be attributed to Defendants." (Defs' Opp. at 35, fn.28.) Plaintiffs

---

[23] Plaintiffs never agreed to limit the declarations that would be submitted on summary judgment. Indeed, at the time counsel were conferring on discovery, Defendants had not yet decided if they would file a motion for summary judgment. (Order Dkt. No 128, ¶ 5). The follow-up letter sent by Gil Messina is consistent with Plaintiffs' intention not to limit evidence submitted on summary judgment, as the letter describes the list as a "good faith, *non-binding*, list of the plaintiffs who *may* testify at trial in this matter." (Ex. JJ, Messina Letter to Huseny)  [emphases added].

made no such suggestion, but the reason these facts may be new to Defendants is because of their own discovery failures.   Defendants never served a Request for Documents and the only Interrogatories they served were in October 2013, well before the merger closed.   Plaintiffs responded to those Interrogatories on November 6, 2013, also before the merger closed.   (Dkt. No. 141-9).   The Interrogatories asked only about Plaintiffs' travel on Defendants' airlines from 2009 to 2013.   The Interrogatories did not ask about travel on other airlines, did not ask about Plaintiffs' future plans to fly, and did not ask if Plaintiffs traveled any specific city-pair.   There is no duty to respond to Interrogatories that were not asked.

Defendants erroneously contend that Plaintiffs' declarations are the type of "self-serving" declarations courts look at with "skepticism." (Defs' Opp. at 35).   *First,* the Plaintiffs are the best and only witnesses suited to testify about their injuries, actual and threatened.   Labeling these affidavits as "self-serving" is nonsensical.   *Second*, the authority cited by Defendants to support this argument is the "sham issue of fact" doctrine, which "prohibits a party from defeating summary judgment simply by submitting an affidavit *that contradicts the party's previous sworn testimony*."   *In re Fosamax Prods. Liab. Litig*., 707 F.3d 189, 195 (2d Cir. 2013) [emphasis added.]   Defendants cannot point to a contradiction in any Plaintiff's sworn testimony.[24]

### VI.   SUMMARY JUDGMENT SHOULD BE GRANTED ON PLAINTIFFS 2(C) CLAIM

In their Opposition, Defendants focus on the fact that this Court ruled the payment to Mr.

---

[24] Defendants argue that Mr. Fry's Declaration is inconsistent with the allegations in the PSASC because the PSASC detailed how Mr. Fry was forced to fly out of Denver rather than Colorado after the US Air merger with America West.   (Def's Opp. at 35, fn.29).   The argument is nonsensical.   Each merger or acquisition may cause reductions in service that would require Mr. Fry to fly more often from Denver than from Colorado Springs.   The fact that service was first reduced when USAir merged with America West does not mean there could be no further service reductions and/or eliminations following the American – USAir merger.   Further, the allegations in the PSASC are not sworn testimony, but even if they were, they are not inconsistent with his declaration.
Defendants also complain that Rosemary D'Augusta submitted an errata to her deposition with information that she did travel in 2011 on Continental and United.   Her affidavit, while more specific, is consistent with that testimony that she did travel on those carriers.   Defendants complain that she did not produce the "receipts" that she located.   Defendants' did not request that she produce documents at her deposition and defendants never served a request for production of documents.

Horton "a severance payment" (Defs' Opp. at 37, fn. 30) and he was paid by the merged entity

when he "continued to serve AAG as Chairman of the Board of Directors." (Defs' Opp.at 37)

*First,* this Court did not rule that the payment to Mr. Horton was a legitimate severance

payment. Rather, the Court assumed for purposes of the motion to approve the payment that it

was a severance payment because the motion and the "American CEO Letter Agreement"

described it as such. (Dkt. 7587, p.15) The Court noted that "the UCC stated that the payment

to Mr. Horton is an aggregate payment that included *not only severance, but also other types of*

*remuneration*." *Id.* at 15, n.10 [emphasis added]. *Second,* the Transition Agreement stated that

"Executive's status as an officer and employee of the Company ended with his transition to his

role as Chairman of the Board effective as of the Closing Date, ..." Ex. II.

There is nothing in Defendants' Opposition to rebut that Mr. Horton opposed the merger

until he reached an agreement to be paid approximately $20 million on February 13, 2013,

followed on February 14, 2013, by the announcement of the merger. (See the facts in Pls' Cross-

Mot. at 56.) The payment "included not only severance" and was not paid by his employer. "The

*sine qua non* of a § 2(c) violation…is an improper payment, *i.e.*, a payment of a commission,

brokerage, or discount other than for services actually rendered." *Blue Tree Hotels Inv. (Canada),*

*Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 223-224 (2d Cir. 2004).

## CONCLUSION

In light of the foregoing, Plaintiffs respectfully request that this Court grant Plaintiffs'

Cross-Motion for Summary Judgment.

Respectfully submitted:

Dated: September 1, 2017

By: */s/ Joseph M. Alioto*
    Joseph M. Alioto (SBN 42680)
    Jamie L. Miller (SBN 271452)
    ALIOTO LAW FIRM
    One Sansome Street, 35th Floor
    San Francisco, CA  94104
    Telephone: (415) 434-8900
    Facsimile: (415) 434-9200

    *Attorneys for the Clayton Act Plaintiffs*

## COUNSEL FOR PLAINTIFFS

Joseph M. Alioto (SBN 42680)
*Admitted Pro Hac Vice*
Jamie L. Miller (SBN 271452)
*Admitted Pro Hac Vice*
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, CA  94104
Telephone: (415) 434-8900
Facsimile: (415) 434-9200
Email:  jmalioto@aliotolaw.com
          jmiller@aliotolaw.com


Gil D. Messina (SBN 029661978)
*Admitted Pro Hac Vice*
MESSINA LAW FIRM, P.C.
961 Holmdel Road
Holmdel, NJ 07733
Telephone: (742) 332-9300
Facsimile: (742) 332-9301
Email: gmessina@messinalawfirm.com


Christopher A. Nedeau (SBN 81297)
*Admitted Pro Hac Vice*
NEDEAU LAW FIRM
154 Baker Street
San Francisco, CA 94117
Telephone:  415-516-4010
Email:  cnedeau@nedeaulaw.net