LATHAM & WATKINS LLP
  Daniel M. Wall (admitted *pro hac vice*)
  Sadik Huseny (admitted *pro hac vice*)
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Facsimile: (415) 395-8095

*Attorneys for Defendant Merged Entity*
*American Airlines Group Inc.*

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Case No. 11-15463-SHL |
| | : | |
| AMR CORPORATION, *et al.*, | : | Chapter 11 |
| | : | |
| Debtors. | : | (Jointly Administered) |

------------------------------------------------------------x
------------------------------------------------------------x

| | | |
|---|---|---|
| CAROLYN FJORD, *et al.*, | | |
| | : | Adversary No. 13-01392-SHL |
| Plaintiffs, | : | |
| vs. | : | |
| | : | |
| AMR CORPORATION, *et al.*, | : | |
| | : | |
| Defendants. | : | |

------------------------------------------------------------x

### DEFENDANT AMERICAN AIRLINES GROUP INC.'S
### PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     PROCEDURAL HISTORY ................................................................................. 5

        A.      Pretrial Proceedings ............................................................................... 5

                1.      The Chapter 11 Cases ................................................................. 5

                2.      Plaintiffs' Initial Complaint ....................................................... 6

                3.      Plaintiffs' Attempt to Obtain a Temporary Restraining Order ................ 6

                4.      Plaintiffs' Motions to Amend ..................................................... 7

                5.      The Parties' Cross-Motions for Summary Judgment ................. 9

                6.      Plaintiffs' Request to Issue New Expert Opinions ................... 10

                7.      Pretrial Filings ......................................................................... 11

        B.      The Trial ............................................................................................... 12

III.    FINDINGS OF FACT ....................................................................................... 14

        A.      Characteristics of the Airline Industry ................................................ 14

                1.      Network Airline Dynamics ...................................................... 14

                2.      The Entry of LCCs & The Rise of LCC Competition ............. 16

                3.      Low Barriers to Entry into City Pairs ...................................... 18

        B.      Competitive Conditions Leading Up to the Merger ............................ 20

                1.      External Shocks to the Airline Industry ................................... 21

                2.      Other Legacy Carrier Mergers ................................................. 23

                3.      Relative Weaknesses in the American and US Airways Networks ........ 24

        C.      The Rationale for the Merger ............................................................... 25

        D.      The DOJ Lawsuit, DOJ Settlement, and Consummation of the Merger ............ 29

        E.      Evidence of Competitive Effects ......................................................... 31

                1.      Concentration in the Identified City Pairs Post-Merger ......... 32

                2.      Prospective Competitive Effects Analyses .............................. 34

                        a.      Dr. Ordover's Coordinated Effects Analysis ................. 35

                        b.      Dr. Carlton's Prospective Analysis of the Merger ........ 39

                3.      Procompetitive Effects From Network and Cost Efficiencies ................ 40

|  |  | a. | Network Benefits ............................................................... | 40 |
|  |  | b. | Increase in Investments..................................................... | 44 |
|  | 4. | | Low-Cost Carrier Competition Continues to Grow................................ | 46 |
|  | 5. | | Post-Merger Capacity Changes...................................................... | 48 |
|  | 6. | | Post-Merger Price Changes........................................................... | 52 |
|  |  | a. | Dr. Lundgren's Average Fares Calculations.......................... | 52 |
|  |  | b. | American's Evidence Relating to Post-Merger Fare Trends ....... | 53 |

IV. | CONCLUSIONS OF LAW .............................................................. | 56

A. | The Proper Framework For Analyzing a Merger Under Section 7 of the Clayton Act............................................................................ | 57

B. | The Relevance of Post-Merger Evidence ......................................... | 59

C. | The Relevance of Efficiencies Evidence ......................................... | 62

D. | Market Definition............................................................................ | 66

1. | Airline Service Between City Pairs Are the Relevant Markets in this Case......................................................... | 68

2. | The City Pair Markets at Issue.................................................. | 69

3. | Plaintiffs Failed to Prove that Their Identified City Pairs Are Cognizable Relevant Antitrust Markets............................... | 70

E. | Plaintiffs' Market Concentration Evidence Does Not Accurately Predict or Reflect the Merger's Effects on Competition ................................... | 73

1. | HHIs Have Limited Predictive Value ....................................... | 73

2. | Changes in Airfares, Output, and Capacity Since the Merger Indicate Robust Competition..................................... | 76

3. | The Merger Resulted in Procompetitive Efficiencies............................. | 78

F. | Plaintiffs Have Not Met Their Burden To Show the Merger Is Anticompetitive................................................................................ | 81

1. | Dr. Lundgren's Average Fare Calculations Are Unreliable and Insufficient ................................................................... | 81

2. | Plaintiffs' General Grievances Regarding the State of the Airline Industry Have No Causal Connection to the Merger ................. | 83

G. | Plaintiffs' Lack of Standing ............................................................. | 87

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*AD/SAT, Division of Skylight, Inc. v. Associated Press*,
181 F.3d 216 (2d Cir. 1999)............................................................................ 2, 3, 66, 67

*American Medical Association v. United Healthcare Corp.*,
No. 00-cv-2800, 2007 WL 683974 (S.D.N.Y. March 5, 2007).......................... 89

*Chicago Bridge and Iron Co. v. F.T.C.*,
534 F.3d 410 (5th Cir. 2008)........................................................................ 57, 59, 60

*City of New York v. Group Health, Inc.*,
649 F.3d 151 (2d Cir. 2011)........................................................................... 67

*F.T.C. v. H.J. Heinz Co.*,
246 F.3d 708 (D.C. Cir. 2001) ....................................................................... 63

*F.T.C. v. Sysco Corp.*,
113 F. Supp. 3d 1 (D.D.C. 2015) ................................................................... 64

*F.T.C. v. Tenet Health Care Corp.*,
186 F.3d 1045 (8th Cir. 1999) ....................................................................... 64

*F.T.C. v. University Health, Inc.*,
938 F.2d 1206 (11th Cir. 1991) ..................................................................... 63

*Federal Housing Finance Agency v. Merrill Lynch & Co.*,
No. 11-cv-6202, 2014 WL 798385 (S.D.N.Y. Feb. 28, 2014) ........................ 23

*Fjord v. AMR Corp. (In re AMR Corp.)*,
502 B.R. 23 (Bankr. S.D.N.Y. 2013)............................................................. 2, 7

*Fjord v. AMR Corp. (In re AMR Corp.)*,
506 B.R. 368 (Bankr. S.D.N.Y. 2014)........................................................... 7

*Fjord. v. AMR Corp. (In re AMR Corp.)*,
527 B.R. 874 (Bankr. S.D.N.Y. 2015)....................................................... *passim*

*Funeral Consumers Alliance, Inc. v. Service Corp. International*,
695 F.3d 330 (5th Cir. 2012) ......................................................................... 89, 91

*Gelboim v. Bank of America Corp.*,
823 F.3d 759 (2d Cir. 2016)........................................................................... 91

*Geneva Pharmaceuticals Technology Corp. v. Barr Laboratories Inc.*,
386 F.3d 485 (2d. Cir. 2004).......................................................................... 57

*Global Discount Travel Services, LLC v. Trans World Airlines, Inc.*,
960 F. Supp. 701 (S.D.N.Y. 1997)................................................................. 68, 69

*Hospital Corp. of America v. F.T.C.*,
807 F.2d 1381 (7th Cir. 1986) ................................................................. 59, 62

*Hub v. Sun Valley Co.*,
682 F.2d 776 (9th Cir. 1982) .......................................................................... 23

*In re AMR Corp.*,
477 B.R. 384 (Bankr. S.D.N.Y. 2012) ............................................................ 27

*In re New Jersey Title Insurance Litigation*,
683 F.3d 451 (3d Cir. 2012) ..................................................................... 69, 87

*In re Northwest Airlines Corp.*,
208 F.R.D. 174 (E.D. Mich. 2002) ................................................................ 68

*In re Text Messaging Antitrust Litigation*,
782 F.3d 867 (7th Cir. 2015) .......................................................................... 37

*In re Zinc Antitrust Litigation*,
No. 14-cv-3728, 2016 WL 3167192 (S.D.N.Y June 6, 2016) ......................... 57

*Indium Corp. of America v. Semi-Alloys, Inc.*,
566 F. Supp. 1344 (N.D.N.Y. 1983) .............................................................. 89

*Kentucky Speedway, LLC v. National Association of Stock Car Auto Racing, Inc.*,
588 F.3d 908 (6th Cir. 2009) .......................................................................... 70

*Lavoho, LLC v. Apple, Inc.*,
232 F. Supp. 3d 513 (S.D.N.Y. 2016), *aff'd sub nom. Diesel eBooks, LLC v.*
*Simon & Schuster, Inc.*, 869 F.3d 55 (2d Cir. 2017) ....................................... 85

*Lektro–Vend Corp. v. Vendo Co.*,
660 F.2d 255, 276 (7th Cir. 1981) ................................................................ 60

*RC Bigelow, Inc. v. Unilever NV*,
867 F.2d 102 (2d Cir. 1989) ..................................................................... 57, 91

*Re-Alco Industries, Inc. v. National Center For Health Education, Inc.*,
812 F. Supp. 387 (S.D.N.Y. 1993) ................................................................ 66

*Rebel Oil Co., Inc. v. Atlantic Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) .......................................................................... 67

*Saint Alphonsus Medical Center-Nampa, Inc. v. St. Luke's Health System, Ltd.*,
778 F.3d 775 (9th Cir. 2015) .......................................................................... 57

*State of New York v. Kraft General Foods, Inc.*,
926 F. Supp. 321 (S.D.N.Y. 1995) ................................................................ 66

*Summers v. Earth Island Institute*,
555 U.S. 488 (2009) ........................................................................................ 89

*Telerate Systems, Inc. v. Caro*,
689 F. Supp. 221 (S.D.N.Y. 1988) ................................................................ 70

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) ............................................................................. 66

*United States v. American Express Co.*,
    838 F.3d 179 (2d Cir. 2016), *aff'd sub nom. Ohio v. American Express Co.*,
    138 S.Ct. 2274 (2018) ................................................................................ 66, 67

*United States v. Anthem, Inc.*,
    855 F.3d 345 (D.C. Cir. 2017) ....................................................................... 2, 58

*United States v. AT&T Inc.*,
    310 F. Supp. 3d 161 (D.D.C. 2018) .............................................................. 63, 64

*United States v. Baker Hughes Inc.*,
    908 F.2d 981  (D.C. Cir. 1990) ................................................................... *passim*

*United States v. Bazaarvoice, Inc.*,
    No. 13-cv-00133, 2014 WL 203966 (N.D. Cal. Jan. 8, 2014) ............................ 59

*United States v. Citizens & Southern National Bank*,
    422 U.S. 86 (1975) ........................................................................................... 72

*United States v. General Dynamics Corp.*,
    415 U.S. 486 (1974) ............................................................................. 59, 60, 73

*United States v. H&R Block*,
    833 F. Supp. 2d 36 (D.D.C. 2011) ................................................................... 66

*United States v. International Harvester Co.*,
    564 F.2d 769 (7th Cir. 1977) ........................................................................... 60

*United States v. Marine Bancorporation*,
    418 U.S. 602 (1974) ......................................................................................... 66

*United States v. Syufy Enterprises*,
    903 F.2d 659 (9th Cir. 1990) ........................................................................... 60

*United States v. US Airways Group, Inc., et al.*,
    No. 13-cv-01236 ............................................................................................. 23

*United States v. US Airways Group, Inc., et al.*,
    No. 13-cv-01236 (D.D.C.) ......................................................................... 29, 30

*United States v. Von's Grocery Co.*,
    384 U.S. 270 (1966) ......................................................................................... 58

*United States v. Waste Management, Inc.*,
    743 F.2d 976 (2d Cir. 1984) ............................................................................. 59

## STATUTES

15 U.S.C. § 13(c) .................................................................................................. 9

15 U.S.C. § 18 .............................................................................................. 1, 6, 57

15 U.S.C. § 26 ................................................................................................. 1, 6

## OTHER AUTHORITIES

ABA Section of Antitrust Law, ANTITRUST LAW DEVELOPMENTS (8th ed. 2017) ..................... 58

ABA Section of Antitrust Law, MERGERS AND ACQUISITIONS: UNDERSTANDING
    THE ANTITRUST ISSUES (2000) ............................................................................. 63

Black's Law Dictionary (10th ed. 2014) .................................................................. 85

N. Economides, *The Economics of Networks*, 14 Int'l J. of Industrial Org. 673
    (October 1996). ............................................................................................... 65

P. Areeda and H. Hovenkamp, AN ANALYSIS OF ANTITRUST PRINCIPLES AND
    THEIR APPLICATION (4th ed. 2018) .................................................................. 3, 68

U.S. Department of Justice & Federal Trade Commission, Horizontal Merger
    Guidelines (Aug. 19, 2010) .......................................................................... *passim*

U.S. Department of Justice, Merger Guidelines (1984) ............................................. 59

## I.  INTRODUCTION

1.      Plaintiffs—a group of 40 air travel consumers and travel agents—filed this lawsuit over five years ago, alleging that the then-proposed merger between US Airways and American Airlines (the "Merger") violated Section 7 of the Clayton Antitrust Act, 15 U.S.C. § 18, and seeking preliminary and permanent injunctive relief to enjoin the Merger under Section 16 of the Clayton Act, 15 U.S.C. § 26.  This Court denied Plaintiffs' application for a temporary restraining order to block the Merger, and the Merger was consummated on December 9, 2013.  The parties have continued to litigate this case since then, with Plaintiffs attempting to amend their complaint multiple times, and the case finally proceeded to trial on March 11, 2019, after the Court denied the parties' cross-motions for summary judgment.

2.      Since the outset of this litigation, Plaintiffs' case has been predicated on a theory rooted in 1960s case law that any indication of increased market concentration is sufficient, on its own, to prevail in an action challenging a merger.  Despite the fact that this Court rejected Plaintiffs' approach at the outset of this litigation and multiple times thereafter, pointing to the fact that the majority of courts have adopted a different, modern framework for assessing the competitive effects of mergers, Plaintiffs continued to press their outdated theory at trial.  As a result, Plaintiffs' case rests almost entirely on market share and "HHI" calculations of concentration in various passenger air-travel city pairs.

3.      The problem for Plaintiffs is that contemporary merger law requires much more.  To prevail, a party seeking to enjoin a merger must engage in rigorous economic analysis that tests for competitive effects in a defined, relevant market, and must demonstrate an actual likelihood of consumer harm.  This analysis is organized around a three-step, burden-shifting process whereby (1) the plaintiff may first establish a presumption that the merger will "substantially lessen competition" by showing that it will lead to undue concentration in a relevant market, (2) the

defendant may rebut the presumption with evidence that casts doubt on the predictive value of concentration statistics, in which case (3) the burden shifts back to the plaintiff, who must produce additional evidence of anticompetitive effects and ultimately establish, by a preponderance of the evidence, that the merger is likely to substantially lessen competition. *United States v. Baker Hughes Inc.*, 908 F.2d 981, 982–83 (D.C. Cir. 1990); *see also United States v. Anthem, Inc.*, 855 F.3d 345, 349 (D.C. Cir. 2017), *cert. dismissed*, 137 S.Ct. 2250 (2017); *Fjord v. AMR Corp. (In re AMR Corp.)*, 502 B.R. 23, 38–39 (Bankr. S.D.N.Y. 2013).

4.      Plaintiffs' Section 7 claim fails under this framework.  Not surprisingly, because it is the near-exclusive focus of their efforts, Plaintiffs have met their initial burden; that is, they have provided sufficient evidence of increased concentration in city pairs to raise a presumption of anticompetitive effects.  However, that presumption is unusually weak in this case because of the nature of airline city-pair markets.

5.      City pairs are the proper way to frame the relevant markets because in contemporary practice, as reflected in the U.S. Department of Justice (the "DOJ") and Federal Trade Commission (the "FTC") Horizontal Merger Guidelines, market definition "focuses solely on demand substitution factors, i.e., on customers' ability and willingness to substitute away from one product to another in response to a price increase or a corresponding non-price change such as a reduction in product quality or service."  U.S. Dept. of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines (Aug. 19, 2010) § 4 ("2010 Horizontal Merger Guidelines").  Supply responses, which the case law deems relevant to market definition as well, *see, e.g.*, *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 227 (2d Cir. 1999), are considered later in the analysis, principally in connection with competitive effects and entry.  2010 Horizontal Merger Guidelines § 4.  Nevertheless, it is uncontroversial that "the substantial market power that concerns antitrust law" requires "some protection against rivals' entry or expansion."  P. Areeda and H. Hovenkamp, An

Analysis of Antitrust Principles and Their Application ¶ 501 (4th ed. 2018); *AD/SAT*, 181 F.3d at 227 (cross-elasticity of supply thwarts a "would-be monopolist's attempt to charge supracompetitive prices").

6.    On this ground alone the Court could find that American Airlines Group Inc. ("American") has met its burden to undermine the predictive value of concentration statistics. The evidence at trial established not only that very few city-pair markets are protected by entry barriers but, in addition, that the airline industry is characterized by a very high degree of supply substitutability (the ability to take productive assets deployed in one market and use them in another), because for nearly all city pairs the air travel service is jointly produced along with travel between other city pairs. That is, the airplanes, airport facilities, and human assets that produce service between City Pairs A and B also produce service between many additional city pairs. Indeed, in hub-and-spoke airline networks, the productive assets are producing service between hundreds or thousands of city pairs simultaneously. And as a general matter, simply by redirecting its existing productive assets, an airline can readily enter new city-pair markets.

7.    Nevertheless, there is no need for the Court to rely solely on the absence of entry barriers and supply substitutability in concluding that American has met its burden of undermining the predictive value of Plaintiffs' concentration statistics. American produced overwhelming evidence that Plaintiffs' structural evidence does not accurately predict or reflect the Merger's effects on competition. Specifically, American presented compelling evidence showing that the Merger was intended to, and actually did, result in significant procompetitive efficiencies, primarily due to the fact that US Airways and American had highly complementary route networks that, when combined, created more total options for consumers than they had before the Merger. American also presented a large body of uncontested post-Merger evidence showing that, after the Merger, both the industry and American's own output increased, airfares on overlap routes did not increase

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
San Francisco

relative to non-overlap routes, and consumer choices increased substantially. Taken together, American's evidence thoroughly undermined any predictive value of Plaintiffs' concentration statistics, putting the burden back on Plaintiffs to prove likely anticompetitive effects by other means.

8.    Plaintiffs offered little evidence in response to American's rebuttal. Indeed, there are only two kinds of evidence offered by Plaintiffs that arguably fall within the third part of the *Baker Hughes* burden-shifting paradigm. The first consists of calculations performed by Plaintiffs' expert, Dr. Carl Lundgren, which purportedly show that average nominal fares increased on certain concentrated city-pair routes after the Merger. The Court rejects these as persuasive proof of either actual or likely adverse effects from the Merger. Plaintiffs offered no evidence controlling for other factors that may explain higher average fares, and thereby failed to link Dr. Lundgren's average fare calculations to the Merger. For example, Dr. Lundgren's calculations do not even control for inflation. The testimony of American's expert, Dr. Dennis Carlton, thoroughly undermined these average fare statistics. Dr. Carlton presented the results of his own published and peer-reviewed econometric studies indicating that the Merger *did not* result in any anticompetitive price increases or output reductions.

9.    The second category of evidence Plaintiffs offered that arguably falls within the third part of the *Baker Hughes* burden-shifting paradigm was testimony by many of the named Plaintiffs, who for nearly two full days of the five-day trial presented a litany of grievances about current conditions in the airline industry. This testimony does not help Plaintiffs establish that the Merger is anticompetitive. Plaintiffs consistently failed to draw a causal connection between these grievances and the Merger, and instead appear to rely on a *post hoc ergo propter hoc* argument that any unpleasant experience or allegedly high airfare since the Merger must have been caused by the Merger. To the contrary, cross-examination repeatedly demonstrated that for one reason or another,

many of the complaints could not possibly have been caused by this Merger. This evidence cannot satisfy Plaintiffs' burden, particularly when weighed against the substantial evidence presented by American showing that the Merger has not had anticompetitive effects and has actually been *procompetitive*. Overall capacity at American and in the industry has increased since the Merger, prices have decreased, and competition from other airlines (in particular, low-cost carriers) continues to grow. For these and other reasons set forth below, American clearly prevails in the third and ultimate step of the *Baker Hughes* analysis.

10.     The Court sets forth its findings of fact and conclusions of law below. Based on these findings and conclusions, the Court holds that the merger between US Airways and American Airlines does not violate Section 7 of the Clayton Act. Upon that basis, the Court denies Plaintiffs' request for permanent injunctive relief and will enter judgment for American.

## II.     PROCEDURAL HISTORY

### A.     Pretrial Proceedings

#### 1.     The Chapter 11 Cases

11.     On November 29, 2011, AMR Corporation and American Airlines (the "Debtors") filed a voluntary petition for Chapter 11 bankruptcy in this Court. *See In re AMR Corp., et al.*, No. 11-15463 (SHL) (S.D.N.Y. Bankr.), Dkt. No. 1. While the Debtors explored various strategic restructuring alternatives, they ultimately determined that a merger with US Airways would maximize value for the Debtors' stakeholders. *See* Adv. Dkt. No. 72 (Mem. of Decision) at 3.[1] On February 13, 2013, the Debtors entered into an agreement and plan of merger with US Airways, and on May 10, 2013, this Court entered an order approving the merger agreement. *See In re AMR Corp., et al.*, No. 11-15463 (SHL) (S.D.N.Y. Bankr.), Dkt. No. 8096. On June 5, 2013, the Debtors

---

[1] All citations to "Adv. Dkt." refer to documents on the docket of this adversary proceeding, Adversary No. 13-01392.

filed the Second Amended Joint Chapter 11 Plan, which was predicated upon the Merger.  *Id.*, Dkt. No. 8590.

          2.      <u>Plaintiffs' Initial Complaint</u>

12.     On August 6, 2013, the named Plaintiffs in this case—a group of 40 individuals who allegedly purchased airline tickets from American in the past and claim they expect to do so in the future—filed an adversary proceeding in the Debtors' Chapter 11 cases.  Plaintiffs alleged that the then-proposed Merger between American Airlines and US Airways violated Section 7 of the Clayton Act, 15 U.S.C. § 18, because "the effect of the proposed merger may be substantially to lessen competition, or to tend to create a monopoly in the transportation of airline passengers in the United States."  Adv. Dkt. No. 1 (Complaint) ¶¶ 1–5, 166.  Plaintiffs sought preliminary and permanent injunctive relief to enjoin the Merger under Section 16 of the Clayton Act, 15 U.S.C. § 26, and to recover their cost of suit, including a reasonable attorney's fee.  *Id.* ¶ 166.

13.     The parties agree that the Court has jurisdiction over this matter, and that this adversary proceeding is a "core proceeding" under 28 U.S.C. §§ 157(b)(2)(A).  Adv. Dkt. No. 104 (Answer) ¶ 7; *see also* Adv. Dkt. No. 129 (Notice, Consent, and Reference of a Civil Action to the Bankruptcy Court).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  Adv. Dkt. No. 104 (Answer) ¶ 8.

          3.      <u>Plaintiffs' Attempt to Obtain a Temporary Restraining Order</u>

14.     On August 13, 2013, the DOJ, joined by several states, filed a complaint against AMR Corporation (American's holding company) and US Airways Group in the U.S. District Court for the District of Columbia seeking to enjoin the proposed merger of American and US Airways, alleging that it would violate Section 7 of the Clayton Act (the "DOJ Action").  Adv. Dkt. No. 214-1 (Stipulation of Undisputed Facts) ¶ 9.  On November 12, 2013, AMR and US Airways Group

entered into a settlement with the DOJ resolving the DOJ's lawsuit (the "DOJ Settlement"). *Id.* ¶ 10.

15.     Despite the DOJ Settlement, Plaintiffs here sought to enjoin the Merger, and applied for a temporary restraining order to block it, which this Court denied in November 2013. *See Fjord v. AMR Corp. (In re AMR Corp.)*, 502 B.R. 23 (Bankr. S.D.N.Y. 2013). The Court concluded that Plaintiffs failed to articulate how they would be irreparably harmed by the impending Merger, and that Plaintiffs had not demonstrated a likelihood of success on the merits because they failed to show that the Merger was likely to cause anticompetitive effects. The Court also expressed serious doubt as to the viability of Plaintiffs' claimed national market, and found problematic Plaintiffs' failure to provide any analysis or allegations regarding "which city-pairs are at issue in light of the New Merger [i.e. after the divestitures of slots and gates required by the DOJ Settlement]." *Id.* at 40. Accordingly, the Court allowed the Merger to proceed, and after Plaintiffs' appeals to the District Court, the Second Circuit, and the Supreme Court were unsuccessful, the Merger closed on December 9, 2013.

### 4.    Plaintiffs' Motions to Amend

16.     On January 10, 2014, Plaintiffs filed the first of a series of motions to amend the Complaint, seeking to add: (a) new factual allegations; (b) a claim for treble damages under Section 4 of the Clayton Act; (c) a demand for a jury trial; and (d) modifications to the declaratory relief sought under Section 16 of the Clayton Act. *See* Adv. Dkt. Nos. 91, 91-1. The Court granted Plaintiffs' motion in part, permitting the addition of new factual allegations and the modification of the declaratory relief sought, but denied Plaintiffs' request to add a damages claim and a demand for a jury trial. *Fjord v. AMR Corp. (In re AMR Corp.)*, 506 B.R. 368, 385–86 (Bankr. S.D.N.Y. 2014). Thereafter, Plaintiffs filed the First Amended Complaint, which remains operative. *See* Adv. Dkt. No. 103.

17.     A month later, in May 2014, Plaintiffs sought again to amend their complaint to add a damages claim and request for a jury trial, and then filed a revised motion on June 2, 2014.  *See* Adv. Dkt. No. 105, 115.  In March 2015, the Court denied Plaintiffs' revised motion in its entirety. *Fjord. v. AMR Corp. (In re AMR Corp.)*, 527 B.R. 874, 883 (Bankr. S.D.N.Y. 2015).

18.     In August 2015, Plaintiffs attempted yet again to amend their complaint—this time, to add claims under Sections 1 and 3 of the Sherman Act in order to (i) make this litigation similar to an unrelated set of lawsuits alleging collusion over airline capacity and (ii) have this case transferred to the consolidated multidistrict litigation ("MDL") proceeding in that action, pending before Judge Kollar-Kotelly of the District Court for the District of Columbia.  *See* Adv. Dkt. No. 118.  In February 2016, the Judicial Panel on Multidistrict Litigation ("JPML") denied Plaintiffs' motion to transfer this action.  *See In re Domestic Airline Travel Antitrust Litigation*, MDL No. 2656, Dkt. No. 301 (Order Denying Transfer).   Following Plaintiffs' unsuccessful attempt to transfer and consolidate this case with the MDL, Plaintiffs voluntarily abandoned their pending motion to amend and agreed to move forward solely on the Section 7 claim on the Merger, as set forth in the First Amended Complaint, which seeks equitable relief and not damages.  *See* Adv. Dkt. No. 202-1 (Sept. 7, 2016 Joint Ltr. to Chambers).  On February 22, 2017, the parties filed a written notice of consent "to have a United States Bankruptcy Judge conduct all proceedings in this case including trial, the entry of final judgment, and all post-trial proceedings."  Adv. Dkt. No. 129.

19.     On January 13, 2019—four days after this Court entered an order setting a trial date of March 11, 2019, *see* Adv. Dkt. No. 188, and long after discovery was closed and summary judgment motions were resolved—Plaintiffs filed a motion for leave to file a second amended and supplemental complaint to allege injury and damages under Section 4 of the Clayton Act and demand for jury trial, *see* Adv. Dkt. No. 191.  On February 26, 2019, this Court denied Plaintiffs'

final attempt to amend the complaint, *see* Adv. Dkt. No. 206, finding the motion untimely, prejudicial, and without merit. *Id.* at 10.

> 5. <u>The Parties' Cross-Motions for Summary Judgment</u>

20. Pursuant to the stipulated case schedule, the parties completed fact discovery on March 15, 2017 and expert discovery on April 14, 2017. *See* Adv. Dkt. No. 128 at 1. On May 12, 2017, American filed a motion for summary judgment as to Plaintiffs' Section 7 claim on the grounds that Plaintiffs had failed: (a) to establish a relevant market, (b) to offer evidence or conduct a requisite analysis of any adverse competitive effects resulting from the Merger, and (c) to establish antitrust standing by identifying how the Merger's alleged anticompetitive effects impact them personally or why they are appropriately antitrust plaintiffs. American also sought summary judgment on Plaintiffs' newly asserted "commercial bribery" claim under Section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c).[2] *See* Adv. Dkt. No. 140. On June 24, 2017, Plaintiffs filed an opposition to American's motion for summary judgment and a cross-motion for summary judgment. *See.* Adv. Dkt. No. 149.

21. On September 14, 2018, this Court issued an order denying Plaintiffs' Cross-Motion for Summary Judgment in its entirety, and granting in part and denying in part American's Motion for Summary Judgment. Adv. Dkt. No. 176. The Court granted American's motion as to Plaintiffs' claim under Section 2(c) of the Robinson-Patman Act, as well as to Plaintiffs' claim under Section 7 of the Clayton Act, as brought in their capacity as travel agents and/or arising in an alleged national market. *Id.* at 2. The Court denied American's motion regarding Plaintiffs' Section 7 claim "as

---

[2] While Plaintiffs did not assert their Section 2(c) claim as a separate cause of action, they took the position that paragraphs 68 to 73 of the First Amended Complaint stated a claim for commercial bribery under that statute. *See* Adv. Dkt. No. 149-1 at 55.

brought by Plaintiffs in their roles as domestic airline customers, and arising out of city-pair markets." *Id.*

22.    The Court delivered its oral opinion on the summary judgment motions on August 29, 2018.  Adv. Dkt. No. 177 (Summ. J. Bench Ruling).  With respect to the issue of Plaintiffs' standing, the Court explained that, because it found "City Pairs to be a proper market framing, Plaintiffs demonstrate standing sufficiently to survive summary judgment."  *Id.* at 46:9–11. However, the Court explained that Plaintiffs "still retain the burden for [] trial of identifying which specific City Pairs are relevant for their claim." *Id.* at 46:11–14.  The Court also reiterated its previous finding that the travel agent Plaintiffs are not efficient enforcers of the antitrust laws and therefore lacked antitrust standing to maintain a private action in their capacities as travel agents. *Id.* at 47:15–19.  The Court noted that "there are many questions about the Plaintiffs' analysis of their data and their case in general, [but] summary judgment is not the stage at which the Court directly weighs the merits of the parties' evidence." *Id.* at 73:12–15.

6.    Plaintiffs' Request to Issue New Expert Opinions

23.    Over five years after the case was filed, almost two years after expert discovery had closed, and several months after the Court's ruling on summary judgment, Plaintiffs attempted to issue a "Supplemental Expert Report of Dr. Carl Lundgren" dated November 12, 2018 (the "New Report").  According to Plaintiffs, the New Report aimed to "bring the data current and, based upon the current data, render an opinion about the anti-competitive effects of the merger in the particular city-pair markets that the Court has directed the Plaintiffs to identify." *See* Adv. Dkt. No. 178.  The Court allowed Plaintiffs to supplement and update their prior expert opinions but denied Plaintiffs' request to introduce new opinions in the New Report regarding the alleged competitive effects of the Merger, finding that they were not permissible supplements but, rather, an attempted "second bite at the apple—an opportunity to correct fatal defects in the reports they have submitted." *See*

Adv. Dkt. No. 179 at 3 (Order Denying Plaintiffs' Request to Supplement Expert Report). The Court highlighted the scope of the duty to supplement by clarifying that the sole purpose of Dr. Lundgren's prior report was to review and update the DOJ's HHI calculations and to calculate post-merger HHI for the most recent four quarters of data, and that his prior report made crystal clear that the calculations "were presented without further analysis or conclusions based on statistical, econometric, or other expert economic analysis." *Id.* at 4. The Court noted that it was "wholly inappropriate" for Plaintiffs to suddenly come up with and try to introduce, years later and just before trial was scheduled to commence, purported "effects" opinions via the New Report, as "Dr. Lundgren has never previously opined on the causal effect of the merger in the Prior Report or any time during the five-year history of this litigation." *Id.*

24.     On December 26, 2018, Plaintiffs filed a Motion For Leave To Serve Supplemental Expert Report of Dr. Carl Lundgren and/or Motion For Reconsideration, Adv. Dkt. No. 181, which the Court denied on January 30, 2019 for the same reasons. Adv. Dkt. No. 199 (Order Denying Plaintiffs' Motion for Reconsideration).

7.     <u>Pretrial Filings</u>

25.     On March 4, 2019, the parties filed various motions *in limine* to exclude certain evidence and argument at trial, along with oppositions to those motions.[3] The parties also filed a Joint Pretrial Order, which attached (1) a Stipulation of Undisputed Facts, (2) Stipulations

---

[3] Plaintiffs filed the following motions *in limine*: (1) to exclude evidence relating to Plaintiffs' prior litigation (Adv. Dkt. Nos. 223, 223-1); (2) to exclude deposition testimony designated by Defendants in *United States v. US Airways, et al.* (Adv. Dkt. Nos. 226, 226-1); (3) to exclude evidence of efficiencies and/or to exclude evidence of efficiencies unrelated to any city-pair relevant market (Adv. Dkt. Nos. 227, 227-1); and (4) to exclude the testimony of Heather Garboden (Adv. Dkt. Nos. 228, 228-1). Defendant filed the following motions *in limine*: (1) to exclude evidence and argument regarding plaintiffs' other litigations against American Airlines (Adv. Dkt. Nos. 210, 212); and (2) to exclude news articles and third-party reports (Adv. Dkt. Nos. 211, 212).

The Court reserved ruling on these motions *in limine* until an issue became relevant and necessary at trial. Neither party attempted to introduce evidence regarding Plaintiffs' prior litigation or other litigations against American, so those motions were rendered moot. The Court addresses the remaining motions *in limine* below.

Regarding the Conduct of Trial, (3) the parties' witness lists for trial, (4) Plaintiffs' identification of the specific city pairs that are relevant to their claims, and (5) the parties' exhibit lists for trial. Adv. Dkt. No. 214.  On March 5, 2019, pursuant to the parties' previously filed stipulation, the parties filed the written direct testimony of the witnesses they intended to call live at trial.  *See* Adv. Dkt. Nos. 236–245; 249-1; 249-2; 249-3; 249-4; 249-5.

### B.    The Trial

26.    The trial began on March 11, 2019 and ended on March 15, 2019, with closing argument scheduled for April 26, 2019.

27.    Plaintiffs called ten fact witnesses and one expert witness in their case-in-chief. Specifically, Plaintiffs called (as an adverse witness) the Chief Executive Officer of American Airlines, William Douglas Parker, and nine named Plaintiffs, all of whom had submitted written direct testimony:  Bill Rubinsohn (Adv. Dkt. No. 242)[4], Sondra Russell (Adv. Dkt. No. 243), Donald Fry (Adv. Dkt. No. 238), Lisa McCarthy (Adv. Dkt. No. 241), Gabriel Garavanian (Adv. Dkt. No. 239), Jose Brito (Adv. Dkt. No. 237), Valarie Jolly (Adv. Dkt. No. 240), Gary Talewsky (Adv. Dkt. No. 245), and June Stansbury (Adv. Dkt. No. 244).[5]  Plaintiffs' expert witness, Dr. Carl Lundgren—an economist who currently works at the United States Department of Labor in relation to mine health and safety issues, and more particularly, on the costs and benefits of proposed rules or final rules for the mining industry—also testified at trial, in addition to submitting written direct testimony (Adv. Dkt. No. 236).[6]

---

[4] Unless otherwise noted, the Court refers to the written direct testimony submitted by each witness as a "Witness Stmt." in the remainder of its citations herein.

[5] The parties also submitted a stipulation stating that Plaintiffs Carolyn Fjord, Don Freeland, and Gail Kosach each flew on certain city pairs.  *See* Adv. Dkt. No. 260.

[6] The Court refers to Dr. Lundgren's written direct testimony as the "Lundgren Trial Declaration" in the remainder of its citations herein.

28.      For purposes of efficiency, American conducted its direct examination of Mr. Parker during Plaintiffs' case-in-chief.  American also submitted written direct testimony for Mr. Parker (Adv. Dkt. No. 249-2).  During American's case, it called one additional fact witness and three expert witnesses, all of whom also submitted written direct testimony.[7]  American's second fact witness, Heather Garboden, worked in the Financial Planning and Analysis department at American Airlines from December 2013 until December 2018, and worked at US Airways for over 10 years prior to the Merger.[8]  American called the following individuals as expert witnesses:  (1) Daniel M. Kasper, an airline industry expert who has testified in various matters concerning the airline industry, including in AMR Corporation's Chapter 11 proceedings before this Court; (2) Dr. Janusz A. Ordover, an Emeritus Professor of Economics at New York University who specializes in industrial organization, antitrust, and regulation economics, and who has consulted and testified in numerous antitrust matters, including many matters in the airline industry; and (3) Dr. Dennis W. Carlton, a University of Chicago economist and Professor who specializes in the economics of industrial organization and who has served as an expert in court cases involving airlines and as a consultant to airlines involved in a number of proposed mergers and alliances.

---

[7] *See* Adv. Dkt. Nos. 249-1 (Garboden Witness Stmt.); 249-5 (Ordover Witness Stmt.); 249-3 (Carlton Witness Stmt.). American filed the Kasper Witness Statement on March 5, 2019, *see* Adv. Dkt. No. 249-4, but presented a corrected version of the Kasper Statement to the Court at trial, which the Court accepted into evidence. *See* Trial Tr. at 973:21–975:10, 980:4–11.  The Court's citations to the "Kasper Witness Stmt." herein refer to that corrected version.

[8] As noted *supra* n.3, Plaintiffs filed a motion *in limine* to exclude the testimony of Heather Garboden on the basis that it constitutes improper expert testimony (Adv. Dkt. Nos. 228, 228-1).  At trial, the Court held that witnesses "can talk about what they do in the ordinary course of their business and what they perceive in that ordinary course, but if somebody, while very knowledgeable and based on specialized expertise, has some testimony that rises to the level of expert testimony, then I'm keeping that out. . . .  So facts are in, opinion is out, to the extent it's opinion about the merger writ large."  Trial Tr. (Day 3) at 691:15–692:4.  Plaintiffs did not object on this basis to the testimony that Ms. Garboden provided at trial, and therefore they waived any such objection to her in-court testimony.  In any event, the Court finds that Ms. Garboden's testimony, including the testimony contained in her witness statement, does not constitute improper opinion testimony because it is fact testimony, based on Ms. Garboden's personal and professional experience.  *See United States v. Cuti*, 720 F.3d 453, 457 (2d Cir. 2013) (holding that the testimony of two certified accountants regarding certain transactions was fact, and not expert, testimony because each of the accountants was "personally familiar with the accounting of the transactions at issue").  Accordingly, it is admissible in its entirety, and the Court denies Plaintiffs' motion *in limine* to exclude it (Adv. Dkt. No. 228).

29.    The parties also submitted designated deposition testimony, along with counter-designations and objections to the designated testimony.  Plaintiffs designated deposition testimony from the following witnesses:   Donald Casey (Vice President of Revenue Management[9] of American); Beverly Goulet (Chief Integration Officer of American); Thomas Horton (former Chairman and CEO of American); Scott Kirby (former President of American); Andrew Nocella (Executive Vice President and Chief Revenue Officer of American); and Virasb Vahidi (former Chief Commercial Officer of American).   American designated deposition testimony from the following witnesses:  Jerald Behrens (travel agent at Travel Leaders Group and Tzell Travel, LLC); Derek DeCross (Vice President of Global Sales of American); Thomas Horton; Scott Kirby; Michael Malaney (one of the named Plaintiffs, as an adverse witness); and Andrew Nocella.

## III.    FINDINGS OF FACT

### A.    Characteristics of the Airline Industry

#### 1.    Network Airline Dynamics

30.    American Airlines and US Airways, as they existed prior to the Merger, operated as "network" carriers—a term which is generally used to refer to airlines that operate "hub-and-spoke" route networks.  *See* Trial Tr. (Day 4) at 981:15–23 (Kasper); Parker Witness Stmt. ¶ 6.  United Airlines and Delta Airlines are the other major network airlines in the United States.  Network airlines compete both with one another and with "point-to-point" carriers as described below.

31.    "Hub-and-spoke" networks rely on "hubs"—centralized points in an airline's network through which flights are routed—to efficiently transport passengers on a single airline between numerous origin and destination points, including small and mid-sized cities.  *See* Kasper Witness Stmt. ¶ 16; Parker Witness Stmt. ¶ 6; Trial Tr. (Day 2) at 341:19–342:22 (Parker).  With

---

[9] All listed titles are the titles of these individuals at the time of their depositions.

any given number of flights, a hub-and-spoke system can connect many more points than an equivalent number of flights operating point-to-point. For example, eight flights in a point-to-point system would create, one-for-one, eight different city-pair options, while in a hub-and-spoke system an airline could create over thirty different city-pair options. Parker Witness Stmt. ¶ 6. Using this structure, a network airline is able to serve hundreds of otherwise uneconomical destinations, which proliferates thousands of otherwise uneconomical routes. *Id.*; *see also* Trial Tr. (Day 2) at 342:11–13 (Mr. Parker testifying that a hub-and-spoke model "tends to work well in terms of generating market opportunities that absolutely wouldn't exist without that model"); Garboden Witness Stmt. ¶ 9.

32.     The competitive strength of a network carrier is inherently tied to the size of its network: more hubs means more potential connections, which means more routes that travelers can use to get where they want to go. *See* Parker Witness Stmt. ¶¶ 4, 7. This is especially important for attracting frequent fliers such as business travelers, who in a real sense, "buy the network" as well as service from one city to another in order to benefit from airline loyalty programs. *See id.* ¶ 17. Mr. Kasper explained that a broad, nationwide network is particularly valuable to the business or frequent traveler because it offers more schedule options, more direct routings, and a broader range of destinations that allow them to earn and redeem more frequent flyer miles. *See* Kasper Witness Stmt. ¶ 82.

33.     Also, a network airline is able to create the most value when its hubs are strategically dispersed across the United States. Parker Witness Stmt. ¶ 7. Hubs must be within reasonable distances of the cities they serve, and in locations that avoid inefficient routing (such as needing to fly west to go east, or making two connections instead of one). Thus, a key measure of a network carrier's quality and ability to attract passengers is the overall breadth of its network. Kasper Witness Stmt. ¶ 17; *see also* Parker Witness Stmt. ¶ 7.

2.      The Entry of LCCs & The Rise of LCC Competition

34.      The Airline Deregulation Act of 1978 resulted in a number of changes that permitted low-cost carriers to enter the market, and thereby transformed the industry from one characterized by economic regulation to one of intense competition. *See* Kasper Witness Stmt. ¶¶ 8, 13–21. Prior to the industry's deregulation, competition was limited by rules imposed by the United States Civil Aeronautics Board ("CAB"), which restricted entry by new airlines, controlled the routes existing carriers could serve, tightly regulated fares, and effectively prevented carriers from using lower costs as a competitive advantage. *Id.* ¶ 13. Deregulation fundamentally changed the airline industry, eliminating government control over airfares and regulatory barriers to entry. This enabled widespread adoption of hub-and-spoke networks among large carriers, but also opened the door to competition from new-entrant low-cost carriers. *See id.* ¶¶ 16–18. In the wake of deregulation, a number of these new-entrant low-cost carriers (such as Southwest, Spirit, and Frontier) entered the markets for interstate airline service and rapidly grew. *Id.* ¶¶ 21, 24.

35.      As their name implies, the business model of "low-cost carriers" or "LCCs"[10] is predicated on keeping costs—and thus fares—low. *Id.* ¶¶ 16–18. Once the CAB no longer regulated airline fares, LCCs were able to profitably undercut the fares charged by higher-cost network airlines and gain market share. *See id.* LCCs maintain low costs by, among other things,[11] serving larger markets with substantial local demand and offering service on a point-to-point basis. *See id.*; Parker Witness Stmt. ¶ 8. Although a hub-and-spoke network allows a carrier to serve a greater number of destinations and otherwise uneconomical destinations, nonstop point-to-point

---

[10] Unless otherwise noted, the Court uses the term "LCCs" throughout to collectively refer to both "low cost carriers" and "ultra-low-cost carriers," which are also known as ULCCs.

[11] *See* Kasper Witness Stmt. ¶¶ 19–20 (describing LCCs' fleet type, efficient aircraft utilization, and labor cost advantage).

service is the least expensive way for a carrier to serve a particular market so long as there is sufficient passenger demand. *See* Parker Witness Stmt. ¶ 8; Trial Tr. (Day 2) at 342:14–22 (Parker) (explaining that a hub-and-spoke model "tends to be a higher-cost model than flying point to point"); Kasper Witness Stmt. ¶ 80 ("[O]perating a comprehensive, full-service network capable of providing convenient access to international and domestic destinations (including many small communities) is inherently more costly than operating a point-to-point network."); *id.* ¶¶ 80–81 (explaining the costs associated with operating a hub-and-spoke network).

36.    Some LCCs (and in particular, ULCCs) have offered particularly low base fares by "unbundling" charges for components of airline service such as a seat assignment or carry-on luggage that have traditionally been included in the price of a ticket. Kasper Witness Stmt. ¶ 41. Unbundling these services and charging for them separately allows the carrier to reduce base fares significantly, simultaneously allowing passengers to choose which particular ancillary services they want to buy. *Id.*

37.    As a result, low cost carriers have driven down fares industry-wide. The relationship between LCC expansion and a decline in fares is well-documented in both academic and government literature. *See id.* ¶¶ 36–37; Carlton Witness Stmt. ¶ 15. The presence of LCC competitors in particular markets is a significant competitive constraint because LCCs put downward pressure on the prices other carriers can charge in those markets. Trial Tr. (Day 4) at 990:14–22 (Kasper). This so-called "Southwest Effect" was described in a leading analytic study by Brueckner, Singer, and Lee conducted in 2013—a study relied upon by experts for *both* parties. *See* Trial Tr. (Day 4) at 991:11–15 (Kasper); Carlton Witness Stmt. ¶ 15; Lundgren Trial Decl. at 29–46; Trial Tr. (Day 3) at 857:16–866:4 (Lundgren).[12] That study found that Southwest's presence

---

[12] An update to this study confirmed the continued existence of the Southwest Effect and found that other LCCs like Spirit, Alaska, and JetBlue had comparable effects. Trial Tr. (Day 4) at 991:16–25 (Kasper).

on a route lowered fares by 26%, while the presence of a second LCC lowered fares by another 12%.  Lundgren Trial Decl. at 35.

38.     Defendant's expert, Dr. Dennis Carlton, corroborated these findings, concluding that the presence of LCC competitors on a given route substantially reduces average fares.  Dr. Carlton found that on nonstop routes, a single nonstop LCC competitor reduces average fares by approximately 26%.  Carlton Witness Stmt. ¶ 16.  Two nonstop LCC competitors reduce average fares by 36%, while three or more nonstop LCC competitors drive down prices by as much as 43%. *Id.*

39.     Consistent with the "Southwest Effect," average airline prices have declined steadily as LCCs have expanded the scale and scope of their operations.  LCCs' share of domestic passengers increased from 7% in 1990 to 45% in 2017.  Kasper Witness Stmt. ¶ 33.  Over the same time period, the real (i.e., inflation adjusted) domestic airline price per mile fell by 42%.  *Id.* ¶ 33. This evidence further suggests that LCCs act as the primary determinant of prices in the U.S. domestic airline industry.

3.      Low Barriers to Entry into City Pairs

40.     Plaintiffs argue that there are high entry barriers in the airline industry, pointing to high capital costs and the fact that there have been no new airlines in the United States since 2007. American contests this, primarily on the ground that entry barriers must be assessed in relation to city pairs (the relevant markets), and with few exceptions there are very low barriers for existing airlines to enter new city pairs.  The Court finds that American's position is correct.

41.     The vast majority of traveling passengers fly on a small fraction of the over 10,000 city pair "products" available, while the remaining passengers are dispersed among the remaining lightly traveled city pairs.  *See* Trial Tr. (Day 4) at 1008:25-1009:4 (Kasper).  And nearly all of those city pair "products"—densely-traveled or not—are jointly produced using airplanes, pilots,

airport facilities, fuel, etc. that are servicing many other city pairs. This existing capital, broadly dispersed, makes it possible for an airline to simply redeploy resources to enter a new city-pair market—it does not generally need to invest in new resources to do so. *See* Trial Tr. (Day 2) at 411:12-16 (Parker). So unlike the typical case where, in addressing entry, a court might ask whether a new firm could obtain *new* resources it needs to develop, produce, and effectively distribute a new product, in the airline industry the entry question is primarily about whether existing airlines can redeploy or make marginal additions to their existing assets to serve a new city pair. Overwhelming evidence indicates that the answer is yes.

42.    The rapid entrance and expansion of LCC carriers is evidence of the low barriers to entry in the airline industry. Since deregulation, LCCs have more than quintupled their share of the U.S. domestic airline market. Kasper Witness Stmt. ¶ 61. They have done so by serving an ever-increasing number of city pairs with their point-to-point or "focus city" business models. *Id.* ¶ 23. Notably, LCCs have successfully entered every legacy carrier hub and, as of 2016, serve 76% of legacy carrier hub-to-hub routes. *Id.* ¶ 61. There was considerable evidence at trial of LCCs entering American-US Airways overlap routes since the Merger. For example, since the Merger, one or more LCCs began serving 5 of the 12 routes on which both US Airways and American offered service before the Merger. Parker Witness Stmt. ¶ 53.

43.    LCC entry, in particular, can—and does—occur quickly. In fact, a major competitive advantage of point-to-point flying is that it allows LCCs to be opportunistic; a LCC can swiftly enter a market where it sees opportunity, whereas legacy carriers are limited by the location of their existing hubs. *See id.* ¶ 8; Garboden Witness Stmt. ¶ 11. As just one example of quick LCC entrance, between 2011 when it entered American's hub at Dallas Fort-Worth ("DFW") and 2013, Spirit added nonstop service to 25 new destinations from DFW. Kasper Witness Stmt. ¶ 50. And JetBlue, which began operations in 2000, has since entered every single American

Airlines hub city.  *Id.* ¶ 52.  Similarly, Virgin America, which launched in 2007, entered six of American's nine hub cities before it merged with Alaska in 2016.  *Id.*  Even at "slot-controlled" airports[13]—Washington's Reagan National ("DCA") and New York's LaGuardia ("LGA") and John F. Kennedy International ("JFK")—LCC competition grew more than nine-fold between 1999 and 2016.  *Id.* ¶ 50.

44.     Network carriers are also able to use their broad national networks to expand into each other's hubs.  American's expert, Mr. Kasper, explained at trial that legacy carriers routinely "invad[e]" other network airlines' hubs, and that the notion of an exclusionary "fortress hub" has been "turned on its head."  Trial Tr. (Day 4) at 996:16–22 (Kasper).

45.     Dr. Carlton analyzed the frequency of entry and exit on connecting routes with more than ten passengers daily each way using data from the second quarter of 2008 through the first quarter of 2013.  Carlton Witness Stmt. ¶ 19.  Dr. Carlton found that, during that period, nearly 60% of high-traffic connecting routes in the United States experienced at least one entry.  *Id.*  Thus, as Dr. Carlton summarized at trial, entry is occurring "quite frequently" on domestic routes.  Trial Tr. (Day 5) at 1369:15–16 (Carlton).

**B.      Competitive Conditions Leading Up to the Merger**

46.     The Merger was a reaction not only to increased competition from LCCs, but to a number of events that occurred in the years preceding it.  In short, legacy network airlines like United Airlines, Delta Airlines, American Airlines, and US Airways struggled to endure a host of external shocks in the first decade of the 2000s that made it difficult for them to maintain their profitability, and many filed for bankruptcy.  Legacy airlines were also forced to confront a substantial weakness in their businesses at that time:  the airlines were operating networks that were

---

[13] Slot-controlled airports are those for which the Federal Aviation Administration requires airlines to obtain landing and departure slots due to airport capacity constraints.  Kasper Witness Stmt. ¶ 50.

too limited to provide the breadth of options that passengers sought, but that were nonetheless enormously costly to maintain.  At that point, no legacy carrier had a truly national network, let alone an expansive enough network to maintain a competitive advantage over the LCCs' low-cost model.  Delta and United ultimately solved this problem by merging with Northwest Airlines and Continental Airlines, respectively, to create more ubiquitous networks.  Those mergers left US Airways and American at a competitive disadvantage and the airlines found themselves losing business not only to the LCCs, but also to the improved national networks of Delta and United.

1.     External Shocks to the Airline Industry

47.     In the decade preceding the American Airlines/US Airways merger, the airline industry faced a number of external shocks that either reduced demand for air travel or increased the airlines' costs.  *See* Parker Witness Stmt. ¶ 9; Garboden Witness Stmt. ¶ 10; Kasper Witness Stmt. ¶¶ 64–67; Carlton Witness Stmt. ¶ 22.  The terrorist attacks of September 11, 2001 led to a massive reduction in demand for air travel.  Parker Witness Stmt. ¶ 9; Garboden Witness Stmt. ¶ 10.  Following the 9/11 attacks, passenger demand plummeted, particularly in markets where alternative means of travel (e.g., train or car) became more attractive than flying.  Kasper Witness Stmt. ¶ 64.  Overall domestic U.S. airline industry traffic dropped by 40 million passengers after 9/11.  Kasper Witness Stmt. ¶ 67.

48.     As the industry tried to recover from the 9/11 attacks, it was met with other challenges including a reduced demand for travel as a result of the SARS outbreak, an unprecedented rise in fuel costs—which peaked when oil prices hit nearly $150 a barrel in July 2008—and the Great Recession, which began in December 2007 and persisted until June 2009.  Parker Witness Stmt. ¶ 9; *see also* Kasper Witness Stmt. ¶ 64 (describing other factors contributing to the decline in demand for air travel after 9/11).  Notably, jet fuel prices *tripled* from 2003 to 2011–12.  Kasper Witness Stmt. ¶ 68.  Mr. Parker characterized this period as "cataclysmic" for

the airline industry as a whole. Trial Tr. (Day 2) at 369:9–12 (Parker). He also explained that demand and cost shocks like these are particularly problematic for network carriers. Parker Witness Stmt. ¶ 10. By the nature of their hub-and-spoke structure, network airlines are committed to a scale of operations that could, in difficult economic times, significantly exceed demand. *Id*. In fact, none of the four large network carriers in existence in 2012—Delta, United, American, and US Airways—was able to cover its cost of capital between 2000 and 2012. Kasper Witness Stmt. ¶ 73. Network carriers US Airways, Northwest Airlines, Delta Airlines, United Airlines, and American all filed for bankruptcy between 2003 and 2012. Parker Witness Stmt. ¶ 10.

49.     These macroeconomic conditions were responsible for reductions in capacity during the same period, particularly during the Great Recession from 2007 to 2009. *See* Carlton Witness Stmt. ¶ 22; Kasper Witness Stmt. ¶¶ 74–76. Indeed, the sharp declines in demand in 2008 and the first part of 2009, coinciding with a dramatic increase in the national unemployment rate, Carlton Witness Stmt. ¶ 22, caused several airlines to use the bankruptcy process to reduce capacity. *See* Trial Tr. (Day 2) at 369:12–17 (Parker); *see also* Kasper Witness Stmt. ¶¶ 74–76 ("individual airlines' efforts to increase load factor constitute an economically rational and expected response by airlines facing massive losses and chronically underutilized capacity"). Thomas Horton, the former CEO of American Airlines, testified in a deposition taken by the Department of Justice that the Great Recession "had an effect on demand" and caused airlines to reevaluate their capacity accordingly. T. Horton Sept. 20, 2013 Dep. Tr. at 23:22–24:1.[14]

---

[14] As explained *supra* note 3, Plaintiffs filed a motion *in limine* to exclude deposition testimony designated by Defendants in the DOJ Action, including the September 20, 2013 testimony from Mr. Horton cited here, *see* Adv. Dkt. Nos. 226, 226-1. The Court denies Plaintiffs' motion. With respect to Mr. Horton's testimony in particular, Plaintiffs' counsel acknowledged that "Mr. Horton's prior testimony . . . taken by the government [in the DOJ Action] can be used as if it were taken [in this action]." *See* Adv. Dkt. No. 221-1 (T. Horton Dec. 12, 2013 Dep. Tr.) at 5:10–6:2. The deposition testimony from the DOJ Action is also admissible pursuant to Federal Rule of Civil Procedure 32(a)(8). The "accepted inquiry" under Rule 32 "focuses on whether the prior cross-examination would satisfy a reasonable party who opposes admission in the present lawsuit. Consequently, courts have required only a substantial identity of issues, and the presence of an adversary with the same motive to cross-examine the deponent." *Fed. Hous. Fin.*

2.      Other Legacy Carrier Mergers

50.     Although Chapter 11 restructuring helped to reduce legacy network carriers' costs, it was not sufficient, by itself, to restore them to a competitive position in the industry.  Legacy carriers soon realized that in order to generate more revenue and offset the cost advantage enjoyed by LCCs, they needed to offer potential passengers access to a comprehensive national network. *See* Garboden Witness Stmt. ¶ 11; *see also id.* ¶ 12 ("Our analyses indicated a need for US Airways (and legacy airlines generally) to create broad, ubiquitous networks in order to offer a sustainable competitive alternative to LCCs.").  Many network airlines came to the conclusion that merging with another airline that had a complementary network was the best way to fill the gaps in their own network and reach scale.  *See id.* ¶ 11.

51.     In 2008, Delta and Northwest Airlines merged under the Delta name, and in 2010, United and Continental Airlines merged under the United name.  Parker Witness Stmt. ¶ 11.  These mergers dramatically broadened the Delta and United networks, allowing each to create nationwide coverage.  *See id.* ¶ 11.  These broader networks, in turn, enabled Delta and United to attract more passengers because they allowed each airline to provide far more diverse scheduling options, increased direct routings, a broader range of destinations, and more attractive loyalty benefits, all

---

*Agency v. Merrill Lynch & Co.*, No. 11-cv-6202, 2014 WL 798385, at *1 (S.D.N.Y. Feb. 28, 2014) (quoting *Hub v. Sun Valley Co.*, 682 F.2d 776, 778 (9th Cir. 1982)) (internal quotation marks omitted).

There is no question that these requirements are met here.  Both the DOJ and this action allege that the Merger between US Airways and American violates Section 7 of the Clayton Act because it is likely to substantially lessen competition in certain city-pair markets. *Compare, e.g.*, *United States v. US Airways Group, Inc., et al.*, No. 13-cv-01236 (D.D.C.), Dkt. No. 1 ¶ 39, *with* Adv. Dkt. No. 103 (*Fjord* First Am. Compl.) ¶ 190.  The DOJ thus had the "same motive to cross-examine" the deponents in that action as Plaintiffs do here, and the DOJ's cross-examination would "satisfy a reasonable party" who opposes admission of the DOJ depositions in this action. *Fed. Hous. Fin. Agency*, 2014 WL 798385, at *1.  Moreover, Plaintiffs themselves offer testimony from the DOJ depositions of three of the five witnesses whose testimony they contest.  Allowing Plaintiffs, but not American, to offer this testimony would undermine the "twin goals of fairness and efficiency" that the federal rules are designed to promote. *Id.* (citation omitted).  And the witnesses meet Rule 32's "unavailability" requirement, as American has represented (and Plaintiffs do not contest) that all but one of the witnesses whose DOJ testimony is designated reside more than 100 miles from Manhattan. *See* Adv. Dkt. No. 216 at 7.  While the residence of the final witness, Mr. Jerald Behrens, is unclear, the Court need not decide whether his testimony is admissible because it does not rely upon it in reaching its decision in this Order.

of which are valuable to passengers, especially "high-yield" business travelers. *See id.*; Kasper Witness Stmt. ¶¶ 82–83. As a result, Delta and United's ubiquitous networks ultimately eroded both American's and US Airways' market share. *See* Parker Witness Stmt. ¶ 11; Kasper Witness Stmt. ¶¶ 84–86; Garboden Witness Stmt. ¶¶ 12–13; DX-23 at 9–10.

52.    Plaintiffs argued at trial that these prior legacy mergers were the cause of industry-wide capacity reductions, but the actual evidence presented at trial established that the Delta/Northwest and United/Continental mergers in fact had no such effect. In 2013, American's expert, Dr. Carlton, conducted a retrospective analysis of the Delta/Northwest and United/Continental mergers. His study showed no evidence of a sustained decline in capacity following those mergers. *See* Carlton Witness Stmt. ¶ 21. In fact, available seat miles ("ASMs"—a standard measure of airline capacity) began to *increase* steadily prior to the Delta/Northwest merger in October 2008 and continued to grow before and after the United/Continental merger in October 2010. *Id.* A second retrospective study Dr. Carlton conducted in 2016 confirmed that the Delta/Northwest and United/Continental mergers had no anticompetitive effect on capacity, output, or fares. *Id.* ¶¶ 37–41, 43.

3.    <u>Relative Weaknesses in the American and US Airways Networks</u>

53.    On the other hand, the Delta and United mergers presented challenges for the then much-smaller American and US Airways networks. *See* Kasper Witness Stmt. ¶¶ 84–86; Parker Witness Stmt. ¶ 11; Garboden Witness Stmt. ¶¶ 12–13. US Airways' network had a strong East Coast presence, but only one West Coast hub in Phoenix, and thus lacked the same depth of coverage across the rest of the country that Delta's and United's networks possessed. *See* Garboden Witness Stmt. ¶ 13. And while American had two large hubs in the Midwest, its network had a significant "hole" in the East Coast—the most heavily traveled region in the country. Parker Witness Stmt. ¶ 23. American had a hub in Miami and a relatively small market presence in New

York, with little in between them. *Id.* American thus had no way to efficiently serve the millions of passengers looking to travel up and down the East Coast. *Id.*; *see also* Trial Tr. (Day 2) at 538:9–17 (Parker) (explaining that a passenger traveling on American from the northeast United States to the southeast or Florida would have to fly through Dallas or Chicago); DX-023 at 12–14.

54.    Executives at both US Airways and American recognized the relative weakness of their networks following the Delta and United mergers. Mr. Parker acknowledged at trial that as a result of its structural disadvantage, US Airways revenue lagged that of Delta and United. Parker Witness Stmt. ¶ 12.[15] Likewise, Thomas Horton, the former CEO of American, previously testified at deposition that he believed that United's post-merger network was "superior to American's" and "more attractive to corporate accounts." T. Horton Sept. 20, 2013 Dep. Tr. at 18:4–6. A November 2011 internal AA presentation similarly predicted that the Delta and United mergers "may adversely affect AA over time." DX-012 at 13. The presentation called into question the continued relevance of American's network, particularly with respect to attracting and retaining new corporate accounts. *Id.* It further indicated that American's network deficiencies impaired the strength of its frequent flyer program, along with its ability to attract and retain alliance members. *Id.*

## C.    The Rationale for the Merger

55.    US Airways pursued a merger with American in order to create a national network that would rival United's and Delta's, which US Airways' management believed was the key to long-term competitiveness. Parker Witness Stmt. ¶¶ 14–15, 31. The evidence presented at trial showed that combining the American and US Airways networks was the best path to achieving the network scope and resulting competitive benefits already enjoyed by the airlines' legacy competitors. *See id.* ¶¶ 15, 26–27, 31; Kasper Witness Stmt. ¶ 88. The combination of US Airways

---

[15] Further compounding US Airways' long-term challenges was a diminishing labor cost advantage that was a function of labor agreements that had begun to expire. Parker Witness Stmt. ¶ 13.

and American's complementary networks presented growth and connectivity opportunities that were unavailable absent a merger. Garboden Witness Stmt. ¶ 15; *see also* Trial Tr. (Day 2) at 364:15–22 (Parker) ("We fit together so well because of US Airways' strength on the east coast, where American had the biggest deficiency, we created an airline that could compete against United and Delta, and without it we were concerned about our ability to do so."). American's hubs in Miami, New York (JFK), Chicago, Dallas (DFW), and Los Angeles (LAX) were well-spaced from and complemented US Airways' hubs in Philadelphia, Washington, D.C. (DCA), Charlotte, and Phoenix. Parker Witness Stmt. ¶ 26. In fact, the networks were so complementary that they competed head-to-head on just 12 of the nearly 700 nonstop routes they served. *Id.* ¶ 32; DX-105 at 8. The combination of the airlines' geographically diverse networks was therefore predicted to create approximately 1,300 new connecting opportunities that did not previously exist, Parker Witness Stmt. ¶ 28—an estimate that under-predicted the new connections the Merger *actually* created, *see infra* Section E.3.a. With its combined network, the merged American Airlines would truly be an "anywhere to everywhere" national carrier, able to compete on equal footing with the newly expanded national networks of Delta and United. *See* DX-023 at 4.

56.     The airlines could not have achieved these same network benefits through organic growth. *See* Parker Witness Stmt. ¶¶ 7, 14; D. DeCross Oct. 3, 2013 Dep. Tr. at 219:19–220:5. Creating a nationwide network organically would have required the airlines to develop one or more new hubs, which is an extremely difficult, risky, and expensive undertaking. *See* Parker Witness Stmt. ¶ 7. As Mr. Parker explained, opening a new hub may require "airport facilities (terminals, gates, slots) that may not be available where you want them to be, or are already occupied by other carriers. . . . The best locations have already been taken, and most efforts to build brand new hubs have failed." *Id.* Mr. Parker further testified that opening a new hub "presents huge risks, all premised on the successful launching of dozens of new routes, without any guarantee of success."

*Id.* ¶ 14.  Mr. Parker believed that US Airways "lacked the size or the capital necessary to make these kind of sunk investments based on a hope that sufficient demand for an operation of this size would materialize."  *Id.*  Derek DeCross, Vice President of Global Sales at pre-Merger American Airlines similarly testified at deposition in 2013:  "We cannot create the type of network that the combination of AA and US Airways [did] and have that be a profitable venture.  That's why, in order to compete with what United did, what Delta did, why you hear people like myself saying this [merger] is necessary to be able to be profitable. . . .  [Y]ou cannot create the type of network depth and breadth you need by growing organically."  D. DeCross Oct. 3, 2013 Dep. Tr. at 219:19–220:5.

57.    Nor would "codesharing"—a term that describes the relationship between two air carriers in which one carrier is permitted to place its schedule identifier (a unique two letter airline designation) on flights offered by the other—achieve the same benefits as the Merger.  Codesharing is a "considerably inferior way" for an airline to expand its network as compared to a merger, because "in codeshare, you can't coordinate schedules" or pricing—"two things that are of great, great interest to consumers."  Trial Tr. (Day 4) at 1056:6–1057:6 (Kasper).  Mr. Kasper testified that the "literature on that is quite clear, and that is that a merger has far more economic benefit for the consumers than codesharing. . . .  What the studies have shown is that the quality of service is much higher to the consumer when carriers can do that type of integrated planning and service provision than it is if you are two independent parties just doing it by contract, which is what a codeshare is."  *Id.* at 1087:8–1088:14 (Kasper).[16]

---

[16] As this Court previously explained, an air carrier's ability to enter into codesharing agreements is affected by various factors, including the labor agreements it has with its pilots.  *In re AMR Corp.*, 477 B.R. 384, 431 (Bankr. S.D.N.Y. 2012).  In connection with American's motion (in its bankruptcy proceedings before this Court) under Section 1113 of the Bankruptcy Code to reject the collective bargaining agreements between American and its pilots, flight attendants, and certain transit workers, American requested the ability to enter into essentially unlimited codesharing agreements.  *Id.* at 431–32.  While this Court found that "a significant increase in codesharing would greatly benefit

58.    Plaintiffs argue that the Merger was instead motivated by an anticompetitive intent on US Airways' part to reduce or restrict capacity industry-wide, and in particular to stop American from increasing capacity according to the plan by which American hoped to emerge from bankruptcy.  The only significant piece of evidence supporting this theory that Plaintiffs presented at trial was an early draft of a US Airways presentation meant to advocate publicly against American's standalone plan.  *See* PX-058.  A single slide in that draft presentation proposed saying that American's growth plan would reverse industry capacity discipline and put pressure on airfares.

59.    Plaintiffs offered no testimony from anyone who wrote, saw, or used this draft slide. Plaintiffs' counsel questioned Mr. Parker about it at length during trial, even though Mr. Parker never saw it in the ordinary course of business.  *See* Trial Tr. (Day 2) at 359:20–361:19, 382:9–17, 391:14–20, 393:11–16.   And in that testimony (including redirect by American's counsel) Mr. Parker credibly explained that US Airways never had any intention of reducing capacity after the Merger, never advocated against American's standalone plan with the messaging in the draft slide, and that his principal objection to American's standalone plan was not the projected growth rate, but the fact that the type of growth proposed would do nothing to address the structural deficiencies in American's network so that it could better compete against United, Delta and the LCCs.  Trial Tr. (Day 2) at 372:22–373:12, 374:18–24, 380:18–381:11, 533:4–8; *see also* Parker Witness Stmt. ¶¶ 33–35; Garboden Witness Stmt. ¶ 17.  In comparison, the Merger, Mr. Parker explained, would do exactly that.  Parker Witness Stmt. ¶¶ 31, 35.  Furthermore, under Mr. Parker's stewardship, American did not reduce capacity.  In fact, it increased capacity as discussed below. The Court thus finds that the American/US Airways Merger was not motivated by some desire to reduce or restrict industry capacity, but rather by the airlines' interest in addressing structural

---

American," it held that "American has not shown by a preponderance of the evidence . . . that essentially unlimited codesharing is necessary to achieve a successful reorganization" and denied American's motion.  *Id.* at 433.

deficiencies in their networks so that they could better compete and thus ultimately better service customers.

### D.    The DOJ Lawsuit, DOJ Settlement, and Consummation of the Merger

60.    As noted, the DOJ filed a complaint against AMR Corporation and US Airways Group on August 13, 2013, seeking to enjoin the proposed merger of AMR Corporation and US Airways because it would allegedly violate Section 7 of the Clayton Act.  Adv. Dkt. No. 214-1 (Stipulation of Undisputed Facts) ¶ 9.  On November 12, 2013, without agreeing to liability or resolution of any issue of fact or law, including as to the necessity of any divestitures under antitrust law, AMR and US Airways Group entered into a settlement with the DOJ that provided for the merging parties to divest certain assets and resolved the DOJ's lawsuit challenging the proposed merger.  *Id.* ¶ 10; *see also* DX-049 at 1; *United States v. US Airways Group, Inc., et al.*, No. 13-cv-01236 (D.D.C.), Dkt. No. 170 (Final Judgment) at 1.  On the same day, the DOJ submitted to the district court a proposed Final Judgment reflecting the terms of the settlement and a "Competitive Impact Statement" relating to that proposed Final Judgment.  *See* DX-050 at 1–2.  Because the merger before this Court reflects the remedies achieved by the DOJ Settlement, the Court briefly summarizes the settlement's terms and stated rationale.

61.    In order "to remedy the harm to competition that [the DOJ alleged] was likely to result from the proposed merger," DX-050 at 2, the proposed Final Judgment, among other things, "require[d] the divestiture of slots, gates, and ground facilities at key airports around the country to permit the entry or expansion of airlines that can provide meaningful competition in numerous markets, eliminate the significant increase in concentration of slots at Reagan National [Airport] that otherwise would have occurred, and enhance the ability of low-cost carriers to compete with legacy carriers on a system-wide basis."  *Id.*  Specifically, the proposed Final Judgment required the combined American Airlines to divest or transfer:  (1) 104 take-off and landing slots at DCA;

(2) 34 slots at LGA; and (3) rights and interests to two airport gates and associated ground facilities at each of Chicago O'Hare International Airport, Los Angeles International Airport, Boston Logan International Airport, Miami International Airport, and Dallas Love Field.  *Id.* at 2–3.

62.    In its Competitive Impact Statement, the DOJ explained how the proposed divestitures specifically targeted the handful of airports that had operational barriers that made entry and expansion difficult for new and existing competitors.  *Id.* at 6–7.  The DOJ argued that by requiring the "divestiture of an unprecedented quantity of valuable facilities at seven of the most important airports in the United States," the settlement would eliminate these operational barriers and "create network opportunities for the purchasing carriers that would otherwise have been out of reach for the foreseeable future."  *Id.* at 8.  Those opportunities would then "provide increased incentives for those carriers to invest in new capacity and expand into additional markets."  *Id.*  The DOJ thus concluded that the "proposed remedy will deliver benefits to consumers that could not be obtained by enjoining the merger."  *Id.*; *see also* Trial Tr. (Day 4) at 1168:20–1169:4 (Ordover) ("So the effect of the settlement was to strengthen and embolden . . . the LCCs and the latest incarnation of extra-low-cost carriers, or ULCCs . . . to actually act as these disruptors.  What the government did through the settlement is offered additional critical assets to the industry mavericks, which they can use to go head to head with the legacy carriers.").

63.    On December 9, 2013, AMR and US Airways consummated the Merger, Adv. Dkt. No. 214-1 (Stipulation of Undisputed Facts) ¶ 11, and on April 25, 2014, the District of Columbia District Court entered a Final Judgment approving and ordering the agreed-upon divestitures, *United States v. US Airways Group, Inc., et al.*, No. 13-cv-01236 (D.D.C.), Dkt. No. 170.[17]  As a

---

[17] The Federal Aviation Administration granted a single operating certificate for American Airlines and US Airways on April 8, 2015.  Adv. Dkt. No. 214-1 (Stipulation of Undisputed Facts) ¶ 12.

result, Southwest acquired 54 of the DCA slots (i.e., 27 slot-pairs) that enabled it to more than double its number of daily departures from that airport from 17 to over 40 per day. Kasper Witness Stmt. ¶ 53. Similarly, JetBlue acquired 24 of the DCA slots (i.e., 12 slot-pairs) in addition to a permanent transfer of eight additional slot pairs that it had been leasing from American. *Id.* Virgin America acquired eight DCA slots (i.e., four slot-pairs) enabling that LCC to offer four daily roundtrips from the airport. *Id.* The settlement also increased LCC presence at LaGuardia. Southwest acquired a total of 11 additional slot pairs at that airport (six new slot pairs plus the permanent transfer of five slot pairs it had been leasing from American), which Southwest used to increase service between LGA and Dallas, Kansas City, Nashville, Houston, Chicago, and St. Louis. *Id.* ¶ 54. Similarly, Virgin America acquired six LGA slot pairs, enabling it to initiate new services at that airport. *Id.*

### E.    Evidence of Competitive Effects

64.    The record evidence in this case contains not only the usual predictions regarding the expected competitive effects, but also substantial evidence concerning actual changes in output, airfares, product offerings, and service levels since the Merger. Both sides offered such evidence. Plaintiffs offered Dr. Lundgren's analysis of changes in average fares on certain city pairs and extensive lay testimony of post-Merger conditions. American offered testimony from Mr. Parker and especially Ms. Garboden about various metrics of current industry performance, as well as similar testimony from Mr. Kasper. American also provided a sophisticated econometric study of post-Merger pricing and output by Dr. Carlton.

65.    The Court addresses the legal issues relating to post-Merger evidence in Section IV.B below. Here, the Court summarizes the parties' evidence (both predictive and post-Merger) and makes findings as to the factual disputes raised at trial.

1.   Concentration in the Identified City Pairs Post-Merger

66.     Plaintiffs' case centers on estimated concentration levels based on a list of city-pair routes that the DOJ first identified as "city pairs where the Merger is presumptively illegal" (the "DOJ List") in its amended complaint in the DOJ Action.  *See* Adv. Dkt. No. 103 (First Amended Compl.), ¶ 143, App'x A (attaching list of city pairs from DOJ Action).  The DOJ compiled this list of 1,008 city pairs using the "Herfindahl-Hirschman Index" or "HHI," which is a commonly accepted measure of market concentration and is calculated by summing the squares of the market shares of each identified market participant, thus giving proportionately greater weight to the larger market shares.  *See id.*; *see also* 2010 Horizontal Merger Guidelines § 5.3.  Following the thresholds articulated in the 2010 Horizontal Merger Guidelines, the DOJ List identified the city pairs in which, based on concentration levels in 2012 and the estimated post-Merger concentration levels, the Merger would be "presumptively illegal" because the post-Merger HHI would be greater than 2,500, and the change in HHI would be greater than 200.  *See* Adv. Dkt. No. 103, App'x A.[18]

67.     After the Merger closed and several years passed, Plaintiffs retained their expert witness, Dr. Carl Lundgren, who, in a March 2017 report: (i) recalculated HHIs for the city pairs on the DOJ List using updated Department of Transportation ("DOT") data for the calendar year 2012, and (ii) calculated post-Merger HHIs for the most recent four quarters of data (covering the period from October 1, 2015 to September 30, 2016).  *See* Lundgren Trial Decl. at 18–20. Dr. Lundgren concluded that, in approximately 785 of the 1,008 city pairs initially identified by the DOJ, the post-merger HHI exceeded 2500 and the change in HHI exceeded 200.  *See id.* at 20.  This meant that, according to Dr. Lundgren, despite the DOJ's earlier predictions, in 223 city pairs

---

[18] The Merger Guidelines themselves do not use the phrase "presumptively illegal."  Rather, they say that market shares and HHIs either "potentially raise significant competitive concerns" or that, with higher values, the merger "will be presumed to be likely to enhance market power."  2010 Horizontal Merger Guidelines § 5.3.

(roughly one quarter of the 1,008), concentration levels as measured by the HHI *decreased* or there was no relevant increase in concentration.

68.     In a December 21, 2018 Declaration, Dr. Lundgren updated his HHI calculations by using post-Merger numbers for the one-year period covering July 1, 2017 through June 30, 2018. *See id.* at 103–06.  Dr. Lundgren concluded that, of the 1,008 city pair markets initially identified in the DOJ List, there were now only 765 where HHI exceeded 2,500 or the change in HHI exceed 200.  *Id.*  In other words, 243 city pairs (about a quarter of the 1,008) no longer met both of those criteria.[19]  At trial, Dr. Lundgren explained that additional competition entering into those 243 city-pair markets or expansion by other entities might explain this change.  Trial Tr. (Day 3) at 867:21– 868:12 (Lundgren).

69.     American takes no position on whether Dr. Lundgren properly calculated the HHIs set forth in his various reports.  Instead, American argues that hundreds of HHI effects like these are inevitable in any network airline merger, even where, as here, the networks were so complementary that US Airways and American offered competing nonstop service on just 12 routes.  American therefore concentrates its arguments on whether, in the absence of city pair-specific entry barriers and given high supply substitutability, high HHIs are predictive of the Merger's competitive effects.

70.     American does point out a flaw in Dr. Lundgren's methodology.  It is clear from Dr. Lundgren's findings that HHIs in these city pairs are changing over time:  the number of "presumptively illegal" city pairs decreased from 1,008 as identified by the DOJ in 2012, to 785 in 2017, and then to 765 in 2018.  Despite these significant changes over time, Dr. Lundgren chose to measure the pre-Merger market concentration using data from the four quarters of 2012, essentially

---

[19] Defendant's expert Dr. Carlton pointed out that Dr. Lundgren's data shows that on an additional 143 routes, the level of market concentration decreased, although not by enough to fail the two-part test.  Carlton Witness Stmt. ¶ 54.

a full year before the Merger actually closed in December 2013. *See* Trial Tr. (Day 3) at 867:6–12

(Lundgren).    Dr. Lundgren's HHI calculations thus do not necessarily portray the market

concentration levels at the time of the Merger, and the changes in market concentration resulting

from it.    Likewise, his comparisons of average fares before and after the Merger capture and

attribute, to the Merger fare increases during the eleven-and-a-half months of 2013 *before* the

Merger.  This makes the probative value of Dr. Lundgren's work questionable.[20]  However, because

American does not assert that Plaintiffs failed to meet their *prima facie* burden—and because Dr.

Lundgren's analysis is rebutted by American's competitive effects evidence in any event, as

explained below—the Court finds that Dr. Lundgren's HHI calculations satisfy the first step in the

*Baker Hughes* analysis.

## 2.    Prospective Competitive Effects Analyses

71.    Contemporary merger analysis does not stop with an analysis of HHIs and changes

in HHIs.  As explained in the 2010 Horizontal Merger Guidelines and by Dr. Janusz Ordover during

trial, statistical proof is now ordinarily coupled with a competitive effects theory that in most cases

posits either adverse "unilateral effects" (based on elimination of competition between the two

merging firms) or "coordinated effects" (by enabling or encouraging post-merger coordinated

interaction among firms in the relevant market).

---

[20] As noted earlier, Dr. Lundgren is an economist who currently works at the United States Department of Labor in relation to mine health and safety issues, and more particularly, on the costs and benefits of proposed rules or final rules for the mining industry.  He is not an antitrust economist now, nor has he worked in the field in the past, and there was no indication that he understood antitrust economics at anything more than a rudimentary level.  He also consistently testified that high HHIs make a merger "presumptively illegal" under the DOJ/FTC Merger Guidelines, when that phrase appears nowhere in the *Guidelines*.  *See* 2010 Horizontal Merger Guidelines § 5.3.  The contrast between Dr. Lundgren and Drs. Dennis Carlton and Janusz Ordover, American's economic experts with decades of antitrust expertise and eminent antitrust credentials, was stark.

72.     Plaintiffs put on no competitive effects cases of this type.  For reasons only they can know, they simply never prepared a distinct competitive effects analysis (at least not during the discovery period when they were allowed to do so).

73.     American, on the other hand, offered a comprehensive coordinated effects analysis by Dr. Ordover and multiple prospective studies by Dr. Carlton that by their nature study both unilateral and coordinated effects.  That testimony stands unrebutted by Plaintiffs.  Not only did Dr. Lundgren not respond to it in a timely manner, the cross-examination of Drs. Ordover and Carlton did nothing whatsoever to cast doubt on their testimony.  The Court adopts as findings the following key points from American's prospective competitive effects analyses.

a.     *Dr. Ordover's Coordinated Effects Analysis*

74.     Dr. Ordover addressed the potential for the Merger to enable or encourage post-Merger coordinated interaction, which occurs "when firms undertake actions to raise industry profits that otherwise are not profit maximizing for a given firm acting in isolation and absent concurrence from its rivals."  Ordover Witness Stmt. ¶ 11.  Mergers can contribute to successful coordination by reducing the number of actors that need to coordinate, and sometimes by eliminating a particularly disruptive actor (a so-called "maverick").  But merely eliminating one actor (which every merger does) does not mean a merger increases the likelihood of successful coordination.  The market itself must be conducive to successful coordination, which not all are.  Accordingly, the coordinated effects component of a merger analysis asks if the market setting is one in which coordination is a concern, and then if the merger makes coordination more likely or more effective, or increases the stability of a coordinated market outcome.  *Id.* ¶ 13.

75.     Successful coordination is *less* likely when certain conditions are met, two of which are particularly relevant to airline mergers such as this one.  The first is the inability to monitor rivals' actual behavior; if firms are unable to observe their rivals' private strategic actions it will be

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
San Francisco

difficult to reach terms of coordination and enforce them.  *Id.* ¶ 12.  The second is if rivals must

adjust prices or alter strategic actions rapidly in response to changing market conditions; under this

condition, the ability to "cheat" under the guise of "innocent" adjustments is greater and the ability

to monitor more difficult.  *Id.*  These factors are assessed in relation to how many actors (the

remaining competitors in the market) need to coordinate.  *See id.* ¶ 13.

76.    Based on these principles, the characteristics of the airline industry, and his data

analysis, Dr. Ordover concluded that the Merger between US Airways and American does not

increase the risk of coordination on either prices or capacity in the industry.  *See id.* ¶¶ 6-10.

77.    The Court agrees that the risk of successful price coordination was not increased by

the Merger.  The industry is vigorously competitive and exhibits low barriers to entry, which

impedes the coordination of prices.  There are disruptors in the industry:  the LCCs that have

continued to gain market share and exert downward pressure on prices over the past several

decades, and of course whose number was unaffected by the Merger.[21]  *Id.* ¶¶ 20–24.  Moreover,

the economic realities of pricing in the industry significantly impede successful and lasting

coordination.  The process of setting fares and determining how many seats (if any) to offer at each

fare and at each point in time is highly complex and significantly opaque.  *Id.* ¶¶ 25–29.  Contrary

to Plaintiffs' argument, pricing information available through the Airline Tariff Publishing

Company ("ATPCO") does not aid efforts at coordination.  *Id.* ¶¶ 31–36.  And airlines' "yield

management" tools—sophisticated systems that open and close "fare buckets" at various points in

time—further add to the complexity of pricing.  *Id.* ¶¶ 43–47.[22]

---

[21] The divestitures resulting from the DOJ's settlement with American and US Airways further expanded LCCs' access to airport facilities and thereby enhanced their competitive impact and facilitated the expansion of their roles as mavericks over a larger set of routes and airports with the inevitable destabilizing effects on any attempt by legacy airlines to coordinate.  *Id.* ¶¶ 100–01.

[22] This is not to say that competition in the airline industry does not produce parallel *outcomes*, such as similar fares for the same service or similar policies.  It has frequently been observed that airlines "watch each other like hawks"

78.    Dr. Ordover's coordinated effects analysis first addresses the risk of price coordination, i.e., coordinated airfares. He provides extensive proof that airfares for any city pair vary and are highly dispersed at any given time. *Id.* ¶¶ 51–52. Moreover, available fares do not move in a systematic manner that might easily be predicted and followed by competitors. *Id.* ¶ 52. This diversity in prices and price dynamics is indicative of markets where a multitude of factors affect supply and demand, some of which are common to some rivals and some of which are idiosyncratic, leading to diverse competitive choices. *Id.* Such diversity is a significant obstacle to price coordination. *Id.*; *see also id.* ¶¶ 54–83.

79.    Plaintiffs have argued that ancillary fees have increased since the Merger, so Dr. Ordover also addresses obstacles to successful coordination with respect to ancillary fees. He argues convincingly that the use of ancillary fees complicates price coordination, because it reflects the "unbundling" of airfares into multiple components, allowing airlines to offer different combinations of base fares and either separately priced or bundled ancillary services. *Id.* ¶ 87. This "makes the whole prices even more opaque to a rival." Trial Tr. (Day 4) at 1160:25–1161:11 (Ordover). Moreover, airlines differ in their rules for applying the various fees and the extent to which carriers discount or waive fees is no observable to rivals. Ordover Witness Stmt. ¶¶ 84–86.

80.    Finally, and responsive to Plaintiffs' argument about capacity discipline, Dr. Ordover addresses whether the Merger increases the likelihood of a successful coordinated reduction in capacity. His testimony, in short, is that a coordinated reduction in capacity is far more difficult than Plaintiffs maintain. The fundamental problems are that capacity (a) has many dimensions and (b) is in many hands, including not only legacy network carriers but LCCs for whom capacity expansion is core to the business model.

---

and often copy one another's pricing moves. *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 875 (7th Cir. 2015) (Posner, J.).

81.     The Court agrees that the complexity of networks and the competitive overhang from both network carriers and LCCs makes any capacity reduction scheme in the airline industry very difficult, certainly absent direct communications that establish reasonably specific capacity reduction metrics.  *Id.* ¶ 90.  Otherwise, airlines would not know where to reduce capacity or how to detect "cheating."  Plaintiffs' arguments imply that capacity is a unitary thing that can be metered up or down by turning a dial.  In reality, "[a]irlines operate complicated networks comprised of segments that are used both for nonstop passengers traveling between the endpoints of the segment, and by a heterogeneous pool of connecting passengers who are using the segment as part of more complicated itineraries."  *Id.*  Moreover, "[t]he differences between airline routes, frequencies, and networks result in different incentives to adjust capacity from any given *status quo*.  And these different incentives—rooted in the fact that each pair of airlines typically competes over a different set of routes, and that each overlap route has different importance to an airline's overall network configuration—substantially complicates any attempt to devise a workable capacity reduction strategy."  *Id.* ¶ 92.

82.     A capacity reduction scheme is also complicated by the fact that the airlines' yield management practices "regularly change the mix of nonstop and connecting passengers on any given flight, as well as the composition of connecting itineraries."  *Id.* ¶ 94.  "The variability across routes, time, and airlines in the share of non-stop passengers and in the composition of passenger itineraries implies that on any overlap route, any pair of airlines may compete over some of the passengers on a flight and not others, and both the mix of these passengers and the seats made available to them are in constant flux."  *Id.*  These complexities, among others, are significant impediments to successful capacity-based coordination, and there is no evidence that the Merger between American and US Airways meaningfully affects the likelihood of overcoming these obstacles.  *Id.* ¶ 97.

b.     *Dr. Carlton's Prospective Analysis of the Merger*

83.     In 2013, prior to the Merger's consummation, American's expert, Dr. Carlton, conducted a prospective analysis of the Merger using American and US Airways' ordinary-course modeling of the Merger's effects. Carlton Witness Stmt. ¶¶ 24–25, 27. Dr. Carlton concluded that "network quality improvements created by the Merger would generate substantial procompetitive output expansions, which would exceed, many times over, any plausible nominal fare increases from the transaction." *Id.* ¶ 24. In short, his analysis found that because the merged airline's network would be broader and more robust, it would attract more consumers and lead to many more routes and consumers options—an "output expansion" that would result in great benefits to consumers, far exceeding any possible (but unlikely) negative effects.

84.     Dr. Carlton based this analysis on predictions American made in the ordinary course of business as to the volume of American and US Airways passengers by route (broken down by high-fare and low-fare passengers) for both a scenario in which the airlines remained separate and a scenario in which they were merged. *Id.* ¶ 28. That data showed that the merged carrier would attract nearly 2.9 million more domestic passengers annually than would the two standalone carriers. *Id.* ¶ 29. Dr. Carlton explained that this projected increase in consumer demand had to be driven by network quality improvements that flowed directly from the proposed transaction, including improved scheduling, the expansion of network service from many airports, and the creation of thousands of new routes. *Id.* ¶ 26. Dr. Carlton further found that much of this increased demand would be "spilled" (i.e., not served) due to insufficient existing capacity unless the merged airline increased capacity, which of course would incentivize the merged carrier to expand capacity and thus lead to increased output. *Id.* ¶ 34. In other words: the merged airline would be expected to grow capacity—a procompetitive, not an anticompetitive, result.

85.     Dr. Carlton was able to assign a dollar value to the net consumer benefits associated with this incremental traffic.  He explained at trial that, under reasonable assumptions, an increase in consumer welfare from a merger can be measured by asking what decrease in price would generate an equivalent increase in passenger traffic.  *Id.* ¶ 30.  This is the methodology that the Department of Justice used in assessing the Delta/Northwest merger.  *Id.*  Using this method, Dr. Carlton computed the predicted change in consumer welfare on each route due to the Merger. *Id.* ¶ 31.  He ultimately found that total domestic consumer benefits from the transaction would amount to over $900 million per year.  *Id.*  Even after accounting for conservative estimates of potential adverse fare effects from the transaction, Dr. Carlton determined that the predicted benefits of the Merger would amount to at least $750 million per year.  *Id.* ¶¶ 32–33.

### 3.     Procompetitive Effects From Network and Cost Efficiencies

86.     American also presented evidence of procompetitive effects, including efficiencies that have been realized since the Merger.  This evidence was largely unchallenged by Plaintiffs.

#### a.     *Network Benefits*

87.     The primary benefits of the Merger spring from the combination of the highly complementary networks of American and US Airways.  The Merger provided the new American with domestic network coverage comparable to that of United, Delta, and Southwest, thus making the new American more competitive against these carriers as well as against other LCCs.  Kasper Witness Stmt. ¶ 86.  In terms of total destinations worldwide, the Merger helped to close the global network gap disparity that existed with United (377 destinations) and Delta (335 destinations).  *Id.* ¶ 87.  As standalone carriers in 2013, American served 279 destinations worldwide, while US Airways served 202 destinations.  By merging, the new American served 342 unique destinations in 2013, and has since expanded that number to 363 in 2018.  *Id.*

88.    The named Plaintiffs themselves admitted the importance of a large, strong airline network like the one created by the Merger.  For example, Plaintiff Bill Rubinsohn recognized that "[o]ne of the benefits of having comprehensive national networks is that you can get more places without having to switch airlines."  Trial Tr. (Day 1) at 127:19–23 (Rubinsohn); *see also id*. at 113:8–16 (Rubinsohn) (testifying that network hubs offer more connections to other destinations than point-to-point carriers).  Plaintiff Michael Malaney testified that a "big network is so valuable" because "when you're traveling, you need options when things go wrong."  M. Malaney Mar. 24, 2014 Dep. Tr. at 25:15–17; *see also id*. at 27:15–19 (admitting that it is beneficial to his travel agency customers "that airlines have larger networks so [he] can give [his] customers more options").  And Plaintiff Sondra Russell testified that she prefers flying American because of the "benefits" it offers, such as its AAdvantage frequent flyer program.  *See* Trial Tr. (Day 1) at 174:19–25 (Russell).

89.    The data confirms that the combination of the US Airways and American networks has yielded significant benefits for consumers, particularly with respect to travel options.  Today, American offers 1,132 separate nonstop routes,[23] which is an increase of 143 nonstop routes (14.5%) from the combined 989 nonstop routes that American and US Airways collectively offered in 2013.  Garboden Witness Stmt. ¶ 21 & Table 1.  The increases in the number of city pairs[24] serviced through a variety of direct and connecting routes, and the number of unique itineraries[25]

---

[23] A "route" refers to nonstop service between two cities.  Garboden Witness Stmt. ¶ 20.

[24] For these purposes, "city pairs" refers to all of the origin city/destination city combinations that can be reached using nonstop and/or one-stop itineraries, with the count being non-directional (for example, Albuquerque-Phoenix is counted as one city pair, regardless of whether directional itineraries exist for flights from Albuquerque to Phoenix, from Phoenix to Albuquerque, or both.  Garboden Witness Stmt. ¶ 20.

[25] "Itineraries" refers to all travel itineraries constructed from different combinations of American or US Airways-operated flights; itineraries are differentiated based on connecting hub (for one-stop itineraries), departure time, arrival time, and flight number(s).  Garboden Witness Stmt. ¶ 20.

offered by American, are even greater.  *Id.* ¶ 22 & Table 1.  In July 2013, as independent carriers, American and US Airways could service 25,598 unique city pairs, on over 318,494 unique itineraries.  Today, American services 30,536 unique city pairs over 372,543 unique itineraries.  That represents increases of 19% in unique city pairs and 17% in unique itineraries across American's network.  *Id.*  These increases and procompetitive benefits were not challenged by Plaintiffs in any respect.

90.    Consumers traveling on the specific city pairs that Plaintiffs identified as being at issue in this lawsuit, *see* Adv. Dkt. No. 214-5 (Plaintiffs' Identification of City Pairs), also have more options than they did before the Merger.  The total number of unique itineraries between those city pairs has increased from 9,577 in 2013 (on American and US Airways collectively, prior to the Merger) to 15,836 in July 2018, which is an increase of 65%.  Garboden Witness Stmt. ¶ 24 & Table 2.[26]  Again, these increases and procompetitive benefits were not challenged by Plaintiffs in any respect.

91.    The larger hub network created by the Merger especially benefits customers in smaller communities across the country.  It is well recognized that the traveling options of passengers in smaller communities is determined by their ability to fly to hubs, because those customers are, in general, able to reach many destinations throughout the world only by connecting through a hub airport.  Trial Tr. (Day 4) at 1009:8–1010:16 (Kasper); *see also id.* at 1125:15–17

---

[26] Certain of the named Plaintiffs testified that American has reduced or cancelled some service on certain routes since the Merger (*see, e.g.*, Fry Witness Stmt. ¶ 9; Garavanian Witness Stmt. ¶ 12; Russell Witness Stmt. ¶ 15; Stansbury Witness Stmt. ¶ 26; Talewsky Witness Stmt. ¶¶ 30–33).  With so many routes at issue, that is to be expected.  Furthermore, some of the reductions or cancellations were because low-cost carriers (like Southwest in flights out of Manchester, New Hampshire, or JetBlue in flights out of Boston) had taken over those markets.  *See* Trial Tr. (Day 1) at 281:13-24 (Mr. Garavanian agreeing that Southwest "has now taken a huge share of Manchester's market"); *id.* at 279:23-280:4 (Mr. Garavanian agreeing that JetBlue is now "the largest carrier" in Boston).  The more important point is that Plaintiffs did not challenge American's evidence regarding the overall increases in customer options since the Merger, including the overall increases in options on the specific city pairs that Plaintiffs identified as relevant to their claims.

(Garboden) ("Having a larger network allows for more connections, which then allows you to go and fly to some of these smaller cities."). In most cases, it is the network carriers that serve these small cities. As Mr. Kasper explained: "There is something like 10,000 city pairs in the U.S., and only a small fraction of those have enough traffic to support nonstop service. So in order to obtain service, it is necessary to be able to have these concentrations of traffic at the hub." *Id.* at 1008:25–1009:7.

92.     Before the Merger, "the independent US Airways and American often required customers to travel on highly circuitous routes to reach smaller cities due to the unideal locations of each airline's hubs." Parker Witness Stmt. ¶ 46. Now, because the combined airline's nine hubs are dispersed throughout the United States, "the new American can serve omni-directional travel needs from most of its spokes." *Id.*; *see also* Garboden Witness Stmt. ¶ 33. For example, customers traveling from Memphis, Tennessee now have the option of connecting through eight hub cities (Charlotte, DCA, Dallas Fort-Worth, LGA, Miami, Chicago, Philadelphia, and Phoenix) to reach their ultimate destination, and those hub cities provide access to hundreds of other cities across the world. Parker Witness Stmt. ¶ 46.

93.     Indeed, Plaintiffs themselves recognize the benefits of a large hub-and-spoke network. As Plaintiff Bill Rubinsohn testified, Chicago O'Hare—an American hub—is a better airport to use to connect to destinations beyond Chicago than Chicago Midway because "[i]f you fly on Southwest into Midway you can go beyond on the Southwest network, but to a more limited number of points." Trial Tr. (Day 1) at 113:8–16 (Rubinsohn). Similarly, Plaintiff Michael Malaney testified that his airline of choice is Delta, because it has "the biggest network flying out of Grand Rapids" and thus provides more connecting options for consumers. M. Malaney Mar. 24, 2014 Dep. Tr. at 24:20–26:3. Plaintiff Sondra Russell also testified that, since the Merger,

American has increased its flight options to and from her home city of Waco, Texas. *See* Trial Tr. (Day 1) at 154:4–13 (Russell).

94.     American's data regarding the growth of its regional service—which primarily benefits smaller communities—demonstrates the effect of the Merger on these smaller communities. From 2013 to 2018, American has seen an 18.9% increase in domestic regional ASMs and a 10.3% increase in domestic regional seats. Garboden Witness Stmt. ¶ 34 & Table 6. American's focus on the regional network has led to new service in 17 domestic cities that were not serviced by either US Airways or American in 2013. *Id.* ¶ 35. For instance, three of these cities are in Montana—a state that neither US Airways nor American serviced prior to the Merger. *Id.* American flew over 240,000 seats to and from Billings, Bozeman, and Missoula during 2018, mostly on regional aircraft. *Id.*

95.     Service to other smaller cities has also grown immensely since the Merger. For example, American flew 90% more seats to and from Fort Wayne International Airport (in Indiana) in 2018 than it did in 2013, and it serves 39.7% more destinations from that airport than it did in 2013. *Id.* ¶ 36. There has been even more significant growth at, for example, Gerald R. Ford International Airport (in Grand Rapids, Michigan): American flew 138.2% more seats to and from that airport in 2018 than it did in 2013, and to 44.4% more destinations. *Id.*

b.     *Increase in Investments*

96.     American, of course, came to this Court bankrupt. The undisputed evidence presented at trial by American showed that, on account of the Merger, American emerged from bankruptcy able to compete not only with a better network, but also by investing aggressively in projects that benefit consumers.

97.     In particular, American has increased investments in the infrastructure of its hubs. Since the Merger, American invested more than $2 billion to update the Dallas-Fort Worth airport;

it invested more than $200 million in facilities and improvements at Philadelphia International Airport; it completed nearly $18 million in facility and equipment upgrades at Reagan National Airport; it invested more than $100 million in improvements at Charlotte Douglas International Airport; it signed a lease with Chicago O'Hare International Airport, allowing the airport to spend $8.5 billion on a massive expansion; it signed a deal with New York LaGuardia Airport to spend $4 billion on a new terminal; and it was announced that American will invest $344 million in New York's John F. Kennedy International Airport.  Garboden Witness Stmt. ¶ 30.  These investments include both customer-facing improvements (e.g., new charging stations, new kiosks, improved club and lounge facilities) and operational improvements (e.g., improved baggage systems, updated HVAC systems), all of which benefit customers overall.  Trial Tr. (Day 4) at 1123:9–1124:15 (Garboden).

98.    American has also expanded and improved its fleet of aircraft.  Since the Merger, American has taken delivery of 304 new mainline aircraft—replacing older, less efficient types such as MD80s and Boeing 757s with new 737s, A321s, and A319s—and it has taken delivery of 330 new regional aircraft.  Garboden Witness Stmt. ¶ 37; Trial Tr. (Day 4) at 1126:18–23 (Garboden).  Indeed, American is currently "on the tail end of taking delivery of the largest . . . aircraft order in the history of any airline"—an order that American had placed prior to the Merger. Trial Tr. (Day 4) at 1126:9–17 (Garboden); id. (Day 2) at 547:4–20 (Parker).  American now has the newest and youngest fleet of any U.S. network carrier, even though it continues to maintain more aircraft in its fleet than any other U.S. carrier.  Garboden Witness Stmt. ¶ 37 & Table 7.  It is once again worth noting that all of this specific factual evidence presented by Ms. Garboden as to the benefits American provided its consumers, post-Merger—through increased capacity, increased travel options, infrastructure improvements, and fleet expansion and improvements—was left

entirely unchallenged and unrebutted by Plaintiffs via cross-examination, or via any specific rebuttal evidence presenting a contrary picture.

4.    Low-Cost Carrier Competition Continues to Grow

99.    As explained below, a significant factor in this Court's view that the Merger was not likely to harm competition and has not harmed competition is the clear and striking vitality of LCC competition.

100.    The evidence at trial demonstrated that competition from LCCs and ULCCs remains strong and in fact has increased significantly since the Merger.  Customers are traveling on LCCs more now than ever before.  As of 2018, 87% of passengers traveling between two domestic cities had LCC options, as compared to 81% in 2013 (Kasper Witness Stmt. ¶ 35), and LCCs' share of domestic passengers was 45% in 2017, as compared to 37% in 2013 (Kasper Witness Stmt. ¶ 33). *See also* Parker Witness Stmt. ¶ 8 (nearly 80% of American' passengers travel on routes served by American and one or more LCCs or ULCCs).

101.    The capacities of LCCs and ULCCs are also growing at rapid rates.  For example, between 2013 and 2018, Spirit's total ASMs have grown by 162.7%, JetBlue's total ASMs have grown by 41%, and Southwest's total ASMs have grown by 23.5%.  Garboden Witness Stmt. ¶ 27 & Table 4.  This growth is especially significant in the new American's nine hubs.  Between December 2013 and 2018, the total domestic annual seats to and from American's hubs on ULCCs increased by 99%, and seats to and from those hubs on Southwest increased by 23%.  Garboden Witness Stmt. ¶ 28 & Table 5.

102.    Mr. Kasper testified that LCCs and ULCCs will continue this growth trend in the future for several reasons.  First, these airlines "continue to have a significant cost advantage vis-à-vis legacy carriers" due to the "cost of doing business on a point-to-point operation versus a hub operation."  Trial Tr. (Day 4) at 996:23–997:18 (Kasper).  Second, the LCCs and ULCCs have

placed substantial orders of new aircraft.  Kasper Witness Stmt. ¶¶ 45–46; *see also* Trial Tr. (Day 4) at 997:19–25 (Kasper).  Since these airlines' fleets "are relatively young, that's usually an indication that most of the aircraft on order will be for net growth, additions to capacity."  Trial Tr. (Day 4) at 997:22–25 (Kasper).  Mr. Kasper concluded:  "So you have high profit margins, big aircraft orders, consistent cost advantages, all those say to me low-cost carriers are going to continue to be a significant factor and probably increasingly significant as time goes on."  *Id.* at 998:10–15 (Kasper).[27]

103.    At trial, nearly every testifying Plaintiff acknowledged their use of LCC options since the Merger.  For example, June Stansbury testified that all but one of the flights she took since the Merger were on Southwest, and that she booked all of these Southwest flights using her "Rapid Rewards" frequent flyer points.  Trial Tr. (Day 3) at 780:13–781:7 (Stansbury); *see also id.* (Day 1) at 198:14–200:14 (Fry) (testifying that he has taken or paid for Southwest flights since the Merger); *id.* (Day 2) at 646:19–647:9, 653:10–16, 664:10–13 (Jolly) (testifying that she has taken Southwest flights since the Merger).  Similarly, Gary Talewsky testified that JetBlue offers a number of nonstop flights out of Boston, which he has taken, *id.* (Day 3) at 731:7–13 (Talewsky), and Donald Fry testified that he has paid for and taken flights on Alaska Airlines and Southwest since the Merger, Fry Witness Stmt. ¶ 4; Trial Tr. (Day 1) at 198:12–24 (Fry).  Numerous other plaintiffs testified that LCCs offered travel options to and from their preferred airports.  *See* M. Malaney Mar. 24, 2014 Dep. Tr. at 16:8–17:6, 18:15–25, 19:20–22, 47:6–13 (admitting that Southwest, Allegiant, Sun Country, Spirit, Frontier, and JetBlue operate out of his airports of choice); Trial Tr. (Day 1) at 93:25–96:20 (Rubinsohn) (testifying that JetBlue, Southwest, Spirit, and Frontier serve Philadelphia International Airport, Mr. Rubinsohn's airport of choice); *id.* (Day

---

[27] Additionally, as discussed in Section E.6 below, the evidence demonstrates that LCCs continue to exert downward pressure on fares, thus refuting Plaintiffs' claim that the "Southwest Effect" no longer exists.

1) at 152:5–9, 156:6–12 (Russell) (testifying that Southwest and Alaska offer service out of Dallas Love Field, and Spirit, Alaska, JetBlue, Frontier, and Sun Country offer flights from Dallas-Fort Worth); *id*. at 232:19–233:13 (McCarthy) (testifying that Southwest, JetBlue, Frontier, Spirit, Sun Country, and West Jet fly out of Fort Meyers, Ms. McCarthy's airport of choice); *id*. (Day 1) at 275:20–278:19 (Garavanian) (testifying that JetBlue, Southwest, Alaska, and Frontier fly out of Boston and Southwest flies of Manchester, both of which Mr. Garavanian utilizes for travel).

104.    The Court further finds no basis in fact for Plaintiffs' contention that the "Southwest Effect" is no longer a strong constraint on network airlines' airfares.  To be sure, it is now more appropriately called the LCC Effect, because it is produced by more LCCs than Southwest Airlines. But both the testimony in the record and the most recent academic studies strongly validate the view that LCCs continue to act as the constraining force on airfares, even when an LCC does not serve a particular city pair.  *See supra* Section A.2; *see infra* Section E.6.b.  The constraining force of LCCs was central to the DOJ Settlement, and the Court finds no basis for doubting that the constraint is real and prevalent.

5.    Post-Merger Capacity Changes

105.    American also presented evidence regarding increases in capacity since the Merger, both at American and throughout the industry.  Plaintiffs did not dispute this evidence.

106.    At American in particular, each of the three metrics that airlines use to measure capacity—total seats, total ASMs, and total passengers flown—increased from 2013 to 2018. Garboden Witness Stmt. ¶ 25–26 & Table 3.  In 2018, there were 11 million more seats than in 2013; 9 million more passengers flown; and 22.5 billion more ASMs.  *Id.* ¶ 26 & Table 3.  In terms of percentages, from 2013 to 2018, American saw a 4.5% increase in total seats, a 4.6% increase in total passengers flown, and an 8.5% increase in total ASMs.  *Id.*

107.   This growth is not limited to American.   The airline industry as a whole has experienced significant capacity expansion since 2013.  Garboden Witness Stmt. ¶ 27 & Table 4. Between 2013 and 2018, Delta's ASMs grew 13.5%, United's ASMs grew 11.7%, JetBlue's ASMs grew 41%, Southwest's ASMs grew 23.5%, Spirit's ASMs grew 162.7%, and Alaska's ASMs grew 43.1%.  *Id.*; *see also* Trial Tr. (Day 4) at 1134:23–1136:8 (Garboden).

108.   These industry-wide capacity increases are reflected in the growth of American's hubs.  Since the Merger, seats flown to and from American's hubs each year, on both American and other carriers, have grown significantly.  There has been a 5% increase in total annual seats on American alone for flights to and from those hubs, and a total increase of 12% across all carriers servicing those hubs.  Garboden Witness Stmt. ¶ 28–29 & Table 5.  American has also increased service out of those hubs by adding new gates and routes.  Garboden Witness Stmt. ¶ 30.[28]

109.   American's expert witness Dr. Carlton also performed analyses of the capacity changes after the Merger.  In particular, Dr. Carlton presented the conclusions of a peer-reviewed retrospective study that he conducted in 2016, which analyzed the three last legacy airline mergers (i.e., Delta/Northwest, United/Continental, and American/US Airways) in order to assess their competitive effects using data available after each merger was consummated.  Carlton Witness Stmt. ¶ 36.  Dr. Carlton and his co-authors analyzed the effect of those mergers on overlap routes with no major competitor or only one major competitor (i.e., routes served only by the merging carriers or the merging carriers and one other carrier) "because that is where one would expect a

---

[28] For example:  American has created a shuttle-type service with 15 flights each day between New York and Chicago; added six new destinations out of Washington Reagan National Airport (DCA), where it also acquired a new gate and where it plans to add a new 14-gate concourse; added 23 new routes from Charlotte Douglas International Airport (CLT), and is adding approximately half a dozen new gates at that airport; added 31 new routes from Miami International Airport (MIA); opened five new gates and added 28 new routes out of Chicago O'Hare International Airport (ORD); added 27 new routes out of Los Angeles International Airport (LAX); and added 21 new routes out of Phoenix's Sky Harbor International Airport (PHX).  Garboden Witness Stmt. ¶ 30.

merger's anticompetitive effects to be concentrated." *Id.* ¶ 37. Dr. Carlton explained that, "[i]f the mergers were generally anticompetitive, the analysis would be expected to show higher quality-adjusted fares and lower output on routes where the two merging carriers overlapped compared to routes where the merging carriers did not overlap." *Id.* On the other hand, "if the mergers were procompetitive, the greatest efficiencies would likely occur on the overlapping *nonstop* routes—since they are typically at the heart of the merged firm's network." *Id.*

110.    To study the effects of these mergers, Dr. Carlton and his co-authors used the "difference-in-differences" estimation technique—a "standard econometric analysis that compares changes in, say, output on routes that could have been affected by a merger to changes in output on routes that likely would not have been affected by a merger"—in order to account for the confounding effects of non-merger-related changes in economic conditions. *Id.* ¶ 38. Specifically, they identified the merger effects by relying on effects experienced only on overlap routes but not on control (non-overlap) routes, with common changes across overlap and control routes attributed to non-merger related changes. *Id.* To analyze the competitive effects of each merger on nonstop overlap routes, Dr. Carlton and his co-authors analyzed routes on which the merging parties were the only two nonstop carriers prior to the merger ("2-to-1 nonstop overlaps") or two of three nonstop carriers prior to the merger ("3-to-2 nonstop overlaps"). *Id.* ¶ 41. They identified separate control routes for the 2-to-1 and 3-to-2 nonstop overlaps in each merger, e.g., nonstop control routes for the Delta/Northwest merger could not be United/Continental or American/US Airways nonstop or connecting overlap routes. *Id.* They followed a similar approach for the analysis of overlap connecting routes. *Id.*

111.    Pooling the information from each of the three prior legacy mergers, Dr. Carlton and his co-authors found that there was no competitive harm on 2-to-1 and 3-to-2 nonstop overlap routes relative to nonstop non-overlap routes. *Id.* ¶ 42. With respect to capacity, they found that, on

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

average, there was a statistically significant *increase* in output on nonstop overlap routes relative to nonstop non-overlap routes, which "is not consistent with anticompetitive merger effects on overlap routes." *Id.* Specifically, the number of passengers flown on routes where both merging parties were providing nonstop service, relative to control routes, increased on average by 12.0%, and available seats increased by 23.6% on overlapping routes relative to non-overlap routes. *Id.* And an analysis of each merger separately similarly demonstrated that the American/US Airways Merger in particular increased passengers by about 20.2% and increased seats by about 19.6%. *Id.* ¶ 43.

112.    Plaintiffs' only counter is a new argument that American did not expand its capacity *as much* as was envisioned in American's standalone plan (approximately 20% over five years). But why would it? The Merger transformed American into a vastly larger and different airline, with a different set of challenges and opportunities than those faced by legacy American. It makes no sense to think that the newly merged American should have had the exact same growth targets in the short term, when it had in fact just grown enormously and needed to focus on integration and how to best utilize its much larger asset base. There is accordingly no basis to infer (as Plaintiffs do) some kind of capacity *reduction* or anticompetitive effect because the new American's capacity increase fell short of 20% over five years.[29] The weight of the evidence shows that both American and the industry in general have substantially increased output and capacity since the Merger. There

---

[29] The problems with this new argument do not stop there. The 20% benchmark presumes that growth projections in the "standalone plan" would have been achieved by legacy American, post-bankruptcy. Plaintiffs put on no proof to that effect. Furthermore, Plaintiffs put on no proof of what portion of the proposed growth would have been in the relevant markets (or in the U.S. generally, since legacy American was projecting a combination of domestic and international growth). To the extent legacy American's growth projections did not implicate the relevant markets, they are irrelevant. Finally, it is mathematically and analytically incorrect to use legacy American's 20% projection as any kind of benchmark for a much larger post-merger network. If it was meaningful to compare projected standalone growth to American's post-merger growth, the baseline would be the sum of (a) projected legacy American domestic growth and (b) the domestic growth US Airways would have achieved under those conditions. There is no basis whatsoever for concluding that this would add up to 20% growth over 5 years by the merged company.

is no basis for inferring adverse competitive effects because output and capacity did not increase more.

### 6.    Post-Merger Price Changes

113.    The parties both presented evidence relating to airfare changes after the Merger.

#### a.    *Dr. Lundgren's Average Fares Calculations*

114.    Plaintiffs' expert, Dr. Lundgren, calculated the growth in passengers and the growth in average fares between 2012 and the four quarters ending in the second quarter of 2018 on the 1,008 city-pair routes identified in the DOJ Action. *See* Lundgren Trial Decl. at 103–06. He found that, in 708 of the 1,008 city pairs, there was an increase in the average fare. *Id.* at 106.

115.    As Dr. Carlton pointed out, there are several problems with Dr. Lundgren's calculations. First, even Dr. Lundgren's own analysis shows that average fares *fell* on 300 routes, including 190 routes on which HHI increased by more than 200 points. Similarly, Dr. Lundgren's analysis shows that average fares increased on 133 routes on which the HHI fell or increased less than 200 points during the same time period. Carlton Witness Stmt. ¶ 63. These discrepancies suggest that Dr. Lundgren's conclusions regarding market concentration do not correspond to his conclusions about fare changes.

116.    Dr. Lundgren also admitted that his average fare calculations do not account for inflation, Trial Tr. (Day 3) at 878:4–11 (Lundgren), and thus it is possible that fares actually fell, in real-dollar terms, on routes where Dr. Lundgren found they increased, in nominal dollars, *id.* at 880:1–10 (Lundgren). Nor did Dr. Lundgren present any analysis showing that fare changes on the 1,008 city pairs identified by the DOJ—i.e., city pairs purportedly affected by the Merger—systematically differed from fare changes on other city pairs. Carlton Witness Stmt. ¶ 64. In other words, Dr. Lundgren's analysis provided no "control group" against which to measure the fare changes he observed.

117.     Dr. Carlton also explained how Dr. Lundgren's analysis—which concluded that the simple average increase in fares between 2012 and the four quarters ending in the second quarter of 2018 across all 1,008 routes was 7.9%—improperly treated each city pair equally, regardless of the amount of traffic on each city pair.  *Id.* ¶ 65.  Dr. Carlton sorted the city pairs by number of passengers, and found that Dr. Lundgren's analysis showed that average fares actually fell on 13 of the 15 largest city pairs.  *Id.*   On the two city pairs in which Dr. Lundgren found an increase in average fares, that increase was only 1.2% and 2.2%.  *Id.*  Moreover, Dr. Carlton found that if the change in fare in each city pair is weighted by traffic, the weighted average fare fell during the same period.  *Id.* ¶ 66.  In other words, the average passenger on the 1,008 routes that Dr. Lundgren analyzed paid less for airfare after the Merger than before the Merger.  *Id.*[30]

b.     *American's Evidence Relating to Post-Merger Fare Trends*

118.     At trial, American introduced evidence demonstrating that fares have actually *decreased* since the Merger.  First, as part of his 2016 retrospective study described above, Dr. Carlton found not only that there was a statistically significant *increase in output* on nonstop overlap routes relative to nonstop non-overlap routes resulting from the legacy airline mergers, but also that there was a statistically significant *price reduction* on those routes.[31]  Carlton Witness Stmt. ¶ 42.  Specifically, when pooling the information from each of the three prior legacy mergers, Dr. Carlton and his co-authors found that, relative to control routes, fares decreased by an average

---

[30] Dr. Carlton performed the same analysis on the 298 city pairs that Plaintiffs identified as relevant to their claims on January 25, 2019, *see* Adv. Dkt. No. 214-5.  If the change in fare in each of those city pairs is weighted by traffic, the weighted average fare changed during the period by -1.0% to 1.6%, depending on the weighting.  Therefore, Dr. Lundgren's analysis implies that the average passenger on the identified city pairs paid about the same after the Merger as they did before the Merger.  Carlton Witness Stmt. ¶ 69.

[31] Dr. Carlton explained that, when performing this analysis of the mergers' effects on prices, he and his co-authors accounted for the fact that, even if nominal fares have risen, quality-adjusted fares may have fallen.  Carlton Witness Stmt. ¶ 39.  They did so by examining "changes in the number of passengers traveling on overlap routes as well as seat capacity on overlap routes, both of which should move inversely to changes in quality-adjusted fares."  *Id.*

of 6.3% on routes where both merging parties were providing nonstop service. *Id.* These results

for fares, in combination with the results for output and capacity described in Section E.5 above,

show that the mergers resulted in decreases in quality-adjusted fares on nonstop overlapping routes,

relative to non-overlap routes. *Id.* As to connecting routes, there also was no evidence of

anticompetitive effects for connecting overlaps relative to non-overlap connecting routes. *Id.*

119.    When analyzed separately, the American/US Airways merger exhibited similar

results with respect to fares: on nonstop routes, the Merger reduced average fares by about 12.3%,

and there was no evidence of anticompetitive effects for connective overlaps relative to non-overlap

connecting routes. *Id.* ¶ 43. Dr. Carlton's 2016 retrospective study thus confirmed the results of

his 2013 prospective study, which predicted that the Merger would be procompetitive. *See id.*; *see*

*supra* Section E.2.b.

120.    At trial, Ms. Garboden also testified regarding post-Merger price changes. She

explained that TRASM, or "total revenue per available seat mile," has declined (in real-dollar

terms) for American and the industry since the Merger. In the airline industry, TRASM measures

the amount of revenue an airline seeks for every seat-mile flown, and it includes not only the base

fare of a ticket, but also any other fees associated with that ticket that a consumer might pay,

including ancillary fees like bag fees or upgrade fees. Garboden Witness Stmt. ¶ 40; Trial Tr. (Day

4) at 1127:25–1128:9 (Garboden). TRASM is generally calculated by dividing total operating

revenue by available seat mile. Garboden Witness Stmt. ¶ 40.

121.    In nominal dollars, American's TRASM in 2018 was 101.6% that of its 2013

TRASM, and the industry TRASM in 2018 was 98.7% of 2013 levels. *Id.* ¶ 41 & Table 8. The

1.6% increase in American's TRASM was outpaced by inflation during the same timeframe, which

was 7.8% between 2013 and 2018. *Id.* This means that in real-dollar terms, overall TRASM for

American and the industry has actually declined since the Merger. *Id.* TRASM has also been in

line with fuel prices—one of the largest components of airline costs—which, like TRASM, declined in 2014 and 2015, and then rose thereafter. *Id.* ¶ 42 & Table 9. Finally, even as industry capacity (as measured by ASMs and seats) increased, industry TRASM decreased between 2013 and 2018. Specifically, ASMs and seats for the U.S. airline industry in 2018 exhibited an increase of 19.9% and 17.2%, respectively, compared to 2013 levels, and TRASM for the industry in 2018 was 1.3% lower than TRASM for the industry in 2013. *Id.* ¶ 43 & Table 10. Once again, Plaintiffs did not dispute this evidence.

122. American also presented evidence—which Plaintiffs did not dispute—regarding its "Advantage Fares" pricing approach, which is the name that US Airways gave to "discounted/lower fares on a connecting route offered to induce customers to choose the connective service rather than the non-stop alternative on a competing airline." Parker Witness Stmt. ¶ 54. While Plaintiffs alleged that the Merger would lead to the loss of Advantage Fares pricing, the evidence demonstrates that this did not come to pass. While American briefly suspended Advantage Fares pricing in the first quarter of 2016, it reversed that decision because Southwest began offering similar service at Advantage Fares levels. *Id.* ¶ 55. Delta and United reinstated their similar discounted connecting fare programs as well, and today, "the Advantage Fares pricing approach of low-cost, connecting service is alive and well, and in fact is much more prevalent industry-wide than it was pre-Merger." *Id.* Under the right market conditions, American even undercuts *itself* by offering lower-priced one-stop fares on routes where it also offers nonstop service, which is not something that US Airways (or any other carrier) did prior to the Merger. *Id.*

123. American's decision to maintain Advantage Fares pricing also demonstrates the effect that Southwest and other LCCs and ULCCs continue to have on fares in the airline industry. The evidence shows that the steady and significant increase of LCCs' share of domestic passengers has corresponded with a decline in in cost of domestic air travel:  LCC's share of domestic

passengers increased from 7% in 1990 to 45% in 2017, and in the same period, the real (i.e., inflation-adjusted) domestic airline price per mile fell by 42%.   Kasper Witness Stmt. ¶ 33. Moreover, real average domestic airfares decreased by 4.5% during the second quarter of 2018 compared to the second quarter of 2017, falling to the lowest level for a second quarter since at least 1995. *Id.* ¶ 34.  All of this evidence demonstrates that the so-called "Southwest Effect"—i.e., that LCCs like Southwest lower fares in the markets they enter—is alive and well.[32]

## IV.    CONCLUSIONS OF LAW

124.    Taken as a whole, the Court's findings of fact are that pre-Merger, the airline industry was vigorously competitive—and that post-Merger, competition continued and even increased.   Plaintiffs failed to address, in any meaningful respect, American's abundant evidence that the Merger was not only *intended* to create a network that would better compete with the other airlines and benefit consumers, but that it actually realized those expectations.   The evidence showed that the Merger led to three robust, nationwide network carriers, that LCCs continued to expand and grow and exert downward pressure on prices, and that consumers post-Merger were faced with an array of competitive options, leading as a general matter to significant increases in output and decreases in price. Analyzing these findings through the appropriate antitrust legal framework, as set forth in greater detail below, the Court holds that Plaintiffs failed to demonstrate that the effect of the Merger was substantially to lessen competition, and that the merger between US Airways and American Airlines does not violate Section 7 of the Clayton Act.

---

[32] Plaintiffs referenced a 2013 study stating that Southwest Effect "may not be as prominent following a merger." PX-090 at 10.  The weight of the evidence demonstrates otherwise.

A.     **The Proper Framework For Analyzing a Merger Under Section 7 of the Clayton Act**

125.    The Court now turns to the legal standards governing a Clayton Act Section 7

claim.  Section 7 of the Clayton Act provides as follows:

> No person engaged in commerce or in any activity affecting
> commerce shall acquire, directly or indirectly, the whole or any part
> of the stock or other share capital and no person subject to the
> jurisdiction of the Federal Trade Commission shall acquire the
> whole or any part of the assets of another person engaged also in
> commerce or in any activity affecting commerce, where in any line
> of commerce or in any activity affecting commerce in any section
> of the country, the effect of such acquisition may be substantially to
> lessen competition, or to tend to create a monopoly.

15 U.S.C. § 18.

126.    In other words, Section 7 "is concerned with whether an acquisition or a merger

itself may cause antitrust injury."  *In re Zinc Antitrust Litig.*, No. 14-cv-3728, 2016 WL 3167192,

*22 (S.D.N.Y June 6, 2016) (quoting *Geneva Pharm. Tech. Corp. v. Barr Labs Inc.*, 386 F.3d 485,

511 (2d. Cir. 2004)).    Modern case law provides for a burden-shifting process in which plaintiffs

typically establish a prima facie case with, for example, market concentration statistics, and

defendants attempt to rebut it by offering conflicting evidence of the merger's probable effects on

competition.   *See* Adv. Dkt. No. 177 (Summ. J. Bench Ruling) at 18:7–12; *Baker Hughes*, 908

F.2d at 982–83; *Saint Alphonsus Medical Center-Nampa, Inc. v. St. Luke's Health Sys., Ltd.*, 778

F.3d 775, 783 (9th Cir. 2015) ("Section 7 claims are typically assessed under a burden-shifting

framework." (quoting *Chicago Bridge and Iron Co. v. F.T.C.*, 534 F.3d 410, 423 (5th Cir. 2008));

*RC Bigelow, Inc. v. Unilever NV*, 867 F.2d 102, 107–08 (2d Cir. 1989) (explaining the presumption

created by market share statistics and a defendant's burden of rebutting this presumption).  Upon

rebuttal by the defendant, "the burden of producing additional evidence of anticompetitive effect

shifts to the [plaintiff], and merges with the ultimate burden of persuasion, which remains with the

[plaintiff] at all times." *Anthem, Inc.*, 855 F.3d at 350 (quoting *Baker Hughes, Inc.*, 908 F.2d at 983).

127.   Plaintiffs have steadfastly maintained throughout this case that the *Baker Hughes* approach is inconsistent with a series of Supreme Court merger cases decided in the 1960s that have never been directly overruled.  As Plaintiffs read these cases, a merger that results in any significant increase in concentration or eliminates a substantial competitor is unlawful without more, save for the rare case of a "failing firm."  Plaintiffs went so far as to cross-examine American's economic experts on this legal precedent, ultimately eliciting their views that economic theory would not condemn the mergers prohibited by these cases.  *See, e.g.*, Trial Tr. (Day 5) at 1274:13–1280:25 (Plaintiffs' counsel questioning Dr. Carlton about "cases by the Supreme Court" and Dr. Carlton explaining that the "economic reasoning underlying" those cases "has been shown to be incorrect").

128.   The Court has previously addressed Plaintiffs' arguments about the 1960s cases.[33] It will not revisit the issue except to say that there is no doubt the law has moved on from the rigid hostility to mergers evident in these cases, which caused Justice Potter Stewart to famously observe that "[t]he sole consistency that I can find is that in litigation under § 7, the Government always wins."  *United States v. Von's Grocery Co.*, 384 U.S. 270, 301 (1966) (Stewart, J., dissenting).  Perusing the current Merger Guidelines or any antitrust treatise and underlying cases demonstrates that contemporary merger analysis is far more complex and sophisticated than Plaintiffs would have it.  *See, e.g.*, 2010 Horizontal Merger Guidelines § 10; ABA Section of Antitrust Law, ANTITRUST LAW DEVELOPMENTS, Ch. 3 (8th ed. 2017).  The trend toward a deeper, less structural analysis

---

[33] *See, e.g.*, Adv. Dkt. No. 72 (Mem. of Decision on TRO Application) at 18 n.12 ("[A] quick review of the relevant antitrust case law suggests that antitrust law has evolved since the 1960s to encompass a more flexible, industry-specific analysis."); Adv. Dkt. No. 177 (Summ. J. Bench Ruling) at 18:7–12 ("Modern case law provides for a burden-shifting process in which plaintiffs typically establish a prima facie case with, for example, market concentration statistics, and defendants attempt to rebut it by offering conflicting evidence of the merger's probable effects on competition.").

began with the Supreme Court's 1974 decision in *United States v. General Dynamics Corp.*, 415 U.S. 486 (1974), and continued with the publication of the influential 1984 Department of Justice Merger Guidelines.    *See* U.S. Dep't of Justice, Merger Guidelines (1984), *available at* http://www.justice.gov/atr/hmerger/11249.pdf.    Since then, decisions by the courts of appeals (including the Second Circuit) and district courts and refinements to the Merger Guidelines have developed and applied the more refined analysis the Court applies to this case.    *See, e.g.*, *United States v. Waste Mgmt., Inc.*, 743 F.2d 976 (2d Cir. 1984); *Hosp. Corp. of Am. v. F.T.C.*, 807 F.2d 1381, 1386 (7th Cir. 1986);[34] *Chicago Bridge*, 534 F.3d at 410; *Baker Hughes*, 908 F.2d at 981.[35]

## B.      The Relevance of Post-Merger Evidence

129.    An important preliminary issue in this case is the relevance of "post-merger evidence," meaning evidence about the performance of the relevant markets since the Merger.    A peculiarity of this case is the lengthy period of time between consummation of the Merger (in December 2013) and trial (in March 2019).    Most merger trials occur before the merger is consummated, and therefore there is no post-merger evidence; the analysis is entirely prospective. There are occasional exceptions, but even then trial usually occurs shortly after the merger closed. *See, e.g.*, *United States v. Bazaarvoice, Inc.*, No. 13-cv-00133, 2014 WL 203966 (N.D. Cal. Jan. 8, 2014) (trial occurred approximately one year after merger closed).

130.    There is no doubt that, as a logical matter, post-merger evidence can be highly probative.    *See Gen. Dynamics*, 415 U.S. at 504–06 (where post-merger evidence goes "directly to

---

[34] Plaintiffs note that in *Hospital Corp. of Am. v. F.T.C.*, Judge Posner observed that the 1960s cases have not been overruled and that *General Dynamics* was (arguably) a failing firm case.    807 F.2d at 1386.    Judge Posner's point, however, was that "[t]he most important developments that cast doubt on the continued vitality of such cases as *Brown Shoe* and *Von's* are found *in other cases*, where the Supreme Court, echoed by the lower courts, has said repeatedly that the economic concept of competition, rather than any desire to preserve rivals as such, is the lodestar that shall guide the contemporary application of the antitrust laws."    *Id.* (emphasis added).

[35] In light of Plaintiffs' arguments about the Supreme Court, it is notable that *Baker Hughes* was authored by current Supreme Court Justice Clarence Thomas and joined by current Supreme Court Justice Ruth Bader Ginsburg.

the question of whether future lessening of competition was probable" a district court may be "fully justified in using it"). On the one hand, "[e]vidence of observed post-merger price increases or other changes adverse to customers" may be a substantial reason to find a merger unlawful. 2010 Merger Guidelines § 2.1.1. On the other hand, evidence of post-merger entry or vigorous competition could be a powerful reason to find that a merger is not anticompetitive. *See, e.g.*, *United States v. Syufy Enters.*, 903 F.2d 659, 666–67 (9th Cir. 1990).

131.    The problem courts have encountered is that some post-merger evidence is subject to manipulation by the merged firm, which may find it advisable to "behave competitively" until trial. *See General Dynamics*, 415 U.S. at 504–05 ("violators could stave off [Section 7] actions merely by refraining from aggressive or anticompetitive behavior when such a suit was threatened or pending"); *Bazaarvoice*, 2014 WL 203966, at *4 (discounting post-merger evidence where "Bazaarvoice's employees and officers undoubtedly considered how its post-merger conduct would appear to the government and the Court"). Antitrust courts have therefore developed the pragmatic rule that the probative value of post-merger evidence of market performance is "deemed limited when the evidence could arguably be subject to manipulation," *but* "post-merger evidence that is not subject to manipulation" has probative value, and even "may be dispositive." *Chicago Bridge*, 534 F.3d at 435; *Bazaarvoice*, 2014 WL 203966, at *73; *see also Lektro–Vend Corp. v. Vendo Co.*, 660 F.2d 255, 276 (7th Cir. 1981) (holding that "post-acquisition evidence favorable to a defendant can be an important indicator of the probability of anticompetitive effects," especially if such evidence "could not reflect a positive decision on the part of the merged companies to deliberately but temporarily refrain from anticompetitive actions"); *United States v. Int'l Harvester Co.*, 564 F.2d 769, 777–79 (7th Cir. 1977) (holding that where post-merger evidence is "beyond the powers of the parties to manipulate" it is properly considered by a judge).

132.    In this case, the Court will consider the post-Merger evidence related to pricing, capacity, output, and consumer choice presented by the parties.

133.    In the first place, both parties offer such evidence.  In fact, all of the evidence that Plaintiffs offer that might be deemed material to the third step in the *Baker Hughes* analysis can be characterized as post-Merger evidence, namely (a) Dr. Lundgren's average fares analysis and (b) lay testimony by certain named Plaintiffs about post-Merger competitive conditions.  Were the Court to exclude or discount post-Merger evidence categorically, Plaintiffs would lose by default.

134.    Second, little if any of the post-Merger evidence offered by the parties is easily subject to manipulation by American.  The majority of the evidence concerns the actions of third parties (e.g., growth and entry by LCCs, capacity expansion by other airlines generally) or industry metrics on pricing, capacity and output over the course of a five-year period.  There was no evidence presented, and the Court is aware of none, indicating that the scope of such data, over such time period, is within American's ability (let alone incentive) to manipulate.  One particularly important piece of post-Merger evidence, Dr. Carlton's retrospective study on the price and output effects of the United/Continental, Delta/Northwest and American/US Airways mergers, was also published after peer review.  Particularly in light of Plaintiffs' own numerous efforts to portray American's post-Merger conduct and performance as proof of the Merger's anticompetitive potential, the Court is of the view that the post-Merger evidence in this case should be received and given appropriate weight.

135.    The Court does not, however, consider Plaintiffs' charges concerning post-Merger collusion that are the subject of other litigation, such as the alleged collusion with other airlines over capacity reduction, *see In re Domestic Airline Travel Litigation*, MDL No. 2656 (D.D.C. filed July 6, 2015), or the alleged collusion with other airlines over "combinable" airfares, *see Prosterman et al. v. Airline Tariff Publishing Co., et al.*, 16-cv-02017 (N.D. Cal. filed Apr. 18,

2016).  In assessing a merger, a court looks to *structural* changes in the market that make it "easier

. . . [for firms] to coordinate their pricing *without* committing detectable violations of section 1 of

the Sherman Act, which forbids price fixing."  *Hosp. Corp.*, 807 F.2d at 1386 (emphasis added).

Actual collusion, i.e., where firms have entered into *agreements* to eliminate or restrict competition,

can arise in any industry with or without a merger.  Therefore, as this Court explained at trial,

evidence of post-Merger collusion invokes a "different type of antitrust case."  Trial Tr. (Day 1) at

17:10-11; 16:4–16.[36]

### C.    The Relevance of Efficiencies Evidence

136.    The parties also dispute the relevance of efficiencies evidence.  Plaintiffs go so far

as to file an *in limine* motion to exclude evidence of efficiencies and/or to exclude evidence of

efficiencies unrelated to any city-pair relevant market.  Adv. Dkt. Nos. 227, 227-1.  In Plaintiffs'

view, (1) the inference of likely anticompetitive effects arising from increased concentration can

never be rebutted by efficiencies alone, and (2) even if efficiencies in general can be considered,

efficiencies captured "outside" the relevant market cannot.

137.    Plaintiffs misperceive American's efficiency arguments.  American is not making

the classic efficiencies defense, which attempts to prove on a product-by-product basis that lower

costs of production will more than offset any merger-related ability to raise prices.  *See* 2010

Horizontal Merger Guidelines § 10 (asking "whether cognizable efficiencies likely would be

---

[36] In 2015, Plaintiffs' filed a motion to amend their complaint to add Section 1 and Section 3 claims of the Sherman Act. *See* Adv. Dkt. No. 118-1, Ex. A.  At a status conference, the Court expressed "a great deal of skepticism about the appropriateness of the amendment that has been proposed to me to the extent it seeks to add [Sherman Act claims], which is a completely different and distinct lawsuit to what I have in front of me."  Adv. Dkt. No. 126 (Apr. 4, 2016 Hr'g Tr.) at 11:23–12:3.  Ultimately, Plaintiffs' decided not to proceed with their motion. *See* Dkt. No. 206 at 4. Additionally, the Multidistrict Litigation Panel denied Plaintiffs' motion to transfer the claims contained in their operative complaint to an action alleging collusion and price fixing under the Sherman Act.  The court held that the *Fjord* complaint "does not assert a claim . . . relating to [allegations at issue in *In re Domestic Airline Travel*]. Rather, Plaintiffs challenge the Merger of American Airlines and US Airways . . . a very different dispute from that being litigated in MDL No. 2656."  Order Denying Transfer, 15-mc-1404 (D.D.C. Feb. 4, 2016), Dkt. 301 at 1.

sufficient to reverse the merger's potential to harm customers in the relevant market, e.g., by preventing price increases in that market"). American is instead arguing: *first*, that there was a strong efficiency rationale for the Merger, namely to create a more competitive national airline network; *second*, the improved network is more valuable *to all consumers*, including those flying the relevant city pairs; and *third*, there are accepted ways to estimate the economic value of the improved network which show that overall consumer benefits from the Merger dwarf arguable losses. *See* Carlton Witness Stmt. ¶¶ 24–35; *see also* Parker Witness Stmt. ¶ 21; Garboden Witness Stmt. ¶¶ 20–36.

138.    The Court sees no basis for disregarding American's evidence of efficiencies. There is abundant precedent for "consider[ing] efficiencies as a means to rebut the [plaintiff's] prima facie case that a merger will lead to restricted output or increased prices." *F.T.C. v. H.J. Heinz Co.*, 246 F.3d 708, 720 (D.C. Cir. 2001) (quoting ABA Antitrust Section, Mergers and Acquisitions: Understanding the Antitrust Issues 152 (2000)); *see also United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 191 (D.D.C. 2018), *aff'd*, No. 18-5214, 2019 WL 921544 (D.C. Cir. Feb. 26, 2019) ("If the [plaintiff] satisfies its prima facie burden, the burden then shifts to defendants to provide sufficient evidence that the prima facie case inaccurately predicts the relevant transaction's probable effect on future competition.  One way defendants may do so is to offer evidence that post-merger efficiencies will outweigh the merger's anticompetitive effects." (citations and quotation marks omitted)); *F.T.C. v. Univ. Health, Inc.*, 938 F.2d 1206, 1222 (11th Cir. 1991) ("[A] defendant may rebut the government's prima facie case with evidence showing that the intended merger would create significant efficiencies.").

139.    Proven efficiencies then become part of the all-inclusive third step in the *Baker Hughes* analysis, where the plaintiff has the burden of establishing (with more than a rehash of its structural arguments) that the merger is likely to substantially lessen competition. *Baker Hughes*,

908 F.2d at 982–83; *F.T.C. v. Sysco Corp.*, 113 F. Supp. 3d 1, 82 (D.D.C. 2015) ("evidence of efficiencies" is "relevant to the competitive effects analysis . . . required to determine whether the proposed transaction will substantially lessen competition"); *F.T.C. v. Tenet Health Care Corp.*, 186 F.3d 1045, 1054 (8th Cir. 1999) ("[T]he district court should nonetheless have considered evidence of enhanced efficiency in the context of the competitive effects of the merger.").

140.    This Court may also consider evidence of efficiencies realized "outside" the city pairs that Plaintiffs challenge.  While ordinarily claimed efficiencies are in the relevant market, that is because the usual analysis asks whether the *downward* pressure on prices from efficiencies exceeds the *upward* pressure from the merger, *see AT&T Inc.*, 310 F. Supp. 3d at 191 & n.17, and usually forces "outside the market" do not enter that equation.  But there is a well-recognized exception for mergers that affect multiple, "inextricably linked" markets.  *See, e.g.*, 2010 Horizontal Merger Guidelines § 10, n.14.  In its Horizontal Merger Guidelines, the DOJ explains that while it "normally" assesses competitive effects only in the relevant market, it "will consider efficiencies not strictly in the relevant market, but so inextricably linked with it that a partial divestiture or other remedy could not feasibly eliminate the anticompetitive effect in the relevant market without sacrificing the efficiencies in the other market(s)."  *Id.*  In those cases, the DOJ will evaluate both the anticompetitive effects in the relevant market *and* whether "*the merger is likely to benefit customers overall*."  *Id.* (emphasis added).

141.    A merger of network airlines is the paradigm case for applying this rule because of its unusual potential to generate system-wide efficiencies in the form of cost savings, increases in travel options, and improvements in service quality that benefit the traveling public as a whole, including that portion that fly in relevant city-pair markets.  As this case shows, the combination of two complementary networks can proliferate hundreds of new travel products (travel between new city pairs) and thousands of new and improved routing options, a classic example of efficiencies.

2010 Horizontal Merger Guidelines § 10 ("Efficiencies also may lead to new or improved products
. . . ."). These enhanced choices are immediately beneficial to consumers because they have
immediate access to the greater inventory of airline travel service options. This is consistent with
the most basic principle of network economics—that the value of one's connection to a network
increases with the size of the network. *See, e.g.*, N. Economides, *The Economics of Networks*, 14
Int'l J. of Industrial Org. 673–699 (October 1996).

142.    There is also no question that city-pair markets within an airline network are
"inextricably linked" to one another. From both a supply and demand-side perspective, airlines are
managed as a network—not as distinct markets. The great majority of city-pair "products" are
produced with aircraft and other assets that are producing multiple city-pair products at the same
time. There is a virtuous cycle whereby larger networks aggregate more passengers traveling on
more routes, which allows the airline to expand service and increase frequency, which on the
demand side makes the network more attractive to consumers and on the supply side decreases
average unit costs. *See* Kasper Witness Stmt. ¶¶ 79–80. Even with respect to pricing, city pairs are
significantly linked together. As American's expert Dr. Ordover explains, airlines price airline
service using sophisticated yield management systems that consider not only the demand in each
city-pair market, but how any change to a single nonstop segment will impact the profitability of
the complementary segments to which it connects, and any substitute segments that could be used
to complete the connecting itinerary. Ordover Witness Stmt. ¶ 90. As Dr. Ordover finds, "[e]ach
change in a carrier's route map therefore affects the level of demand it faces across its entire
network." *Id.*

143.    In this rather unique setting, it would be myopic and misleading to allow a plaintiff
to make concentration-based inferences of adverse effects on consumers from city-pair data while
ignoring the benefits to consumers from more efficient and output-enhancing airline networks

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

affecting those and other city-pairs.  Both factors need to be part of the Court's analysis.  The Court

therefore holds that system-wide efficiencies evidence is relevant to the Section 7 analysis here.[37]

### D.    Market Definition

144.    In any merger analysis, "[d]etermination of the relevant product and geographic

markets is a 'necessary predicate' to deciding whether a merger contravenes the Clayton Act."

*United States v. Marine Bancorporation*, 418 U.S. 602, 618 (1974) (citation omitted); *see also State*

*of N.Y. v. Kraft Gen. Foods, Inc.*, 926 F. Supp. 321, 359 (S.D.N.Y. 1995); *United States v. H&R*

*Block*, 833 F. Supp. 2d 36, 50 (D.D.C. 2011).  "The relevant market definition shapes where the

Court must look to determine any actual anticompetitive effects."  *In re AMR Corp.*, 527 B.R. at

883; *see also Re-Alco Indus., Inc. v. Nat'l Ctr. For Health Educ., Inc.*, 812 F. Supp. 387, 392

(S.D.N.Y. 1993) ("Absent an adequate market definition, it is impossible for a court to assess the

anticompetitive effect of challenged practices.").

145.    In defining a cognizable relevant market, the Second Circuit employs the

"Hypothetical Monopolist Test," which is an analysis grounded in the DOJ and FTC Merger

Guidelines.  *See United States v. Am. Express Co.*, 838 F.3d 179, 198 (2d Cir. 2016), *aff'd sub nom.*

*Ohio v. Am. Express Co.*, 138 S.Ct. 2274 (2018); *Todd v. Exxon Corp.*, 275 F.3d 191, 202 (2d Cir.

2001); *AD/SAT*, 181 F.3d at 228.  This is a demand-driven test, under which the critical question is

whether a proposed relevant market "contain[s] enough substitute products so that it could be

subject to post-merger exercise of market power significantly exceeding that existing absent the

merger."  2010 Horizontal Merger Guidelines § 4.1.1.  In other words, are there substitute products

or services to which a consumer can turn, post-Merger, as an economic alternative to the product

or service offered by the merged company?  If so, those products or services (and the companies

---

[37] Accordingly, the Court denies Plaintiffs' motion *in limine* to exclude evidence of efficiencies and/or to exclude
evidence of efficiencies unrelated to any city-pair relevant market (Adv. Dkt. No. 227).

that provide them) are part of the relevant market. Formalistically, the proper delineation of the market "is any grouping of sales whose sellers, if unified by a hypothetical cartel or merger, could profitably raise prices significantly above the competitive level. If the sale of other producers substantially constrain the price-increasing ability of the hypothetical cartel, these others are part of the market." *Am. Express Co.*, 838 F.3d at 198–99 (quoting *AD/SAT*, 181 F.3d at 228).

146.    The Court implements the Hypothetical Monopolist Test "by imagining that a hypothetical monopolist has imposed a small but significant non-transitory increase in price ('SSNIP') within the proposed market. If the hypothetical monopolist can impose this SSNIP without losing so many other sales to other products as to render the SSNIP unprofitable, then the proposed market is the relevant market." *Id.* at 199. On the other hand, if increasing the price of a group of products just causes consumers to buy something else as a substitute, the market is too narrow. *Id.* This is an application of the foundational principles of reasonable interchangeability and cross-elasticity of demand. *See City of New York v. Group Health, Inc.*, 649 F.3d 151, 155 (2d Cir. 2011) (a relevant market must include "all products reasonably interchangeable by consumers for the same purposes").

147.    Cross-elasticity of supply is also relevant to market definition. *See AD/SAT*, 181 F.3d at 227; *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1436 (9th Cir. 1995) ("A reasonable market definition must also be based on 'supply elasticity.'" (citation omitted)). This is the "extent to which producers of one product would be willing to shift their resources to producing another product in response to an increase in the price of the other product." *AD/SAT*, 181 F.3d at 227. "Where there is a cross-elasticity of supply, a would-be monopolist's attempt to charge supracompetitive prices will be thwarted by the existence of firms willing to shift resources to producing the product, thereby increasing supply and driving prices back to competitive levels." *Id.* The Merger Guidelines and some authorities choose to defer supply-side considerations until

later in the analytical process, as a matter of analytical convenience.[38]   It is nevertheless clear that "the substantial market power that concerns antitrust law" requires "some protection against rivals' entry or expansion."  P. Areeda and H. Hovenkamp, An Analysis of Antitrust Principles and Their Application ¶ 501 (4th ed. 2018).

1.    Airline Service Between City Pairs Are the Relevant Markets in this Case

148.    Since the inception of this case, Plaintiffs have advanced two competing product and geographic market definitions.  The first is a "national" market for the transportation of airline passengers in the United States.  *See, e.g.*, Adv. Dkt. No. 103 (First Am. Compl.) ¶ 31; Adv. Dkt. No. 149-1 (Plts.' Cross-Mot. for Summ. J.) at 34–38.  As this Court has held repeatedly, the "national" market theory is not a legally cognizable relevant market and has been similarly rejected by numerous other courts.  *See* Adv. Dkt. No. 177 (Summ. J. Bench Ruling) at 26–37; *In re AMR Corp.*, 527 B.R. at 885–86.  The Court does not repeat its prior reasoning here.

149.    The second market definition advanced by Plaintiffs is one of city pairs.  As this Court recognized previously, the case law recognizes that city pairs are an appropriate way to define the relevant market for purposes of an antitrust analysis of the airline industry.  Adv. Dkt. No. 177 (Summ. J. Bench Ruling) at 26; *In re AMR Corp.*, 527 B.R. at 886 (citing *Global Discount Travel Servs., LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701, 705 (S.D.N.Y. 1997); *In re Northwest Airlines Corp.*, 208 F.R.D. 174, 220 (E.D. Mich. 2002)).  Under the city pair framework, one can view the relevant product market as airline service (as opposed to other transportation options), *see Global Discount Travel*, 960 F. Supp. at 705, and the relevant geographic markets as the specific

---

[38] The Merger Guidelines count as current "market participants" firms "that would very likely provide rapid supply responses with direct competitive impact in the event of a SSNIP."  2010 Horizontal Merger Guidelines § 5.1.  They also recognize an entry defense, *id.* § 9, and "consider whether repositioning [a type of supply response] would be sufficient to deter or counteract what otherwise would be significant anticompetitive unilateral effects from a differentiated products merger."  *Id.* § 6.1

city pairs for which the merging parties sell tickets, *see* Adv. Dkt. No. 177 (Summ. J. Bench Ruling) at 26. Alternatively, since these are markets for a transportation service, one could view the geography traveled as a characteristic of the product. In all events, with city-pairs as the relevant market, "'[f]light times, dates, mileage, and other factors [can be understood as] features that enhance the enjoyment of the product.'" *In re AMR Corp.*, 527 B.R. at 887 (quoting *Global Discount*, 960 F. Supp. at 705) (alterations in original)).

2. <u>The City Pair Markets at Issue</u>

150. Plaintiffs' complaint identified the 1,008 city pairs identified in the DOJ Action, but in the lead up to trial, they identified a more limited list of city pairs that they claim relevant to their Section 7 claim.[39] *See* Adv. Dkt. No. 214-5 (Plaintiffs' City-Pair List, which the Court incorporates by reference). Plaintiffs' list identified 301 city pairs, but it actually contains 298 unique city pairs, as three are duplicates. *See id.* Thus, at the beginning of trial, only the 298 city pairs identified by Plaintiffs remained at issue.

151. At trial, Plaintiffs further limited their list of city pair markets from the 298 unique city pairs they identified as at issue pretrial to 228 unique city pairs. *See* PX-149. The list of 228 city pairs ostensibly results from correlating the 298 city pairs to witness statements and testimony by Plaintiffs as to city pairs on which the named Plaintiffs purportedly have either flown in the past or intend to fly in the future. *See id.*

---

[39] Because this case is brought on behalf of individual private plaintiffs, Plaintiffs were obligated to limit the universe of relevant city-pair markets to a subset of the 1,008 originally identified by the DOJ that Plaintiffs contend that they have actually traveled on in the past, or are likely to travel in the future. *See* Adv. Dkt. No. 177 (Summ. J. Bench Ruling) at 42:11–13 ("Plaintiffs must demonstrate that they have remained actual customers in the alleged relevant markets and made plans to patronize those markets again.") (citing *In re New Jersey Title Ins. Litig.*, 683 F.3d 451, 461 (3d Cir. 2012)).

3.    Plaintiffs Failed to Prove that Their Identified City Pairs Are Cognizable Relevant Antitrust Markets

152.    There is some uncertainty in the record as to whether all of the 228 identified city pairs are in fact cognizable relevant markets. Even apart from the general points that very few city-pair markets are protected by entry barriers[40] and that very rapid supply responses seem likely in the event of supracompetitive pricing, Plaintiffs did not actually try to validate their proposed markets, as is their burden at trial. *See* Adv. Dkt. No. 177 (Summ. J. Bench Ruling) at 46:12-14 ("Plaintiffs . . . retain the burden for a trial of identifying which specific City Pairs are relevant for their claim."); *Telerate Sys., Inc. v. Caro*, 689 F. Supp. 221, 236 n.14 (S.D.N.Y. 1988). That is, they never put on evidence as to whether the city pairs identified by Plaintiffs actually capture all reasonable substitutes—for example, whether flights to a neighboring city (but not encompassed within a proposed city-pair market) might be a reasonable substitute. While certain individual Plaintiffs testified about which airports they themselves considered possible alternatives for their personal travel, that is far short of the kind of analysis normally required to satisfy Plaintiffs' burden of establishing that the city-pair markets identified accurately capture all reasonably interchangeable substitutes considered by consumers.[41] *See Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 919 (6th Cir. 2009) (lay testimony generally "does not provide a sound economic basis for assessing the market . . . the way that a proper interchangeability test would"). Further, Plaintiffs' expert, Dr. Lundgren, did not conduct any

---

[40] Indeed, Plaintiffs conceded at trial that, except for three slot-constrained airports, there are low (if any) barriers to entry at all airports across the country. *See* Trial Tr. (Day 1) at 26:8–18 (Opening) (arguing that the evidence would show that "the barriers to entry, among and between [city pairs] are easy," which "means that at any time these folks could go to or buy or go into other airports," and that "[t]he only issue would be whether there would be a slot," and "all other[ airports] basically are open if there are any high prices").

[41] In its summary judgment ruling, this Court declined to decide whether Plaintiffs' failure to provide expert testimony on the relevant market issue entitled American to summary judgment. *See* Adv. Dkt. No. 177 at 24–26. At trial, Plaintiffs provided no evidence on reasonable interchangeability or cross-elasticity of demand in any respect, either through expert or lay testimony.

analysis or provide any testimony regarding these issues.  Rather, Plaintiffs merely rested on the

articulation of the city-pair markets utilized by the DOJ in its original complaint, which of course

the DOJ itself would have had to prove if its action had proceeded to trial.

153.    That said, American did not try to systematically disprove that specific city pairs

qualify as relevant markets.[42]  Instead, American offered evidence—all of which was undisputed—

of a more general nature about the lack of any meaningful barriers to entry to city-pair markets and

the history of expansion by LCCs and network airlines into city-pair markets writ large.  *See supra*

Section III.A.3.  Mr. Parker testified that the airline business is particularly "competitive" because

carriers "can fly where they want to fly and aircraft move.  It if doesn't work, [a carrier] can try

flying [passengers] somewhere else."  Trial Tr. (Day 2) at 411:12–16 (Parker).  American's expert,

Dr. Carlton, offered unrebutted testimony regarding how the ease of entry into "overlap" markets—

those in which American and US Airways overlapped prior to the Merger—reduced the risk that

the Merger would cause any anticompetitive effects in those markets.  Carlton Witness Stmt. ¶ 18

("[T]he possibility of entry and expansion by carriers currently absent from overlap routes mitigates

the risk of post-Merger price increases on many such routes.").  And the evidence established that

there has in fact been significant entry and expansion into various city-pair markets nationwide:

- LCCs have successfully entered every legacy carrier hub, and offered service on
  76% of the legacy carrier hub-to-hub routes as of 2016.  Kasper Witness Stmt. ¶ 61.

---

[42] During cross-examination of certain of the named Plaintiffs, American did elicit testimony indicating that there were in fact a number of apparently reasonable substitutes for one or both of the origin and destination cities for various plaintiffs flying a particular city-pair route.  For example, Bill Rubinsohn testified that he flies out of West Palm Beach, Ft. Lauderdale, and Miami (Trial Tr. (Day 1) at 109:9–108:19, 118:2–8); Sondra Russell testified that she flies out of Dallas-Ft. Worth, Dallas Love Field, and Waco (*id.* at 151:2–8); and Donald Fry testified that he can fly from Tucson or Phoenix (Trial Tr. (Day 1) at 207:12–19).  While this draws into question the weight to be given lay-opinion testimony in general as to whether any of the city-pair markets are in fact true markets from an antitrust perspective, neither party supplied systematic detailed economic analysis or testimony regarding this issue.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- From the second quarter of 2008 through the first quarter of 2013, nearly 60% of high-traffic connecting routes in the U.S. experienced at least one entry from a competing carrier.  Carlton Witness Stmt. ¶ 19.

- There has been significant LCC and ULCC expansion in every one of American's nine hub cities.  *See* Kasper Witness Stmt. ¶¶ 50–52; Garboden Witness Stmt. ¶ 28 & Table 5.

- Due to the low entry barriers and LCC expansion, LCCs now capture 45% of the market for domestic air travel.  *See* Kasper Witness Stmt. ¶ 33.

154.    The Court's conclusions from this evidence are the following.  First, city-pair markets are relevant markets from the demand-side perspective used in the Merger Guidelines' Hypothetical Monopolist Test and authorities adopting that approach to market definition.  Second, concentration statistics correlating to city-pair markets are sufficient to meet Plaintiffs' burdens under the first step in the *Baker Hughes* burden-shifting paradigm.  *See Baker Hughes*, 908 F.2d at 982; *United States v. Citizens & Southern Nat'l Bank*, 422 U.S. 86, 120 (1975).  However, third, in the airline industry there is no *a priori* reason to think that any given city-pair market will be sufficiently protected by barriers to entry or expansion to permit the exercise of market power for a significant period of time.  The absence of entry barriers,[43] and the unusually high level of supply substitutability render city pair-based concentration statistics a much weaker starting point for a merger analysis than they ordinarily are.

---

[43] The few exceptions are city pairs impacted by slot- or gate-constrained airports. Importantly, the terms of the DOJ settlement focused on and mitigated those barriers.  Through the divestiture by American of the 104 slots at DCA, 34 slots at LGA, and rights and interests in two gates and associate ground facilities at Chicago O'Hare, Los Angeles International, Boston Logan, Miami International, and Dallas Love Field airports, the DOJ settlement addressed the handful of airports nationwide that exhibited operational barriers to entry.  DX-050 at 2–3, 6–7.  These fixes were effective; the divestitures successfully aided the "expansion by the LCCs on the route networks of the legac[y] [airlines]." Ordover Witness Stmt. ¶ 100.  This expansion facilitated LCCs' access to other airport facilities and expanded LCCs "roles as mavericks over a larger set of routes." *Id.* ¶ 101.  The DOJ settlement ensured that there were no barriers to entry in any city-pair routes, even at slot- or gate-constrained airports.

155.    This is important because, at trial, and consistent with their approach since the inception of this case, Plaintiffs' proof was built largely, if not exclusively, around market share and HHI calculations for the city-pair markets that Plaintiffs claim are at issue. This evidence is never as conclusive as Plaintiffs maintain. *Gen. Dynamics*, 415 U.S. at 498 (concentration evidence, standing alone, is "not conclusive . . . of anticompetitive effects"); *Baker Hughes*, 908 F.2d at 984 ("evidence of market concentration simply provides a convenient starting point for a broader inquiry into future competitiveness"); *see also* Carlton Witness Stmt. ¶ 9; Trial Tr. (Day 4) at 1193:8-20 (Ordover) ("Concentration is just a mechanical tool."). But in this case, on this record, it could not possibly carry the day.

**E.    Plaintiffs' Market Concentration Evidence Does Not Accurately Predict or Reflect the Merger's Effects on Competition**

156.    The Court now turns to the second step in the *Baker Hughes* analysis, whether American's rebuttal evidence undermines the probative value of concentration statistics. *See Baker Hughes*, 908 F.2d at 982–83. For the reasons stated below, the Court finds that the evidence at trial demonstrated that Plaintiffs' market concentration data inaccurately reflects the Merger's effect on competition.

**1.    <u>HHIs Have Limited Predictive Value</u>**

157.    As described above, Plaintiffs' expert, Dr. Lundgren, using DOT data for the calendar years 2012 and 2018, calculated a post-Merger HHI of greater than 2,500 and a change in HHI exceeding 200 in 765 of the 1,008 city pairs identified in the DOJ's original list. *See* Lundgren Trial Decl. at 103–06. Of the 228 city pairs that Plaintiffs identified as relevant to their claims,

according to Dr. Lundgren's calculations, 205 have a post-Merger HHI of greater than 2,500 and a change in HHI exceeding 200.[44]  *See* PX-149.

158.    The Court will not find that in the circumstances of this case, these city-pair concentration statistics can sustain a reasonable inference of adverse competitive effects.  At best, HHI calculations are "one useful indicator of likely competitive effects of a merger"; they "may not fully reflect the competitive significance of firms in the market."  2010 Horizontal Merger Guidelines § 5.3.  And as American's expert, Dr. Carlton, explained, "an increase in HHI, by itself, is not evidence of harm to competition" and can be "perfectly consistent with an increase in competition."  Carlton Witness Stmt. ¶¶ 9, 50.  The evidence at trial confirmed that, in this case, even putting aside the errors that plague Dr. Lundgren's analysis, city-pair concentration data does not accurately measure how the Merger has affected competition or will continue to do so in the future.

159.    As an initial matter, the Court notes that there are serious questions as to whether Dr. Lundgren's HHI calculations even reliably portray the market concentration levels in various city-pair markets at the time of the Merger or the changes in market concentration resulting from the Merger.  Notably, Dr. Lundgren measured pre-Merger market concentration with data from the four quarters of 2012 rather than from the four quarters before the Merger actually closed in December 2013.  *See* Trial Tr. (Day 3) at 867:6–12 (Lundgren).  Plaintiffs' HHI calculations—by including an entire year of market concentration information from *before* the Merger—are picking up changes in market concentration and changes in average fares that could not possibly be a result of the Merger.

---

[44] According to Dr. Lundgren's calculations, the city pairs that do not exhibit the presumptively illegal HHI calculations are HOU-RNO, PHX-ROC, LAX-MIA, BTR-PHX, PHX-PNS, BOS-SAT, BOS-EYW, GPT-PHX, CHI-RNO, DFW-SNA, AUS-RNO, MSP-TUS, DFW-OGG, BOS-MOB, BOS-GJT, DFW-STX, DFW-SJU, BOS-HNL, BOS-STT, DFW-IND, DFW-GNV, CMH-DFW, and BOS-ELP.  *See* PX-149.

160.    However, more importantly, American offered overwhelming evidence regarding low barriers to enter city-pair markets, very high supply substitutability, and the continued and sustained proliferation of LCC competition. *See supra* Section III.A and E.4; Kasper Witness Stmt. ¶ 35. These market dynamics—the significant increase of competitive options, against a backdrop of low barriers to entry—are characteristics of the industry that undoubtedly bear on the competitive impact of the Merger.   Indeed, as Dr. Lundgren himself acknowledged, because HHIs are based merely on the market shares of each identified market participant, they can change easily in response to fluctuations in market dynamics, such as the entry or exit of a competitor. *See* Trial Tr. (Day 3) 867:21–868:12 (Lundgren); 869:6–22 (Q. . . . And if . . . for whatever competitive dynamics, the market shares change[,] . . . the HHIs will change as well, right? . . . A.   That is correct.").

161.    Dr. Lundgren's own consecutive rounds of HHI calculations in this case demonstrate their limits.  Despite a prediction by the DOJ that the Merger would cause significant increases in market concentration in 1,008 city pair markets, Dr. Lundgren's initial HHI calculations demonstrated that comparing 2012 to 2016, over 20% of the original 1,008 city pairs still met the criteria of a greater than 2,500 HHI in 2016 and an increase in HHI of over 200. Lundgren Trial Decl. at 20.  And by 2018, based on Dr. Lundgren's work, only 765 of the 1,008 city pairs exhibited a post-Merger HHI greater than 2,500 and a change in HHI greater than 200. *Id.* at 103–06.  So for about a quarter of the original DOJ collection of city pairs, additional competition or "expansion by others" reduced concentration below a presumptively problematic level.  Trial Tr. (Day 3) at 867:21–868:12 (Lundgren).

162.    Dr. Lundgren's own average fare calculations also undermine reliance on HHIs as a predictor of competitive effects.  Of the 228 unique city pairs identified by the Plaintiffs as at issue, *see* PX-149, Dr. Lundgren calculated a *decrease* in average nominal fares between 2012 and 2018

for 55 markets.  That group included the following city pairs, which include within them American hub-to-hub routes:

- Miami, FL (MIA) – Philadelphia, PA (PHL):  Despite a 2018 HHI of 5,177 and an HHI increase of 1,283 from 2012 through 2018, average nominal fares decreased 18.6%.

- Dallas, TX (DFW) – Philadelphia, PA (PHL):  Despite a 2018 HHI of 6,967 and an HHI increase of 2,970 from 2012 through 2018, average nominal fares decreased 16.1%.

- Chicago, IL (CHI) – Phoenix, AZ (PHX):  Despite a 2018 HHI of 3,339 and an HHI increase of 695 from 2012 through 2018, average nominal fares decreased 16%.

- Dallas, TX (DFW) – Phoenix, AZ (PHX):  Despite a 2018 HHI of 4,959 and an HHI increase of 1,357 from 2012 through 2018, average nominal fares decreased 15.9%.

- Phoenix, AZ (PHX) – Washington DC (WAS):  Despite a 2018 HHI of 3,581 and an HHI increase of 518 from 2012 through 2018, average nominal fares decreased 2.3%.

163.    Since the cumulative rate of inflation during the study period was approximately 9%, these figures understate the point.  Forty-nine additional city-pair markets showed increases in average nominal fares below the cumulative rate of inflation.  *See* PX-149.  It is apparent, therefore that HHI comparisons are predicting adverse effects that are refuted by the retrospective evidence available in this case.

   2.   <u>Changes in Airfares, Output, and Capacity Since the Merger Indicate Robust Competition</u>

164.    The evidence at trial in fact demonstrated that the relevant markets and the airline industry in general continue to be robustly competitive.  The most significant evidence in this regard is the published, peer-reviewed retrospective study that Dr. Carlton presented on this and two other

network airline mergers. As discussed in Sections III.E.5–6 above, Dr. Carlton found that on the routes that one would expect to exhibit anticompetitive characteristics after the Merger— i.e., nonstop routes where the number of competitors decreased from two to one or from three to two after the Merger—prices actually *decreased* by 12.3% and capacity (as measured in passengers and in seats) *increased* by about 20%. Carlton Witness Stmt. ¶¶ 37, 42. There was no meaningful cross-examination on this study, let alone rebuttal.

165. American also established through a variety of other evidence that the industry remains competitive. American's hubs have seen a 12% increase in capacity across all carriers since the Merger, which shows that American is investing in those hubs (not shrinking or eliminating them) and that other carriers are engaged in aggressive competition in those hub cities. Garboden Witness Stmt. ¶¶ 28–30 & Table 5. These trends are reflected across the board; capacity for both American and the industry as a whole has increased since 2013,[45] Garboden Witness Stmt. ¶¶ 25–27 & Tables 3–4, and TRASM—which measures an airline's revenue (including ancillary fees) per seat mile—has declined in real-dollar terms since the Merger, both for American and industry-wide, *id.* ¶¶ 40–43 & Tables 8–10. As discussed in detail above, these industry trends are

---

[45] At trial, Plaintiffs pointed out that American's capacity increase since 2013—8.5% as measured by ASMs, *see* Garboden Witness Stmt. ¶ 26 & Table 3—is less than the 20% five-year capacity growth that American's standalone plan projected. *See* Trial Tr. (Day 4) at 1137:1–22 (Garboden). But Plaintiffs provide no support for the proposition that a merger may be deemed anticompetitive simply because post-merger output *expansion*—a fact that on its face indicates a healthy competitive market—does not meet the amount of growth that one of the merging parties predicted it might achieve without a merger. As discussed above, *see supra* note 29 and accompanying text, the evidence demonstrates that the combined entity intended to increase capacity, and that it actually did so, even in the midst of an extremely complicated integration. *See* Garboden Witness Stmt. ¶ 27. Moreover, the standalone American plan was just that—a plan—and such projections are subject to change based on the realities of the economy and other factors. *See, e.g.*, Kasper Witness Stmt. ¶¶ 75–76 (explaining how airlines change their capacity utilization "in response to the changing economic and competitive conditions"). Plaintiffs presented no evidence demonstrating that a standalone American actually would have grown its capacity by 20% over five years, where that growth would have been and how it relates to the relevant markets, or even how the 20% benchmark can be sensibly applied to a different, larger airline. There is no basis for inferring from this argument that the effect of the Merger was to substantially lessen competition.

due in large part to the growth of LCCs, which continue to enter markets and exert downward pressure on fares.

166.    The evidence about increased capacity and output greatly undermines Plaintiffs' reliance on HHIs.  Because "[m]arket power is the ability to raise price profitably *by restricting output*," Areeda & Hovenkamp ¶ 501 (emphasis added), in antitrust law generally evidence of increased output ordinarily defeats claims of anticompetitive effects.  *See Am. Express Co.*, 138 S.Ct. at 2288  ("This Court will 'not infer competitive injury from price and output data absent some evidence that tends to prove that output was restricted or prices were above a competitive level.'") (quoting *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 237 (1993)).  And "[w]here . . . output is expanding at the same time prices are increasing, rising prices are equally consistent with growing product demand." *Brooke Group Ltd.*, 509 U.S. at 237.  It is likely for that reason that Plaintiffs framed their case around the proposition that, given increased concentration, the Merger would lead to output and capacity restrictions.  Yet the evidence shows without substantial dispute that output and capacity have increased since the Merger.  Increased concentration in city pairs did not have the output effects Plaintiffs predicted.

### 3.    The Merger Resulted in Procompetitive Efficiencies

167.    The efficiencies evidence that American presented at trial further demonstrates that Plaintiffs' evidence of market concentration (in the form of HHI calculations) does not provide an accurate or complete picture of the Merger's impact on competition.  As explained in Section III.E.3 above, the merger of US Airways' and American's complementary networks resulted in a more valuable network for *all* American customers, including (but not limited to) those who fly on the specific city pairs that Plaintiffs identified.  This is because legacy carriers like US Airways and American operate airline networks in which changes to one route can affect the desirability of other routes.  *See* Carlton Witness Stmt. ¶ 51.

168.    The evidence demonstrates that the US Airways and American merger achieved these aggregate, network-wide efficiencies.  As described in detail in Section III.E.3.a above, the Merger resulted in a broad network that allowed the new American to compete on equal footing with the recently merged Delta and United, which neither American nor US Airways could do prior to the Merger.  By merging, American served 342 unique destinations worldwide in 2013 (compared to United's 377 destinations and Delta's 335 destinations), and it expanded that number to 363 destinations in 2018.  Kasper Witness Stmt. ¶ 87.  American's broader network now provides significantly more travel options to consumers than pre-Merger US Airways and American combined.  The number of nonstop routes American offers has increased by 14.5%; the number of city pairs served through nonstop or connecting service has increased by 19%; and the number of unique itineraries offered across American's network has increased by 17%.  *See supra* Section III.E.3.a; Garboden Witness Stmt. ¶¶ 21–22 & Table 1.[46]

169.    As explained above, these efficiencies are especially pronounced in smaller communities across the country.  The combined American's broader and more accessible network of hubs allows regional customers to reach thousands of additional spokes worldwide by connecting through those hubs.  *See supra* Section III.E.3.a.  American has also added service to a number of domestic cities and regions that neither US Airways nor American served before the Merger (for example, Montana), and now customers in those areas have access to cities that they previously could access only through highly circuitous routing.  *Id.*; Garboden Witness Stmt. ¶ 35.

170.    Through Dr. Carlton, American estimated that total domestic consumer benefits from increased connectivity due to the Merger were over $900 million per year, and at least $750

---

[46] Moreover, even if this Court's analysis of the effects of the Merger were limited to the specific city-pair markets that Plaintiffs identified, the evidence shows that consumers have *significantly more options* in those markets after the Merger.  *See* Garboden Witness Stmt. ¶ 24 & Table 2 (showing that the total number of unique itineraries between the identified city pairs has increased by *65%* between 2013 and 2018).

million per year accounting for conservative estimates of potential adverse fare effects from the transaction. Carlton Witness Stmt. ¶¶ 32–33. This was pursuant to an accepted methodology that asks what decrease in price would generate an equivalent increase in passenger traffic. *Id.* ¶ 30. These benefits accrue to consumers generally, including those who bought tickets in the relevant markets.

171.    Finally, American provided evidence of investments in American's hub airports and an updated fleet of aircraft that demonstrate the significant efficiencies resulting from the Merger. As described in Section III.E.3.b above, American has invested billions of dollars in improving its hubs, both in terms of customer-facing improvements and operational improvements. *See, e.g.*, Trial Tr. (Day 4) at 1123:9–1124:15 (Garboden). Some of these plainly benefit passengers traveling on the relevant city-pair markets, because they use the new aircraft or the upgraded airport facilities. For example, while Dr. Lundgren concluded that the Chicago–Philadelphia city pair qualified as problematic market based on his HHI calculations, *see* Lundgren Trial Decl. at 115, those calculations do not reflect that American invested more than $200 million in facilities and improvements at Philadelphia International Airport, Garboden Witness Stmt. ¶ 30, or that American signed a lease with Chicago's O'Hare International Airport allowing the airport to spend $8.5 billion on a massive expansion, *id.* Similarly, Dr. Lundgren found that the New York–Tucson city pair qualified as a problematic market, *see* Lundgren Trial Decl. at 111, but neglected that American has signed a deal with LGA to spend $4 billion on a new terminal and that American is planning to invest $344 million in New York's John F. Kennedy International Airport, Garboden Witness Stmt. ¶ 30.

172.    In these circumstances, one cannot reasonably conclude based on concentration statistics that the Merger is likely anticompetitive. Accordingly, the Court finds that American has

satisfied its burden under the second prong of the *Baker Hughes* framework. *Baker Hughes*, 908

F.2d at 982–83.

### F.    Plaintiffs Have Not Met Their Burden To Show the Merger Is Anticompetitive

173.    With American having demonstrated that Plaintiffs' evidence of market

concentration does not accurately reflect the Merger's effects on competition, the burden shifts to

Plaintiffs to prove that the Merger is anticompetitive through other evidence of adverse effects.  *Id.*

At trial, Plaintiffs attempted to satisfy this burden through two categories of evidence: (1) average

fare calculations on certain city-pair routes that were performed by Dr. Lundgren and (2) testimony

from the named Plaintiffs.  The Court finds that none of this evidence is sufficient to establish that

the Merger had an anticompetitive effect.

### 1.    Dr. Lundgren's Average Fare Calculations Are Unreliable and Insufficient

174.    Plaintiffs' primary evidence of alleged anticompetitive effects is that, according to

Dr. Lundgren, average fares in certain of the identified city pairs increased after the Merger. As

discussed in Sections III.E.1 and E.6.a above, there are significant problems with Dr. Lundgren's

methodology and conclusions.  First, Dr. Lundgren found that, of the 228 unique city pairs that

Plaintiffs identified at trial, nominal average fares *decreased* on 55 (i.e., one quarter) of them.  *See*

PX-149.  Plaintiffs therefore cannot claim that the Merger caused an increase in fares on those

routes.  Second, Dr. Lundgren's fare calculations do not account for inflation, and thus they say

nothing about whether fares actually increased in real-dollar terms.  *See* Trial Tr. (Day 3) at 878:4–

11, 880:1–10 (Lundgren).  Third, because Dr. Lundgren merely calculated the simple average

increase in fares on each city pair without accounting for the amount of traffic on that city pair, his

analysis ignores that the average passenger *did not* pay more on the identified routes after the

13-01392-shl    Doc 272    Filed 04/15/19    Entered 04/15/19 23:39:25    Main Document
Pg 89 of 99

Merger than before the Merger. *See* Carlton Witness Stmt. ¶ 66.[47]  In light of these flaws, Dr. Lundgren's calculations do not show that consumers actually paid more for airfare on Plaintiffs' identified routes after the Merger.

175.    Even more significant is Dr. Lundgren's failure to draw any causal connection between his average fare calculations and the Merger.  As this Court has previously held, Plaintiffs must establish a "plausible chain of causation" between the Merger and the alleged harms—in other words, they need to "connect the dots."  *In re AMR Corp.*, 527 B.R. at 888–89.  Dr. Lundgren's analysis admittedly *does not* do that:  he stated that his average fare calculations "are presented without further analysis or conclusions based on statistical, econometric, or other expert economic analysis."  Lundgren Trial Decl. at 74.  Indeed, this Court previously precluded Dr. Lundgren from submitting an updated report that opined on the causal effect of the Merger.  *See* Adv. Dkt. No. 179 (recognizing that "Dr. Lundgren has never previously opined on the causal effect of the merger in [his prior reports] or any time during the five-year history of this litigation").  Neither Plaintiffs nor Dr. Lundgren provides any evidence or analysis indicating that the fare increases that Dr. Lundgren calculates—which themselves suffer from methodological flaws—are a result of the Merger as opposed to a change in economic conditions or some other event.  *See* Carlton Witness Stmt. ¶ 64. Accordingly, the Court finds that Plaintiffs failed to demonstrate that fares increased in the identified city pairs due to the Merger.

---

[47] As noted in Section III.E.6.a above, Dr. Carlton's analysis shows that the average passenger on the 1,008 routes on Plaintiffs' initial list of city pairs (i.e., the DOJ List) paid less after the Merger than before the Merger, and that the average passenger on the 298 city pairs that Plaintiffs identified before trial paid about the same after the Merger as before the Merger.  Carlton Witness Stmt. ¶¶ 66, 69.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

82

2.    Plaintiffs' General Grievances Regarding the State of the Airline Industry Have No Causal Connection to the Merger

176.    Plaintiffs also offer testimony from the named Plaintiffs regarding certain harms they purportedly suffered as evidence of the anticompetitive effects of the Merger. However, Plaintiffs also fail to establish a "plausible chain of causation" between the Merger and these alleged harms, and therefore the named Plaintiffs' testimony does not help them in satisfying their burden of proving that the Merger is anticompetitive. *See In re AMR Corp.*, 527 B.R. at 888–89.[48]

177.    First, many of Plaintiffs' alleged harms are untethered from the Merger in obvious ways. For example, several named Plaintiffs complained about events that occurred *before* the Merger. *See, e.g.*, Trial Tr. (Day 2) at 274:23–275:11 (Garavanian) (admitting that issues he experienced in booking a flight from Boston to Miami on American in 2013 occurred before the Merger closed); *id.* (Day 3) at 785:12–786:8 (Stansbury) (admitting that the "increase in fares that [she] observed on this Reno to New York flight could not have been a result of the American Airlines/US Airways merger" because the alleged fare increase occurred before the Merger). As this Court previously held, such harms cannot be caused by the Merger. *See In re AMR Corp.*, 527 B.R. at 889 ("But all of these alleged harms occurred before the American merger. Despite the lengthy description of pre-merger inconveniences, Plaintiffs have failed to allege any plausible explanation as to how the American merger relates to this harm.").

---

[48] Many of the named Plaintiffs offered testimony (both in their written statements and in court) relating to harms allegedly suffered (1) by the public at large and (2) in their capacity as travel agents. The Court does not consider any of these statements here. First, as to harms suffered by the public at large, this Court previously ruled that Plaintiffs' alleged injuries "must be personal to the Plaintiffs and cannot simply be harm suffered by the general public." *In re AMR Corp.*, 527 B.R. at 890. The Court reiterated this finding at trial. *See* Trial Tr. (Day 2) at 630:19–24 ("I only want to hear testimony about what you personally experienced. I do not want you talking about harms suffered by the general public."). Second, this Court previously ruled that Plaintiff lack standing in their capacity as travel agents, and therefore the Court does not consider any harms suffered by Plaintiffs in that capacity. *See* Adv. Dkt. No. 176 at 2; *see also* Trial Tr. (Day 2) at 563:21–564:7.

178.    Other complaints about which the named Plaintiffs testified clearly resulted from events *other than* the Merger, and therefore they cannot serve as evidence of adverse competitive effects *of* the Merger.  *See, e.g.*, Trial Tr. (Day 1) at 245:3–21 (McCarthy) (testifying that she experienced high airfares and decreased availability because she purchased her ticket the day before the scheduled flight); *id.* at 247:17–248:17 (McCarthy) (admitting that she paid $761 for a flight from Fort Myers to Newark because her husband decided to purchase a first-class ticket); *id.* (Day 1) at 81:7–20, 82:16–17, 82:20–21 (Rubinsohn) (testifying that he is "not at the top of the frequent flyer list anymore" and therefore is not "boarding in the first group" because American added another status level above his); *id.* (Day 2) at 636:14–21 (Jolly) ("I was on a flight and I was watching the movie, and the flight attendant came from behind me and slammed a can of Coke down on my tray.  And I said, I did not order that.  And she said, I know you didn't because you had your headphones in and you couldn't hear me.  And I just said, please take it away."); *id.* (Day 2) at 598:6–599:17 (Brito) (testifying that his flight was delayed and there were long customer service lines due to bad weather).

179.    The remainder of Plaintiffs' complaints fare no better because their only connection to the Merger is that they occurred after the Merger closed.  For example, Plaintiff Gary Talewsky testified that he "personally experienced a major drop in customer service" since the Merger and that he has "noticed cut backs in the quality of food in first class on American," Talewsky Witness Stmt. ¶¶ 26, 28; Plaintiff Sondra Russell testified that "[s]ince the merger and airline consolidation, American and the other airlines are constantly making unannounced schedule changes," Russell Witness Stmt. ¶ 17; Plaintiff Valarie Jolly testified that, in 2019, "the 50% discount on seat fees that [she] received for the previous year as a benefit o[f] achieving 'Gold' status on American [A]irlines was suddenly gone," Jolly Witness Stmt. ¶ 23; and Plaintiff Donald Fry testified that "planes are often smaller on the routes we use and most often more crowded, with less legroom and

smaller cabin facilities such as overhead storage," Fry Witness Stmt. ¶ 7.  But Plaintiffs offered no

evidence that these events were related in any way to the Merger (as opposed to something else),

besides the fact that they happened later in time.  Plaintiffs' "reliance on the timing of [these events]

to prove that the [Merger] caused [their] injury is a *post hoc ergo propter hoc* logical fallacy"[49] and

is insufficient to satisfy their burden.  *See Lavoho, LLC v. Apple, Inc.*, 232 F. Supp. 3d 513, 530

(S.D.N.Y. 2016), *aff'd sub nom. Diesel eBooks, LLC v. Simon & Schuster, Inc.*, 869 F.3d 55 (2d

Cir. 2017).  Plaintiffs have advanced no "plausible chain of causation" between the Merger and

these subsequent events, and therefore they cannot serve as evidence of adverse competitive effects.

*See In re AMR Corp.*, 527 B.R. at 888–89.

180.    The evidence at trial demonstrated that many of Plaintiffs' purported "injuries" are

not the result of the Merger, but rather are due to significant industry changes in response to the

growth and proliferation of LCCs and ULCCs.  The growth of ancillary fees for seat assignments,

carry-on luggage, and checked luggage is a good example.

181.    As discussed above, over the past decade (and starting well before the Merger),

airlines like Spirit and Allegiant have grown rapidly, in large part due to their ultra-low-cost model.

These airlines "unbundled" ancillary services, which allowed those carriers to charge very low base

fares and provide customers with more differentiated price options.  Kasper Witness Stmt. ¶ 41.  In

response, the legacy airlines (including American) were forced to introduce so-called "basic"

economy fares, which also unbundle some ancillary services that consumers may or may not wish

to pay for.  *Id.* ¶ 42; *see also* Trial Tr. (Day 4) at 1085:8–23 (Kasper) (testifying that the legacy

carriers did not "lead the industry in unbundling what used to be the economy product into these

---

[49] *Post hoc ergo propter hoc*, translated as "after this, therefore resulting from it," refers to "the logical fallacy of assuming that a causal relationship exists when acts or events are merely sequential."  Post Hoc Ergo Propter Hoc, Black's Law Dictionary (10th ed. 2014).

constituent parts," but rather "[t]hey were forced into it kicking and screaming" because Spirit and other low-cost carriers "were very successful in drawing traffic away from other legacy carriers, and in effect forced the legacy carriers to respond").[50]  It is not permissible to claim any kind of anticompetitive effect, let alone a Merger-specific effect, from what is fundamentally a kind of low-cost price-matching.  The antitrust laws exist to protect the competitive process, not particular outcomes, and Plaintiffs' somewhat nostalgic preference for the way things used to be is no reason to condemn American's reasonable competitive response to ULCC competition.

182.    Plaintiffs have failed to show that it was the merger between American and US Airways—and not the weather, an isolated customer service issue, the changing dynamics of the airline industry in response to ULCC competition, or any one of "millions of other" events, *see In re AMR Corp.*, 527 B.R. at 889—that caused their alleged injuries.  Accordingly, the named Plaintiffs' testimony does not provide the evidence of adverse competitive effects that Plaintiffs need to satisfy their burden under *Baker Hughes*.

183.    In contrast, the evidence that American marshalled to undermine the concentration statistics strongly shows that the Merger has had substantial procompetitive effects and no discernable anticompetitive effects.  *See supra* Section IV.E.  The Court will not repeat that evidence, save to emphasize that its ultimate conclusion in this case rests on a combination of factors the bear on the central question of whether the Merger may substantially lessen competition, including (a) concentration statistics, (b) evidence of low barriers to entry and expansion,

---

[50] Indeed, airlines instituted a number of these ancillary fees (such as baggage fees) prior to the Merger.  *See* Trial Tr. (Day 1) at 123:11–124:4 (Rubinsohn) (testifying that he "had to pay for baggage before the merger on American"); *id.* (Day 2) at 510:7–23 (Parker) (testifying that American and started charging customers for checking baggage prior to the Merger); *id.* (Day 2) at 625:13–626:3 (Brito) ("The baggage fees started when the fuel crisis was, 2008, 2010."); *id.* (Day 2) at 656:9–23 (Jolly) (testifying that "baggage fees were implemented prior to the merger by American . . . in 2008"); *id.* (Day 1) at 166:20–24 (Russell) (agreeing that "baggage fees on American and some of the other airlines first came about in 2008, 2009, 2010").

(c) prospective and retrospective competitive effects analyses of both potential coordinated and unilateral effects, (d) cost and demand-side efficiencies, especially in the form of an improved network, and (e) abundant evidence of vigorous competition and output expansion since the Merger.  Considering all of this evidence together, the Court cannot conclude that the Merger may substantially lessen competition within the meaning of Section 7 of the Clayton Act.

### G.    Plaintiffs' Lack of Standing

184.    The Court has concluded that Plaintiffs failed to prove a violation of Section 7 of the Clayton Act, and thus it need not reach the issue of whether a named Plaintiff has standing on each of the city pair markets that Plaintiffs identified.  However, because there remain serious questions about Plaintiffs' standing on the identified routes, the Court addresses those issues here for purposes of the record.

185.    For the vast majority of this litigation, Plaintiffs based their Section 7 claim on the city-pair markets that were originally identified in the DOJ Action as markets where the Merger was "presumptively anticompetitive," rather than on city pair markets on which the named Plaintiffs allegedly flew or planned to fly.  *See supra* Section III.E.1.  In its summary judgment bench ruling, this Court explained that, in order to prove standing, "Plaintiffs must demonstrate that they have remained actual customers in the alleged relevant markets and made plans to patronize those markets again."  Adv. Dkt. No. 177 at 42:11–13 (citing *In re New Jersey Title Ins. Litigation*, 683 F.3d 451, 461 (3d Cir. 2012)).  Pursuant to the Court's instruction that Plaintiffs therefore had to "identify[] which specific City Pairs are relevant for their claim," *id.* at 46:10–14, Plaintiffs submitted a list of 298 relevant city pairs on January 25, 2019, which Plaintiffs narrowed to a list of 228 relevant city pairs during trial, *see* Adv. Dkt. No. 214-5; PX-149; *supra* Section D.  All 228 of the identified city pair markets were on the DOJ's original list, which confirms that, even at trial, Plaintiffs continued to rely upon the DOJ's list of 1,008 routes as the outer limit of potential relevant

markets for their claims.  *See* PX-149 (labeling columns, "DOJ City Market 1" and "DOJ City Market 2").

186.    Plaintiffs' attempt to match the named Plaintiffs with routes on the DOJ's list resulted in serious evidentiary gaps at trial.  First, several Plaintiffs admitted that certain of the city-pair routes that they listed in their witness statements—and which appear in PX-149—are actually connecting legs of a flight between a different origin and destination than those listed.  For example, Plaintiff June Stansbury testified that she planned to fly between Phoenix and Kahului, Hawaii (*see* Stansbury Witness Stmt. ¶ 16; *see also* PX-149), but she admitted that her actual origin for such a flight would be Reno, not Phoenix, Trial Tr. (Day 3) at 787:21–788:4 (Stansbury).  Similarly, Plaintiff Gabriel Garavanian testified that he flew from Dallas to Phoenix, from Charlotte to Miami, and from Miami to Philadelphia (*see* Garavanian Witness Stmt. ¶ 6; *see also* PX-149), but admitted that those flights were connecting legs on trips between different city pairs, Trial Tr. (Day 1) at 294:4–296:23 (Garavanian).  Mr. Garavanian even admitted that, instead of listing the origin and destination for his full trips, he "just matched to whatever was in Dr. Lundgren's list."  Trial Tr. (Day 1) at 294:17–19 (Garavanian); *see also* Trial Tr. (Day 3) at 747:23–748:23 (Talewsky) (Mr. Talewsky testifying about a Dallas to Tucson flight in his witness statement that also appeared on Dr. Lundgren's list, which he intended to "walk" to from either his home in Boston or Boca Raton).

187.    The problem with this strategy is that the city pairs in Dr. Lundgren's list *are not connecting flights*; rather, Dr. Lundgren's list contains "the ultimate origin and destination of the flights."  Trial Tr. (Day 3) at 813:12–23 (Lundgren).  So, for example, Mr. Garavanian did not actually travel on the Dallas to Phoenix city pair, as defined by Dr. Lundgren, because the ticket he purchased and the route on which he traveled had an ultimate origin of Boston (not Dallas) and an ultimate destination of Phoenix.  *See* Trial Tr. (Day 1) at 294:20–295:15.  To demonstrate standing

on the Dallas to Phoenix city pair, Plaintiffs instead must prove that at least one named Plaintiff traveled or plans to travel from Dallas (as the ultimate origin) and Phoenix (as the ultimate destination), or vice versa. Accordingly, to the extent that that any of the identified city pairs reflect Plaintiffs' travel on a connecting leg as opposed to the ultimate origin and destination, Plaintiffs lack standing on each of those routes.

188.    A second major problem relating to Plaintiffs' standing is that their stated plans to travel on many of the identified routes are extremely speculative in nature. Even to establish constitutional standing for injunctive relief—which a less "stringent and specific standard" than antitrust standing, *see* Adv. Dkt. No. 177 at 37:22–25 (citing *Indium Corp. of America v. Semi-Alloys, Inc.*, 566 F. Supp. 1344, 1350–51 (N.D.N.Y. 1983))—Plaintiffs must demonstrate that the threat of injury is "actual and imminent, not conjectural or hypothetical." *Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 342 (5th Cir. 2012) (citation omitted); *see also Am. Med. Ass'n v. United Healthcare Corp.*, No. 00-cv-2800, 2007 WL 683974, at *6 (S.D.N.Y. March 5, 2007) ("[P]laintiffs have antitrust standing under Section 16 [of the Clayton Act] only when faced with a 'significant threat' of injury."). "'[S]ome day' intentions—without any description of concrete plans, or indeed any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." *Funeral Consumers All., Inc.*, 695 F.3d at 343 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)) (emphasis in original).

189.    Plaintiffs' list of relevant city pairs is replete with routes on which the named Plaintiffs state they may travel "some day." For example, Plaintiffs allege that Donald Fry has standing on *77 city pairs*, but only *two* of those city pairs (CHI-TUS and NYC-TUS) are ones on which Mr. Fry has actually flown. *See* PX-149; Fry Witness Stmt. ¶¶ 5–6. Of the remaining 75 city pairs, 29 of them are routes out of Tucson (Mr. Fry's home city), and Mr. Fry does not have actual plans to travel on a single one of them. *See* PX-149; Trial Tr. (Day 1) at 205:23–206:22

(Fry).  Indeed, Mr. Fry admitted that he *does not* intend to fly to every one of those cities in the

future.  *Id.* at 205:23–206:7 (Fry).  The remaining 46 of the 75 city pairs on Mr. Fry's list are routes

out of Phoenix, whose airport Mr. Fry stated he "on occasion . . . will utilize" in the future.  PX-149;

Fry Witness Stmt. ¶ 11.  However, Mr. Fry testified that the drive from Tucson to Phoenix is "a

bad, bad drive, over two hours, and I consider it dangerous."  Trial Tr. (Day 1) at 191:14–21 (Fry).

Mr. Fry's testimony that he might, "on occasion," utilize an airport that he believes is "dangerous"

to reach is insufficient to establish standing on these city pairs.

190.    Numerous other Plaintiffs provided similarly speculative testimony regarding their

future travel plans.  Jose Brito testified that he is merely a "potential consumer for travel" on two

of his five identified city pairs (*see* PX-149; Brito Witness Stmt. ¶ 20); Gabriel Garavanian testified

that he "may, at any time in the future, need or desire to fly on" 26 of his 34 identified city pairs

(*see* PX-149; Garavanian Witness Stmt. ¶ 7); Valarie Jolly testified that she is merely a "potential

consumer" on four of her 24 identified city pairs (*see* PX-149; Jolly Witness Stmt. ¶ 27); Lisa

McCarthy testified that she is merely a "potential city pair consumer" on 44 of her 50 identified city

pairs (*see* PX-149; McCarthy Witness Stmt. ¶ 14); Bill Rubinsohn testified that he "prospectively

plan[s] to fly" on 11 of his 21 identified city pairs (*see* PX-149; Rubinsohn Witness Stmt. ¶ 22);

Sondra Russell testified that she "may, at any time in the future need or desire to fly on" 51 of her

54 identified city pairs (*see* PX-149; Russell Witness Stmt. ¶ 10); June Stansbury testified that she

is merely a "potential city pair consumer" on three of her 13 identified city pairs (*see* PX-149;

Stansbury Witness Stmt. ¶ 16); and Gary Talewsky testified that he is merely a "potential

consumer" on five of his 12 identified city pairs (*see* PX-149; Talewsky Witness Stmt. ¶ 17).  In

other words, as to the vast majority of Plaintiffs' identified city pairs, Plaintiffs' future travel on

those routes is merely speculative.  Plaintiffs' future injury in those city pair markets thus cannot

be "actual and imminent," and Plaintiffs lack standing in each of those markets.  *See Funeral Consumers All., Inc.*, 695 F.3d at 342.

191.    Finally, even if Plaintiffs could establish that they traveled or have plans to travel in each of the identified city pair markets, their asserted injuries do not constitute "antitrust injury," which Plaintiffs must demonstrate in order to prove antitrust standing.  *See Gelboim v. Bank of America Corp.*, 823 F.3d 759, 772 (2d Cir. 2016).  As an initial matter, Plaintiffs do not even satisfy their *prima facie* burden of demonstrating that the Merger was anticompetitive in 23 of the identified city pairs, because Dr. Lundgren acknowledged that market concentration (as measured by HHI) in those routes did not reach the thresholds for finding the Merger presumptively illegal.  *See supra* Section E.1.  Moreover, as discussed above, Plaintiffs' primary measure of asserted harm is that the Merger caused an increase in fares, but Dr. Lundgren found that fares actually *decreased* on 58 of the identified routes.  *See* PX-149; *supra* Section F.1.  With respect to the remaining routes, Plaintiffs still must prove that the injury they suffered is "of the type the antitrust laws were designed to prevent *and that flows from that which makes defendants' acts unlawful.*"  *R.C. Bigelow*, 867 F.2d at 107 (emphasis added).  As discussed in detail in Section F.2, Plaintiffs presented no evidence demonstrating that their asserted injuries—most of which are generalized grievances that happened to occur after the Merger—actually *resulted from* the Merger.

192.    Accordingly, the Court finds that in addition to Plaintiffs' failure to demonstrate that the effect of the Merger was substantially to lessen competition, Plaintiffs also failed to prove antitrust standing in all of the city pairs that they identified as relevant markets.

*        *        *

193.    Based on these findings, the Court finds that the merger between US Airways and American Airlines does not violate Section 7 of the Clayton Act.  Upon that basis the Court

**DENIES** Plaintiffs' request for permanent injunctive relief.  Judgment for American will be entered

accordingly.


Dated: April 15, 2019


By:    /s/ Sadik Huseny

Daniel M. Wall (admitted *pro hac vice*)
Sadik Huseny (admitted *pro hac vice*)
LATHAM & WATKINS LLP

*Attorneys for Defendant Merged Entity*
*American Airlines Group Inc.*