**UNITED STATES BANKRUPTCY COURT**                    <u>FOR PUBLICATION</u>
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

In re:                                                Chapter 11

AMR CORPORATION, *et al.*,                            Case No. 11-15463 (SHL)

                   Reorganized Debtors.    (Confirmed)

-------------------------------------------------------------x

CAROLYN FJORD, *et al.*,

                   Plaintiffs

        v.                                    Adv. No. 13-01392 (SHL)

AMR CORPORATION, *et al.*,

                   Defendants.

-------------------------------------------------------------x

<u>**MEMORANDUM OF DECISION**</u>

**A P P E A R A N C E S :**

**LATHAM & WATKINS**
*Counsel for Defendant Merged Entity American Airlines Group Inc.*
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
By:    Daniel M. Wall, Esq.
        Sadik Huseny, Esq.

**ALIOTO LAW FIRM**
*Counsel for the Clayton Act Plaintiffs*
One Sansome Street, 35th Floor
San Francisco, CA 94104
By:    Joseph M. Alioto, Esq.
        Jamie L. Miller, Esq.

**MESSINA LAW FIRM, P.C.**
*Counsel for the Clayton Act Plaintiffs*
961 Holmdel Road
Holmdel, NJ 07733
By:￼    Gil D. Messina, Esq.

**NEDEAU LAW FIRM**
*Counsel for the Clayton Act Plaintiffs*
154 Baker Street
San Francisco, CA 94117
By:    Christopher A. Nedeau, Esq.

# TABLE OF CONTENTS

BACKGROUND .................................................................................................................. 2

I.  PROCEDURAL HISTORY ............................................................................... 2

    A.  The Chapter 11 Cases and the Proposed Merger ...................................... 2

    B.  The Filing of this Adversary Proceeding and the Department of Justice Lawsuit .... 3

    C.  Plaintiffs' Request for a Temporary Restraining Order ............................ 6

    D.  Confirmation and the Consummation of the Merger ................................ 7

    E.  Plaintiffs' Motions to Amend the Complaint ........................................... 7

    F.  The Plaintiffs' Expert Witness – Dr. Carl Lundgren ............................. 10

    G.  The Parties' Cross-Motions for Summary Judgment .............................. 12

    H.  Further Pretrial Procedure ..................................................................... 15

    I.  Trial and Related Filings ....................................................................... 17

II.  THE PRE-MERGER AIRLINE INDUSTRY ................................................. 19

    A.  Deregulation and the Structural Dynamics of the Airline Industry ......... 19

    B.  External Shocks to the Airline Industry ................................................. 22

    C.  Mergers and Restructurings of Other Airline Carriers ........................... 22

    D.  Competitiveness of American and US Airways ...................................... 24

III.  THE PREDICTED BENEFITS OF THE PROPOSED MERGER ON THE
      AIRLINE INDUSTRY ..................................................................................... 25

    A.  Strengthened Competitive Position for American and US Airways ......... 25

    B.  Pro-Competitive Benefits for Consumers .............................................. 26

    C.  Anticipated Impact on Competition in the Airline Industry Generally ..... 27

IV.  THE POST-MERGER EFFECTS ON THE AIRLINE INDUSTRY ............... 28

    A.  Expansion of Capacity and Impact on Prices ........................................ 28

    B.  Improvements in Infrastructure and Fleet Utilization ............................. 31

    C.  Continued Growth and Impact of Low-Cost Carriers ............................. 32

V.  THE PLAINTIFFS' CASE .............................................................................. 34

    A.  Plaintiffs' Lay Witness Testimony ........................................................ 34

    B.  Plaintiffs' Expert Witness Testimony .................................................... 38

**VI.    THE DEFENDANTS' CASE** ....................................................................... **39**

**DISCUSSION** ......................................................................................................... **42**

**I.    THE GOVERNING LEGAL FRAMEWORK** .......................................... **42**

**II.    APPLICATION OF THE *BAKER HUGHES* STANDARD** ................... **46**

A.    Relevant Market Definition and Plaintiffs' Standing .............................. 46

B.    Post-Merger Evidence............................................................................. 49

C.    Plaintiffs' *Prima Facie* Case.................................................................. 52

D.    Defendants' Rebuttal Case...................................................................... 54

E.    Plaintiffs' Additional Evidence of Anticompetitive Effects................... 70

**CONCLUSION** ...................................................................................................... **80**

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court are the merits of the First Amended Complaint (the "First Amended Complaint") [Adv. Proc. ECF No. 103] of the plaintiffs (the "Plaintiffs")[1] in the above-captioned adversary proceeding. The Plaintiffs allege that the merger (the "Merger") between AMR Corporation ("AMR") and US Airways Group, Inc. ("US Airways")—which ultimately formed American Airlines Group Inc. ("AAG" or the "Defendants")[2] —violates Section 7 of the Clayton Antitrust Act, 15 U.S.C. § 18 (the "Clayton Antitrust Act").[3] Accordingly, the Plaintiffs seek, among other things, a final judgment of divestiture to unwind the Merger as well as injunctive relief to enjoin any future mergers pursuant to Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26. The Court held a trial on the Plaintiffs' Section 7 claim as it had been narrowed by the Court's prior rulings in the case, including the parties' summary judgment motions discussed in greater detail below. For the reasons set forth below, the Court denies the Plaintiffs' requested

---

[1]    The Plaintiffs in this adversary proceeding are: Carolyn Fjord, Katherine R. Arcell, Keith Dean Bradt, Judy Bray, José M. Brito, Jan Marie Brown, Robert D. Conway, Judy Crandall, Rosemary D'Augusta, Brenda K. Davis, Pamela Faust, Don Freeland, Donald V. Fry, Gabriel Garavanian, Harry Garavanian, Yvonne Jocelyn Gardner, Lee M. Gentry, Valarie Ann Jolly, Gail S. Kosach, Michael C. Malaney, Len Marazzo, Lisa McCarthy, Patricia Ann Meeuwsen, L. West Oehmig, Jr., Cynthia Prosterman, Deborah M. Pulfer, Dana L. Robinson, Robert A. Rosenthal, Bill Rubinsohn, Sondra K. Russell, Sylvia N. Sparks, June Stansbury, Clyde D. Stensrud, Wayne Taleff, Gary Talewsky, Annette M. Tippetts, Diana Lynn Ultican, J. Michael Walker, Pamela S. Ward, and Christine O. Whalen. *See* First Amended Complaint ¶ 9.

[2]    The Plaintiffs' initial complaint was filed against AMR, American Airlines, Inc., US Airways, and US Airways, Inc. that have since merged into the single entity, AAG. *See* Complaint for Injunctive Relief Against Violation of Section 7 of the Clayton Antitrust Act [Adv. Proc. ECF No. 1]. For purposes of consistency with the Court's prior rulings, the Court shall continue to refer to AAG as the "Defendants" rather than the "Defendant."

[3]    The preamble to the First Amended Complaint indicates that the Plaintiffs also filed this action to "prevent a threatened violation of Section 2(c) of the [Robinson-Patman Act], 15 U.S.C. § 13(c)," which prohibits false commissions or brokerage fees as a disguised form of price discrimination. First Amended Complaint at 2. As the Court previously granted the Defendants' motion for summary judgment with respect to the Plaintiffs' Section 2(c) claim, this claim is not the subject of this decision. *See* Aug. 29, 2018 Hr'g Tr. at 79:17–25 [Adv. Proc. ECF No. 177]; Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment and Denying Plaintiffs' Cross-Motion for Summary Judgment [Adv. Proc. ECF No. 176].

relief and grants judgment to the Defendants.  The following constitutes the Court's findings of

fact and conclusions of law after trial, including relevant procedural background in the case.[4]

## BACKGROUND

## I.    PROCEDURAL HISTORY

### A.  The Chapter 11 Cases and the Proposed Merger

In late November 2011, AMR and certain of its affiliates and subsidiaries (collectively,

the "Debtors") filed a voluntary petition for Chapter 11 relief in the United States Bankruptcy

Court for the Southern District of New York.  *See* Voluntary Petition [Case No. 11-15463, ECF

No. 1]; Plaintiffs Carolyn Fjord, et. al.'s and Defendant American Airlines Group Inc.'s

Stipulation of Undisputed Facts ¶ 7 [Adv. Proc. ECF No. 214-1] (the "Undisputed Facts").  The

Debtors initially contemplated reorganizing in Chapter 11 as a standalone entity.  *See In re AMR

Corp., et al.,* 477 B.R. 384, 417 (Bankr. S.D.N.Y. 2012) ("*AMR I*") (holding that "American's

Business Plan is a reasonable stand-alone business strategy to serve as the basis for American's

Section 1113 Motion").  Ultimately, the Debtors—with the support of the Official Committee of

Unsecured Creditors—pivoted to a reorganization predicated upon a merger between AMR and

US Airways that would ultimately result in the combined entity, AAG, which would continue to

operate under the "American Airlines" name.  *See In re AMR Corp.*, *et al.*, 490 B.R. 158, 160

---

[4]    Defendants sought to seal certain witness statements and later, certain portions of the witness statement of Janusz A. Ordover concerning data with respect to fares, ticketing data, pricing information and pricing trends.  *See* Notice of Defendant American Airlines Group Inc.'s Motion for Entry of Order Pursuant to 11 U.S.C. § 107(b) and Fed. R. Bankr. P. 9018 Authorizing the Filing of Certain Information Provisionally Under Seal in Connection with Defendant American Airlines Group Inc.'s Witness Statements [Adv. Proc. ECF No. 246]; Defendant American Airlines Group Inc.'s Motion for Entry of Order Pursuant to 11 U.S.C. § 107(b) and Fed. R. Bankr. P. 9018 Authorizing the Filing of Certain Information Under Seal in Connection with the Witness Statement of Janusz A. Ordover [Adv. Proc. ECF No. 261].  In response to the Defendants' requests, the Court entered an order sealing portions of Janusz A. Ordover's witness statement.  *See* Order Pursuant to 11 U.S.C. § 107(b) and Fed. R. Bankr. P. 9018 Authorizing the Filing of Certain Information Under Seal in Connection with the Witness Statement of Janusz A. Ordover [Adv. Proc. ECF No. 266] (the "Ordover Sealing Order").  Nothing in this decision implicates the information set forth in the Ordover Sealing Order.  Coupled with the conduct of trial and the public filing of the trial transcripts, the Court concludes that there is nothing in this decision that requires sealing.  *See* Order Designating Official Real-Time Trial Transcripts [Adv. Proc. ECF No. 282].

(Bankr. S.D.N.Y. 2013) ("*AMR II*") (describing the then-proposed merger between AMR and US Airways that would establish the "American Airlines Group Inc."). Prior to the Merger, US Airways was a Delaware corporation and holding company whose primary business was the operation of a network of air carriers through its subsidiaries that included, among others, US Airways Inc. *See* Undisputed Facts ¶¶ 5–6. On February 13, 2013, the Debtors entered into an agreement and plan of merger with US Airways which the Court approved on May 10, 2013. *See* Order Authorizing and Approving (I) Merger Agreement Among AMR Corporation, AMR Merger Sub, Inc., and US Airways Group, Inc., (II) Debtors' Execution of and Performance Under Merger Agreement, (III) Certain Employee Compensation and Benefit Arrangements, (IV) Termination Fees, and (V) Related Relief [Case No. 11-15463, ECF No. 8096]. Shortly thereafter, on June 5, 2013, the Debtors filed the Second Amended Joint Chapter 11 Plan, which was predicated upon the Merger. *See* Second Amended Joint Chapter 11 Plan [Case No. 11-15463, ECF No. 8590].

### B. The Filing of this Adversary Proceeding and the Department of Justice Lawsuit

The Plaintiffs commenced this adversary proceeding in the Debtors' Chapter 11 cases in August 2013. They alleged that the proposed Merger between AMR and US Airways would violate Section 7 of the Clayton Antitrust Act, as its "effect . . . may be substantially to lessen competition, or to tend to create a monopoly in the transportation of airline passengers in the United States." Complaint for Injunctive Relief Against Violation of Section 7 of the Clayton Antitrust Act ¶ 166 [Adv. Proc. ECF No. 1] (the "Initial Complaint"); *see also id*. at ¶¶ 1–5. Accordingly, the Plaintiffs sought preliminary and permanent injunctive relief to enjoin the Debtors from consummating the Merger and/or requiring divestiture as well as the Plaintiffs'

3

recovery of legal and reasonable attorneys' fees pursuant to Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.[5]  *Id.* at 25.

Shortly after the commencement of the Plaintiffs' adversary proceeding, the United States Department of Justice (the "DOJ"), joined by several states (together with the DOJ, the "DOJ Plaintiffs"), filed a complaint against AMR and US Airways in the U.S. District Court for the District of Columbia seeking to enjoin the Merger (the "DOJ Proceeding").  *See* Complaint, United States, et al. v. US Airways Grp., Inc., et al.*,* No. 13-CV-01236 (D.D.C. Aug. 13, 2013), ECF No. 1 (the "DOJ Complaint"); Undisputed Facts ¶ 9.  Alleging that the Merger would violate Section 7 of the Clayton Antitrust Act, the DOJ Plaintiffs asserted that the effect of the Merger would "likely . . . be to lessen competition substantially, or tend to create a monopoly, in interstate trade and commerce in the relevant markets" which were defined to be "city pair[s]," comprised of a "flight's departure and arrival cities."  DOJ Complaint ¶¶ 26, 28, 95.  The DOJ Plaintiffs asserted that the Merger, among other things, would result in a substantial dampening of competition among network airlines in these city pairs, thereby leading to an increase in prices, a reduction in output, and a lessening of service.  *See id.* ¶ 96.  Such predicted effects were argued to be most pronounced at Ronald Reagan Washington National Airport due to its requirement of "slots for takeoffs and landings" that would ultimately restrict new entry.  *Id.* ¶¶ 30–31; *see also id.* ¶¶ 10, 84–86, 96.

The DOJ Plaintiffs utilized the Herfindahl-Hirschman Index ("HHI") as a measurement for market concentration, which is generally calculated as the sum of the squares of market

---

[5]    Both the Plaintiffs and the Defendants agreed that the Court has jurisdiction over these matters, that this proceeding is a "core proceeding" under 28 U.S.C. § 157(b)(2), and that venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  *See* Initial Complaint ¶¶ 6–8; Defendant US Airways' Answer to Complaint for Injunctive Relief Against Violation of Section 7 of the Clayton Antitrust Act ¶¶ 6–8 [Adv. Proc. ECF No. 32]; Answer of Defendants AMR Corporation and American Airlines to Complaint for Injunctive Relief Against Violation of Section 7 of the Clayton Antitrust Act ¶¶ 6–8 [Adv. Proc. ECF No. 40]; *see also* First Amended Complaint ¶¶ 6–8 (stating the same).

shares of each identified market participant.  *See* U.S. DEP'T OF JUSTICE AND FED. TRADE

COMM'N, HORIZONTAL MERGER GUIDELINES § 5.3 (2010) (the "Horizontal Merger Guidelines")

(summarizing the methodology to calculate HHI figures).  They found more than 1,000 domestic

city-pairs where the estimated post-Merger HHI concentration levels and level increases would

be deemed "presumptively illegal" under the DOJ's Horizontal Merger Guidelines.[6]  *See* DOJ

Complaint ¶ 38, App. A (listing more than 1,000 "presumptively illegal" city-pairs); *see also*

Horizontal Merger Guidelines § 5.3 (setting forth policy guidelines regarding a presumption of

enhancement of market power in highly concentrated markets).  In early September 2013, the

DOJ Plaintiffs amended the DOJ Complaint to include an additional plaintiff, the state of

Michigan, as well as an updated list of 1,008 city-pairs and the corresponding HHI calculations

(the "DOJ City-Pairs") that the DOJ deemed to be presumptively illegal under the Horizontal

Merger Guidelines.  *See* Amended Complaint, United States, et al. v. US Airways Grp., Inc., et

al., No. 13-CV-01236 (D.D.C. Aug. 13, 2013), ECF No. 73.

Following weeks of negotiations and discussions, AMR and US Airways entered into a

settlement agreement with the DOJ in mid-November 2013 (the "DOJ Settlement") that offered a

complete and final resolution of the DOJ Action.  *See* Undisputed Facts ¶ 10.  Later that month,

the Court approved the DOJ Settlement.  *See* Order Pursuant to Bankruptcy Rule 9019(a)

Approving Settlement Between Debtors, US Airways, Inc., and United States Department of

Justice, et al. [Case No. 11-15463, ECF No. 11321]; *Fjord v. AMR Corp. (In re AMR Corp.)*, 502

B.R. 23, 29 (Bankr. S.D.N.Y. 2013) ("*Fjord I*").  The DOJ Settlement provided for, among other

things, a divestiture of certain airport slots, gates, and related ground facilities to certain of

---

[6]    The Horizontal Merger Guidelines do not use the phrase "presumptively illegal."  Rather, they state that post-merger HHI concentration levels in excess of 2,500 generally result in a market classification of "highly concentrated" and post-merger increases in HHI levels in excess of 200 are "presumed to . . . likely . . . enhance market power."  Horizontal Merger Guidelines § 5.3.

AAG's competitors, including JetBlue and Southwest. *See* Motion of Debtors for Entry of Order Pursuant to Bankruptcy Rule 9019(a) Approving Settlement Between Debtors, US Airways Group, Inc., and United States Department of Justice, et al. ¶¶ 2, 16 [Case No. 11-15463, ECF No. 10610] (the "DOJ Settlement Motion"). The DOJ Settlement also incorporated a supplemental stipulated order under which AAG committed for a specified period of time to maintain certain hubs and to provide daily scheduled service from its hubs to certain airports that had such service at the time the DOJ Action commenced. *See id.* ¶¶ 2, 17. In late April 2014, the U.S. District Court for the District of Columbia, where the DOJ Action was pending, entered an order of final judgment approving the DOJ Settlement and concluding the DOJ Action. *See* Final Judgment, United States, et al. v. US Airways Grp., Inc., et al.*,* No. 13-CV-01236 (D.D.C. April 25, 2014), ECF No. 170.

### C.  Plaintiffs' Request for a Temporary Restraining Order

Prior to this Court's approval of AMR's entry into the DOJ Settlement—in late November 2013—the Plaintiffs filed a motion for a temporary restraining order to block the Merger. *See* Plaintiffs' Cross-Motion for Temporary Restraining Order [Adv. Proc. ECF No. 57] (the "TRO Motion"). The TRO Motion was filed in response to the DOJ Settlement Motion and the Debtors' related motion requesting that the Court permit the Merger to be consummated without delay, notwithstanding the pendency of this adversary proceeding. *See* TRO Motion at 14 (describing the responsive nature of the TRO Motion); *see also* Motion of Debtors for Entry of Order Regarding Consummation of Merger Pursuant to Scheduling Order [Adv. Proc. ECF No. 47].

At the end of that month, the Court denied the Plaintiffs' TRO Motion and granted the DOJ Settlement Motion as well as the Debtors' related motion seeking consummation of the

6

Merger. *See Fjord I,* 502 B.R. at 29.  With respect to the TRO Motion, the Court concluded that

the Plaintiffs failed to establish that the Merger would cause irreparable harm to each of the

Plaintiffs on an individual basis, failed to demonstrate a likelihood of success on the merits of the

Plaintiffs' underlying antitrust claims, and failed to show that the balance of the hardships and

public interest weighed in their favor.  *See id.* at 37–42.

### D.  Confirmation and the Consummation of the Merger

The Court confirmed the Debtors' Fourth Amended Joint Chapter 11 Plan, which paved

the way for the Merger to move forward.  *See* Findings of Fact, Conclusions of Law and Order

Pursuant to Sections 1129(a) and (b) of the Bankruptcy Code and Rule 3020 of the Federal Rules

of Bankruptcy Procedure Confirming Debtors' Fourth Amended Joint Chapter 11 Plan [Case No.

11-15463, ECF No. 10367].  Accordingly, on December 9, 2013, AMR and US Airways

consummated the Merger which resulted in the formation of AAG.  *See* Undisputed Facts ¶ 11.

Today, AAG is a publicly-traded airline holding company headquartered in Fort Worth, Texas

and parent company to—among others—American Airlines, Inc. ("American"), which is a

wholly-owned subsidiary.  *See id.* ¶¶ 1–3.  American continues to operate airline carriers and

provides domestic and international transportation services for passengers.  *See id.* ¶ 4.

### E.  Plaintiffs' Motions to Amend the Complaint

In January 2014, the Plaintiffs filed the first of several motions to amend their Initial

Complaint.  *See* Plaintiffs' Motion for Leave to File an Amended Complaint to Add Damages

Claim [Adv. Proc. ECF No. 91].  Specifically, the Plaintiffs sought to amend the Initial

Complaint to include, among other things, (1) new factual allegations; (2) a claim for treble

damages under Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15(a); (3) a demand for a jury

trial; (4) modifications to the declaratory relief sought under Section 16 of the Clayton Antitrust

7

Act, 15 U.S.C. § 26; and (5) a request to require AMR and US Airways to hold their assets

separate during the pendency of the case, which was subsequently withdrawn. *See id.* at Ex. A.

The Court granted in part and denied in part the Plaintiffs' first motion to amend, permitting the

inclusion of new factual allegations as well as a revision of the proposed divestiture relief, but

denying the Plaintiffs' request for treble damages and a jury trial. *See Fjord v. AMR Corp. (In re*

*AMR Corp.)*, 506 B.R. 368, 373 (Bankr. S.D.N.Y. 2014) ("*Fjord II*"). In accordance with the

Court's ruling, the Plaintiffs filed the First Amended Complaint which remains the operative

complaint in this case.

Some months later, the Plaintiffs filed a second motion to amend and supplement the

First Amended Complaint, seeking to once more to include a claim for treble damages and a

demand for a jury trial. *See* Plaintiffs' Motion for Leave to File a Second Amended and

Supplemental Complaint and to Add a Damages Claim and Demand for Jury Trial, Ex. A [Adv.

Proc. ECF No. 105]. The Court denied the second motion to amend without prejudice,

highlighting that the motion was "all boilerplate" and devoid of any analysis. Hr'g Tr. at 15:13,

19–20 (May 16, 2014) [Adv. Proc. ECF No. 107]; *see also id.* at 19:5 (emphasizing that the

motion was "just boilerplate"). In response to the Court's ruling, the Plaintiffs filed a third

motion to amend to address the Court's concerns. *See* Plaintiffs' Amended Motion for Leave to

File Second Amended and Supplemental Complaint and to Add Damages Claim and Demand for

Jury Trial (Federal Rule of Civil Procedure 15 and Bankruptcy Rule 7015), Ex. A [Adv. Proc.

ECF No. 106]. The Court ultimately denied the third motion to amend in its entirety. *See Fjord*

*v. AMR Corp. (In re AMR Corp.)*, 527 B.R. 874, 878 (Bankr. S.D.N.Y. 2015) ("*Fjord III*").

Several months later, the Plaintiffs filed a fourth motion to amend and supplement the

First Amended Complaint, seeking once again to include a claim for treble damages and a

demand for a jury trial and add claims under Sections 1 and 3 of the Sherman Antitrust Act, 15

U.S.C. §§ 1, 3. *See* Plaintiffs' Motion for Leave to File a Second Amended and Supplemental

Complaint, Add a Damages Claim and Demand for Jury Trial [Adv. Proc. ECF No. 118]. At

Plaintiffs' request, the Court withheld ruling on the Plaintiffs' fourth motion to amend pending

the outcome of the Plaintiffs' request to transfer and consolidate this case with the multidistrict

airline price-fixing and collusion lawsuits then-pending before the U.S. Judicial Panel on

Multidistrict Litigation (the "MDL Panel"). *See* Memorandum Endorsed Order, dated Oct. 27,

2015 [Adv. Proc. ECF No. 123]; *see also* Hr'g Tr. at 5:14–6:7 (Sept. 9, 2015) [Adv. Proc. ECF

No. 121]. The Plaintiffs' request to transfer this action to the MDL Panel, however, was

ultimately denied. *See* Order Denying Transfer, In re Domestic Airline Travel Antitrust Litig.

[MDL No. 2656, ECF No. 301].

Following the MDL Panel's denial of the Plaintiffs' request to transfer, the Plaintiffs

notified the Court that they will no longer be "proceed[ing] with the pending motion to amend"

but rather, will now be "proceed[ing] on the basis of [the First Amended Complaint]." Joint

Letter to Chambers, dated Sept. 7, 2016 [Adv. Proc. ECF No. 202-1]. Given the Plaintiffs' prior

efforts to seek a jury trial, the Court then inquired as to the parties' intention regarding trial. *See,*

*e.g.,* Hr'g Tr. at 15:11–12, 15:18–22, 16:1–2, 16:18–22 (Feb. 8, 2017) [Adv. Proc. ECF No.

130].[7] In response, the parties filed a written notice of consent, agreeing to a bench trial before

this Court. *See* Notice, Consent, and Reference of a Civil Action to the Bankruptcy Court [Adv.

Proc. ECF No. 129] (the "Consent Notice"); Hr'g Tr. at 16:18–22 (Feb. 8, 2017) (stating that the

parties have agreed to a non-jury bench trial before this Court); *id.* at 18:9–17 (stating that the

parties will submit a written consent to trial before this Court); *see also Wellness Int'l Network*

---

[7]    The Court's inquiry was driven in part to address any concerns regarding this Court's jurisdiction in light of
*Stern v. Marshall,* 564 U.S. 462 (2011).

9

*Ltd. v. Sharif*, 135 S. Ct. 1932, 1949 (2015) (holding that Article III of the Constitution "permits bankruptcy courts to decide *Stern* claims submitted to them by consent"). Specifically, the parties explicitly stipulated that "a United States Bankruptcy Judge [will] conduct all proceedings in this case including trial, the entry of final judgment, and all post-trial proceedings." Consent Notice at 1.

### F.  The Plaintiffs' Expert Witness – Dr. Carl Lundgren

The parties completed fact discovery and expert discovery consistent with the stipulated case scheduling order. *See* Interim Scheduling Order at 1 [Adv. Proc. ECF No. 128]. Notably, the Plaintiffs submitted only one expert in support of their case, Dr. Carl Lundgren. *See* Expert Report of Carl Lundgren for the Alioto Law Firm in the Matter of the Merger of American Airlines and US Airways [Adv. Proc. ECF No. 141-1] (the "Lundgren Report"); Declaration of Sadik Huseny in Support of Defendant American Airlines Group Inc.'s Motion for Summary Judgment ¶ 4 [Adv. Proc. ECF No. 141]. The Plaintiffs submitted the Lundgren Report notwithstanding their prior position that an expert opinion was not necessary as part of their evidentiary case. *See* Hr'g Tr. at 80:20–22 (Feb. 13, 2014) [Adv. Proc. No. 100] (stating that "[the Plaintiffs have] taken the position, Your Honor, that we don't need any experts . . . the [D]efendants do"); *see also* Letter and Proposed Agreed Pre-Trial Scheduling at 2 and n.2 [Adv. Proc. ECF No. 178] (noting that the Plaintiffs' reliance upon the Supreme Court's prior cases, which they argued "dictate that [the Merger] has substantially lessened competition" is "why [P]laintiffs' counsel initially stated [P]laintiffs would not require an expert").

Dr. Lundgren was tasked by Plaintiffs with: (1) reviewing and updating the DOJ's post-Merger HHI figures for the 1,008 presumptively illegal DOJ City-Pairs, and (2) calculating the post-Merger HHI figures for the then-most recent four quarters of data from October 1, 2015

through September 30, 2016.  *See* Lundgren Report at 4.  As a preliminary matter, Dr. Lundgren

began his analysis with an attempt to replicate the DOJ's HHI figures for the 1,008

presumptively illegal DOJ City-Pairs in order to "[ensure] that no grievous errors are introduced

into the HHI calculations."  *Id.*  Dr. Lundgren noted that, although there was a strong correlation

between his HHI calculations and the DOJ's calculations set forth in the DOJ Complaint, "most

[of his] HHI calculation[s] for the 1,008 city-pair markets showed deviations."  *Id.* at 5.  He

attributed such deviations to the DOJ's cursory description of its HHI calculation methodologies

and the U.S. Department of Transportation's April 2014 revision of the 2012 DB1B dataset[8] that

the DOJ used to perform its calculations.  *See generally id.* at 5–13.  Notwithstanding the

deviations, Dr. Lundgren believed that the 98% correlation between his figures and the DOJ's

suggested "reasonable similarit[ies]" in their computations such that "[i]n terms of antitrust

implications, the conclusions that can be derived from these two sets of HHI calculations are

basically the same."  *Id.* at 14.  Accordingly, using the same 2012 dataset, Dr. Lundgren

calculated that 985 of the 1,008 city-pairs the DOJ originally identified would have

presumptively illegal post-Merger HHI concentration levels and level increases under the

Horizontal Merger Guidelines.  *See id.*; *see also id.* at 15 (stating that post-merger HHI

concentration levels in excess of 2,500 and post-merger increases in HHI levels in excess of 200,

thresholds set forth under the Horizontal Merger Guidelines, would render a merger

"presumptively illegal").

---

[8]    The U.S. Department of Transportation's Origin and Destination Survey Data, more commonly referred to as DB1B, is a "public database published by the U.S. Department of Transportation, Bureau of Transportation Statistics" that served as the "data source for all . . . experts in this case."  Declaration of Dr. Carl Lundgren in Support of Plaintiffs' Cross-Motion for Summary Judgment ¶ 16 [Adv. Proc. ECF No. 149-4] (the "2017 Lundgren Declaration").

Utilizing his replication methodology, Dr. Lundgren then calculated the post-Merger HHI figures. *See id.* at 14–16. Dr. Lundgren found that of the 1,008 city-pairs the DOJ had initially identified (for the period of October 2015 through September 2016) 785 of these city-pairs would still be deemed to have presumptively illegal post-Merger HHI concentration levels and level increases under the Horizontal Merger Guidelines. *See id.* at 15–16.

### G. The Parties' Cross-Motions for Summary Judgment

After the close of discovery, the Defendants sought summary judgment on the Plaintiffs' First Amended Complaint. *See* Defendant American Airlines Group Inc.'s Notice of Motion for Summary Judgment [Adv. Proc. ECF No. 139]; Memorandum of Law in Support of Defendant American Airlines Group Inc.'s Motion for Summary Judgment [Adv. Proc. ECF No. 140] ("Defendants' Summary Judgment Motion"). The Defendants argued that summary judgment on the Section 7 claim was appropriate because Plaintiffs failed to: (1) conduct a competitive effects analysis of the Merger under the applicable legal framework; (2) establish a defined and cognizable relevant market; (3) offer evidence of any adverse competitive effects of the Merger; and (4) establish antitrust standing in the form of personal injury, real or threatened, from the Merger. *See* Defendants' Summary Judgment Motion at 2–3, 11–36.

The Plaintiffs cross-moved for summary judgment. *See* Plaintiffs' Cross-Motion for Summary Judgment and Opposition to Defendants' Motion for Summary Judgment [Adv. Proc. ECF No. 149]; Memorandum of Law in Support of Plaintiffs' Cross-Motion for Summary Judgment and Opposition to Defendants' Motion for Summary Judgment [Adv. Proc. ECF No. 149-1] ("Plaintiffs' Cross-Motion"). The Plaintiffs argued, among other things, that they had: (1) established an irrebuttable presumption that the Merger violates Section 7 of the Clayton Antitrust Act; (2) properly alleged two alternative geographic market definitions (while noting

12

that the Defendants have already conceded that city-pairs are a relevant market); and (3)

established standing to bring this action.  *See* Plaintiffs' Cross-Motion at 5–12, 34–55; *see also*

Plaintiffs' Declarations in Support of Cross-Motion [Adv. Proc. ECF Nos. 149-5–149-25]

(providing 20 declarations from individual Plaintiffs outlining their flight histories and future

travel plans in support of their antitrust standing).  Additionally, the Plaintiffs further argued that

circumstantial evidence supported the Plaintiffs' allegation that the severance payment to Mr.

Thomas Horton, the former Chief Executive Officer of AMR, constituted a form of commercial

bribery in violation of Section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c).  *See*

Plaintiffs' Cross-Motion at 55–60.

In support of their request for summary judgment, Plaintiffs submitted an additional

declaration from Dr. Carl Lundgren to "identify . . . city-pair markets from the list of 1,008 city-

pairs initially identified by the [DOJ] to be presumptively illegal after the [Merger] where

average airfares have increased since the [Merger]."  2017 Lundgren Declaration ¶ 2.  Excluding

all HHI concentration levels and level increases, the 2017 Lundgren Declaration focused solely

on 723 city-pairs, a subset of the original 1,008 presumptively illegal city-pairs, which he argued

experienced an increase in average fares post-Merger.  *See id.* ¶ 3.  Consistent with the prior

analysis in the Lundgren Report, Dr. Lundgren examined the differences between the 2012

DB1B dataset and the fiscal year[9] 2016 DB1B dataset (the "FY 2016 Dataset").  *See id.* ¶¶ 10–

13, 15.  Notably, Dr. Lundgren twice emphasized that his calculations and figures were

"presented without further analysis or conclusions based on statistical, econometric, or other

expert economic analysis."  *Id.* ¶¶ 3, 16.

---

[9]    For purposes of this decision, the term "fiscal year" refers to the beginning of the fourth quarter of the prior
year through the third quarter of the current year.  Accordingly, the dataset for fiscal year 2016 encompasses the four
quarters of data beginning with fourth quarter of 2015 through the third quarter of 2016 (i.e., October 1, 2015–
September 30, 2016).  *See* 2017 Lundgren Declaration ¶ 10.

Ultimately, the Court denied the parties' cross-motions for summary judgment as to

Plaintiffs' Section 7 claim as domestic airline passengers.  *See generally* Hr'g Tr. (Aug. 29,

2018) [Adv. Proc. ECF No. 177] (the "Summary Judgment Decision").  In making its

determination, the Court construed the Defendants' prior statements regarding city-pairs as a

judicial admission that city-pairs constituted the proper geographic market.  *See id*. at 22:23–25

(construing Defendants' "prior statement about the City Pairs market as a judicial admission");

*id.* at 26:2–5 (concluding that Defendants' "judicial admission is sufficient for the purposes of

accepting City Pairs as the proper geographic market in this case"); *see also Fjord I*, 502 B.R. at

40 (noting, in this Court's prior ruling, that "the Defendants accept that city-pairs are the

properly defined market").  Utilizing a city-pairs framework as the relevant market, the Court

determined that the Plaintiffs made a sufficient showing of standing to survive a ruling on

summary judgment in their capacity as domestic airline customers.  *See* Summary Judgment

Decision at 46:9–11.  More specifically, the Court found that there remained "genuine disputed

issues of fact regarding the significance of [Plaintiffs'] concentration numbers, the competitive

structure of the industry overall, the import of various trends and consolidation service offers,

and the differences in competitive structure and barriers to entry among specific city pair

markets." *Id.* at 70:5–11.  But the Court granted Defendants' summary judgment on Plaintiffs'

Section 7 claim to the extent it was based on Plaintiffs' roles as travel agents and/or arising out

of an alleged national market.[10]  *See id.* at 80:1–7 (summarizing the Court's ruling); Order

Granting in Part and Denying in Part Defendants' Motion for Summary Judgment and Denying

Plaintiffs' Cross-Motion for Summary Judgment [Adv. Proc. ECF No. 176].

---

[10]    The Court also granted summary judgment to Defendants on Plaintiffs' claim under Section 2(c) of the
Robinson-Patman Act, 15 U.S.C. § 13(c).  *See* Summary Judgment Decision at 79:17–25; Order Granting in Part
and Denying in Part Defendants' Motion for Summary Judgment and Denying Plaintiffs' Cross-Motion for
Summary Judgment [Adv. Proc. ECF No. 176].

In its Summary Judgment Decision, the Court expressed concerns regarding the minimal breadth of evidence the Plaintiffs submitted for the Court's consideration. *See, e.g.,* Summary Judgment Decision at 64:24–65:3 ("[I]n the face of the avalanche of evidence from Defendants, Plaintiffs have responded with what I would characterize [sic] minimal evidence beyond their original HHI data to buttress their case."); *id.* at 71:21 (noting, once again, the Plaintiffs' "minimal additional evidentiary support"). Specifically, the Court highlighted the Plaintiffs' lack of an expert opinion that offered any sort of analytical examination of the antitrust issues before the Court. *See id.* at 71:21–72:2 (noting that "Plaintiffs have not presented an expert opinion in support of a competitive effects analysis"). Nonetheless, the Court concluded that any determination concerning the sufficiency of the Plaintiffs' proffered evidence would be an issue reserved for trial. *See id.* 73:12–15 ("So while there are many questions about the [Plaintiffs'] analysis of their data and their case in general, summary judgment is not the stage at which the Court directly weighs the merits of the parties' evidence."); *id.* at 81:10–15 (stating that the "final weighing of all the evidence in this case, whatever . . . the scope, [will] be conducted at trail [sic]").

## H. Further Pretrial Procedure

After the Court's ruling on summary judgment, the Plaintiffs sought to introduce an updated and supplemental expert report by Dr. Lundgren (the "Lundgren Supplemental Report"). *See* Letter and Proposed Agreed Pre-Trial Scheduling at 1–6 [Adv. Proc. ECF No. 178]. The Plaintiffs explained that they wanted to offer a "causal effects" opinion on any anticompetitive ramifications of the Merger based on the most current data in order to show the Merger's impact on the relevant markets and to address the Court's expressed concerns regarding the lack of competitive effects analysis in the Plaintiffs' evidentiary case. *See id.* at 2–4. The Plaintiffs also argued that admission of the Lundgren Supplemental Report was appropriate given (1) the

15

developments in the airline industry since the Plaintiffs' initial complaint was filed and (2) the

newly available DB1B data from the U.S. Department of Transportation for the period of April

1, 2017 through March 31, 2018. *See id.* at 1–2. After objection by the Defendants, the Court

rejected the admission of the Lundgren Supplemental Report to the extent that it sought to

include a "new opinion regarding the competitive effects of the [M]erger" and requested that the

parties attempt to reach consensus on whether incorporation of the newly available data would

constitute a permissible supplement under Rule 26 of the Federal Rules of Civil Procedure.[11]

Order on Plaintiffs' Request to Supplement Dr. Lundgren's Expert Report at 4–7 [Adv. Proc.

ECF No. 179] (the "Exclusion Order"); *see also* Order Denying Plaintiffs' Motion for

Reconsideration [Adv. Proc. ECF No. 199] (the "Reconsideration Order") (denying Plaintiffs'

subsequent motion seeking permission for the Plaintiffs to serve the Lundgren Supplemental

Report or, in the alternative, for the Court to reconsider its ruling set forth in the Exclusion

Order). But the Court permitted the Lundgren Supplemental Report to the extent that it updated

the data relevant to the opinions that Dr. Lundgren had already provided in the case. *See*

Exclusion Order at 7 (denying Plaintiffs' request to admit the Lundgren Supplemental Report's

new opinions concerning the competitive impact of the Merger); *see also* Hr'g Tr. at 29:24–30:6

(Feb. 20, 2019) [Adv. Proc. ECF No.264] (noting that when the "expert issue came up and there

was a need for some rulings . . . [it was the Court's] understanding that there wasn't really a

debate about [Dr.] Lundgren updating his HHI calculations . . . for purposes of the Plaintiffs'

prima facie case").

---

[11]    Following the Court's rulings on the Lundgren Supplemental Report, the Plaintiffs filed a fifth motion to amend, seeking for a fifth time to add a claim for treble damages under Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15(a) and a demand for a jury trial, which was denied. *See Fjord v. AMR Corp. (In re AMR Corp.)*, 597 B.R. 486, 491–94 (Bankr. S.D.N.Y. 2019) (*"Fjord IV"*) (denying motion to amend on grounds that it was untimely, the relief sought would be prejudicial to the Defendants, and that the Plaintiffs had acted with undue delay).

## I.    Trial and Related Filings

The parties filed a joint pretrial order setting forth, among other things, the parties'

stipulations of undisputed facts, witness lists, the Plaintiffs' list of relevant city-pairs, and the

parties' list of trial exhibits.  *See* Joint Pretrial Order at 1–2 [Adv. Proc. ECF No. 214] (the "Joint

Pretrial Order").  Subsequent to the entry of the Joint Pretrial Order, the parties filed an

additional stipulation of undisputed facts.  *See* Plaintiffs Carolyn Fjord, et al.'s and Defendant

American Airlines Group Inc.'s Stipulation of Undisputed Facts [Adv. Proc. ECF No. 260]

(highlighting certain city-pairs flown by Plaintiffs Carolyn Fjord, Don Freeland and Gail

Kosach).  In accordance with the Joint Pretrial Order, the parties filed the written direct

examinations of the witnesses testifying at trial.[12]  In addition to the live witnesses,[13] both parties

submitted the deposition testimony of other witnesses.[14]

---

[12]    For purposes of this decision, the Court shall hereinafter refer to each respective witness' written direct examination as "[Witness] Dir. Ex."

The Plaintiffs filed written direct examinations for each of the following witnesses: Dr. Carl Lundgren, Jose Brito, Don Fry, Gabe Garavarian, Valarie Jolly, Lisa McCarthy, Bill Rubinsohn, Sondra Russell, June Stansbury, and Gary Talewsky.  *See* Joint Pretrial Order at Ex. 3 [Adv. Proc. ECF No. 214-3]; Written Direct Examination of Dr. Carl Lundgren [Adv. Proc. ECF No. 236] (the "Lundgren Dir. Ex."); Written Direct Examination of Jose Brito [Adv. Proc. ECF No. 237] (the "Brito Dir. Ex."); Written Direct Examination of Don Fry [Adv. Proc. ECF No. 238] (the "Fry Dir. Ex."); Written Direct Examination of Gabe Garavarian [Adv. Proc. ECF No. 239] (the "Garavanian Dir. Ex."); Written Direct Examination of Valerie Jolly [Adv. Proc. ECF No. 240] (the "Jolly Dir. Ex."); Written Direct Examination of Lisa McCarthy [Adv. Proc. ECF No. 241] (the "McCarthy Dir. Ex."); Written Direct Examination of Bill Rubinsohn [Adv. Proc ECF No. 242] (the "Rubinsohn Dir. Ex."); Written Direct Examination of Sondra Russell [Adv. Proc. ECF No. 243] (the "Russell Dir. Ex."); Written Direct Examination of June Stansbury [Adv. Proc. ECF No. 244] (the "Stansbury Dir. Ex."); Written Direct Examination of Gary Talewsky [Adv. Proc. ECF No. 245] (the "Talewsky Dir. Ex.").

The Defendants filed written direct examinations for each of the following witnesses provisionally under seal: Heather Garboden, William Douglas Parker, Dennis W. Carlton, Daniel M. Kasper, and Janusz A. Ordover.  *See* Witness Statement of Heather Garboden [Adv. Proc. ECF No. 249-1] (the "Garboden Dir. Ex."); Witness Statement of William Douglas Parker [Adv. Proc. ECF No. 249-2] (the "Parker Dir. Ex."); Witness Statement of Dennis W. Carlton [Adv. Proc. ECF No. 249-3] (the "Carlton Dir. Ex."); Witness Statement of Daniel M. Kasper [Adv. Proc. ECF No. 249-4] (the "Kasper Dir. Ex."); Witness Statement of Janusz A. Ordover [Adv. Proc. ECF No. 249-5] (the "Ordover Dir. Ex.").  At trial, the Defendants presented a corrected version of Daniel Kasper's written statement which the Court ultimately accepted into evidence.  *See* Mar. 14, 2019 Trial Tr. at 973:21–975:10, 980:4–14 [Adv. Proc. ECF No. 288].  Accordingly, for purposes of this decision, all references to "Kasper Dir. Ex." shall refer to the corrected version.

Both parties also filed a number of motions *in limine* and related oppositions to exclude

certain evidence and arguments at trial, including evidence and argument relating to prior

litigation as well as the testimony of witness Heather Garboden.[15]  The Court reserved ruling on

these motions *in limine* until rulings became appropriate and necessary at trial.  *See* Hr'g Tr. at

9:7–20 (Mar. 11, 2019) [Adv. Pro. ECF No. 276] (stating that, with respect to the motions *in*

*limine*, the Court will "deal with them as [they] go").  At trial, the Court denied Plaintiffs'

Motion *in Limine* No. 5, which sought to exclude the testimony of Heather Garboden on grounds

---

[13]    The Plaintiffs' witness list indicated that they intended to submit written direct testimony of non-testifying
Plaintiffs, Brenda Davis, Carolyn Fjord, Don Freeland, Gail Kosach, and Deborah Pulfer, solely with respect to the
matter of standing.  *See* Joint Pretrial Order at Ex. 3 [Adv. Proc. ECF No. 214-3].  Ultimately, Plaintiffs and
Defendants submitted an additional statement of undisputed facts highlighting city-pairs flown by Plaintiffs Carolyn
Fjord, Don Freeland and Gail Kosach.  *See* Hr'g Tr. at 30:10–32:24 (Mar. 6, 2019) [Adv. Proc. ECF No. 281]
(noting that Plaintiffs and Defendants would submit a stipulation reflecting their agreement on the written direct
testimony of non-testifying Plaintiffs as to standing); Plaintiffs Carolyn Fjord, et al.'s and Defendant American
Airlines Group Inc.'s Stipulation of Undisputed Facts [Adv. Proc. ECF No. 260].

[14]     Plaintiffs submitted the deposition testimony of several other witnesses: Thomas Horton, Andrew Nocella,
Virasb Vahidi, Beverly Goulet, Scott Kirby and Donald Casey.  *See* Joint Pretrial Order, Ex. 2.

       The Defendants submitted the depositions of Jerald Behrens, Derek DeCross, Thomas Horton, Scott Kirby,
Michael Malaney, and Andrew Nocella.  *See* Joint Pretrial Order at Ex. 4 [Adv. Proc. ECF No. 214-4].

[15]    The Plaintiffs filed the following motions *in limine*: (1) Motion *in Limine* to Exclude Certain Evidence of
Plaintiffs' Prior Litigation [Adv. Proc. ECF No. 223] ("Plaintiffs' Motion *in Limine* No. 1") to exclude certain
evidence relating to the Plaintiffs' prior litigation which the Plaintiffs asserted were unrelated, irrelevant, and
prejudicial; (2) Plaintiffs' Motion *in Limine* No. 2 to Exclude Deposition Testimony Designated by Defendants in
U.S. v. US Airways [Adv. Proc. ECF No. 226] ("Plaintiffs' Motion *in Limine* No. 2") to exclude certain of the
Defendants' designations of deposition testimony in *United States v. U.S. Airways Grp., Inc., et al.*, 1:13-CV-1236
as inadmissible hearsay; (3) Plaintiffs' Motion *in Limine* No. 3 to Exclude Evidence of Efficiencies and/or to
Exclude Evidence of Efficiencies Unrelated to Any City-Pair Relevant Market [Adv. Proc. ECF No. 227]
("Plaintiffs' Motion *in Limine* No. 3") to exclude certain evidence of "purported efficiencies" as a result of the
Merger as irrelevant; and (4) Plaintiffs' Motion *in Limine* No. 5 to Exclude Testimony of Heather Garboden [Adv.
Proc. ECF No. 228] ("Plaintiffs' Motion *in Limine* No. 5") to exclude the testimony of Heather Garboden on
grounds that she was an "undisclosed expert witness."

       The Defendants filed the following motions *in limine*: (1) Notice of Motion and Motion *in Limine* to
Exclude Evidence and Argument Regarding Plaintiffs' Other Litigations Against American Airlines [Adv. Proc.
ECF No. 210] ("Defendants' Motion *in Limine* No. 1") to exclude evidence and argument relating to the Plaintiffs'
other litigations against AAG on grounds of irrelevancy (2) Notice of Motion and Motion *in Limine* to Exclude
News Articles and Third-Party Report [Adv. Proc. ECF No. 211] ("Defendants' Motion *in Limine* No. 2") to
exclude news articles or third-party reports relating to air travel on grounds of inadmissibility.  In support of the
Defendants' motions *in limine*, the Defendants also filed the related Memorandum of Law in Support of American
Airlines' Group Inc.'s Motions *in Limine* [Adv. Proc. ECF No. 212] and the Declaration of Sadik Huseny in Support
of American Airlines Group Inc.'s Motions *in Limine* [Adv. Proc. ECF No. 213].

that she was an "undisclosed expert witness," permitting her to testify solely as to facts stemming

from her capacity as an employee. *See* Hr'g Tr. at 674:5–675:17 (Mar. 12, 2019) [Adv. Pro.

ECF No. 277] (ruling that Heather Garboden's testimony will be "appropriate to the extent it

talks about . . . facts well within the scope of her employment"). As for the remaining motions *in*

*limine*, the Court now denies each as moot.[16]

## II.    THE PRE-MERGER AIRLINE INDUSTRY

### A.  Deregulation and the Structural Dynamics of the Airline Industry

The Airline Deregulation Act of 1978 signaled a radical shift in the federal government's

stance on the level of regulation and restraint to be imposed on competition in the airline

industry. As a result of the United States Civil Aeronautics Board's ("CAB") stringent

regulations on airfares, airline routes, and new entry into the industry, the airline industry before

1978 was generally characterized by high costs, inflated prices set by the CAB, and limited

---

[16]    With respect to Plaintiffs' Motion *in Limine* No. 1 and Defendants' Motion *in Limine* No. 1 concerning the exclusion of evidence relating to Plaintiffs' prior litigation and other litigation proceedings against American, respectively, the Court denies these motions as moot since neither party attempted to introduce such evidence at trial. *See* Defendant American Airlines Group Inc.'s Proposed Findings of Fact and Conclusions of Law [Adv. Proc. ECF No. 272] ("Defendants' Proposed FOF/COL") at 11 n.3 (noting that parties did not introduce evidence of Plaintiffs' prior or other litigations against American). Similarly, with respect to Defendants' Motion *in Limine* No. 2, which sought the exclusion of news articles and third-party reports, the Court denies the motion as moot. Plaintiffs did not submit into evidence any of the specified news articles and third-party reports nor does the Court rely on any of the foregoing in reaching its decision. *See* Defendant American Airlines Group Inc.'s Memorandum of Law in Support of its Motions *in Limine* [Adv. Pro. ECF No. 212] (seeking the exclusion of exhibit numbers PX-050, PX-082, PX-087, PX-089, PX-092, PX-106, PX-112 and PX-115). The Court notes, however, that Plaintiffs submitted exhibit PX-02 into evidence during the examination of witness Douglas Parker, which is comprised of an email chain discussing a published news article regarding the merger between United and Continental airlines and their decision to keep Cleveland as a hub. *See* Hr'g Tr. at 479:8–14, 481:14–482:20 (Mar. 12, 2019) (questioning Parker concerning his statements surrounding the article). As Defendants did not object to its admission at trial, that exhibit was admitted. *Id.* at 481:14–19.

Moreover, the Court denies Plaintiffs' Motion *in Limine* No. 2 concerning the exclusion of certain deposition testimony in the DOJ Proceeding as moot as the Court does not rely on such testimony to reach its ruling as discussed below. In a similar vein, the Court also denies Plaintiffs' Motion *in Limine* No. 3 which seeks to bar testimony from certain of Defendants' witnesses focusing on the purported efficiencies stemming from the Merger that are untethered to a specific city-pair market. The Court does not rely on Defendants' submitted evidence concerning efficiencies as the basis for a classic efficiencies defense, but rather considers the submitted evidence as factual context. *See also infra* Discussion, Section II.D.iii (addressing consideration of evidence of the Merger's efficiencies).

point-to-point networks unable to support frequent flights between cities.  *See* Kasper Dir. Ex. ¶¶

13, 15; *see also AMR I,* 477 B.R. at 396 (offering a brief summary on the domestic deregulation

of the airline industry).  Facing minimal direct competition and an inability to reduce prices to

capture lower costs, airlines were effectively disincentivized at the time from partaking in cost-

efficient and profit-maximizing behaviors.  *See* Kasper Dir. Ex. ¶ 14; *see also AMR I*, 477 B.R.

at 396 (discussing the impact of CAB regulations on airline decision-making).

       The enactment of the Airline Deregulation Act of 1978 was transformative, introducing

competitive market forces in the airline industry and paving the way for the development of the

hub-and-spoke "legacy" network carriers as well as the entry and expansion of "point-to-point"

low-cost carriers ("LCCs") and later, ultra-low-cost carriers (the "ULCCs").  *See* Kasper Dir.

Ex. ¶¶ 8, 16; *id.* ¶¶ 18, 21–25 (discussing, among other things, the "LCC revolution" and the

rapid expansion of LCCs beginning in the 1980s); Garboden Dir. Ex. ¶¶ 7–8; *see also AMR I*,

477 B.R. at 396 (noting the emergence of LCCs as a consequence of deregulation).  Network

carriers—generally understood to include American, Delta Airlines, and United Airlines—

operate on a "hub-and-spoke" model, a system of interconnecting flights or "spokes" originating

at a "hub," a centralized point in a route network through which flights are routed.  *See* Kasper

Dir. Ex. ¶¶ 16, 17; Garboden Dir. Ex. ¶ 9.  Such a structure enables network carriers to provide

an "anywhere to everywhere" service, allowing them to offer routes to smaller cities or regions

that would not otherwise be economical to serve and increasing the number of options available

for consumers.  *See* Parker Dir. Ex. ¶ 6; Kasper Dir. Ex. ¶ 17; Garboden Dir. Ex. ¶ 9.

       In contrast, LCCs—such as Southwest Airlines—operate on a lower cost point-to-point

basis, flying direct between two locations, predominantly on lucrative routes that contain

sufficient local air travel demand to sustain operations.  *See* Garboden Dir. Ex. ¶¶ 8, 11; Parker

Dir. Ex. ¶ 8.  The cost savings from the point-to-point structure are then transferred to consumers in the form of lower airfares, giving LCCs a competitive edge over higher cost carriers and allowing them to gain market share.  *See* Garboden Dir. Ex. ¶ 8; Kasper Dir. Ex. ¶ 19.  LCCs also generally maintain lower labor and aircraft costs.  *See* Kasper Dir. Ex. ¶ 19.

Since deregulation, LCCs have grown rapidly, accelerating their expansion in the 1990s and extending their geographic scope.  *See* Kasper Dir. Ex. ¶ 23.  By the end of 2000, LCCs offered substantial service in the West, the South, and the Great Lakes regions, as well as the beginnings of service in the East.  *See* Kasper Dir. Ex. ¶ 25.  By the early 2000s, LCC influence arguably reached a "tipping point," ushering in a new era where LCCs were considered a formidable competitive force in the airline industry and their appeal extended to both leisure and business passengers alike.  *See id.* ¶¶ 29, 39–40; Ordover Dir. Ex. ¶ 22 (stating that LCCs "effectively constrain industry pricing").  As of 2018, more than 75% of domestic air travelers nationwide had access to LCC options.  *See* Kasper Dir. Ex. ¶ 31; *see also* Parker Dir. Ex. ¶ 8 (estimating that nearly 80% of American passengers are traveling on routes served by one or more LCC or ULCC).  The impact of LCCs on the airline industry had become so remarkable that the United States Department of Transportation coined the term the "Southwest Effect" to denote the influence of Southwest and other LCCs on air travel demand and corresponding prices.  *See* Kasper Dir. Ex. ¶ 24; *id.* ¶ 36–38 (summarizing the results of several studies which examined the relationship between LCC expansion and decline in airfares); *see also AMR I*, 477 B.R. at 396 (describing the "Southwest Effect" and its impact on the airline industry); Hr'g Tr. at 110:21–25 (Mar. 11, 2019) (Bill Rubinsohn, a named Plaintiff, testifying that "airfares were significantly less" because US Airways had to match Southwest's prices).

## B.  External Shocks to the Airline Industry

The first decade of the 2000s was a precarious period for the now deregulated airline industry as it was marred by a series of external shocks and macroeconomic events that resulted in severe reductions in demand and surges in costs.  *See* Garboden Dir. Ex. ¶ 10; Parker Dir. Ex. ¶ 9; Kasper Dir. Ex. ¶ 27.  The collapse of the internet bubble, the 9/11 terrorist attacks, the subsequent Great Recession of 2008-2009, coupled with unprecedented spikes in oil prices from 2003-2008, all contributed to a period of substantial upheaval and a period of significant losses in revenue.  *See* Garboden Dir. Ex. ¶ 10; Parker Dir. Ex. ¶¶ 9–10.  The flexibility of network carriers to quickly respond to these sharp dips in demand was limited by the high fixed costs of maintaining hubs.  *See* Parker Dir. Ex. ¶ 10 (noting that the hub-and-spoke structure requires airlines to be committed to a scale of operations that, in difficult times, could greatly exceed demand).  By contrast, LCCs during this time continued to expand and increase profits despite these outside events.  *See* Kasper Dir. Ex. ¶¶ 27, 73; Parker Dir. Ex. ¶ 10; *see also* Kasper Dir. Ex. ¶ 9 (noting that capacity reductions by legacy carriers from 2001-2009 were largely offset by increases in LCC capacity and load factors).

## C.  Mergers and Restructurings of Other Airline Carriers

Facing billions of dollars in lost revenue because of these macroeconomic shocks and the increasing competition from LCCs, numerous legacy carriers—US Airways, Northwest Airlines, Delta Airlines, United Airlines, and American—filed for bankruptcy between 2003 and 2012.  *See* Garboden Dir. Ex. ¶¶ 5, 10; Parker Dir. Ex. ¶¶ 4, 10; Kasper Dir. Ex. ¶ 74.  While Chapter 11 restructurings helped reduce carrier costs and mitigate the effects of these outside events, the bankruptcy restructurings alone were insufficient to fully restore the legacy carriers to profitability.  *See* Kasper Dir. Ex. ¶ 74.  Specifically, legacy carriers remained unable to raise

post-9/11 load factors above break-even levels—there were insufficient passengers to cover the airlines' cost—resulting in massive losses and underutilized capacity. *See id.* ¶¶ 75–76. Consequently, network carriers sought out mergers to weather the new competitive environment and achieve long-term sustainability. *See* Garboden Dir. Ex. ¶ 12; Parker Dir. Ex. ¶ 11. The mergers enabled network airlines to capture "efficiencies and network synergies" that could not otherwise be realized. Parker Dir. Ex. ¶ 4; *see* Kasper Dir. Ex. ¶ 84 (stating that the "success of large network carriers today hinges in significant part on the scope of their networks"). This is because, generally speaking, the utility and value of a network carrier is directly related to the size of its network; expansion of an airline's network leads to an increase in the number of possible routes and allows an airline to capture a larger portion of the passenger market. *See* Parker Dir. Ex. ¶ 4; Kasper Dir. Ex. ¶¶ 79–80.

Not surprisingly then, the mergers between Delta and Northwest Airlines in 2008 and United and Continental Airlines in 2010 resulted in integrated national networks that improved the competitiveness of these merged legacy carriers, while at the same time reducing their costs. *See* Garboden Dir. Ex. ¶¶ 5, 12; Kasper Dir. Ex. ¶¶ 10, 84 & Dem. 10. The newly merged entities of Delta and United increased their market share and passenger traffic, particularly from "high-yield" business travelers, and ultimately expanded their networks without incurring the enormous risk and capital costs normally associated with organic growth and the opening of new hubs. *See* Parker Dir. Ex. ¶¶ 4, 7, 11, 14. The newly formed national networks of the merged legacy carriers have led to an increase in overall legacy carrier capacity over the last several years. *See* Kasper Dir. Ex. ¶ 77.

### D. Competitiveness of American and US Airways

Following the mergers of Delta and United, American and US Airways faced structural network disadvantages relative to their newly merged competitors as both American and US Airways maintained limited networks only concentrated in certain segments of the country. *See* Garboden Dir. Ex. ¶¶ 5, 12–13; Parker Dir. Ex. ¶¶ 4, 13–14, 23–24; Kasper Dir. Ex. ¶¶ 84–86. Prior to the Merger, US Airways' presence was predominantly in the East Coast with hubs in Charlotte, Philadelphia, Phoenix and Washington, whereas American was strongest in the Midwest. *See* Garboden Dir. Ex. ¶ 13; Parker Dir. Ex. ¶¶ 4, 12. American also only maintained a minimal market presence between its Miami hub and New York, which limited its ability to offer service to passengers seeking to travel up and down the East Coast. *See* Parker Dir. Ex. ¶ 23; Hr'g Tr. at 538:7–17 (Mar. 12, 2019) (stating that American passengers flying from the Northeast to the Southeast would have to fly through Dallas or Chicago to reach their destination as there was "no other alternative"). Further threatening US Airways' long-term sustainability and competitiveness was its diminishing labor cost advantage due to the expiration of certain of its labor agreements. *See* Parker Dir. Ex. ¶ 13.

Despite the limited scope of their individual networks, however, American and US Airways' networks were, together, perfectly complementary—each airline maintained its strongest presence in a differing region of the country, and the two had minimal overlap. *See* Garboden Dir. Ex. ¶ 13; Parker Dir. Ex. ¶ 26 (noting that United and American codenamed the Merger "Project Tetris" to reflect the complementary nature of their networks). In light of this, American and US Airways believed that a merger would be an ideal resolution to address their structural disadvantages, enabling the airlines to create an integrated, national network and to realize considerable synergies for the benefit of consumers. *See* Garboden Dir. Ex. ¶¶ 5, 14–17;

Parker Dir. Ex. ¶¶ 27–28, 30–31; *see also* Kasper Dir. Ex. ¶ 88 (stating that "[c]ombining their networks was the only practical way for American and US Airways to attain the network scope and resulting competitive benefits . . . enjoyed by their competitors").

## III.    THE PREDICTED BENEFITS OF THE PROPOSED MERGER ON THE AIRLINE INDUSTRY

### A.    Strengthened Competitive Position for American and US Airways

The success of the legacy carrier business model is generally predicated upon a carrier's ability to provide passengers with an "anywhere-to-everywhere" service and offering a wide range of products. *See* Kasper Dir. Ex. ¶¶ 79, 80; *see also id.* ¶ 84 (stating that the "success of large network carriers . . . hinges in significant part on the scope of their networks"). Accordingly, the melding of American and US Airways' complementary networks was anticipated to strengthen American and US Airways' competitive positions as well as provide several additional benefits, including significant growth and connectivity opportunities that would be otherwise unattainable absent a merger. *See* Garboden Dir. Ex. ¶ 15; Parker Dir. Ex. ¶¶ 4, 14–15; *see also id.* ¶ 21 (stating that the "core" of US Airways' "advocacy for the Merger" was "competitive strategy" through the resolution of the "network disadvantage that both American and US Airways faced"). It was thought that a more comprehensive network resulting in expanded service and coverage would enable American and US Airways to better compete with other legacy carriers as well as LCCs, ULCCs and regional airlines, particularly for corporate consumers who generally favor carriers with larger and more ubiquitous networks. *See* Garboden Dir. Ex. ¶¶ 5, 15; Parker Dir. Ex. ¶¶ 17, 21, 31, 43; Kasper Dir. Ex. ¶ 86; *see also* Parker Dir. Ex. ¶ 38 (noting the Merger would result in the addition to the carriers' network of 130 cities served by American and not US Airways and 62 cities served by US Airways but not American).

25

Furthermore, due to the complementary nature of American and US Airways' networks, the Merger was also expected to allow American and US Airways to maintain the same levels of "available seat miles" ("ASM")[17] post-Merger without a reduction in either airline's fleet or employees.  *See* Parker Dir. Ex. ¶ 29; *see also* Garboden Dir. Ex. ¶ 16 (highlighting that the Merger was a "significant opportunity for fleet optimization").  Both airlines believed that the Merger was the "best possible outcome" and a "better way to achieve all the benefits of a more competitive network, including real, sustainable capacity expansion."  Parker Dir. Ex. ¶¶ 31, 35.

## B.  Pro-Competitive Benefits for Consumers

In addition to the improved competitive posture of American and US Airways, the Defendants believed that the Merger would provide significant value and benefits to consumers. *See, e.g., id.* ¶ 30 (stating that the "most significant consumer benefit" of the Merger was that consumers would have a "one-stop shop" for their travel needs); Carlton Dir. Ex. ¶ 26 (concluding in his 2013 prospective study that the post-Merger consumer benefits were "driven by network quality improvements that flowed directly from the [then-proposed Merger]").  On whole, American and US Airways estimated that the Merger would generate over $1 billion per year in total cost, network and other synergies stemming primarily from consumer value derived from the merged airlines' expanded network.  *See* Parker Dir. Ex. ¶ 30; *see also* Garboden Dir. Ex. ¶ 14 (stating that the post-Merger synergies were "expected to be significant").  American and US Airways believed that the combination of their complementary networks would increase the number of direct and non-stop routes between cities, the number of city-pair options via a connecting route as well as the number of travel itineraries for each city-pair within the network.

---

[17]    "Available Seat Miles," a metric commonly used in the airline industry, serves as the "standard unit of measure for passenger carrying capacity" and represents one seat flying one mile.  Garboden Dir. Ex. ¶ 25; *see also* Carlton Dir. Ex. ¶ 21 (stating that ASMs are a "standard measure of airline capacity").

*See* Garboden Dir. Ex. ¶ 5; Carlton Dir. Ex. ¶ 26; *see also* Garboden Dir. Ex. ¶ 17 (noting that

the "entire thrust behind the Merger was to create a . . . network carrier that would *expand*

offerings and choices for consumers") (emphasis in original); Parker Dir. Ex. ¶ 28 (American

estimated that the combination of airlines would create about 1,300 new connecting

opportunities that would not exist outside of the Merger).  They also anticipated new

connectivity opportunities and increased accessibility for consumers in small and medium-sized

cities to American and US Airways' hubs.  *See* Parker Dir. Ex. ¶ 30.  Specifically, the Merger

would result in the connection of passengers through five East Coast hubs and consequently

create new routes that would link smaller cities in the Midwest and East Coast.  *See id.* ¶ 27.

The Merger was further projected to create the largest frequent flyer program of any U.S.

carrier that would yield additional miles and increased opportunities for consumers to apply such

miles to a greater variety of itineraries.  *See* Garboden Dir. Ex. ¶ 16; Parker Dir. Ex. ¶ 30; *see

also id.* ¶ 39 (noting that American and US Airways anticipated that the combined airline would

have 101 million frequent flyer program members, larger than either United or Delta's

programs).  Additionally, American and US Airways believed that the Merger would lead to

additional improvements, including the strengthening of the oneworld Alliance program, a global

alliance of major airlines, and the enhancement of operations and services.  *See* Garboden Dir.

Ex. ¶ 16 (citing the expected enhancement of customer-valued services, including on-time

performance, baggage handling and other customer amenities).

### C.  Anticipated Impact on Competition in the Airline Industry Generally

American and US Airways believed that the Merger would not lead to anticompetitive

effects on the airline industry.  *See, e.g.,* Carlton Dir. Ex. ¶ 7 (concluding in his 2013 prospective

analysis of the impact of the Merger that the Merger would likely expand American's output by

an estimated 2.9 million passengers and produce other net consumer benefits estimated to be at

least $750 million per year); *id.* ¶ 33 (stating that, not even considering the DOJ Settlement in his

2013 prospective study, "consumer benefits from the [then-proposed Merger] would exceed

many times over any plausible adverse fare effects . . . yielding large net consumer benefits").  In

fact, they believed the Merger would allow for the existence of a third national network carrier,

one that likely would not have existed otherwise.  *See* Parker Dir. Ex. ¶ 31 (stating that, absent

the Merger, American and US Airways would have continued to lose market share to the other

legacy carriers such that there "could very well" be just two national network carriers).  As

Defendants' witnesses testified, the complementary nature of American and US Airways'

networks—coupled with LCC competition—reduced concerns of an increase of airfares or

reduction of competition post-Merger.  *See id.* ¶ 32; Carlton Dir. Ex. ¶ 7 (finding in his 2013

prospective study that LCCs were the "truly disruptive force," putting downward pressure on

prices).  Indeed, American and US Airways directly competed with respect to nonstop service on

only 12 routes out of nearly 700 non-stop routes.  *See* Parker Dir. Ex. ¶ 32.   Overall capacity for

the combined airlines was also not expected to decrease.  *See id.* ¶ 29 (stating that ASM of the

combined carriers was anticipated to remain at the same levels).

## IV.    THE POST-MERGER EFFECTS ON THE AIRLINE INDUSTRY[18]

### A.  Expansion of Capacity and Impact on Prices

Five years following the Merger, the newly combined American has expanded its overall

capacity, including an increase in the number of flight offerings and travel options for

---

[18]    The following discussion concerning the impact of the Merger on the airline industry is accurate with
respect to the periods of time discussed at trial, all of which occurred prior to the outbreak of the COVID-19
pandemic.  Since the start of the pandemic, the global economy has faced substantial difficulties and the airline
industry specifically has suffered a dramatic and sustained drop in air travel demand.  *See* Alison Sider, *Airlines
Plan for Prolonged Coronavirus Drought*, WALL ST. J., (Oct. 16, 2020), https://www.wsj.com/articles/airlines-plan-
for-prolonged-coronavirus-travel-drought-11602848431 (discussing how passenger volume was more than 60%

consumers.  *See* Garboden Dir. Ex. ¶ 21–22 (stating that, since 2013, post-Merger American has

increased its offering of non-stop routes by 14.5%, unique city-pairs by 19% and unique

itineraries across the American network by 17%); *id.* ¶ 26 (stating that, from 2013–2018, post-

Merger American has had an increase of 4.5% in total seats, a 4.6% increase in total passengers

flown and an 8.5% increase in total ASMs); Parker Dir. Ex. ¶ 45 (post-Merger American has

added over 3,000 connecting opportunities, including service to regions where neither American

or US Airways have flown before the Merger).  The upward trend in post-Merger American's

capacity parallels that of the airline industry, which has also experienced considerable growth on

whole since 2013.  *See* Garboden Dir. Ex. ¶ 28.  Notably, the number of regional network and

flight options for small and mid-sized communities have increased since the Merger, including

the number of direct flight options from the combined airline's now nine hubs, resulting in more

efficient and less circuitous travel paths for travelers from such communities.  *See id.* ¶¶ 32–36

(noting, among other things, that post-Merger American has seen an increase of 18.9% in

domestic regional ASMs and a 10.3% increase in domestic regional seats); Parker Dir. Ex. ¶ 46

(stating that the new American can serve omni-directional travel needs from most of its hubs).

In fact, the post-Merger American now offers service in 17 domestic cities that were not

previously served by either American or US Airways prior to the Merger.  *See* Garboden Dir. Ex.

¶ 35.

    The most recent Department of Transportation quarterly airfare report offered at trial

showed that real average domestic airfares have in fact decreased by 4.5% during the second

quarter of 2018 in comparison to the second quarter of 2017, the lowest level for a second

quarter since the government began recording prices in 1995.  *See* Kasper Dir. Ex. ¶ 34.  Along a

---

lower than what it was the year prior and that "U.S. airlines expect that it will be years before their business recovers
from the coronavirus pandemic").  The status of the airline industry in the COVID-19 era is not before this Court.

similar vein, a retrospective econometric[19] study in 2016 on the impact of the Merger further suggests that the Merger did not increase prices. *See* Carlton Dir. Ex. ¶ 7. Specifically, this 2016 retrospective study concluded that the Merger reduced the post-Merger American's average fares by approximately 12.3%, increased the volume of passengers by 20.2%, and increased the number of seats by approximately 19.6%. *See id.* ¶ 43. As one of Defendants' experts explained, any anticompetitive effect on prices would likely have been observed on overlapping routes where American and US Airways were directly competing prior to the Merger. *See id.* ¶ 37 (noting that overlapping routes would be "where one would expect a merger's anticompetitive effects to be concentrated"). But notably, the 2016 retrospective study concluded there was "no evidence of anticompetitive effects for connecting overlaps relative to non-overlap connecting routes" following the Merger. *Id.* ¶ 42.

An examination of trends in the post-Merger American and the industry's overall "total revenue per available per seat mile" ("TRASM")[20] further confirms the 2016 retrospective study's conclusions as to the Merger's impact on price. *See* Garboden Dir. Ex. ¶¶ 40–41. TRASM is a metric which accounts for the base fare of a ticket as well as other fees paid (e.g., baggage fees). *See id.* ¶ 40. The post-Merger American's marginal increase of 1.6% in TRASM levels from 2013 to 2018 was outpaced by the rate of inflation in the amount of 7.8% during the same timeframe. *See id.* ¶ 41. Similarly, the overall airline industry's TRASM decreased 1.3% from 2013 to 2018, indicating that the overall TRASM for both the post-Merger American and the industry on whole, when adjusted for inflation, has declined since the Merger. *See id.* The

---

[19]    Econometric analysis is the application of statistical techniques and methodologies to economic data while controlling for additional factors. *See* Hr'g Tr. at 1261:21–1262:21 (Mar. 15, 2019) [Adv. Proc. ECF No. 280] (Dr. Carlton defining econometrics generally).

[20]    "Total Revenue Per Available Seat Mile" is generally calculated by dividing the total operating revenue by ASMs and represents the amount of revenue per every seat-mile flown. *See* Garboden Dir. Ex. ¶ 40.

fluctuations in TRASM for both American and other network airlines during 2013 through 2018 appear to track the changes in fuel prices, one of the primary determinants of airline costs. *See id.* ¶ 42. Finally, a comparison of TRASM for the airline industry in general against overall changes in ASMs and seats for the period of 2013 to 2018 reflects a steady increase in capacity relative to generally stagnant revenue for the industry on whole. *See id.* ¶ 43.

### B. Improvements in Infrastructure and Fleet Utilization

The Merger has also enabled American to expand service from its nine hubs in Charlotte, Chicago, Dallas, Los Angeles, Miami, New York, Philadelphia, Phoenix, and Washington, D.C. and permitted American to invest heavily in improving its infrastructure. *See* Garboden Dir. Ex. ¶¶ 28–31. Since December 2013, there has been a 5% increase in total annual seats on the post-Merger American from its 9 hubs in conjunction with an overall increase of 12% across all carriers servicing those hubs as of 2018. *See id.* ¶ 29. American has also invested significant capital into facility and infrastructure improvements at certain of its hubs. *See id.* ¶ 30 (stating that, among other things, the combined airline has already invested more than $2 billion at its Dallas hub, $200 million at its Philadelphia hub, $100 million at its Charlotte hub and $18 million at its Washington D.C. hub).

The Merger has also enabled American and US Airways to better optimize the use of their combined fleet and more efficiently allocate aircraft throughout their network to routes where such aircraft would be better suited. *See id.* ¶ 38 (stating that the post-Merger American has since reallocated several Boeing 767 wide-body aircrafts and has replaced regional jets on high-demand routes with larger airplanes). The more efficient allocation of aircraft has led to an increase in consumer options and overall offerings from the combined airline. *See id.* Since the Merger, American also has purchased several new mainline and regional aircraft to replace older

31

and less efficient airplanes, resulting in the largest and youngest fleet of any U.S. network carrier. *See id.* ¶ 37.

### C. Continued Growth and Impact of Low-Cost Carriers

The competitive influence of LCC and ULCC carriers has continued after the Merger, with such carriers continuing to expand and grow. *See* Parker Dir. Ex. ¶ 53. LCCs and ULCCs currently comprise nearly 40% of the combined market for domestic air travel and maintain a customer base that includes both leisure and business passengers. *See id.*; Kasper Dir. Ex. ¶¶ 39–40. LCC and ULCC options are now available to nearly 80% of passengers who fly on American, including at every one of the combined airline's nine hub cities. *See* Parker Dir. Ex. ¶ 53; *see also* Kasper Dir. Ex. ¶ 31 (noting that, as of 2018, over 75% of domestic air travelers industry-wide now have access to LCCs in most states across the country). In fact, LCCs now compete with non-stop service on 5 of the 12 previously overlapping routes that American and US Airways directly competed on prior to the Merger. *See* Parker Dir. Ex. ¶ 53. Considering their historical growth pattern and considerable low operation costs, it is anticipated that LCCs and ULCCs will continue to expand and increase market share. *See* Kasper Dir. Ex. ¶¶ 43–44; *see also id.* ¶ 46 (explaining that a significant portion of future LCC growth is likely to come from ULCCs).

Moreover, the "Southwest Effect" remains in force, as the evidence suggests that the presence of an LCC on a route continues to place downward pressure on prices. *See* Kasper Dir. Ex. ¶¶ 37–38. In an analysis performed in 2015, for example, the DOJ found that on routes at Newark Liberty International Airport that Southwest entered in 2010, average airfares year-over-year declined between 5% and 27%. *See id.* ¶ 38 (citing Verified Complaint at 9–10, U.S. v. United Cont'l Holdings Inc., et al., No. 2:15-CV-07992-WHW-CLW (D.N.J. Nov. 10, 2015));

*see also id.* (noting that certain research has found that even the threat of Southwest's entry on a route can cause network carriers to reduce their fares). The Department of Transportation has generally recognized that on routes where LCCs are present, legacy carriers are "usually forced to adopt a pricing and yield management posture similar to that of their low-cost carrier competition." *See* Kasper Dir. Ex. ¶ 38 (quoting U.S. DEP'T OF TRANSP., OFFICE OF AVIATION AND INT'L AFFAIRS, AVIATION ANALYSIS, FARE RESTRUCTURING IN CINCINNATI – SECOND QUARTER 2005, 6 (2006)).

The extent of LCC influence is also reflected in the network airlines' response to "unbundling" and the offering of low-cost, connecting service. *See, e.g.,* Parker Dir. Ex. ¶ 55 (noting that American's reinstatement of low-cost, connecting service was in response to Southwest's pricing approach). In response to the proliferation of ULCCs—ultra low-cost airlines whose business model is predicated upon the "unbundling" of charges for services previously "bundled" together at a single price—legacy carriers have since introduced "basic" economy fares. *See* Kasper Dir. Ex. ¶¶ 41–42. Such "basic" fares offer discounted pricing but include restrictions such as the inability to fly standby and limits on the ability to select a seat prior to check-in. *See id.* ¶ 42. Similarly, American restarted its Advantage Fares program after the Merger in response to Southwest's offering of a similar service at Advantage Fare prices. See Parker Dir. Ex. ¶ 55 (stating that Delta and United reinstated their discounted connecting fare programs as well). The Advantage Fares program, originally offered by US Airways, provided discounted and lower fares on connecting routes in order to induce consumers to select a connecting service as opposed to a non-stop alternative with a competing airline. *See id.* ¶ 54. Finally, as further incentive to price-sensitive consumers, American has at times undercut its own prices, offering lower-priced one-step fares on routes where it also offers non-stop service

to capture consumers who are willing to trade convenience for low prices and will purchase

tickets when they would otherwise not fly at all.  *See id.* ¶ 55.

## V.     THE PLAINTIFFS' CASE

The Plaintiffs' case-in-chief relies heavily on two sources of evidence: (1) testimony

from some named Plaintiffs about their individual experiences with airline travel and (2) the

expert opinion of Dr. Carl Lundgren.  During the course of trial, the Plaintiffs called nine of the

named Plaintiffs for live testimony in support of their case: Bill Rubinsohn, Sondra Russell,

Donald Fry, Lisa McCarthy, Gabriel Garavanian, Jose Brito, Valarie Jolly, Gary Talewsky, and

June Stansbury (collectively, the "Named Plaintiffs").  Plaintiffs also presented their expert

witness, Dr. Carl Lundgren live at trial.  For the sake of efficiency, the Plaintiffs presented the

direct testimony of their live witnesses in written format (collectively, the "Named Plaintiffs'

Written Testimony").  *See* Joint Pretrial Order at 2.  At trial, Plaintiffs also called as an adverse

witness William Douglas Parker, the Chairman and Chief Executive Officer of AAG.

### A.  Plaintiffs' Lay Witness Testimony

The Named Plaintiffs are nine travel agency owners and/or travel agents who have

collectively flown on hundreds of domestic and international flights with various airlines pre-

and post-Merger, including American and US Airways.  *See* Brito Dir. Ex. ¶¶ 1, 5–6 (travel

agency owner who has flown on 156 domestic and international flights, including 31 American

or US Airways flights); Fry Dir. Ex. ¶¶ 2–3, 4–6 (travel agency owner and travel agent who flew

on 51 flights between 2009 and 2017, including 9 pre-Merger American or US Airways flights,

as well as a handful of American flights since 2017); Garavanian Dir. Ex. ¶¶ 4, 5–6 (travel

agency part-owner and travel agent who has flown "numerous times" on American and US

Airways); Jolly Dir. Ex. ¶¶ 2, 5–7, 22 (travel agency owner who has flown 44 pre-Merger

American flights and 52 post-Merger American flights since 2009); McCarthy Dir. Ex. ¶¶ 3–4, 9–14 (travel agency owner and travel agent who has flown on 238 flights since 2009, including 18 American or US Airways post-Merger flights); Rubinsohn Dir. Ex. ¶¶ 1, 5–7 (travel agency owner who, between 2008 and 2017, has flown on 310 domestic and international flights, including 145 pre-Merger American or US Airways flights and 175 post-Merger American flights); Russell Dir. Ex. ¶¶ 3, 6, 8–10 (travel agency owner and travel agent who, between 2009 and 2017, has flown on 110 domestic and international flights, including 52 pre-Merger American flights and 58 post-Merger American flights); Stansbury Dir. Ex. ¶¶ 3, 9–16 (travel agency owner and travel agent who has flown on 94 domestic and international flights since 2009, including 18 pre-Merger American or US Airways flights and 76 post-Merger American or US Airways flights); Talewsky Dir. Ex. ¶¶ 4, 10–18 (travel agency owner and travel agent who has flown 215 domestic and international flights since 2009, including 56 pre-Merger American flights and 32 post-Merger American flights).

The Named Plaintiffs allege a litany of harms purportedly suffered from the Merger, ranging from economic harms to the overall deterioration in the quality of the flying experience. The alleged economic harms include increases in airfares and ancillary fees, as well as the imposition of fees for services that were previously complimentary such as checked baggage, in-flight meals, lounge access and seat assignments. *See, e.g.,* Brito Dir. Ex. ¶ 7 (alleging, among other things, increased airfares, the imposition of baggage fees, charges for inflight meals and lounge access and "outrageous" fuel surcharges); Garavanian Dir. Ex. ¶¶ 9–12 (discussing the increases in airfares for flights in and out of Manchester, NH resulting from a decrease in flight availability); Jolly Dir. Ex. ¶¶ 9, 12, 16 (discussing, among other things, the increase in baggage and change fees, as well as higher airfares); Fry Dir. Ex. ¶¶ 7, 8 (stating that "in [his] experience,

air travel has continued to degrade, particularly since the [M]erger of American Airlines and US

Airlines"); Hr'g Tr. at 81:21–82:2, 84:23–85:8, 85:23–86:15 (Mar. 11, 2019) (Rubinsohn

testifying as to the increase in airfares and baggage fees, the lack of food service and the

imposition of change fees); *id.* at 147:16–24 (Russell testifying as to the imposition of baggage

fees and the increase in change fees); *id.* at 224:10–22, 229:4–17 (McCarthy testifying as to the

increase in airfares); Hr'g Tr. at 707:18–22, 708:8–11, 708:16–709:17, 713:20–714:13, 720:2–14

(Mar. 13, 2019) [Adv. Proc. ECF No. 278] (Talewsky testifying as to the increase in airfares and

fees for lounge access, the imposition of fees for seat assignments, baggage and change fees).

The Named Plaintiffs also testified as to the negative impact of the Merger on their

ability to operate their travel agencies, including a reduction in demand and loss of business.

*See, e.g.,* Jolly Dir. Ex. ¶ 18 (testifying that it has become "difficult and time consuming to offer

good service" at her travel agency and that she has lost clients when they "blame [her] for

overbooked flights or when airlines take away pre-reserved and paid for seats"); McCarthy Dir.

Ex. ¶ 25 (stating that the reduction in flight options following the Merger has resulted in a

decrease in "demand for the entire travel industry, which hurts travel agencies' ability to

survive"); Hr'g Tr. at 769:7–16 (Mar. 13, 2019) (Stansbury explaining that the Merger has

"further complicated [his job] by having to explain these ancillary fees, by having to go on and

purchase seats for people or pay ancillary fees").[21]

Aside from economic harms, the Named Plaintiffs also complained of the deterioration in

quality of the overall flying experience as reflected in the decreased number of connecting flight

options from smaller hubs, a reduction in benefits and value in frequent flyer programs, a

---

[21] But as discussed in greater detail below, the Court previously ruled that the Plaintiffs' testimony would
only be considered as to alleged harms they incurred as domestic airline customers in the relevant city-pair markets,
and not as alleged harms suffered by the public or by the Plaintiffs' travel agent customers. *See infra* Discussion,
Section II.A.

reduction in seat pitches and the reduction in quality of customer service. *See, e.g.,* Fry Dir. Ex. ¶ 7 (stating that "air travel has continued to degrade" with smaller planes that were "most often more crowded, with less legroom and smaller cabin facilities such as overhead storage"); Jolly Dir. Ex. ¶¶ 12–13 (citing a reduction in available flight options); McCarthy Dir. Ex. ¶ 18 (asserting that the Merger has resulted in "less options, less seat assignments and availability, and reduced customer service"); Rubinsohn Dir. Ex. ¶ 13 (noting reduced flight route options between American and US Airways hubs and cities such as Raleigh, NC, Pittsburgh, PA and St. Louis, MO); Stansbury Dir. Ex. ¶¶ 8, 18, 26 (stating that the Merger has resulted in reduced seat availability, lack of seat assignments, lack of legroom, reduced or cancelled service on routes to smaller cities and a loss of privileges for AAdvantage loyalty program members); Hr'g Tr. at 270:11–272:12 (Mar. 11, 2019) (Garavanian detailing the devaluation of his frequent flyer miles and the "terrible" customer service he received after being bumped out of first class).

Certain of the Named Plaintiffs further attribute the alleged harms in part to the overall consolidation of the airline industry generally, opining that "airline consolidation in general and more specifically, the 2013 merger of American and [US Airways] has caused a loss of competition in the industry." Rubinsohn Dir. Ex. ¶ 8; Russell Dir. Ex. ¶ 11; Stansbury Dir. Ex. ¶ 29; Talewsky Dir. Ex. ¶ 40; *see also* Brito Dir. Ex. ¶ 15 (concluding that competition has decreased as a result of "consolidation in the airline industry and after the most recent merger of [American] and [US Airways]"); Jolly Dir. Ex. ¶ 8 (stating that "airline consolidation in general and more specifically, the 2013 merger of American and [US Airways], threatens to cause and has caused a loss of competition in the industry"); McCarthy Dir. Ex. ¶ 18 (attributing the alleged harms suffered to "airline mergers and consolidation and specifically the American merger").

In addition to the Named Plaintiffs, Plaintiffs also called on William Douglas Parker to testify during which he was questioned about, among other things, US Airways' rationale for pursuing the Merger and AMR's proposed standalone business plan. *See, e.g.,* Hr'g Tr. at 338:20–339:5 (Mar. 12, 2019) (questioning Mr. Parker concerning the estimated valuation of the then-proposed Merger); *id.* at 357:20–358:3 (inquiring with Mr. Parker about his knowledge of AMR's plan to emerge from Chapter 11 on a standalone basis).

### B.  Plaintiffs' Expert Witness Testimony

The testimony of Dr. Carl Lundgren, an economist and the Plaintiffs' sole expert witness, included the following: (1) the Lundgren Report; (2) the 2017 Lundgren Declaration; and (3) Dr. Lundgren's declaration, dated Dec. 21, 2018 (the "2018 Lundgren Declaration").  Lundgren Dir. Ex. ¶¶ 1–4.  The 2018 Lundgren Declaration updated the conclusions set forth in the Lundgren Report and the 2017 Lundgren Declaration with "more recent data from the DB1B public database published by the U.S. Department of Transportation, Bureau of Transportation Statistics" spanning the period of July 1, 2017 through June 30, 2018.  *Id.*, Ex. 3 ¶ 3.  Specifically, Dr. Lundgren concluded in the 2018 Lundgren Declaration that 765 of the 1,008 DOJ City-Pairs would still be deemed to have presumptively illegal post-Merger HHI concentration levels and level increases under the Horizontal Merger Guidelines, reflecting a decrease from the 785 city-pairs previously described in the Lundgren Report.  *Id.*, Ex. 3 at 5. With respect to average fares, Dr. Lundgren further concluded that 708 of the 1,008 DOJ City-Pairs experienced an increase in average fares over the same time period, a decrease from the 723 city-pairs originally identified in the 2017 Lundgren Declaration.  *Id.*, Ex. 3 ¶ 13; *see also* Hr'g Tr. at 847:16-24 (Mar. 13, 2019) (testifying that the fare growth figures exclude ancillary fees but do account for the fares of LCCs and ULCCs).  Dr. Lundgren stated that his opinion was

"consistent with the facts, analysis and opinions" contained in each of the Lundgren Report, the

2017 Lundgren Declaration and the 2018 Lundgren Declaration. Lundgren Dir. Ex. ¶¶ 2–4.

## VI.    THE DEFENDANTS' CASE

At trial, the Defendants called upon three expert witnesses—Daniel M. Kasper, Dennis

W. Carlton and Janusz A. Ordover—and one lay witness, Heather Garboden, for live testimony

in support of their case. The Defendants' three expert witnesses offered testimony that assessed

the competitive impacts of the Merger on the airline industry. Each provided a different

perspective.

The first of the Defendants' experts was Mr. Daniel M. Kasper, a specialist in the

transportation industry who serves as a senior consultant at the firm Compass Lexecon. *See*

Kasper Dir. Ex. ¶ 1; Hr'g Tr. at 975:14–17 (Mar. 14, 2019) [Adv. Proc. ECF No. 279]. Mr.

Kasper examined the airline industry prior to and following the Merger and concluded that the

industry was "intensely competitive before the [Merger] and remains so." Kasper Dir. Ex. ¶ 7.

Mr. Kasper attributed the high levels of price competition in the pre-Merger airline industry to

the elimination of regulatory barriers and the pervasive presence of LCCs, which he argues have

and will continue to exert "downward pressure . . . on prices." *Id.* ¶ 8. Additionally, Mr. Kasper

asserted that the recent mergers of other legacy carriers, whose business models are predicated

upon a hub-and-spoke structure, have further contributed to robust post-Merger competition in

the domestic airline market. *See id.* ¶¶ 10, 89. Mr. Kasper finally explained that the decrease

and later increase in airline capacity beginning in 2001 can be attributed to factors other than

legacy airline mergers (i.e., exogenous macroeconomic events and the subsequent strengthening

of the national economy resulting in increased demand for air travel). *See id.* ¶¶ 9, 62.

The second of Defendants' experts was Dr. Dennis W. Carlton, a professor of economics at the Booth School of Business at the University of Chicago and a consultant at Compass Lexecon.  *See* Carlton Dir. Ex. ¶¶ 1, 4; Hr'g Tr. at 1236:9–14, 1237:2–5, 1239:4–10 (Mar. 15, 2019) [Adv. Proc. ECF No. 280].  Dr. Carlton previously served as Deputy Assistant Attorney General for Economic Analysis at the Antitrust Division for the DOJ.  *See* Carlton Dir. Ex. ¶ 3. Dr. Carlton employed econometric analysis to examine the Merger and addressed the Plaintiffs' claims of adverse competitive effects, as well as Plaintiffs' claim that the Merger would eliminate US Airways' frequent flyer program.  *See* Carlton Dir. Ex. ¶ 6.  Underlying Dr. Carlton's analysis were certain baseline assumptions concerning the characteristics of the airline industry, including the "substantial number of competitors on many of the routes; the importance of [LCC] competition [on prices] on these routes; and the relative ease and frequency of entry on most routes."  *Id.* ¶¶ 7, 14–15.  In performing three different econometric studies, Dr. Carlton looked to changes in total output and capacity as "key summary measures of competitive effects."  *Id.* ¶ 13.  Dr. Carlton noted that his methodology applied the "standard economic approach" set forth in the Horizontal Merger Guidelines and related literature.  *Id.* ¶ 11.

The first of Dr. Carlton's three econometric studies, performed in 2013 on a retrospective basis, examined the competitive impacts of the prior mergers of Delta and Northwest, as well as United and Continental.  *See id.* ¶¶ 20–23.  The 2013 retrospective study, based in part on regression analysis, concluded that the prior legacy carrier mergers had "no adverse effects on competition."  *Id.* ¶¶ 20, 23.  The second of the econometric studies, also performed in 2013 but on a prospective basis, examined the Merger itself and predicted that the Merger would have a procompetitive effect; he concluded that it would generate "substantial procompetitive output expansions [that] would exceed, many times over, any plausible nominal fare increases from the

40

transaction." *Id.* ¶ 24.  Dr. Carlton asserted that his conclusions would remain the same even

without the divestures that were part of the DOJ Settlement.  *See id.* ¶ 35.  Finally, in 2016, Dr.

Carlton performed a retrospective study of all three legacy carrier mergers and concluded that the

legacy carrier mergers, including the Merger, were procompetitive, thus confirming the results of

both his 2013 prospective and retrospective studies.  *See id.* ¶¶ 41, 44.  In reaching this

conclusion, Dr. Carlton focused on pre-merger overlapping routes between merging airlines.  *See*

*id.* ¶ 37.  Specifically as to the Merger, he found that it "reduced average fares, increased the

number of passengers flying, and increased the number of seats available."  *Id.* ¶¶ 7, 44.  As for

the Plaintiffs' assertion that the Merger would eliminate US Airways' frequent flyer program,

Dr. Carlton concludes that this allegation was unfounded as US Airways has continued to offer

its frequent flyer program and such program was in fact expanded post-Merger.  *See id.* ¶¶ 77,

79.

 The last of the Defendants' testifying expert witnesses, Dr. Janusz A. Ordover, serves as

a professor of economics at New York University and consultant at Compass Lexecon.  *See*

Ordover Dir. Ex. ¶¶ 1, 4; Hr'g Tr. at 1139:7–12 (Mar. 14, 2019).  Previously, Mr. Ordover

served as the Deputy Assistant Attorney General for Economics at the Antitrust Division for the

DOJ.  *See* Ordover Dir. Ex. ¶ 2.  He provided an "economic perspective" that specifically

addressed the Plaintiffs' assertion that the Merger would "'substantially increase' the 'prospects

for effective collusion among the airlines remaining after [the] [M]erger.'"  *Id.* ¶ 5.  Accounting

for the DOJ Settlement, Dr. Ordover concluded that the airline industry is not conducive to

effective coordination and the Merger did not enhance effective coordination.  *See id.* ¶¶ 6–7.  In

fact, he asserted that the airline industry was "highly competitive prior to the [M]erger and

remains so."  *Id.* ¶ 9.  His conclusions were primarily driven by "overwhelming empirical

evidence" and "substantiated, significant consumer benefits from this [M]erger," observations

that the airline industry behaves in a manner consistent with "effective competition" such that the

Merger did not elevate the risks of "coordinated effects." *Id.* ¶¶ 7, 103.  Additionally, the

prevalence of LCCs, further enhanced by the divestitures that were part and parcel to the DOJ

Settlement, would "disrupt any form of coordination on prices or other competitive dimensions."

*Id.* ¶¶ 7, 104.

In addition to the expert witnesses, Defendants also presented Heather Garboden to

testify as a lay witness solely as to facts within the scope of her employment.  *See* Hr'g Tr. at

674:5–675:17 (Mar. 12, 2019) (holding that Heather Garboden's testimony will be "appropriate"

as to facts stemming from her capacity as an employee).  Ms. Garboden testified as to the

strategic rationale behind the Merger and internal post-Merger metrics that offer insight

concerning the impact of the Merger.  *See* Garboden Dir. Ex. ¶ 5.

## DISCUSSION

## I.    THE GOVERNING LEGAL FRAMEWORK

Generally, Section 7 of the Clayton Antitrust Act prohibits a merger or acquisition that

"*itself* may cause antitrust injury."  *In re Zinc Antitrust Litig.*, No. 14-CV-3728, 2016 WL

3167192, at *22 (S.D.N.Y. June 6, 2016) (quoting *Geneva Pharm. Tech. Corp. v. Barr Labs.*

*Inc.*, 386 F.3d 485, 511 (2d Cir. 2004)) (emphasis in original).  Specifically, Section 7 provides:

> No person engaged in commerce or in any activity affecting commerce shall
> acquire, directly or indirectly, the whole or any part of the stock or other share
> capital . . . where in any line of commerce or in any activity affecting commerce in
> any section of the country, *the effect of such acquisition may be substantially to
> lessen competition, or tend to create a monopoly.*

15 U.S.C. § 18 (emphasis added).

Any analysis performed under Section 7 is immersed in a realm of "*probabilities*, not

certainties or possibilities."  *United States v. Baker Hughes, Inc.*, 908 F.2d 981, 984 (D.C. Cir.

1990) (emphasis in original).  In considering a merger's effect on competition, modern courts have applied a burden-shifting analysis in which plaintiffs bear the initial burden of establishing a *prima facie* case.  *See id.* at 982–83 (establishing a burden-shifting analysis to a horizontal acquisition case);[22] *United States v. Waste Mgmt. Inc.*, 743 F.2d 976, 983–84 (2d Cir. 1984) (concluding that the ease of entry into the relevant market was sufficient to rebut a *prima facie* showing of illegality under a burden-shifting analysis); *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 198–99 (S.D.N.Y. 2020) (applying the three-part burden shifting analysis to assess a Section 7 claim); *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015) (stating that "Section 7 claims are typically assessed under a 'burden-shifting framework'") (quoting *Chi. Bridge & Iron Co. v. FTC*, 534 F.3d 410, 423 (5th Cir. 2008)); Summary Judgment Decision at 18:7–12 ("Modern case law provides for a burden-shifting process in which plaintiffs typically establish a *prima facie* case with, for example, market concentration statistics, and defendants attempt to rebut it by offering conflicting evidence of the merger's probable effects on competition.").

Under such a framework, a plaintiff must first make a "showing that a transaction will lead to undue concentration in the market for a particular product in a particular geographic area" which establishes a "presumption that the transaction will substantially lessen competition."

---

[22]    Horizontal mergers are defined to be "mergers and acquisitions involving actual or potential competitors" whereas vertical mergers encompass non-horizontal transactions, including, in its strictest form, the combination of "firms or assets at different stages of the same supply chain." Horizontal Merger Guidelines § 1 (defining horizontal mergers); U.S. DEP'T OF JUSTICE AND FED. TRADE COMM'N, VERTICAL MERGER GUIDELINES § 1 (2020) (defining vertical mergers).  Notably, despite its initial formulation within the horizontal merger context, the *Baker Hughes*' burden-shifting analysis has been applied to both horizontal and vertical mergers subject to differences in the type and nature of evidence a plaintiff must present to satisfy its initial burden.  *See, e.g., United States v. Anthem, Inc.*, 855 F.3d 345, 349 (D.C. Cir. 2017) (applying the *Baker Hughes* burden-shifting analysis to a horizontal merger); *United States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019) (stating that, in applying *Baker Hughes* to a proposed vertical merger, a plaintiff must make a "fact-specific" showing that a merger is "likely to be anticompetitive" as opposed to a mere offering of market concentration statistics to establish a *prima facie* case).

*Baker Hughes*, 908 F.2d at 982.  To satisfy this initial burden, plaintiffs have typically made a

showing, pursuant to the Horizontal Merger Guidelines, of post-merger HHI concentration levels

in excess of 2,500 and post-merger increases in HHI levels in excess of 200.[23]  *See, e.g., United*

*States v. Anthem, Inc.*, 855 F.3d 345, 349 (D.C. Cir. 2017) (noting that the "most common way to

make [a] showing is through . . . [HHI]" and the application of the Horizontal Merger

Guidelines), *cert. dismissed*, 137 S.Ct. 2250 (2017); *Baker Hughes*, 908 F.2d at 983 & n.3

(utilizing the DOJ's then-merger guidelines to conclude that the government "established a

*prima facie* case of anticompetitive effect" through its showing that the merger would

"significantly increase" concentration in an already highly concentrated market); *Saint*

*Alphonsus*, 778 F.3d at 788 (concluding that the "extremely high HHI on its own establishes the

*prima facie* case").  Such showings lead to presumptions of market concentration and the

enhancement of market power.  *See* Horizontal Merger Guidelines § 5.3.

Once a plaintiff makes its *prima facie* case, the burden then shifts to a defendant to "rebut

[the] presumption" with "sufficient evidence" to show that the "*prima facie* case inaccurately

predicts the relevant transaction's probable effect on future competition."  *Baker Hughes*, 908

F.2d at 982, 989, 991.  A defendant may satisfy its burden by making an "affirmative[] showing

why a given transaction is unlikely to substantially lessen competition, or by discrediting the data

underlying the initial presumption in the [plaintiff's] favor."  *Id.* at 991.  The required sufficiency

of a defendant's evidence, however, is directly proportional to the strength of plaintiffs' *prima*

*facie* case.  *See id.* (stating that "[t]he more compelling the *prima facie* case, the more evidence

---

[23]    The Court notes that, while not binding on courts, the Horizontal Merger Guidelines serve a significant role
in the evaluation of proposed mergers.  *See* Horizontal Merger Guidelines § 1 (noting that the Horizontal Merger
Guidelines were prepared in part to "assist . . . courts in developing an appropriate framework for interpreting and
applying . . . antitrust laws in the horizontal merger context"); *Anthem*, 855 F.3d at 349 (stating that the Horizontal
Merger Guidelines remain a "helpful tool" for analyzing proposed mergers).

the defendant must present to rebut it successfully"). Once rebutted, the "burden of producing

additional evidence of anticompetitive effect shifts to the [plaintiff], and merges with the

ultimate burden of persuasion, which remains with the [plaintiff] at all times." *Id.* at 983.

Throughout this case, Plaintiffs have consistently maintained that a line of Supreme

Court merger cases decided in the 1960s, which promulgated the "incipiency doctrine,"[24] serve

as the governing legal standard for Section 7 claims.[25]  But as this Court has previously noted,

modern antitrust case law has evolved since the 1960s, developing into a more flexible, totality-

of-the-circumstances approach.  *See Fjord I*, 502 B.R. at 39 n.12 ("[A] quick review of the

relevant antitrust case law suggests that antitrust law has evolved since the 1960s to encompass a

more flexible, industry-specific analysis."); Summary Judgment Decision at 18:7–12 (noting that

modern antitrust case law adopts a burden-shifting analysis); *see also Baker Hughes*, 908 F.2d at

984 (stating that the "Supreme Court has adopted a totality-of-the-circumstances approach to

[Section 7], weighing a variety of factors to determine the effects of particular transactions on

competition"); *United States v. AT&T Inc.*, 290 F. Supp. 3d 1, 4 (D.D.C. 2018) (discussing how a

merger should be analyzed within the "context of its particular industry" and "in light of a

---

[24]    The phrase "incipiency doctrine" refers the congressional policy to restrict mergers that may lead to a possible restriction of competition. *See, e.g., Brown Shoe Co., Inc. v. United States*, 370 U.S. 294, 346 (1962) (stating that the court could not "avoid the mandate of Congress that tendencies toward concentration in industry [were] to be curbed in their incipiency"); *United States v. Von's Grocery Co.*, 384 U.S. 270, 277 (1966) (discussing the underlying congressional intent to enact Section 7 as a desire to "preserve competition among many small businesses by arresting a trend toward competition in its incipiency before that trend developed to the point that a market was left in the grip of a few big companies"); *E.I. du Pont de Nemours & Co.*, 353 U.S. at 597 (defining "incipiency" within this context to mean "any time when the acquisition threatens to ripen into a prohibited effect").

[25]    Plaintiffs argued repeatedly that the "incipiency doctrine" remains the controlling precedent. *See, e.g.,* First Amended Complaint ¶ 47 (asserting that the line of Supreme Court cases relying on the "incipiency doctrine" has "never been overruled and remains controlling law"); Plaintiffs' Proposed Findings of Fact and Conclusions of Law ¶ 15 ("Plaintiffs' Proposed FOF/COL") [Adv. Proc. ECF No. 273] (citing a line of "binding Supreme Court precedents [that] recognized and developed what is known as the 'incipiency doctrine'"); Hr'g Tr. at 10:25–11:5 (Mar. 11, 2019) (stating that the Plaintiffs "also rely on the Supreme Court decisions, none of which have been overruled, and no action has been taken by Congress to overrule them, and with regard to those cases, [the Plaintiffs] will be following the law on them"); Hr'g Tr. at 1274:13–1280:25 (Mar. 15, 2019) (cross-examining Defendants' expert witness, Dr. Carlton, concerning his writings on "decisions by the Supreme Court . . . with regard to mergers").

'variety of factors'—including the transaction's size, structure, and potential to generate efficiencies . . . that 'are relevant in determining whether a transaction is likely to lessen competition'") (citing *Baker Hughes*, 908 F.2d at 985 (internal quotation marks omitted)).  This shift in contemporary merger analysis towards a more comprehensive inquiry has its genesis in *United States v. Gen. Dynamics Corp.*, 415 U.S. 486 (1974).  Citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 321–22 (1962), the Supreme Court in *General Dynamics* concluded that "statistics concerning market share and concentration, while of great significance, were not conclusive indicators of anticompetitive effects" and that a merger should be evaluated within the "context of its particular industry."  *Gen. Dynamics*, 415 U.S. at 498.  Since *General Dynamics*, various courts—including the Second Circuit—have relied upon a multiplicity of relevant factors in performing a Section 7 violation analysis.  *See Waste Mgmt.*, 743 F.2d at 981–84 (considering ease of entry into the relevant product and geographic market in its determination that the merger did not violate Section 7); *see also Chi. Bridge*, 534 F.3d at 437–39 (offering a detailed analysis of a barriers-to-entry defense, ultimately determining that there was substantial evidence to conclude that such defense was insufficient to rebut the *prima facie* case); *Anthem*, 855 F.3d at 364 (affirming the lower court's ruling after a consideration of the "totality of circumstances," including an examination of claimed merger-specific efficiencies); Horizontal Merger Guidelines (offering in great detail the variety and types of evidence the DOJ relies upon to determine whether a horizontal merger would substantially lessen competition).

## II.    APPLICATION OF THE *BAKER HUGHES* STANDARD

### A.  Relevant Market Definition and Plaintiffs' Standing

Prior to analyzing a potential Section 7 violation, a court must first address the gating issues of market definition and standing.  *See United States v. E.I. du Pont de Nemours & Co.*,

46

353 U.S. 586, 593 (1957) ("Determination of the relevant market is a necessary predicate to a finding of a violation of the Clayton Act."); *Biocad, JSC v. F. Hoffman-La-Roche, Ltd.*, No. 16 Civ. 4226, 2017 WL 4402564, at *3 (S.D.N.Y. 2017) ("[A]ntitrust standing is 'a threshold, pleading-stage inquiry'") (quoting *Gatt Commc'ns, Inc. v. PMC Assocs., LLC*, 711 F.3d 68, 75 (2d Cir. 2013)).  As this Court has already held, city-pairs constitute the relevant market for purposes of this proceeding.[26]  *See* Summary Judgment Decision at 26:2–5 (concluding that Defendants' judicial admission concerning the appropriate market definition was enough to support a ruling that city-pairs constitute the "proper geographic market in this case"); Hr'g Tr. at 53:19–20 (Mar. 11, 2019) (Defendants agreeing that "the city pair markets . . . are the relevant markets here"); *see also* First Amended Complaint ¶ 32 (Plaintiffs asserting that "well-defined submarkets exist which, in themselves constitute geographic and/or product markets for antitrust purposes and include what are known as 'city pairs'"); *Fjord I*, 502 B.R. at 40 (stating that "Defendants accept that city-pairs are the properly defined market").  Moreover, within the confines of this city-pairs market definition, the Court has already concluded that these Plaintiffs have made a sufficient showing of standing, finding that Plaintiffs had established their standing as airline customers.  *See* Summary Judgment Decision at 40:20–22 ("Plaintiffs are best positioned to bring an antitrust suit in their role as customers of air travel.").  But such standing does not otherwise extend to allegations of harm suffered by their customers.[27]  *See id.* at 40:14–

---

[26]    In its Summary Judgment Decision, the Court rejected the Plaintiffs' national market theory.  *See* Summary Judgment Decision at 27:8–9 (holding that the Plaintiffs' national market theory is "as deficient as ever"); Hr'g Tr. at 54:11–14 (Mar. 11, 2019) (Defendants stating that they "agree that the relevant markets are city pairs" and noting that the Court has "already held that there is no national market").

[27]    The Court held in its Summary Judgment Decision that Plaintiffs lacked standing in their capacity as travel agents as they were not "efficient enforcers" of antitrust laws.  Summary Judgment Decision at 47:15–19.  In reaching its conclusion, the Court noted that "Plaintiffs [were required to] demonstrate that they [had] remained actual customers in the alleged relevant markets and made plans to patronize those markets again."  *Id.* at 42:11–13 (citing *In re N.J. Title Ins. Litig.*, 683 F.3d 451, 461 (3d Cir. 2012)).

18 (finding that Plaintiffs have standing "in certain markets as customers, but . . . [not] as travel agents"); *see also* Hr'g Tr. at 89:3–8 (Mar. 11, 2019) ("[T]here was a ruling about standing and what was decided was that the [P]laintiffs . . . did not have antitrust standing for purposes of their role as travel agents.").

Notwithstanding the Court's conclusion that Plaintiffs have standing, the "Plaintiffs [at trial] still retain[ed] the burden . . . of identifying which specific [c]ity [p]airs [were] relevant for their claim." Summary Judgment Decision at 46:12–14. In an attempt to satisfy this burden, the Plaintiffs submitted a list of 298 city-pairs before trial as relevant to the Named Plaintiffs' testimony, a notable decrease from the 1,008 city-pairs originally identified as presumptively illegal in the Lundgren Report. *See* Joint Pretrial Order, Ex. 5; Hr'g Tr. at 913:12–19 (Mar. 13, 2019) (stating that Exhibit 5 to the Joint Pretrial Order contains "[t]hree hundred one" city-pairs which include "three duplicates so . . . actually 298" city-pairs that are relevant to the Court's analysis); Hr'g Tr. at 957:7–16 (Mar. 14, 2019) (both Plaintiffs and Defendants affirmed they were in agreement that their respective exhibits of city-pairs reflect the 298 city-pairs originally designated in the Joint Pretrial Order).[28] While the parties initially agreed as to the 298 city-pairs comprising the relevant market, this number shifted during and after trial. *See* Plaintiffs' Proposed FOF/COL ¶ 165 (asserting that the relevant market of city-pairs was instead 204 city-pairs); Defendants' Proposed FOF/COL ¶ 151 (asserting that the relevant market of city-pairs was instead 228 city-pairs). Ultimately, both Plaintiffs and Defendants agreed that the relevant

---

The Court notes that the Defendants continue to dispute that Plaintiffs have in fact established standing. *See* Defendants' Proposed FOF/COL, Section IV(G) (arguing that Plaintiffs lack standing). But for the reasons summarized above and set forth in the Court's prior decisions, the Court overrules the Defendants' objection based on standing.

[28] The Court further notes that the Plaintiffs, in fact, listed only 296 city-pairs—as opposed to 298—in their trial exhibit, a discrepancy not explained during trial. *See* PX-149 (listing 296 city-pairs as the relevant market).

city-pairs for the Court's consideration were the 204 city-pairs listed in Table A to the Plaintiffs'

Proposed FOF/COL.  *See* Hr'g Tr. at 17:5–6 (Apr. 26, 2019) [Adv. Proc. ECF No. 286]

(Plaintiffs' counsel stating that "[t]he 204 . . . are the presumptive illegal markets in which the

Plaintiffs flew"); *id.* at 19:1–3 (Plaintiffs' counsel stating that "for purposes of liability . . . you

would use the numbers in which the Plaintiffs were threatened and that would be the 204"); *id.* at

20:18–23 (Plaintiffs' counsel affirming that "the Court should be looking at the 204" in

determining whether a violation of Section 7 exists); *id.* at 66:20–21 (Defendants' counsel stating

that, on the particular issue of standing, Plaintiffs would need to "show . . . injury in these 204

markets").  Accordingly, the Court's Decision will address the Plaintiffs' claims as to these 204

city pairs.[29]

### B.  Post-Merger Evidence

While most antitrust trials challenging a merger occur before consummation and thus, are

limited to assessing the facts prior to any merger, that is not the case here.[30]  In such

---

[29]    The Plaintiffs state that the 204 city-pairs listed in Table A to the Plaintiffs' Proposed FOF/COL are comprised "[o]f the city pairs . . . which Plaintiffs have flown or will fly in the future [where] presumptively illegal concentrations exist."  Plaintiffs' Proposed FOF/COL ¶ 165.  The Court understands the 204 city-pairs to indicate that the Named Plaintiffs have flown or will fly on 204 of the 765 city-pairs that Dr. Lundgren previously identified in the 2018 Lundgren Declaration as having presumptively illegal post-Merger HHI concentration levels and level increases under the Horizontal Merger Guidelines.  *See also* Hr'g Tr. at 17:3–10 (Apr. 26, 2019) (Plaintiffs' counsel stating that "there is the 765, which was an initial . . . part of the presumptive illegal markets.  The 204, you know . . . are the presumptive illegal markets in which the Plaintiffs flew on . . . [and allege] would likely fly in the future").

[30]    The language of Section 7 is forward-looking in assessing an acquisition that "may" substantially lessen competition.  15 U.S.C. § 18; *see also E.I. du Pont de Nemours & Co.*, 353 U.S. at 597 (noting that the objective of the Clayton Antitrust Act was "primarily to arrest apprehended consequences of inter corporate relationships before those relationships could work their evil, which may be at or any time after the acquisition, depending on the circumstances of the case"); H.R. REP. NO. 94-1373, at 7 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 2637 (noting that "Section 7 is an 'incipiency' statute . . . intended to halt monopolies and restraints of trade in their initial stages, before they ripen into full-scale Sherman Act violations").  The federal pre-merger notification and waiting-period system for large mergers and acquisitions established under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (the "HSR Act"), 15 U.S.C. § 18a, has contributed to this trend of pre-merger challenges.  *See* ABA Antitrust Law Section, Competition/Consumer Protection Policy and North American Comments Task Force, *Analyzing the Scope of Enforcement Actions Against Consummated Mergers in a Time of Heightened Scrutiny* (Apr. 2020) at 1–2 & n.3, https://ourcuriousamalgam.com/wp-content/uploads/Consummated-Mergers-Policy-Task-Force-Apr-2020-FINAL.pdf (noting that "most U.S. merger enforcement challenges are made before the underlying merger has taken place" in part due to an emphasis on pre-merger analysis under the HSR Act); *see also* H.R. REP. NO. 94-1373, at 8

circumstances, post-merger evidence may be potentially probative and relevant for a court's review of the competitive impact of a merger.  *See, e.g., Gen. Dynamics*, 415 U.S. at 504–06 (finding that the lower court's use of post-merger evidence was "justified" as such evidence "went directly to the question of whether future lessening of competition was probable"); Horizontal Merger Guidelines § 2.1.1 (indicating that "[e]vidence of observed post-merger price increases or other changes adverse to customers is given substantial weight" when evaluating a consummated merger); *see also* Horizontal Merger Guidelines § 5.3 (considering "both the post-merger level of market concentration and the change in concentration resulting from a merger" when examining market concentrations).  Not surprisingly, both Plaintiffs and Defendants have submitted post-Merger evidence for the Court's consideration, including Dr. Lundgren's 2018 calculations, lay testimony from certain Named Plaintiffs and Dr. Carlton's retrospective econometric studies.  *See, e.g.,* 2018 Lundgren Declaration ¶ 3 (summarizing his updated findings using post-Merger data from 2017 and 2018); Carlton Dir. Ex. ¶¶ 36–44 (discussing his retrospective analysis of data from 2016); Fry Dir. Ex. ¶ 5 (summarizing his domestic flight history since June 2017).

A court, however, may not blindly rely on post-merger evidence.  To be considered, such evidence must not be the product of manipulative behavior of "violators [attempting to] stave off . . . actions merely by refraining from aggressive or anticompetitive behavior when such a suit

---

(stating that the HSR Act was proposed to provide the government a "realistic chance" to challenge mergers and address larger mergers before they "become almost unchallengeable" post-consummation).  Indeed, challenges to mergers have occurred prior to or shortly after consummation.  *See, e.g., E.I. du Pont de Nemours & Co.*, 353 U.S. at 598 (noting that "[p]rior cases under [Section] 7 were brought at or near the time of acquisition"); *Baker Hughes*, 908 F.2d 981 (reviewing a lower court's denial to issue an injunction to enjoin a proposed acquisition); *Anthem*, 855 F.3d 345 (reviewing a lower court's granting of a permanent injunction of a proposed merger between the second-and third-largest national health insurance carriers); *see also New York v. Kraft Gen. Foods Inc.*, 926 F. Supp. 321 (S.D.N.Y. 1995) (assessing a Section 7 challenge to a merger brought approximately 5 weeks after its consummation); *United States v. Bazaarvoice, Inc.*, No. 13-CV-00133-WHO, 2014 WL 203966 (N.D. Cal. Jan. 8, 2014) (assessing a Section 7 challenge to a merger approximately one year after the merger closed).

[is] threatened or pending." *Gen. Dynamics*, 415 U.S. at 504–05.  Indeed, courts have recognized that determination of the probative value of post-merger evidence is tied to whether it is possible for such evidence to be easily manipulated.  *Compare Chi. Bridge*, 534 F.3d at 435 (stating that the probative value of post-merger evidence easily subject to manipulation is "deemed limited") *with United States v. Bazaarvoice, Inc.*, No. 13-CV-00133-WHO, 2014 WL 203966, at *4 (N.D.Ca. 2014) (noting that "post-merger evidence that is not subject to manipulation is of greater probative value, and may be dispositive")*; see also Lektro–Vend Corp. v. Vendo Co.*, 660 F.2d 255, 276 (7th Cir. 1981) (holding that "post-acquisition evidence favorable to a defendant can be an important indicator of the probability of anticompetitive effects," particularly where such evidence "could not reflect deliberate manipulation by the merged companies [to] temporarily . . . avoid anticompetitive activity"); *United States v. Int'l Harvester Co.*, 564 F.2d 769, 780 (7th Cir. 1977) (holding that post-merger evidence that is "beyond the power of the parties to manipulate" may be properly considered).

Applying these principles here, the Court concludes that the post-Merger evidence here is appropriate and helpful in assessing the Section 7 inquiry now before it.  Considering the amount of time that has passed since the consummation of the Merger in 2013 and the nature of the evidence presented, the Court finds little basis, if any, to suggest that the evidence submitted is subject to American's manipulation.  The majority of the evidence provided by Defendants centers on market trends involving third parties such as LCCs and ULCCs, as well as industry metrics on pricing, capacity and output spanning a period of up to five years.  If anything, the protracted passage of time since the closing of the Merger makes the conclusions derived from the post-Merger evidence even more compelling.

### C.  Plaintiffs' *Prima Facie* Case

Under the burden-shifting Section 7 analysis, plaintiffs generally bear the initial burden of formulating a *prima facie* case, which may be established on "only one factor, market concentration."  *Baker Hughes*, 908 F.2d at 984; *see also* Summary Judgment Decision at 18:7–12 (stating that a *prima facie* case is typically established with market concentration statistics). The Plaintiffs' *prima facie* case here rests on two principal allegations: (1) that the Merger has led to presumptively illegal market concentrations in relevant city-pair markets as reflected in Dr. Lundgren's HHI calculations and (2) that there has been a general market trend towards an increase in concentration in the domestic passenger airline industry over the past year.  *See* Summary Judgment Decision at 50:23–51:5 (citing the First Amended Complaint at 12 & App. A and Plaintiffs' Cross-Motion at 12–15).

The Court finds that Plaintiffs have satisfied their burden of establishing a *prima facie* Section 7 case based on the updated post-Merger HHI calculations provided in the 2018 Lundgren Declaration with respect to each of the 204 city-pairs comprising the relevant market. While the 80% reduction in relevant city-pairs from the Plaintiffs' original 1,008 DOJ City-Pairs to the 204 number now before the Court is striking, the Court finds that the concentration statistics provided by Plaintiffs for the 204 city-pairs satisfy the requirements set forth in the Horizontal Merger Guidelines.  *See* Horizontal Merger Guidelines § 5.3.  Plaintiffs indicated that post-Merger HHI concentration levels and changes in HHI levels for each of the 204 city-pairs were in excess of 2,500 and 200, respectively.  *See* Plaintiffs' Proposed FOF/COL, Table A. Specifically, Dr. Lundgren's calculations reflected 2018 HHI levels for the relevant city-pairs ranging from 2,640 to 9,635 and changes in HHI levels from 2012 to 2018 ranging from 215 to 5,693, levels which were sufficiently high under the Horizontal Merger Guidelines to establish a

presumption of anticompetitive concerns.[31]  *See id.* (providing the city-pairs for which, pursuant to Dr. Lundgren's HHI calculations, are "presumptively illegal" under the DOJ's Horizontal Merger Guidelines); *see, e.g., United States v. Anthem Inc., et al.*, 236 F. Supp. 3d 171, 257 (D.D.C. 2017), *aff'd*, 855 F.3d 345 (D.C. Cir. 2017) (holding that plaintiffs' post-merger market share and HHI concentration figures were "sufficiently large" to establish a *prima facie* case); *United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 72 (D.D.C. 2011) (concluding that a post-merger change in HHI levels of approximately 400 and a post-acquisition HHI level of 4,691 was sufficient to establish a *prima facie* case of anticompetitive effects); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 716 (D.C. Cir. 2001) (finding that a post-merger increase in HHI levels of 510 points established a presumption of anticompetitive effects by a "wide margin" pursuant to the Horizontal Merger Guidelines).  Generally speaking, only the "closest available approximation" of market shares and HHI estimates is all that is needed; exact precision is not necessary.[32] *Anthem*, 236 F. Supp. 3d at 207 (stating that plaintiffs "need not present market shares and HHI estimates with the precision of a NASA scientist") (quoting *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 54 (D.D.C. 2015)); *see also H&R Block*, 833 F. Supp. 2d at 72 (indicating that a "reliable, reasonable, close approximation of relevant market share is sufficient").

Additionally, the Court notes that there is a "clear general trend towards concentration" in the domestic airline industry, a fact not contested by Defendants.  Summary Judgment Decision

---

[31]    Notably, Defendants "[do] not assert that Plaintiffs have failed to meet their *prima facie* burden." Defendants' Proposed FOF/COL ¶ 70.

[32]    As previously noted, Dr. Lundgren attempted to replicate the DOJ's HHI figures as set forth in the DOJ Complaint and acknowledged that although there was a 98% correlation between his calculations and the DOJ's calculations, "most [of his] HHI calculation[s] . . . showed deviations."  Lundgren Report at 5.  Nonetheless, Dr. Lundgren believed that, because of the high correlation between the two sets of figures, any antitrust conclusions derived would essentially be the same. *See id.* at 14.  Since only an approximation is required to establish a *prima facie* case, the Court will not address the precision of Dr. Lundgren's HHI calculations at this juncture.  Indeed, Defendants do not take any position as to the accuracy of Dr. Lundgren's calculation of HHI figures in his various reports and declarations.  *See* Defendants' Proposed FOF/COL ¶ 69.

at 53:24–55:24 (discussing the mergers among the other large passenger airlines in recent years as well as Plaintiffs' assertions concerning barriers to entry). Accordingly, the Court concludes that Plaintiffs have sufficiently established a *prima facie* case of anticompetitive effects in the relevant market.

### D. Defendants' Rebuttal Case

Generally, "[i]t is a foundation of [S]ection 7 doctrine . . . that evidence on a variety of factors can rebut a *prima facie* case." *Baker Hughes*, 908 F.2d at 984. Indeed, courts have looked to a number of factors in deciding whether defendants have made a successful rebuttal, including, among other things: ease of entry, market share and concentration, industry structure and supply and demand elasticities. *See id.* at 985 (citing examples of a multiplicity of factors that courts have considered in determining whether a *prima facie* case has been rebutted). While there is no clear standard governing a defendant's rebuttal of a *prima facie* case, there is a general principle of direct proportionality between the compelling nature of a *prima facie* case and the amount of evidence that a defendant must present to successfully rebut a presumption of undue concentration. *See FTC v. CCC Holdings Inc.,* 605 F. Supp. 2d 26, 46–47 (D.D.C. 2009) (stating that despite a lack of a clear standard, "[t]he more compelling the prima facie case, the more evidence the defendant must present to rebut [the presumption] successfully") (quoting *Baker Hughes*, 908 F.2d at 991) (internal quotations omitted). To rebut the Plaintiffs' *prima facie* showing, Defendants have submitted, among other things, both expert and lay witness testimony on the various effects of the Merger on the airline industry.

### i. Dr. Carlton's Econometric Analysis

Defendants' expert witness, Dr. Carlton, presented three separate econometric analyses to rebut Plaintiffs' allegation that the Merger had resulted in presumptively illegal market concentrations. Courts have generally recognized and accepted the use of econometric analysis

in evaluating a potential Section 7 violation.  *See, e.g., United States v. AT&T Inc.*, 310 F. Supp.

3d 161, 215–18 (D.D.C. 2018), *aff'd,* 916 F.3d 1029 (D.C. Cir. 2019) (determining that Dr.

Carlton's regression analysis provided "significant, real-world evidence" and could be afforded

probative weight in predicting the potential pricing effects of a challenged vertical merger); *New

York v. Kraft Gen. Foods Inc.*, 926 F. Supp. 321, 333–35, 341 (S.D.N.Y. 1995) (evaluating

econometric analysis from both plaintiffs and defendants in assessing a potential Section 7

violation); *see also* Horizontal Merger Guidelines § 6.1 (stating that in determining extent of

unilateral effects and "[w]here sufficient data are available, the Agencies may construct

economic models designed to quantify the . . . price effects resulting from the merger").  Dr.

Carlton's first study examined the retrospective impact of prior legacy carrier mergers, his

second analyzed the prospective impact of the Merger as of 2013 and his third reviewed the

retrospective impact as of 2016 of the last three legacy airline mergers, including this Merger.

*See* Carlton Dir. Ex. ¶ 7.  The Court finds these three studies—and Dr. Carlton's related

testimony—to be credible and very persuasive evidence.

Dr. Carlton's first study is a 2013 retrospective analysis, employing a "variety of

analyses, including the use of regression techniques" and concluding that the prior two legacy

mergers of Delta and Northwest and United and Continental Airlines "did not generate

anticompetitive fare increases or output reductions." *Id.* ¶ 23.  Specifically, the 2013

retrospective study examined overall trends in post-9/11 ASMs and found that capacity had, in

fact, increased following each of the two prior legacy mergers. *See id.* ¶ 21.  Notably, the 2013

study further concluded that fluctuations in airline capacity were "effectively . . . mirror image[s]

of . . . pattern[s] in unemployment," thereby suggesting that capacity reductions in the years prior

to the Merger were likely "associated with poor macroeconomic conditions" and not with other

55

legacy airline mergers.  *Id.* ¶ 22.  The results of Dr. Carlton's 2013 retrospective study lend

support to the notion that, despite the airline industry's overall trend towards concentration, the

prior legacy airline mergers did not, as of 2013, result in anticompetitive effects.

Dr. Carlton next performed a prospective study in 2013 to investigate the potential

competitive impact of the then-proposed Merger.  *See id.* ¶ 24.  Specifically, Dr. Carlton

concluded that the Merger would yield considerable consumer benefits as a result of improved

network quality and thus would have a procompetitive effect.  *See id.*  Incorporating American's

internal estimates that the Merger could lead to an overall increase of 2.9 million passengers (or

approximately 2.8%)[33] for the combined entity, Dr. Carlton estimated that the Merger, on a

"conservative" basis, would produce over $900 million in "consumer benefits associated with

[the] merged-party traffic increases," which he viewed as "direct evidence of the increase in

[post-Merger] network quality."  *Id.* ¶ 25–26, 29; *see also id.* ¶ 25 (indicating that his

monetization of consumer benefits, based on an estimation of demand elasticity, was built upon

"well-accepted methodologies . . . also relied upon by DOJ staff to assess past airline mergers").

Coupling this with overestimates of possible post-Merger fare increases from separate published

papers,[34] Dr. Carlton concluded that the estimated $900 million in consumer benefits would far

---

[33]    American's estimate was achieved through QSI modeling, a planning tool generally utilized among airline carriers in the ordinary course to predict traffic levels for schedules of flights by all carriers.  *See* Carlton Dir. Ex. ¶ 27.

[34]    Dr. Carlton's estimated fare increases were based on the following: (1) "Baseline fare concentration effects" figures derived from Dr. Carlton's own study and (2) "BLS fare effects" figures derived from Jan K. Brueckner, Darin Lee & Ethan S. Singer, *Airline Competition and Domestic US Airfares: A Comprehensive Reappraisal*, 2 Econ. of Transp. 1 (2013).  Carlton Dir. Ex. ¶ 32 & n.2.

exceed any possible adverse impacts on prices, resulting in significant net consumer benefits.[35]
*See id.* ¶ 33.[36]

Finally, Dr. Carlton performed a final retrospective study in 2016 that examined the competitive impact of the last three legacy carrier mergers, including the Merger, on both a collective and individual basis.[37] The results of the 2016 retrospective study confirmed the conclusions of Dr. Carlton's prior 2013 studies and found that, as of 2016, the Merger did not have an anticompetitive impact. *See id.* ¶¶ 38, 44. Rather, the 2016 retrospective study found, among other things, that the Merger produced "procompetitive output expansions on nonstop overlap routes, indicating reductions in quality-adjusted fares[38] and a lack of anticompetitive effects on connecting overlaps." *See id.* ¶ 44.

Of particular significance is the 2016 retrospective study's use of the multiple regression "difference-in-differences" technique[39] and its findings on overlapping routes served by either both merging carriers or one of the merging carriers and one other carrier, the routes where

---

[35]  The fare increase estimates were predicated upon the assumption that there would be "no rival response to a merger which combine[d] two carriers on a route." Carlton Dir. Ex. ¶ 32.

[36]  The 2013 prospective study did not account for the divestitures that were a part of the DOJ Settlement. *See* Carlton Dir. Ex. ¶ 35. Dr. Carlton opined that the estimated net consumer benefits would be even greater to the extent the DOJ Settlement produced additional benefits to consumers. *See id.*

[37]  The data used for the 2016 study was derived from the DB1B database, the same database used by Dr. Lundgren, as well as airline schedules from the Official Airline Guide and the T100 (Form 41) database from the Bureau of Transportation Statistics. *See* Carlton Dir. Ex. ¶ 40.

[38]  To estimate changes in quality-adjusted fares that cannot generally be directly computed, Dr. Carlton relied on the assumption that output as measured in number of passengers and quality-adjusted fares were inversely related. *See* Carlton Dir. Ex. ¶ 39 (noting that this was done to recognize that quality-adjusted fares may have decreased despite an increase in nominal fares).

[39]  The "difference-in-differences" estimation methodology, a "standard econometric technique," is a form of multiple regression analysis that compares changes in a treatment group versus changes in a control group to capture general trends while controlling for outside factors. *See* Carlton Dir. Ex. ¶ 38 (summarizing the "difference-in-differences" estimation methodology); *see also* Hr'g Tr. at 1248:3–11 (Mar. 15, 2019) (Carlton testifying that the difference-in-differences methodology is used to "evaluate the effect of . . . a treatment, in this case a merger . . . [and] allows you to isolate what is the effect of . . . the merger as distinct from all other factors in the industry").

anticompetitive impacts likely would be most pronounced.  *See id.* ¶¶ 37–38.  Specifically, Dr.

Carlton compared changes on these potentially affected routes (i.e., a "treatment" group) against

changes on routes likely not impacted by the merger (i.e., a "control group"), allowing for the

isolation of merger effects and the suggestion of a causal impact.[40]  *See id.* ¶ 38.  The

"difference-in-differences" methodology allows for the accounting of "confounding effects of

non-merger related changes in economic conditions, identifying the merger effects by relying on

effects experienced only on overlap routes but not on control routes, with common changes

across overlap and control routes attributed to non-merger related changes."  *Id.*  As noted in the

publication of Dr. Carlton's 2016 retrospective study in the *International Journal of Industrial

Organization*, the "difference-in-differences" methodology "account[s] for inflation when

examining changes in fares over time."  Dennis Carlton, Mark Israel, Ian MacSwain & Eugene

Orlov, *Are Legacy Airline Mergers Pro- or Anti-Competitive? Evidence from Recent U.S. Airline

Mergers*, 62 INT'L J. OF INDUS. ORG. 58, 66 n.8 (2019); *see* Carlton Dir. Ex. ¶ 7 (noting the

publication of the 2016 retrospective study in the "peer-reviewed International Journal of

Industrial Organization").  Examining nonstop routes where the impact of the Merger would be

most evident, Dr. Carlton found that prices after the Merger decreased by approximately 12.3%,

the number of passengers (i.e., output) increased by approximately 20.2% while the number of

available seats (i.e., capacity) increased by approximately 19.6%.  *See* Carlton Dir. Ex. ¶¶ 37, 43.

Dr. Carlton's findings of an increase in output on these routes are consistent with other findings

of increases in American's capacity since the Merger was consummated.  *See* Garboden Dir. Ex.

---

[40]    The 2016 retrospective study examined both nonstop and connecting routes.  With respect to nonstop
routes, the "treatment" group was comprised of pre-merger routes where the merging parties were either the only
two nonstop carriers ("2-to-1 nonstop routes") or were two of three nonstop carriers ("3-to-2 nonstop routes").  *See*
Carlton Dir. Ex. ¶ 41.  In contrast, the "control group" was generally comprised of connecting or non-nonstop
overlapping routes comprised of the same number of nonstop carriers as those in the "treatment" group during the
respective pre-merger period.  *Id.*  Similar analysis was used to examine overlap connecting routes, comparing such
routes against non-overlap connecting routes.  *Id.*

¶ 27, Table 4 (reflecting an annual increase in ASMs for American beginning in 2013).

Moreover, Defendants have shown that such increases in output continued for another two years

following Dr. Carlton's final study. *See id.* ¶ 26 (noting an increase of 8.5% in total ASMs from

2013 through 2018); *id.* ¶ 29 & Table 5 (stating that there was a "5% increase in total annual

seats on American flights alone for flights to and from its 9 hubs" between 2013 and 2018).

The conclusions set forth in Dr. Carlton's 2016 retrospective study on overlapping

routes—where anticompetitive effects likely would be most evident—are especially compelling

because the study utilized methodologies that isolated merger effects and accounted for factors

such as inflation.  Impacts on prices, market output and capacity are generally considered

indicators of a merger's competitive impact, and showings of increased output have been found

to overcome claims of anticompetitive effects in other antitrust contexts.  *See, e.g., Ohio v. Am.*

*Express Co.*, 138 S.Ct. 2274, 2288 (2018) (stating that, in evaluating alleged violations under the

Sherman Act, the court "[would] 'not infer competitive injury from price and output data absent

some evidence that tends to prove that output was restricted or prices were above a competitive

level'") (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 237

(1993)); *Brooke Grp.*, 509 U.S. at 237 (noting, in a predatory price discrimination suit under the

Robinson-Patman Act, "[w]here . . . output is expanding at the same time prices are increasing,

rising prices are equally consistent with growing product demand"); *cf.* Horizontal Merger

Guidelines § 2.2.1 ("Explicit or implicit evidence that the merging parties intend to raise prices,

reduce output or capacity . . . after the merger, or explicit or implicit evidence that the ability to

engage in such conduct motivated the merger, can be highly informative in evaluating the likely

effects of a merger.").

Dr. Carlton also pointed out difficulties with Dr. Lundgren's approach. Dr. Carlton examined changes in airfares for the 15 largest city-pairs of the 1,008 presumptively illegal city-pairs Dr. Lundgren initially identified in the Lundgren Report. *See* Carlton Dir. Ex. ¶ 65. He found that Dr. Lundgren's calculations reflect decreased average airfares for 13 of the 15 routes between 2012 and 2018. *See id.* Moreover, to the extent such changes in airfares are weighted by traffic, the weighted average fare actually decreased over the same period, implying that the average customer actually paid less post-Merger. *See id.* ¶ 66. Similarly, Dr. Carlton looked at changes in fares for the 15 largest city-pairs of the 298 city-pairs originally identified in the Joint Pretrial Order as comprising the relevant market for this proceeding.[41] *See id.* ¶ 68; Joint Pretrial Order, Ex. 5 (listing the 298 city-pairs relevant to the Named Plaintiffs' testimony to comprise the relevant market for purposes of this proceeding). He also found that average fares typically fell and, when weighted by traffic, average passengers paid approximately the same post-Merger as they did pre-Merger. *See* Carlton Dir. Ex. ¶¶ 68–69. Of the 15 largest city-pairs in the subset of 298 city-pairs, 11 of these city-pairs remain as part of the relevant market for purposes of this proceeding. *Compare* Carlton Dir. Ex., Dem. 8 *with* Plaintiffs' Proposed FOF/COL, Table A (listing the 204 city-pairs ultimately comprising the relevant market).

Taken together, Dr. Carlton's three econometric analyses and his related testimony credibly demonstrate that the Merger has expanded airline output, and that it has resulted in a reduction of average fares, an increase in the number of total passengers, and an increase in the

---

[41] Plaintiffs criticize Dr. Carlton for his failure to individually address all of the 1,008 city-pairs identified as presumptively illegal in the Lundgren Report as well as the subset of 298 city-pairs initially comprising the relevant market for this proceeding. *See* Plaintiffs' Proposed FOF/COL ¶ 327 ("Dr. Carlton's study did not analyze all 1,008 city pair relevant markets identified in Plaintiffs' First Amended Complaint or all 298 city pairs identified by Plaintiffs in this case"). The Court notes that Dr. Carlton's analysis was prepared prior to the commencement of trial during which time the number of city-pairs that Plaintiffs sought to include as the relevant market was in flux. As previously discussed, the Plaintiffs further modified the number of relevant city-pairs downward to 204 after the start of trial. *See* Plaintiffs' Proposed FOF/COL, Table A. Given the changing scope and number of relevant city-pairs over the course of this proceeding, the Court rejects Plaintiffs' criticism of Dr. Carlton on this score.

number of seats available.  *See* Carlton Dir. Ex. ¶¶ 7, 44.  Dr. Carlton has demonstrated that

competition in the relevant markets and the airline industry generally remains robust and that the

Merger has not substantially lessened competition.  Dr. Carlton's studies are particularly

compelling when juxtaposed against Dr. Lundgren's testimony primarily centered on HHI

calculations for the 204 city-pairs comprising the relevant market.  Generally speaking, HHI

calculations alone are only a starting point in an antitrust inquiry.  *See Anthem*, 236 F. Supp. 3d

at 209 (noting that the Horizontal Merger Guidelines "make clear that calculating market shares

and applying them in the HHI is a predicate step to determining whether agencies need to

investigate a potential merger further"); *FTC v. Warner Comm'ns, Inc.*, 742 F.2d 1156, 1163 n.1

(9th Cir. 1984) (holding that concentration statistics merely provide a "meaningful context

within which to address the question of [a] merger's competitive effects"); *Chi. Bridge,* 534 F.3d

at 432 (cautioning that a party was "plac[ing] too much weight on the HHIs as a dispositive

measure of market concentration" in light of other existing evidence).  Rather, HHI calculations

are primarily useful in providing a useful framework and starting point for a more fulsome

analysis of competition in the relevant market.  *See* Horizontal Merger Guidelines § 5.3 (stating

that market concentration is "often one useful indicator of [the] likely competitive effects of a

merger . . . used in conjunction with other evidence of competitive effects" and "may not fully

reflect the competitive significance of firms in the market or the impact of a merger").  In fact,

Dr. Lundgren himself acknowledged that higher HHIs are merely "*associated* with an increased

likelihood of reduced competition."  Hr'g Tr. at 809:2–6 (Mar. 13, 2019) (emphasis added); *see

also* Carlton Dir. Ex. ¶ 9 (discussing how an increase in HHI "by itself is not evidence of harm to

competition"); *id.* ¶ 50 (providing a hypothetical situation where a single firm's increase in

output results in an overall increase in HHI despite other firms remaining unchanged to illustrate a scenario in which increases in HHI may be entirely consistent with increases in competition).

### ii.    Other Evidence of Competition in the Airline Industry

The Defendants' other evidence further rebuts the Plaintiffs' *prima facie* case.  In the five years after the Merger's consummation, measures of airline capacity—total seats, total ASMs and total passengers flown—for both American individually as well as the airline industry overall have seen notable increases.  *See* Garboden Dir. Ex. ¶¶ 26–27 (stating that from 2013-2018, American saw "a 4.5% increase in total seats, a 4.6% increase in total passengers flown, and an 8.5% increase in total ASMs" while the largest U.S. airlines have seen year-by-year increases in capacity).  In the same vein, post-Merger TRASM in real dollars, after accounting for inflation, has also declined for both American and the overall industry.  *See* Garboden Dir. Ex. ¶¶ 41–43 & Tables 8–10 (finding that overall TRASM for American and the airline industry has declined since the Merger in a manner consistent with fluctuations in fuel prices).

Additional characteristics of the airline industry further reflect a continuing trend of robust competition.  Foremost of these is the continued vitality of LCCs.  The evidence conclusively establishes that they remain a formidable competitive force within the airline industry and place downward pressure on air fares—a phenomenon that even Plaintiffs' own witnesses, including Dr. Lundgren, have acknowledged.[42]  *See, e.g.,* Hr'g Tr. at 823:6–22 (Mar.

---

[42]    Plaintiffs, citing to a study prepared by the Government Accounting Office, have argued that the Southwest Effect "may not be as prominent following a merger," a contention derived from a finding that Southwest had raised fares in markets following the mergers of Delta and Northwest and US Airways and America West.  Hr'g Tr. at 427:12–428:6 (Mar. 11, 2019).  However, as noted, Plaintiffs' own witnesses, including Dr. Lundgren, have offered both statements and anecdotal observations which detract from Plaintiffs' assertions.

Additionally, Plaintiffs' assertions run contrary to the findings set forth in the paper, "Airline Competition and Domestic U.S. Airfares: A Comprehensive Reappraisal," published in the *Economics of Transportation*, which both parties refer to and rely upon for its methodologies. *See* Brueckner, Lee & Singer, *supra* note 34; Lundgren Report at 9 & n.3 (describing his adoption of the authors' approach for combining airports into city markets in an attempt to replicate the DOJ's HHI figures); Lundgren Report, Ex. B (including a copy of the cited paper); Carlton Dir. Ex. ¶ 32 (discussing his use of the authors' fare estimates in addition to his own to evaluate the impact of the

13, 2019) (Dr. Lundgren stating during direct examination that "[i]n those markets where the LCCs are operating, there would be—I'm going to assume that they have lower, the legacy airlines, that those fares are lower typically.  Yes, [LCCs] would bring down the average in those markets."); Hr'g Tr. at 110:16–111:4 (Mar. 11, 2019) (Rubinsohn agreeing that his observation that airfares were "significantly less" on routes where Southwest flies was an example of the "Southwest Effect").  Given their low-cost business model and relatively younger aircraft fleet, LCCs remain poised for additional growth and expansion.  *See* Kasper Dir. Ex. ¶¶ 43–46 (stating that LCCs are likely to continue their growth, largely driven by the expansion of ULCCs whose cost structures are lower than even that of Southwest or JetBlue).  While there are substantial capital costs for new entrants into the airline industry generally, barriers to entry for existing carriers into new routes are relatively low, suggesting that the further expansion of LCCs and ULCCs remains a possibility.[43]  *See* Parker Dir. Ex. ¶ 7 (highlighting the "low barriers to entry into routes"); Kasper Dir. Ex. ¶ 50 (stating that "LCC entry into particular city-pairs can (and does) occur rapidly").  Indeed, the expansive growth of LCCs over the past several years reflects the degree to which LCCs are able to enter into routes.  *See, e.g.,* Kasper Dir. Ex. ¶ 50 (noting that Spirit, a ULCC, added non-stop service to 25 new destinations from Dallas Fort-Worth between 2011 and 2013); *id.* (noting that LCC flights at three slot-controlled airports increased

---

Merger).  The Court notes the paper concludes that "most forms of legacy-carrier competition have weak effects on average fares" while LCC competition has "dramatic fare impacts, whether it occurs on the airport-pair, at adjacent airports, or as potential competition."  Brueckner, Lee & Singer, *supra* note 34, at 1; *see also id.* at 2 (highlighting the study's empirical findings that show decreases in airfares where LCCs are present).

[43]    Plaintiffs argue that there are substantial barriers to entry in the airline industry based on the assertion that there have not been any major airline entrants to the market in recent years.  *See* First Amended Complaint, ¶¶ 159–60 (stating that there have only been two new major carrier entrants in recent years and no "new, viable competitors in the national market since 2000"); Plaintiffs' Proposed FOF/COL ¶¶ 181, 185 (noting testimony of Daniel Kasper acknowledging that Virgin America was the last major airline carrier to enter the market in 2007) (citing Hr'g Tr. at 1040:16–22 (Mar. 14, 2019)).  But Plaintiffs do not themselves provide any further evidence or analysis to support their contention, which the Court finds unpersuasive given the continued expansion of LCCs.

more than nine-fold between 1999 and 2016); *id.* ¶ 61 ("LCCs have more than quintupled their

share of the U.S. domestic airline market . . . [and] 87% of all domestic air passengers travel on

city-pairs that are served by at least one LCC").[44]

In sum, Defendants were uniquely positioned to observe the effects of the Merger several

years after its consummation given the timing of trial in this case.  This evidence about the

airline industry pre- and post-Merger, as well as an analysis of the impact of the Merger

specifically through the use of econometric methodologies (which isolate and control for factors

such as inflation), was highly persuasive in supporting Defendants' position.  Moreover, given

the length of time that has passed since the Merger, the potential for manipulation of post-Merger

evidence appears improbable.  Given all the compelling evidence outlined above that has been

presented by the Defendants, the Court concludes that Defendants have easily overcome

Plaintiffs' *prima facie* showing.[45]

### iii.  Evidence of the Merger's Efficiencies

Defendants have also turned to purported efficiencies in support of their position.  Some

courts have considered a merger's efficiencies when evaluating an antitrust claim.  *See Deutsche*

*Telekom*, 439 F. Supp. 3d at 207 (noting that the trend among lower courts has been to

---

[44]    Indeed, as previously discussed, the Merger itself was driven in part by a desire to strengthen American and US Airways' ability to compete with LCCs and ULCCs.  *See* Parker Dir. Ex. ¶ 32 (noting that LCCs have "entered many of these routes since the Merger"); Kasper Dir. Ex. ¶ 73 (noting that American's initial foray into bankruptcy was driven in part by "heightened competition from LCCs").  The recent gate and slot divestitures that were part of the DOJ Settlement may further strengthen the competitive position of LCCs.  *See* Carlton Dir. Ex. ¶ 17 (noting that the role of LCC competition was "enhanced by the slot and gate divestitures agreed to in the settlement of the DOJ litigation").

[45]    Defendants have further argued that the Merger resulted in additional procompetitive efficiencies, stemming from the combination of American and US Airways' complementary networks.  They believed that the merging of the airlines' networks would yield "significant benefits for consumers, particularly with respect to travel options"—resulting in procompetitive benefits to consumers generally as well as to smaller communities—and increased efficiencies in infrastructure investments and the expansion of its fleet aircraft.  Defendants' Proposed FOF/COL ¶ 89; *see id.* ¶¶ 95, 97–98; Kasper Dir. Ex. ¶ 86.

"recognize or at least assume that evidence of efficiencies may rebut the presumption that a merger's effects will be anticompetitive, even if such evidence could not be used as a defense to an actually anticompetitive merger"); *see also Anthem*, 855 F.3d at 355 (stating that the court will "proceed on the assumption that efficiencies as presented by Anthem could be such a defense under a totality of the circumstances approach"); *Saint Alphonsus*, 778 F.3d at 790 (stating that the court will "assume . . . [that] a defendant can rebut a prima facie case with evidence that the proposed merger will create a more efficient combined entity and thus increase competition"); *cf. Deutsche Telekom*, 439 F. Supp. 3d at 208 (noting that claimed efficiencies must be "both merger-specific and verifiable"); *Anthem*, 855 F.3d. at 356 (stating that to be deemed merger-specific, any claimed efficiency must be shown to be unachievable "by either company alone because, if [it] can, the merger's asserted benefits can be achieved without the concomitant loss of a competitor.'") (citing *Heinz*, 246 F.3d at 722); Horizontal Merger Guidelines § 10 (describing when efficiencies would be deemed merger-specific).  While the Court finds Defendants' evidence of efficiencies both credible and persuasive, the Court does not need to rely upon the purported efficiencies claimed by Defendants in reaching its conclusion today given that the Defendants' other evidence discussed above easily overcomes Plaintiffs' *prima facie* case.

### iv.  Likelihood of Coordination in the Airline Industry

Nonetheless, while the Court finds the Defendants' evidence discussed above to be credible and convincing, it is not persuaded by one aspect of Defendants' case.  The Defendants have argued, in part, that conditions in the airline industry are generally not conducive to effective coordination and that the Merger itself was not likely to enhance such coordination to the detriment of competition.  *See* Ordover Dir. Ex. ¶¶ 6–7.  They explain that successful coordination hinges upon participants' ability to enforce coordination, which is dependent upon

65

the "availability of key information concerning market conditions, transactions, and individual competitors." *Id.* ¶¶ 11, 15–16; *see also id.* ¶¶ 12–13 (noting that successful coordination is less likely when parties are unable to monitor rivals' behavior and rivals must adjust prices or strategic actions in response to market conditions). Transparency and full and complete knowledge as to participants' actions is critical. *See id.* ¶ 16 (stating that "transparency is an especially important factor" for parties to both reach terms of coordination and to detect and punish detractors). Defendants assert that the industry is not conducive to coordination, in part, because airlines are unable to properly monitor other airlines' pricing behavior as the "process of setting fares and determining how many seats (if any) to offer at each fare and at each point in time is highly complex," resulting in an "essentially opaque" system. *Id.* ¶¶ 25, 27.

But the Court finds the Defendants' arguments regarding the transparency of airline carrier pricing to be unpersuasive given the history of this bankruptcy. In the main bankruptcy case before this Court, the Debtor AMR sought the Court's approval of its motion to reject certain collective bargaining agreements pursuant to Section 1113 of the Bankruptcy Code. *See generally* Debtors' Section 1113 Application; *AMR I*, 477 B.R. at 393. As part of that proceeding, AMR submitted the expert testimony of Daniel Kasper, one of the same experts who testified in this matter. In explaining the economic challenges facing AMR and the airline industry as a whole, Mr. Kasper opined that there is now "an *unprecedented* level of price transparency resulting from online distribution channels to exert further downward pressure on fares over the past decade." Declaration of Daniel M. Kasper in Support of Debtors' Motion to Reject Collective Bargaining Agreements Pursuant to 11 U.S.C. § 1113 ¶ 72 [Case No. 11-15463, ECF No. 2041, Ex. 1] (emphasis added). A result of this increased transparency has been the "increased commodization of airline travel, especially for price sensitive passengers." *Id.* ¶

66

73.  He attributed the newfound transparency to the "rapid spread of Internet-based airfare search engines [which has] greatly reduced (indeed, almost eliminated) the costs of searching for the lowest possible fares."  *Id.* ¶ 72.  Having found Mr. Kasper to be a highly credible witness in that prior proceeding as well as in this case, the Court cannot reconcile Mr. Kasper's statements concerning "unprecedented" transparency for consumers with the notion that sophisticated corporations (like airlines) lack the ability to monitor fellow competing airlines' prices.  Thus, the Court is not convinced that that coordination within the airline industry is unlikely.  But given the wealth of other evidence provided by Defendants, the Court's view about coordination does not impact the Court's ultimate conclusions concerning the Merger.

### v.  Plaintiffs' Reliance on the Standalone Plan

Plaintiffs seek to undercut Defendants' case by relying on the standalone plan that was discussed in the bankruptcy case before the Merger was proposed.  Plaintiffs harp on the fact that American's capacity increase of 8.5% fell well short of the projected 20% capacity growth over the course of five years under American's standalone plan.  *See, e.g.,* Hr'g Tr. at 12:12–17 (Mar. 11, 2019) (noting that American intended to increase its capacity by approximately 20% over a five-year period); Hr'g Tr. at 372:22–376:3 (Mar. 12, 2019) (suggesting that America, along with other legacy carriers, "rationalized" or reduced capacity since 2005).  But Plaintiffs have failed to demonstrate why a merger should be deemed anticompetitive simply because a merged company failed to ultimately meet a projected benchmark as to capacity or output that was made under an alternative restructuring plan.

Moreover, Plaintiffs' reliance on the projection in the standalone plan takes that projection out of context.  Bankruptcy courts are routinely presented with projections as a basis for confirmation of a plan or other purposes.  The projection relied upon by Plaintiffs here was presented as part of a Section 1113 application by Debtor AMR that sought permission to reject

67

its collective bargaining agreements with its unions. *See generally* Motion of Debtors for Entry

of Order Pursuant to 11 U.S.C. § 1113 Authorizing Debtors to Reject Collective Bargaining

Agreements [Case No. 11-15463, ECF No. 2035] ("Debtors' Section 1113 Application"); *AMR I*,

477 B.R. at 417 (discussing the propriety of American formulating a standalone business plan).

That proceeding examined whether Debtor AMR's proposed changes to the collective bargaining

agreements were necessary for reorganization. As such, the focus was on the Debtors' proposed

changes to the collective bargaining agreements viewed in the context of AMR's ongoing losses.

The capacity increase projected was but one part of AMR's multifaceted standalone plan of that

was the backdrop to an evaluation of AMR's extensive and complex proposed change to the

collective bargaining agreements. *See AMR I*, 477 B.R. at 401–02 (describing the various

elements of the standalone plan). And even where projections are central to an inquiry before

the Bankruptcy Court, they are best understood as estimates based on available information, with

such estimates considered as less reliable the further out in time they extend. *See id.* at 415

(noting that satisfaction of Section 1113(b)'s requirement that a proposal be "based on the most

complete and reliable information available at the time" is difficult to satisfy because "available

information may change based on the twists and turns of the bankruptcy"); *cf.* Kasper Dir. Ex. ¶¶

75–76 (explaining that airlines "respon[d] to . . . changing economic and competitive

conditions," lending support to the notion that projections are not guarantees and remain subject

to ever-changing economic factors). This is powerfully demonstrated by the current economic

difficulties of businesses stemming from the current unforeseen COVID-19 pandemic.

Relatedly, Plaintiffs assert that the many of Defendants' claimed benefits were achievable absent

the Merger, rendering the Merger unnecessary. *See* Plaintiffs' Proposed FOF/COL ¶¶ 241–75

(arguing that American and US Airways' standalone plans for growth obviated the need for the

Merger); *id.* ¶¶ 290–93 (arguing that American could have achieved an expansion of its network

through codesharing as provided for under its standalone plan which "included agreements with

its unions to increase its code sharing [sic] arrangements for which American received approval

as part of the restructuring process").  But once again, that is not the inquiry now before the

Court, which is whether the Merger violates Section 7 of the Clayton Antitrust Act.  In any

event, Plaintiffs' assertions about codesharing ignore the history of this case.  Under AMR's

motion to reject its collective bargaining agreements, AMR did seek approval to enter into

unlimited codesharing agreements.  *See AMR I*, 477 B.R. at 431–32.  But the Court denied that

request.  While the Court acknowledged that increases in codesharing could be beneficial, it

ultimately held that American had not shown "by a preponderance of the evidence . . . that

essentially unlimited codesharing [was] necessary to achieve a successful reorganization." *Id.* at

433.  Additionally, Plaintiffs failed to offer any other evidence to establish that codesharing

could serve as a viable alternative to the Merger.  In fact, Mr. Kasper testified that codesharing

was generally a "considerably inferior" method to expand a network as opposed to a merger due

to the lack of ability to "coordinate schedules . . . [and] pricing."  Hr'g Tr. at 1056:24–1057:6

(Mar. 14, 2019); *see also id.* at 1087:12–1088:14 (Kasper stating that the "literature . . . is quite

clear, and that is that a merger has far more economic benefit for the consumers [sic] than

codesharing").[46]

---

[46]    While the Plaintiffs' argument about whether the Merger was really necessary is not the relevant inquiry
now before this Court, Plaintiffs have not demonstrated that the standalone plan was as good or better in creating
value for stakeholders as the Merger.  Indeed, the Merger that was the basis for AMR's ultimate plan of
reorganization, eventually proved to be highly successful in maximizing value for its constituents and stakeholders,
including providing for recovery to equityholders, a rare occurrence in Chapter 11 proceedings.  *See, e.g.,* Conor
Shine, *What's Next for American Airlines Five Years After its Merger with US Airways*, Dall. Morning News, Dec.
9, 2018, https://www.dallasnews.com/business/local-companies/2018/12/09/what-s-next-for-american-airlines-five-
years-after-its-merger-with-us-airways/; *AMR Shareholders to Receive Rare Value from Chapter 11*, Reuters, Feb.
14, 2013, https://www.reuters.com/article/americanairlines-merger-equity/amr-shareholders-to-receive-rare-value-
from-chapter-11-idUSL1N0BF0T020130215 (highlighting that American's shareholders expected to receive

### E.  Plaintiffs' Additional Evidence of Anticompetitive Effects

With Defendants' successful rebuttal of Plaintiffs' *prima facie* case, the burden now

shifts to Plaintiffs to produce sufficient additional evidence of the Merger's anticompetitive

effects. *See Baker Hughes*, 908 F.2d at 983.  To satisfy their burden, Plaintiffs have submitted

additional information from Dr. Lundgren and testimony from a number of the Named Plaintiffs.

### i.  Dr. Lundgren's Additional Calculations

In addition to his initial HHI figures, Dr. Lundgren submitted unweighted average[47] fare

and passenger growth calculations for the relevant city-pairs.  He contends that a subset of this

data demonstrates fare increases for 2012 through 2016, as well as weighted average fare growth

calculations for the FY 2016 Dataset.[48]  *See* 2017 Lundgren Declaration (calculating unweighted

average fare and passenger growths for the period of 2012 through fiscal year 2016 for

individual city-pairs and an overall average fare growth weighted by passengers on all routes that

experienced increases); 2018 Lundgren Declaration (calculating unweighted average fare and

passenger growths for the period of 2012 through fiscal year 2018 for individual city-pairs).  To

compute unweighted averages for each relevant city-pair, Dr. Lundgren employed the following

formula: the change in the average fare or passenger growth between 2012 and the respective

---

recoveries valued at approximately $350 to $400 million, something "unusual in Chapter 11 cases—and unprecedented in recent airline restructurings").

[47]    The phrase, "unweighted average," simply refers to an arithmetic mean.  *See* Hr'g Tr. at 1262:22–1263:20 (Mar. 15, 2019) (Carlton testifying that Dr. Lundgren took a "simple average" of fluctuations in average fares).  In contrast, a "weighted average" is defined to be "an average that can attach more importance (weight) to some observations than to others."  GRAHAM UPTON & IAN COOK, *Weighted Average, in* A DICTIONARY OF STATISTICS (3d. ed. 2014), https://www.oxfordreference.com/view/10.1093/acref/9780199679188.001.0001/acref-9780199679188-e-1741.

[48]    Of the 298 city-pairs parties comprising the relevant market at the beginning of trial, 78 city-pair routes had nominal average fares that *decreased*, resulting in only 220 city-pairs reflecting an unweighted increase.  *See* PX-149; *see also supra* note 28 (noting that PX-149 lists 296 city-pairs as opposed to 298).  Of the remaining 204 city-pairs being considered at the end of trial, Plaintiffs identified 54 city-pair routes where nominal average fares had decreased, resulting in 150 city-pairs reflecting an unweighted increase.  *See* Plaintiffs' Proposed FOF/COL, Table B.

year of the dataset (i.e., either 2016 or 2018) divided by the corresponding fare or passenger

growth figure for 2012.  *See* 2017 Lundgren Declaration ¶ 12; 2018 Lundgren Declaration ¶ 14.

Finally, Dr. Lundgren's 2017 declaration further includes an average of the change in fares

weighted by passenger growth on all routes that experienced unweighted average increases for

the period 2012 through fiscal year 2016.  *See* 2017 Lundgren Declaration, Annex A.  Plaintiffs'

primary evidence of alleged anticompetitive effects stems from the alleged changes in average

fares in a subset of the city-pairs identified, which Dr. Lundgren states "are presented without

further analysis or conclusions based on statistical, econometric, or other expert economic

analysis."  2017 Lundgren Declaration ¶ 3.

Plaintiffs assert that Dr. Lundgren's average fare calculations are sufficient to establish a

causal link between the Merger and the observed post-Merger average fares.  But the Court

disagrees for a variety of reasons.  First, Dr. Lundgren's fare calculations do not account for

inflation and, therefore, do not shed any light as to the changes in average fares in real-dollar

terms that would permit more informed and accurate comparisons.  *See* Hr'g Tr. at 878:4–11

(Mar. 13, 2019) (Dr. Lundgren conceding that his nominal fares calculations "[do] not talk about

inflation . . . [but rather] the average fare growth in terms of the fares paid in 2012 and the fares

paid in 2016"); *id.* at 880:1–10 (Dr. Lundgren further conceding that "there is no part of [his]

average fare work that is presented in either of [his] two reports that tries to convert the nominal

data into real dollars").  In fact, as Dr. Carlton noted in his testimony, Dr. Lundgren's estimated

7.9% increase in unweighted average fares overall between 2012 and fiscal year 2018 was in

actuality lower than the inflation rate over the same period, implying that "in real terms the price

. . . if [the Court] accepted it . . . means in real terms [that] prices are falling."  Hr'g Tr. at

1262:22–1263:20 (Mar. 15, 2019).

71

Without addressing the effect of inflation on airfares, one cannot conclude that the

Merger is responsible for changes in post-Merger prices. *See* Carlton Dir. Ex. ¶ 64 (noting that

Dr. Lundgren "presents no analysis that accounts for changes in economic conditions . . . and

how such changes . . . affected airline fares independent of any purported effect of the Merger");

Hr'g Tr. at 1248:9–17 (Mar. 15, 2019) (Carlton testifying that he used the "difference-in-

differences" methodology to "isolate what is the effect of, say, the merger as distinct from all

other factors in the industry . . . [including] inflation [and] a whole bunch of things that are going

on"); *see also* Carlton, Israel, MacSwain, & Orlov, *supra* p. 58 , at 58 (stating that because "fares

are affected by many economic factors other than the number of competitors on a route and those

factors may be changing over time . . .  a simple before-and-after examination of *nominal* fares

on routes affected by [a] merger risks attributing the merger trends in fares that may have some

other causes") (emphasis added); *id.* at 66 n.8 ("Generally, one needs to account for inflation

when examining changes in fares over time."). Considerations of the impact of inflation are

even more paramount where there has been a considerable passage of time. *See* Carlton Dir. Ex.

¶ 9 (highlighting that Dr. Lundgren's analysis spans over a period of approximately five-and-a-

half years).

Indeed, courts performing antitrust analysis have considered whether fluctuations in

prices could be explained by inflation or otherwise attributed to anticompetitive behavior. *See,*

*e.g., Brooke Grp.*, 509 U.S. at 213 (noting, as part of its evaluation of a claim under the

Robinson-Patman Act, that "[l]ist prices for cigarettes increased in lockstep, twice a year, for a

number of years, irrespective of the rate of inflation"); *Cablevision Sys. Corp. v. FCC,* 649 F.3d

695, 712 (D.C. Cir. 2011) (affirming the FCC's findings in its issued order that, among other

things, there was still "evidence that cable prices have risen in excess of inflation") (citing to *In*

72

*re Review of the Comm'n's Program Access Rules & Examination of Program Tying Arrangements*, 25 FCC Rcd. 746, 776 ¶ 42 (2010)); *United States v. Eastman Kodak Co.*, 853 F. Supp. 1454, 1473 (W.D.N.Y. 1994) (citing to defendant's expert's conclusion that, among other things, "inflation-adjusted film prices have declined over the previous two years, due primarily . . . to increasing competition" in evaluating whether relief from an antitrust consent decree was warranted).  Because Dr. Lundgren did not control for inflation, concrete conclusions or even inferences cannot be drawn concerning whether the changes in airfares were actually caused by the Merger as opposed to other factors.

Second, Dr. Lundgren's average fare calculations do not account for changes in output, capacity, or quality adjustments during the relevant periods of time, all of which may impact airfares.  *See* Hr'g Tr. at 881:6–15 (Mar. 13, 2019) (Dr. Lundgren acknowledging that his nominal fares computations do not account for industry capacity or output); *id.* at 882:8–883:10 (Dr. Lundgren conceding that his methodology does not account for changes in quality which could have otherwise been achieved through the use of a "hedonic model," a model that allows for the adjustment of price data to account for changes in quality).  Determination of pricing in the airline industry is a multifaceted and complex process and is contingent upon a number of factors, including capacity, which Plaintiffs themselves acknowledge can result in fluctuations in prices.  *See* Ordover Dir. Ex. ¶ 27 (describing the "highly complex" price-setting process of the airline industry); Plaintiffs' Proposed FOF/COL ¶ 280 (stating that "[a]irlines use GDP growth as a predictor of demand to calibrate capacity"); First Amended Complaint ¶ 107 (asserting that "[c]apacity reduction has resulted in higher prices for fares and other services").  As such, the Court is unable to draw any conclusions from Dr. Lundgren's analysis as to whether the variations in airfares are the result of the Merger as opposed to other factors.

Third, Dr. Lundgren treated each city-pair equally, not accounting for the amount of airline traffic.  *See* 2018 Lundgren Declaration ¶ 14 (describing his computation methodology). When a weighted analysis is actually done, average fares on the largest city-pairs appear to have fallen between 2012 and 2018 as previously discussed.  *See* Carlton Dir. Ex. ¶¶ 65–68 (noting that if changes in fares for each of the 1,008 city-pairs were weighted by traffic, the weighted average fare has fallen by 2.1% to 5.3% depending on the weighting performed); Hr'g Tr. at 888:24–889:22 (Mar. 13, 2019) (Dr. Lundgren acknowledging that the calculations submitted in connection with the 2018 Lundgren Declaration did not include an examination of the impact of number of passengers on changes in average fares).  Oddly, only the 2017 Lundgren Declaration included any sort of a weighted analysis, diminishing the ability to perform any meaningful comparisons between Dr. Lundgren's 2017 and 2018 findings or draw his intended inferences as to trends.  The lack of a weighted analysis in his 2018 findings forecloses a conclusion that, at least as of 2018, the average passenger paid more on an identified route pre-Merger than post-Merger.  *See* Carlton Dir. Ex. ¶ 66 (stating that, after weighing each city-pair by traffic, the weighted average fare fell, "imply[ing] that the average passenger . . . paid less after the Merger than before the Merger").

Fourth and finally, Dr. Lundgren's analysis begins in 2012, approximately one year prior to the consummation of the Merger.  Thus, his baseline for comparison does not portray the actual state of the airline industry and market at the time of the Merger.  This calls into question whether anyone may confidently conclude or even infer that any changes in fares actually stemmed from the Merger.

On whole, Dr. Lundgren's barebones calculations—that fail to account for outside factors—do not support Plaintiffs' contention that the Merger resulted in higher post-Merger

prices for certain city-routes, let alone establish a causal relationship between the Merger and post-Merger fares.[49]  Accordingly, the Court finds that Dr. Lundgren has failed to sufficiently demonstrate that the Merger resulted in an increase in airfares on the identified city-pairs.

### ii.    Analysis of the Named Plaintiffs' Testimony

Plaintiffs have also submitted testimony from various Named Plaintiffs about purported harms they have allegedly suffered because of the Merger.  Plaintiffs' testimony, however, is largely anecdotal and fails to establish a causal relationship between these alleged harms and the Merger, rendering this evidence insufficient to establish a showing of the Merger's supposed anticompetitive impact.

First and foremost, many of the Named Plaintiffs' alleged harms are a laundry list of general grievances concerning the state of the airline industry untethered from the Merger.  *See, e.g.,* Hr'g Tr. at 81:14–20 (Mar. 11, 2019) (Rubinsohn testifying that because he was no longer at the "top of the frequent flyer list," he was no longer "boarding in the first group"); *id.* at 84:15–22 (Rubinsohn testifying that due to the closer spacing between seats, there is "not as much knee room as there used to be"); Hr'g Tr. at 572:9–15 (Mar. 12, 2019) (Brito testifying that first-class passengers were no longer entitled to lounge access); *id.* at 574:3–7 (Brito testifying that in-flight seats "don't recline as much and you have less legroom"); *id.* at 612:23–614:17 (Jolly testifying that prices had "increased" because there was a reduction in availability of seats that could be purchased with frequent flier miles and she instead was required to use cash); *id.* at 636:8–21

---

[49]    As previously noted, the Court rejected the admission of the Lundgren Supplemental Report to the extent that it sought to include new opinions concerning the competitive impact of the Merger.  *See* Exclusion Order at 4–7 (denying the Plaintiffs' request to admit the Lundgren Supplemental Report on grounds that, among other things, the Lundgren Supplemental Report did not constitute a "supplement" under Federal Rules of Civil Procedure Rule 26(e) and the timing of the request was inappropriate); *see also* Reconsideration Order (denying Plaintiffs' request for permission to serve the Lundgren Supplemental Report or, in the alternative, for the Court to reconsider the ruling under the Exclusion Order).  As the underlying reasoning for the exclusion of the Lundgren Supplemental Report is set forth in detail in the Exclusion and Reconsideration Orders, the Court will not repeat that analysis here today.

(Jolly testifying that she was "harmed" by an incident with an American employee: "I was on a flight and I was watching the movie, and the flight attendant came from behind me and slammed a can of Coke down on my tray.  And I said, I did not order that.  And she said, I know you didn't because you had your headphones in and you couldn't hear me.  And I just said, please take it away."); Hr'g Tr. at 717:4–718:6 (Mar. 13, 2019) (Talewsky testifying that the quality of food service for first-class had declined because he received a "cold meal" and "on a coast-to-coast flight . . . [he] got, like, a fig bar . . . [and] [t]here was maybe a piece of fruit").  Moreover, some of Plaintiffs' grievances were the direct product of circumstances and choices made by the Named Plaintiff and thus, provided little insight into the industry.  *See, e.g.,* Hr'g Tr. at 245:3–21 (Mar. 11, 2019) (McCarthy testifying that she was "forced" to pay over $3,600.00 to purchase a first-class ticket due to a lack of availability of coach seats when she booked tickets one day prior to her desired travel date); *id.* at 247:17–248:20 (McCarthy testifying that she elected to pay $761 for a first-class flight from Fort Myers to Newark after considering her checked bag, "comfort and value" and "timing").  Plaintiffs have not offered any persuasive explanation as to how the Merger bears a relationship to such alleged harms.[50]

Indeed, the weight of the credible evidence suggests that any of the Plaintiffs' purported "injuries" likely originate not from the Merger itself, but rather from industry changes, particularly amongst legacy carriers, in response to the growth and proliferation of LCCs and ULCCs.  *See* Kasper Dir. Ex. ¶ 41 (discussing how ULCCs have "unbundled" ancillary services, allowing consumers to elect which services they would like to purchase, including carry-on luggage and seat selection); *id.* ¶ 42 (noting that, in response to the proliferation of ULCCs,

---

[50]    The Court had previously highlighted this issue in its Summary Judgment Decision and Plaintiffs have not made any effort to address this problem at trial.  *See* Summary Judgment Decision at 43:19–22 (stating that the "Court agrees with the Defendants about the generality and irrelevance of many of the complaints and statements included").

legacy carriers have adopted "basic" economy fares where, in exchange for a discounted fare, certain ancillary services are unbundled); *see also* Hr'g Tr. at 1085:8–23 (Mar. 14, 2019) (Kasper testifying that legacy carriers were "forced into [unbundling services] kicking and screaming" as a result of a need to compete with LCCs and ULCCs). In fact, the implementation of baggage fees specifically predates the consummation of the Merger. *See* Hr'g Tr. at 123:11– 124:4 (Mar. 11, 2019) (Rubinsohn testifying that he "[paid] for baggage before the [M]erger on American); Hr'g Tr. at 625:13–626:3 (Mar. 12, 2019) (Brito testifying that the "baggage fees started when the fuel crisis [occurred in] 2008, 2010"); *id.* at 656:9–23 (Jolly testifying that the "baggage fees were implemented prior to the [M]erger . . . in 2008"). Sole reliance on the mere coincidence that the alleged harms occurred post-Merger cannot and does not alone establish a conclusion of causation. *See Lavoho, LLC v. Apple, Inc.*, 232 F. Supp. 3d 513, 530 (S.D.N.Y. 2016) (stating that plaintiffs' reliance on the timing of events to prove causation is "a *post hoc ergo propter hoc* logical fallacy" and is insufficient to satisfy their burden), *aff'd sub nom., Diesel eBooks, LLC v. Simon & Schuster, Inc.*, 869 F.3d 55 (2d Cir. 2017). Given the credible evidence before the Court, Plaintiffs have not established a "plausible chain of causation" between the Merger and these subsequent events, rendering Plaintiffs' attempts to make a showing of adverse competitive effects utterly lacking. *Fjord III*, 527 B.R. at 888–89.

Moreover, the timing of Plaintiffs' alleged harms often fails to align with the Merger; that is, the claimed harms supposedly occurred before the Merger was ever consummated. *See, e.g.,* Hr'g Tr. at 109:12–17 (Mar. 11, 2019) (Rubinsohn alleging harm because Pittsburgh and Raleigh ceased to be hubs but later acknowledged that both, in fact, ceased being hubs "way before the [M]erger"); *id.* at 153:3–10 (Russell alleging harm because only American served her preferred airport in Waco but later acknowledged that Continental, a former competitor at the Waco

location, had in fact dropped its flights at least a year prior to the consummation of the Merger);

Hr'g Tr. at 274:23–275:11 (Mar. 12, 2019) (Garavanian acknowledging that the issues he

experienced in booking flights from Boston to Miami on American in 2013 occurred prior to the

closing of the Merger); Hr'g Tr. at 785:12–786:8 (Mar. 13, 2019) (Stansbury acknowledging that

the "increase in fares [she] observed on [a] Reno to New York flight could not have been a result

of the American/US Airways [M]erger"). As the Court has recognized, Plaintiffs bear the

burden of making a showing as to how such alleged harms, which occurred pre-Merger, may be

attributed to the consummation of the Merger itself. *See Fjord III*, 527 B.R. at 889 (noting that

"all of these alleged harms occurred before the American merger" and that "Plaintiffs have failed

to allege any plausible explanation as to how the American merger relates to this harm"); *see*

*also* Summary Judgment Decision at 44:13–17 (noting that the "declarations are filled with

complaints that do not appear on their face to be tied to the [M]erger, as well as the irrelevant

criticisms of other non-defendant airlines and comments about trips that took place long before

the [M]erger").

Named Plaintiffs' testimony is also riddled with other issues which greatly diminish its

persuasiveness. For example, multiple Named Plaintiffs testified to harms experienced on flights

and routes that fall outside of the scope of the relevant market and this proceeding, including

testimony concerning international flights as well as flights taken on city-pair routes not

identified by Dr. Lundgren as being presumptively illegal. *See, e.g.,* Hr'g Tr. at 164:21–165:20

(Mar. 11, 2019) (Russell alleging harm on a flight from Dallas to Fort Lauderdale, a route that

Dr. Lundgren did not argue was a city-pair that had experienced an increase in concentration); *id.*

at 201:4–15 (Fry acknowledging that only 2 of the last 38 flights he has flown were included in

Dr. Lundgren's report); *id.* at 236:15–19 (McCarthy acknowledging that only 6 of the 105 city-

pairs she alleged experienced harm were included in Dr. Lundgren's report); *id.* at 246:3–14

(McCarthy acknowledging that her written testimony included an international flight to Punta

Cana, Mexico); Hr'g Tr. at 583:25–584:3 (Mar. 12, 2019) (Brito acknowledging that the

majority of his flying is comprised of international travel); Hr'g Tr. at 744:23–745:9 (Mar. 13,

2019) (Talewsky acknowledging that the alleged harmful incident he suffered from occurred on

an international flight from Tokyo to Chicago).

Similarly, Named Plaintiffs testified to harms suffered on connecting flights, and failed to

tie those flights to the city-pairs identified by Dr. Lundgren. *See* Hr'g Tr. at 813:12–21 (Mar. 13,

2019) (Dr. Lundgren stating that his report covers solely city-pairs comprised of "ultimate origin

and destination of . . . flights," "[n]one of [which] would be connecting flights, in which you first

fly to an airport that's in between or somewhere and . . . then fly out to your ultimate

destination"); *but see, e.g.*, Hr'g Tr. at 204:4–8 (Mar. 11, 2019) (Fry acknowledging that his

flight from Tucson to Dallas/Fort Worth was in actuality the first leg of a connecting flight); *id.*

at 296:12–23 (Garavanian clarifying that a large number of city-pairs provided in his written

testimony were in actuality connecting flights).  Named Plaintiffs have also testified as to city-

pairs they intend to fly on in the future on a purely speculative basis with no concrete plans to do

so.  *See Malaney v. UAL Corp.*, No. 3:10-CV-02858-RS, 2010 WL 3790296, at *14 (N.D.Ca.

Sept. 27, 2010) (concluding that plaintiffs' affidavits stating an "unformed hope of future air

travel . . . [a] speculative and *de* minimis injury (assuming there would be injury) [are]

insufficient to establish irreparable harm"); *see also, e.g.,* Hr'g Tr. at 205:23–206:22 (Mar. 11,

2019) (Fry admitting that, with the exception of one flight, he had not purchased tickets or made

any concrete plans to visit any of the other roughly 33 cities he testified that he "may" travel to);

Hr'g Tr. at 787:13–20 (Mar. 13, 2019) (Stansbury stating that she had not actually booked travel

on those routes where she was a "potential city-pair consumer").  These issues raise questions concerning the credibility of certain Named Plaintiffs as well as their standing with respect to the relevant city-pairs.

In sum, Plaintiffs have failed to establish a causal relationship between the Merger and the Named Plaintiffs' alleged harms, rendering the Named Plaintiffs' testimony insufficient to establish a showing of the Merger's alleged anticompetitive impact.

### iii.  Plaintiffs' Evidence in Summary

For the reasons set forth above and based on the entire record before the Court, the Court concludes that Plaintiffs have not effectively rebutted Defendants' evidence and thus, fail to carry their ultimate burden to show that the effect of the Merger has been to substantially lessen competition.  *See, e.g.*, *Anthem,* 855 F.3d at 364 (evaluating the propriety of a proposed merger after "[h]aving considered the totality of circumstances") (citing *Baker Hughes*, 908 F.2d at 984); *Anthem*, 236 F. Supp. 3d at 180, 258–59 (determining whether plaintiffs have "met their ultimate burden of persuasion" based on the "entire record"); *H&R Block*, 833 F. Supp. 2d at 92 (utilizing a "totality of the evidence" approach to determine whether the anticompetitive effects were a likely result of the proposed merger).

## <u>CONCLUSION</u>

For the reasons set forth above, the Court denies Plaintiffs' request for permanent injunctive relief and grants judgment to the Defendants.  The Defendants should settle an order on 10 days' notice consistent with this Decision.  The proposed order must be submitted by filing a notice of the proposed order on the Case Management/Electronic Case Filing docket, with a copy of the proposed order attached as an exhibit to the notice.  A copy of the notice and proposed order shall also be served upon Plaintiffs' counsel.

Dated: New York, New York
          January 29, 2021

                                        /s/ Sean H. Lane
                                        UNITED STATES BANKRUPTCY JUDGE